James L. Day, (admitted *pro hac vice* )
Thomas A. Buford, AK Bar No. 1805046
Lesley Bohleber, (admitted *pro hac vice*)
Bush Kornfeld LLP
601 Union Street, Suite 5000
Seattle, WA 98101-2373
Telephone: (206)292-2110
Fax: (206) 292-2014
Email: jday@bskd.com;
tbuford@bskd.com; lbohleber@bskd.com
*Attorneys for Debtors*

HONORABLE GARY SPRAKER

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF ALASKA AT ANCHORAGE

| | |
|---|---|
| In re | Chapter 11 |
| WHITTIER SEAFOOD, LLC, [1] | Lead Case No. 24-00139 |
| Debtors. | Jointly Administered |

DECLARATION OF ALEKSEY KOZLOV IN SUPPORT OF WHITTIER SEAFOOD LLC AND SILVER WAVE LLC'S MOTION FOR ORDER (1) APPROVING THE SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES; (2) APPROVING THE ASSUMPTION AND ASSIGNMENT OF THE ARRC LEASE; (3) DETERMINING THAT BUYER QUALIFIES AS GOOD FAITH PURCHASER UNDER 11 U.S.C. SECTION 363(m); AND (4) AUTHORIZING DISTRIBTUIONS

I, ALEKSEY KOZLOV, declare as follows:

---

[1] The Debtors are Marine Fishing International, Inc. ("MFI Inc."), Case No. 24-00140; Marine Fishing International, LLC ("MFI LLC"), Case No. 24-00141; Modys, LLC ("Modys"), Case No. 24-00142; Salacia, LLC ("Salacia"), Case No. 24-00143; Silver Wave, LLC ("Silver Wave"), Case No. 24-00144; and Whittier Seafood, LLC ("Whittier") (collectively, the "Whittier Group").

DECLARATION OF ALEKSEY KOZLOV– Page 1

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

2837 ib24f401xz

1.      I am over the age of 18 and competent to testify to the matters herein.  I give this declaration based on my own personal knowledge of the matters stated herein, unless indicated otherwise. I make this Declaration in support of Whittier and Silver Wave's Motion for Order (1) Approving Sale of Assets Free and Clear of Liens; (2) Approving the Assumption and Assignment of the ARRC Lease; (3) Determining that Buyer Qualifies as Good Faith Purchaser; and (4) Authorizing Distributions (the "Motion"). Undefined capitalized terms shall have the same meaning as set forth in the Motion.

2.      I am the Authorized Person for the Sellers.

3.      Through counsel and Hilco, Sellers have negotiated the Purchase Agreements. True and correct copies of the Whittier and Silver Wave Purchase Agreements are attached hereto as Exhibits A and B, respectively.

4.      The Lady Angela and the Esther Point have been listed for sale by Dock Street since December 2023. Silver Wave did not receive any offers for either Vessel through Dock Street.

5.      Hilco has advised me that Buyer's offer is the highest and best offer received for the Acquired Assets.

6.      I believe that the sale of the Acquired Assets pursuant to the Purchase Agreements is in the best interest of their respective bankruptcy estates and will provide the maximum recovery for creditors.

7.      The Purchase Agreements have been negotiated and proposed in good faith after arm's-length bargaining by the parties.  All of the terms of the Proposed Sale are disclosed.

8.      Buyer was a prior customer of MFI, Inc. In 2023, Buyer purchased crab from MFI. Inc. for approximately $186,000.

DECLARATION OF ALEKSEY KOZLOV– Page 2

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

2837 ib24f401xz

9.    CMCC Seafood, an entity I believe to be affiliated with Buyer, was a prior customer of Whittier.  Between 2020 and 2024, CMCC Seafood purchased fish from Whittier with purchase orders totaling $4.6 million.

10.    The crab and fish sales to Buyer and CMCC Seafood were arms-length transactions.

11.    Other than as disclosed herein, neither Sellers nor my wife or I, have any connection or relationship with the Buyer.

12.    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


DATED in Bellevue, Washington, this 24th day of February 2025.

/s/
Aleksey Kozlov

DECLARATION OF ALEKSEY KOZLOV– Page 3

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

2837 ib24f401xz

# EXHIBIT A

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("**Agreement**") is entered into as of this 10th day of February by and between CMCC Co. Ltd, a private limited company incorporated under the laws of Hong Kong ("**Buyer**"), on the one hand, and Whittier Seafood, LLC, an Alaska Limited Liability Company ("**Seller**" or "**Whittier**"), on the other hand. (Each of Buyer and Seller is a "**Party**" and both are the "**Parties**").

## RECITALS:

A.       On August 19, 2024 ("**Petition Date**"), Whittier commenced the Chapter 11 Case by filing a voluntary petition for relief under chapter 7 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Alaska (the "**Court**"), and assigned case no. 24-00139 (the "**Bankruptcy Case**").

C.       Buyer desires to purchase from Seller, and Seller desires to sell, convey, assign and transfer to Buyer the Acquired Assets (defined below) pursuant to, *inter alia*, section 363 of the Bankruptcy Code, in the manner and subject to the terms and conditions set forth herein.

D.       The transaction(s) contemplated by this Agreement are subject to the approval of the Bankruptcy Court, pursuant to section 363 of the Bankruptcy Code, and may only be consummated pursuant to a final, non-appealable order entered by the Bankruptcy Court in the Chapter 11 Case approving the terms of this Agreement (the "**Sale Order**").

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE 1
## DEFINITIONS

**Section 1.1**       **Defined Terms.**  In addition to the capitalized terms defined elsewhere in this Agreement, the following terms have the following meanings:

(a)       "Accounts Receivable" means any amounts owed to Seller by a Customer.

(b)       "Acquired Assets" has the meaning set forth in Section 2.1.

(c)       "Administrative Books and Records" means any Books and Records as necessary to allow Seller to complete administration of the Bankruptcy Case, including but not limited to completion of any required Tax returns, review and resolution of claims filed in the Bankruptcy Case, pursuit of any claims against third parties, administering any rights under insurance policies, and other similar issues necessary to complete administration of the Bankruptcy Case.

(d)       "Agreement" has the meaning set forth in the Preamble.

(e)      "ARRC Lease" means the ground lease for the real property upon which the Processing Plant sits, located on the north side of Whittier Street between Glacier and Eastern Streets in Whittier, Alaska, that is the subject of the ground lease between Alaska Railroad Corporation and Great Pacific Seafoods, Inc. dated October 22, 1990, ARRC Contract No. 6299, as amended by Supplements 1, 2, 3, and 4 dated October 24, 1990; December 17, 1991; July 7, 2008; May 8, 2017 respectively; and as assigned to Seller pursuant to the Assignment of Lease by Operation of Law, Supplement No. 4 to ARRC contract No.6299; and thereafter administered as ARRC Contract No. 0286 as amended by Supplement No 1 to ARRC Contract No. 0286 dated June 29, 2018.

(f)      "Assumed Executory Contracts" has the meaning set forth in Section 2.2(a).

(g)      "Assumed Lease" has the meaning set forth in Section 2.2(a).

(h)      "Assumed Liabilities" means the obligations under the Assumed Executory Contracts and other obligations assumed by the Buyer as set forth in Section 2.2, below.

(i)      "Bid Procedures" means the Bid Procedures approved by the Court on or about January 14, 2025, in the form attached as Schedule 1.1(i), that govern the process and procedures for another interested buyer to submit a bid higher than the Buyer's offer contained herein, including an auction to the extent that one or more higher bids are submitted.

(j)      "Books and Records" means all books and records pertaining to the Acquired Assets of any kind, wherever located.

(k)      "Business Day" means any day excluding Saturday, Sunday, any legal holiday under the laws of the State of Alaska or a day on which banks located in the State of Alaska are required by law or other governmental action to close.

(l)      "Buyer" has the meaning set forth in the Preamble.

(m)      "Closing" has the meaning set forth in Section 3.1.

(n)      "Closing Date" means the date on which Closing occurs, which shall be the earlier of April 30, 2025 or ten calendar days after entry of the Sale Order, unless a later date is agreed to by the Seller and Buyer in writing.

(o)      "Cure Costs" means cure obligations, costs, and fees due with respect to the Assumed Executory Contracts in the amounts set forth on Schedule 2.2;

(p)      "Customer" means each of Seller's customers.

(q)      "Damages" has the meaning set forth in Section 9.2(d).

(r)      "Deposit" has the meaning set forth in Section 2.5.

(s)      "Deposit Agent" means the law firm of Bush Kornfeld LLP.

(t)  "Excluded Assets" has the meaning set forth in Section 2.3.

(u)  "Execution" means the time that both Buyer and Seller have executed this Agreement.

(v)  "Existing Contract" means any oral or written contract, agreement, real or personal property lease, sublease, license, distribution arrangement, sale and purchase agreement, or purchase and sale order to which Seller is a party.

(w)  "Governmental Authority" means any foreign or United States federal, state, or local government, governmental regulatory, or administrative authority, agency, or commission, or any court, tribunal, or judicial or arbitral body.

(x)  "Knowledge" means the actual knowledge of the Party's officers after reasonable inquiry.

(y)  "Lease" means the leases to which Seller is a party listed on Schedule 2.2.

(z)  "Liabilities" mean all liabilities and obligations (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, due or not yet due), including all liabilities for Taxes with respect to periods before the Closing Date, including periods before the Petition Date.

(aa)  "License" means the licenses to which Seller is a licensor listed on Schedule 2.2.

(bb)  "Lien" means any lien (statutory or otherwise), hypothecation, encumbrance, security interest, interest, mortgage, deed of trust, pledge, restriction, charge, instrument, license, preference, priority, security agreement, Tax (including foreign, federal, state, or local Tax), order of any Governmental Authority, of any kind including, without limitation: (i) any assignment or deposit arrangement in the nature of a security device; (ii) any claim based on the theory that Buyer is a successor of Seller; and (iii) any leasehold interest, license, or other right, in favor of a third party or Seller, to use any portion of the Acquired Assets, whether secured or unsecured, choate or inchoate, contingent or non-contingent.

(cc)  "Fisherman Receivables" means certain outstanding obligations from individuals pursuant to certain promissory notes, harvest advance agreements, and/or preferred ship mortgages in favor of Seller as set forth in Schedule 1.1(cc).

(dd)  "Party" or "Parties" has the meaning set forth in the preamble to this Agreement.

(ee)  "Permit" means all licenses, permits, franchises, approvals, authorizations, consents or orders of, filings with, or notifications to, any Governmental Authority, whether foreign, provincial, municipal, federal, state, or local, necessary for the past or present conduct or operation of Seller's business.

3

(ff)    "Person" means any individual, corporation, partnership, limited liability company, trust, association, joint venture, or other entity of any kind.

(gg)    "Personal Property Taxes" has the meaning set forth in Section 3.4(a).

(hh)    "Processing Plant" means the building and improvements situated on the real property that is subject to the ARRC Lease.

(ii)    "Purchase Price" has the meaning set forth in Section 2.5(a).

(jj)    "Purchase Price Allocation Schedule" has the meaning set forth in Section 2.6.

(kk)    "Representative" means any attorney, accountant, agent, independent contractor, or other representative.

(ll)    "Sale Hearing" means the hearing of the Court to approve this Agreement and its contemplated transactions.

(mm)    "Sale Order" means the order of the Court, in the form and substance attached as Schedule 1.1(mm) hereto (or, if revised, reasonably acceptable to Buyer), entered by the Court pursuant to section 363(b) of the Bankruptcy Code: (i) approving this Agreement and its contemplated transactions; (ii) approving the sale of the Acquired Assets to Buyer free and clear of all Liens pursuant to section 363(f) of the Bankruptcy Code; (iii) approving Seller's assumption and assignment to Buyer of the Assumed Executory Contracts pursuant to section 365 of the Bankruptcy Code; (iv) assuming and assigning the Assumed Executory Contracts such that the Assumed Executory Contracts will be in full force and effect from and after the Closing; (v) finding that Buyer is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code; (vi) confirming that Buyer is acquiring the Acquired Assets free and clear of the Unassumed Liabilities; and (vii) retaining jurisdiction of the Court to interpret and enforce the terms and provisions of this Agreement and the Sale Order.

(nn)    "Schedules" means the Schedules attached to this Agreement.

(oo)    "Tax" means any tax, duty, charge, fee, levy, penalty, or other assessment imposed by any Governmental Authority, including income, profit, provisional, salary, estate, excise, property, sales, use, occupation, transfer, franchise, payroll, windfall or other profits, alternative minimum, gross receipts, intangibles, capital stock, estimated, employment, unemployment compensation or net worth, environmental, ad valorem, stamp, value-added or gains tax, capital duty, registration and documentation fees, custom duties, tariffs and similar charges, withholding, payroll, social security contributions or charges, disability, or other taxes (including any fee, assessment or other charge in the nature of or in lieu of any tax), including any interest, penalties, or additions attributable thereto, and any liability to make payment by way of reimbursement, recharge, indemnity, damages or management charge related to taxes and regardless of whether such amounts are chargeable directly or primarily against Seller.

(pp)    "Unassumed Liabilities" has the meaning provided for in Section 2.4.

## ARTICLE 2
## PURCHASE AND SALE

**Section 2.1      Transfer of Assets.**  Pursuant to the terms and conditions of this Agreement, at the Closing Seller will sell, convey, transfer, assign, and deliver (or cause to be sold, conveyed, transferred, assigned, and delivered) to Buyer, free and clear of all Liens, and Buyer will acquire and accept from Seller, all right, title, and interest in and to, the following assets (collectively, the "Acquired Assets"):

(a)     all Seller's interests in and under the Assumed Executory Contracts;

(b)     the Processing Plant;

(c)     all deposits or prepayments relating to the Assumed Executory Contracts;

(d)     except in connection with the Seller's rights, defenses and objections in connection to claims filed in the Bankruptcy Case, all of Seller's rights, claims, credits, immunities, defenses, or rights of set-off against third parties (excluding former and present employees of Seller) relating to the Acquired Assets including, but not limited to, unliquidated rights under warranties;

(e)     all of Seller's equipment including, but not limited to, all the equipment described on Schedule 2.1(e);

(f)     all of Seller's real property described on Schedule 2.1(f);

(g)      all of Seller's Fisherman Receivables described on Schedule 1.1(cc); and

(h)     all of Seller's tangible personal property located at (1) the Processing Plant and (2) the real property described on Schedule 2.1(f) not described above and except for Excluded Assets, as set forth in Section 2.3.

**Section 2.2      Assignment and Assumption of Executory Contracts and Liabilities.**

(a)     Schedule 2.2 sets forth each Contract, Lease, and License to be assumed by Seller and assigned to Buyer at Closing.  Each Lease set forth on Schedule 2.2 is referred to in this Agreement as an "Assumed Lease."  Each Contract set forth on Schedule 2.2 is referred to in this Agreement as an "Assumed Contract."  Each License set forth on Schedule 2.2 is referred to in this Agreement as an "Assumed License." Together, the Assumed Contracts and the Assumed Licenses are referred to in this Agreement as the "Assumed Executory Contracts."  Notwithstanding anything to the contrary herein, Buyer has the right in its sole and absolute discretion to remove any Assumed Executory Contract from Schedule 2.2 prior to the Sale Hearing  and with respect to such Assumed Executory Contract so removed from Schedule 2.2, **_however,_** the Cure Costs associated with any Assumed Executory Contract removed prior to Closing shall be added to the cash portion of the Purchase Price set forth in Section 2.5(a).

(b)     On the Closing Date, Seller shall assume and assign to Buyer the Assumed Executory Contracts and Buyer shall pay in full the Cure Costs related to the Assumed Executory Contracts.

(c)     Buyer assumes all Seller's obligations arising under the Assumed Executory Contracts after Closing.

(d)     Buyer assumes the following liabilities related to the Acquired Assets arising before or after Closing, as specified: i) warranties whenever arising; and ii) all other claims arising after Closing.

(e)     Buyer assumes, at Closing, all obligations to pay the amounts due to the creditors specified on Schedule 2.2(e).

(f)     This <u>Section 2.2</u> does not limit any claims or defenses Buyer may have against any party other than Seller.  The transactions contemplated by this Agreement in no way expand the rights or remedies of any third party against Buyer or Seller as compared with the rights and remedies such third party would have had against Seller absent the Bankruptcy Case had Buyer not assumed such Assumed Liabilities.  Buyer shall indemnify Seller with respect to the Assumed Liabilities, including defense of any action by any third party to seek recovery from Seller of the Assumed Liabilities.

Section 2.3     **Excluded Assets.**  Notwithstanding anything to the contrary in this Agreement, all assets that are not Acquired Assets, including the following assets are retained by Seller and are not being sold or assigned to Buyer under this Agreement (the "<u>Excluded Assets</u>"):

(a)     cash, cash equivalents, deposits (except those described in <u>Section 2.1</u> above, investment securities, and bank accounts;

(b)     all Existing Contracts that are not Assumed Executory Contracts;

(c)     computers and servers necessary to allow Seller to complete its required Tax returns and the administration of the Bankruptcy case;

(d)     the Administrative Books and Records, and other documents relating solely to the organization, maintenance, and existence of Seller as limited liability company;

(e)     Seller's personnel records;

(f)     all refunds, rebates, credits, and other amounts due to Seller related to any Taxes or that arise out of Seller's operation of its business;

(g)     all benefit plans to which Seller is a party and all related rights except to the extent assumed by Buyer;

(h)     all causes of action held by Seller before the Closing including, but not limited to, all actions arising under the Bankruptcy Case;

(i)      all rights under any insurance policy maintained by Seller;

(j)      Seller's ownership in any subsidiary;

(k)      any rights of Seller under this Agreement;

(l)      The anhydrous ammonia tank on Sellers Property (MSI 375-25 or MSI375-97), which is the property of Multifrost, Inc.; and

(m)      Accounts Receivable.

**Section 2.4**      **No Other Liabilities Assumed.**  Other than the Assumed Liabilities, the Cure Costs, or as otherwise set forth in this Agreement, Buyer shall not assume or be bound by or be obligated or responsible for any duties, responsibilities, commitments, expenses, obligations or any other Liability of Seller (the "Unassumed Liabilities").

**Section 2.5**      **Purchase Price.**

(a)      Purchase Price.  The "Purchase Price" for the Acquired Assets shall be $4,413,456 and is comprised of: i) $4,400,003 to be paid, in cash, at Closing; and ii) the total Cure Amounts in the amount of $13,453  to be paid by Buyer.

(i)      Deposit.  Before or contemporaneously with Execution, Buyer has paid to Deposit Agent $440,000 to be held and released in accordance with the terms of this Agreement (the "Deposit").

**Section 2.6**      **Allocation Schedule.**  The Parties agree that the Purchase Price will be allocated among the Acquired Assets in accordance with their relative fair market values as set forth in Schedule 2.6 in compliance with the Bid Procedures. If the Parties are unable to resolve the issues concerning Purchase Price allocation by agreement, they shall submit the allocation matter to the Court for final determination in conjunction with the Sale Notice and Motion, which determination shall be binding and not subject to appeal.  Seller and Buyer must prepare mutually-acceptable and substantially identical initial and supplemental Internal Revenue Service Forms 8594 "Asset Acquisition Statements under 1060" consistent with the Purchase Price Allocation Schedule (giving effect to mutually agreed-on adjustments through the allocations set forth in the Purchase Price Allocation Schedule as a result of any required adjustments to the Purchase Price).

**ARTICLE 3**
**CLOSING**

**Section 3.1**      **Closing.**  On the terms and conditions set forth in this Agreement and in the Sale Order, the closing of the transactions contemplated by this Agreement (the "Closing") will be completed virtually by the parties or held at the offices of Bush Kornfeld LLP, 601 Union Street, Suite 5000, Seattle, Washington (or other location identified by Seller) no later than the Closing Date if all conditions set forth in ARTICLE 7 and ARTICLE 8 below are either satisfied or waived.  The Parties agree to expeditiously seek approval of the Sale Order.

2837 ib24g801xc

Notwithstanding the foregoing, the Closing may be held at another time and place mutually agreeable to the Parties.

<strong>Section 3.2          Actions at Closing.</strong>

(a)      <u>Documents and Possession</u>.  At Closing, Seller must deliver or cause to be delivered to Buyer:

(i)      one or more bills of sale, assignments, documents necessary to transfer the Acquired Assets, all consistent with the terms of this Agreement and otherwise in a form reasonably acceptable to Buyer, conveying in the aggregate all of the Acquired Assets, duly executed by Seller;

(ii)      a copy of the Sale Order;

(iii)      the Books and Records relating to the Acquired Assets; and

(iv)      appropriate documents providing for the assumption and assignment of the Assumed Executory Contracts duly executed by Seller.

(b)      <u>Payment</u>.  Buyer must deliver to Seller the Purchase Price (determined in accordance with <u>Section 2.5</u>) *less* an amount equal to the Deposit by wire transfer at Closing of immediately available funds to the account that Seller designates in writing not less than one Business Day before the Closing.

(c)      <u>Form of Documents</u>.  If a form of any document to be delivered under this Agreement is not attached as an exhibit to this Agreement, that document must be created, executed, and delivered in form and substance and in a manner reasonably and mutually satisfactory to the Parties.

<strong>Section 3.3          Transaction Expenses.</strong>  Except as expressly provided in this Agreement, each Party bears its own costs and expenses, including attorney, accountant, and other independent contractor fees, in connection with the execution and negotiation of this Agreement and the consummation of its contemplated transactions.

<strong>Section 3.4          Prorations.</strong>

(a)      <u>Personal Property Taxes</u>.  Ad valorem personal property taxes associated with the Acquired Assets (the "<u>Personal Property Taxes</u>") that are periodically imposed and are payable for a tax period that includes (but does not end on) the Closing Date are prorated as of the Closing Date. Seller bears the proportion of, and has the sole responsibility for, such taxes equal to a fraction, the numerator of which is equal to the number of days elapsed from the beginning of the applicable tax period to the Closing Date and the denominator of which is the number of days in the entire applicable tax period. Buyer is responsible for the remainder.

(b)      <u>Post-Closing Tax Responsibility</u>.  Unless otherwise provided to the contrary in this Agreement, Buyer is solely responsible for Taxes relating to the Acquired Assets applicable

8

to or arising from the Post-Closing Period, including any transfer taxes, and the Seller is solely responsible for Taxes relating to the Acquired Assets applicable to or arising before the Closing.

(c)    <u>Utilities</u>.  Seller must attempt to obtain final meter readings for utilities at the locations that are the subject of Assumed Leases and other all real property listed on Schedules 2.1(f) and 2.2 as of the Closing Date and must pay for all utilities to the Closing Date.  If it is not practicable to obtain the meter reading for any utility as of the Closing Date or there are un-metered utilities, then as soon as all such utility bills are finally received, Seller and Buyer must, on a pro rata basis using the actual number of days of the year and month that have elapsed as of the Closing Date (including the Closing Date), pay their respective shares of such bills.

(d)    <u>Prorations Generally; Percentage Rents</u>.

(i)    Any other payments with respect to the Assumed Leases, including all common area costs and costs under the Assumed Leases, must be prorated between Buyer and Seller on the Closing Date or as soon after as is reasonably practicable with the Seller responsible for the prorated portion of any such payments through the day before the Closing Date.  Seller is responsible for any penalties and interest payable for rent or other items under each Assumed Lease when due as a result of Seller's underpayment or late payment before the Closing. Buyer is responsible for any such amounts in respect of the Post-Closing Period.

(ii)    If any of the items described above cannot be finally apportioned at the Closing because of the unavailability of the amounts to be apportioned or otherwise, or are incorrectly apportioned at or after Closing, such items must be apportioned or reapportioned, as the case may be, as soon as practicable after the Closing or the date such error is discovered or the event giving rise to an apportionment or reapportionment occurs, as applicable.

(iii)    For purposes of calculating prorations, the Seller is deemed to have possession of the real property listed on Schedule 2.2(f) and the real property subject of an Assumed Lease up to and including the Closing Date. All such prorations must be made on the basis of the actual number of days of the year and month elapsed as of the Closing.

**Section 3.5      Possession and Risk of Loss.**  Buyer will be deemed to have taken possession of the premises listed on Schedule 2.2(f) and the premises that are the subject of the Assumed Leases (each, an "<u>Assumed Leased Location</u>"), together with title and possession of all Acquired Assets, wherever located, on the Closing Date.  Buyer assumes all risk of loss by fire or other casualty and all risks relating to all the Acquired Assets and the Assumed Leased Locations on the Closing Date and after.

## ARTICLE 4
## SELLER'S REPRESENTATIONS AND WARRANTIES

As an inducement to Buyer to enter into this Agreement, Seller represents and warrants to Buyer that:

**Section 4.1    Organization and Authorization.**  Seller has all necessary power and authority to enter into this Agreement and has taken all company action necessary to execute and deliver this Agreement, to consummate the transactions contemplated by this Agreement, and to

perform Seller's obligations under this Agreement. No other company proceedings on Seller's part are necessary to authorize the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated by this Agreement.  This Agreement has been duly executed and delivered by Seller and is a valid and binding obligation of Seller, enforceable against it in accordance with its terms.  Each agreement or instrument that has been or will be entered into or executed and delivered by Seller in connection with the transactions contemplated by this Agreement has been (or will be) duly authorized, executed and delivered by Seller, and is (or will be when authorized, executed and delivered) a valid and binding obligation of Seller, enforceable against it in accordance with its terms.

Section 4.2        **No Violation.**  Except to the extent not enforceable due to operation of applicable bankruptcy law or the Sale Order, the execution, delivery, and performance of this Agreement and the consummation of its contemplated transactions by Seller do not and will not   require any authorization, consent, approval, exemption, or other action by or notice or declaration to, or filing with, any court or administrative or other Governmental Authority or any third party, including, without limitation, under the provisions of Seller's operating agreement or other constitutive documents.

Section 4.3        **Governmental Consents and Approvals.**  Except for the Sale Order, to Seller's Knowledge, there are no consents, waivers, agreements, approvals, permits, or authorizations of, or declarations, filings, notices, or registrations to or with, any Governmental Authority required to be made or obtained by Seller in connection with the execution, delivery, and performance of this Agreement and the consummation of its contemplated transactions.

Section 4.4        **Title to Assets.**

(a)        Seller has good and marketable title to the Acquired Assets.

(b)        Subject to Court approval, Seller has the power and the right to sell, assign, and transfer, and Seller will sell and deliver to Buyer and, on consummation of the transactions contemplated by this Agreement, Buyer will acquire, good and marketable title to the Acquired Assets free and clear of all Liens.

Section 4.5        **As Is.**  Except as expressly set forth in this Agreement, the Acquired Assets are sold "***As Is, Where Is***." Except for the representations and warranties expressly set forth in this ARTICLE 4, Seller neither makes nor implies any other representation or warranty, including a warranty of fitness for a particular purpose or a warranty of merchantability, in connection with any of the Acquired Assets.

Section 4.6        **Personal Property Taxes.**  All Personal Property Taxes that are the responsibility of Seller under Section 3.4 above have been paid or will be paid in full as of the Closing.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF BUYER

As an inducement to Seller to enter into this Agreement, Buyer represents and warrants to Seller that:

2837 ib24g801xc

**Section 5.1        Organization.**  Buyer is a corporation duly organized, validly existing, and in good standing under the laws of the Special Administrative Region of Hong Kong, China.

**Section 5.2        Authorization.**  Buyer has all necessary power and authority to enter into this Agreement and has taken all company action necessary to execute and deliver this Agreement, to consummate the transactions contemplated by this Agreement, and to perform Buyer's obligations under this Agreement. No other company proceedings on Buyer's part are necessary to authorize the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated by this Agreement.  This Agreement has been duly executed and delivered by Buyer and is a valid and binding obligation of Buyer, enforceable against it in accordance with its terms.  Each agreement or instrument that has been or will be entered into or executed and delivered by Buyer in connection with the transactions contemplated by this Agreement has been (or will be) duly authorized, executed and delivered by Buyer, and is (or will be when authorized, executed and delivered) a valid and binding obligation of Buyer, enforceable against it in accordance with its terms.

**Section 5.3        Governmental Consents and Approvals.**  To Buyer's Knowledge, other than the Sale Order, no consent, waiver, agreement, approval, permit, or authorization of, or declaration, filing, notice or registration to or with, any United States federal or state governmental or regulatory authority is required to be made or obtained by Buyer in connection with the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated by this Agreement.

**Section 5.4        No Violation.**  The execution and delivery of this Agreement and the other agreements specified in it and the consummation of the transactions contemplated by this Agreement do not and will not (a) violate any provision of Buyer's organizational documents or (b) conflict with or violate any statute or law, or any judgment, decree, order, regulation, or rule of any court or Governmental Authority binding on or applicable to Buyer or by which the property or assets of Buyer are bound or affected.

## ARTICLE 6
## ADDITIONAL COVENANTS

**Section 6.1        Further Assurances.**

(a)        Buyer and Seller shall use commercially reasonable efforts to timely obtain any consent, provide necessary information, or address any other issues required for the consummation of the transactions contemplated by this Agreement.

(b)        Buyer and Seller will execute any documents and use commercially reasonable efforts to take or cause to be taken all actions necessary, proper, or advisable to consummate the transactions contemplated by this Agreement but neither Buyer nor Seller is required to make any payments to any party, except as set forth in this Agreement.

## ARTICLE 7
## CONDITIONS TO SELLER'S OBLIGATIONS

The obligation of Seller to sell the Acquired Assets and to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or before the Closing Date, of each of the following conditions, any of which Seller may waive (in whole or in part) in accordance with Section 10.4 below.

**Section 7.1        Covenants and Representations.**    Each of Buyer's representations and warranties contained in ARTICLE 5 above are true in all material respects as of the Closing Date as though made on that date (except that representations and warranties explicitly made as of a specific date need only be true as of that specific date), and the Buyer has performed in all material respects all covenants, agreements, and conditions required by this Agreement to be performed, satisfied, and complied with by Buyer on or before the Closing.

**Section 7.2        Litigation.**    No action, suit, or other proceeding is pending before any Governmental Authority seeking or threatening to restrain, seek damages in respect of, or prohibit the consummation of the transactions contemplated by this Agreement.

**Section 7.3        Court Approval.**    The Court has entered the Sale Order.

**Section 7.4        Closing.**    The Closing has occurred on or before the Closing Date.

**Section 7.5        Deliveries.**    On or before the Closing Date, Buyer has delivered to Seller all of the following:

(a) a certificate from Buyer in a form reasonably satisfactory to Seller, dated as of the Closing Date, stating that the conditions specified in Section 7.1 above have been satisfied; and

(b) the Purchase Price.

## ARTICLE 8
## CONDITIONS TO BUYER'S OBLIGATIONS

The obligations of Buyer to purchase the Acquired Assets and to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or before the Closing Date, of each of the following conditions, any of which Buyer may waive (in whole or in part) in accordance with Section 10.4 below:

**Section 8.1        Representations, Warranties and Covenants.**    Each of Seller's representations and warranties contained in ARTICLE 4 above are true in all material respects as of the Closing Date as though made on that date (except that representations and warranties that are expressly made as of a specific date need only be true as of that specific date), and the Seller has performed in all material respects all covenants, agreements, and conditions required by this Agreement to be performed, satisfied, and complied with Seller on or before the Closing Date.

**Section 8.2        Litigation.**  No action, suit, or other proceedings is pending before any Governmental Authority seeking or threatening to restrain, seek damages in respect of, or prohibit the consummation of the transactions contemplated by this Agreement.

**Section 8.3        Court Approval.**  The Sale Order shall have been entered and shall not be subject to a court order staying the effect of the Sale Order.

**Section 8.4        Approvals and Consents.**  All necessary consents, including any deemed consents as set forth in the Sale Order, have been duly obtained, made or given, and are not subject to the satisfaction of any condition that has not been satisfied or waived.

**Section 8.5        Deliveries.**  On or before the Closing Date, Seller has delivered to Buyer all of the following:

(a) a certificate in a form reasonably satisfactory to Buyer, dated as of the Closing Date, stating that the conditions specified in <u>Section 8.1</u> have been satisfied; and

(b) the documents and instruments called for in <u>Section 3.2(a)</u> above.

## ARTICLE 9
## TERMINATION; REMEDIES

**Section 9.1        Termination.**  This Agreement may be terminated, in writing, at any time before Closing:

(a)        by mutual written consent executed by both Buyer and Seller;

(b)        by Buyer if Seller is in material breach of any material covenant, representation, undertaking or warranty that would prevent a condition in Article 8 from being satisfied, and, if curable, is not cured within ten (10) Business days after written notice from Buyer, or if a condition set forth in ARTICLE 8 is impossible (other than through the failure of Buyer to comply with its obligations under this Agreement) to satisfy and Buyer has not waived such condition in writing on or before the Closing Date;

(c)        by Seller if Buyer is in material breach of any material covenant, representation or warranty that would prevent a condition in Article 7 from being satisfied, and, if curable, is not cured within ten (10) Business days after written notice from Seller, or if it appears that a condition set forth in ARTICLE 7 is impossible (other than through the failure of Seller to comply with its obligations under this Agreement) to satisfy and Seller has not waived such condition in writing on or before the Closing Date; and

(d)        by both Buyer and/or Seller upon Seller's closing of the sale of all or substantially all of the Acquired Assets to a party or parties other than Buyer pursuant to one or more Overbids; and

(e)        by either party if the Closing has not occurred on or before April 30, 2025, or ten days after entry of the Sale Order, whichever is later, unless a later date is agreed in writing by the Parties.

**Section 9.2        Obligations on Termination.**  If this Agreement terminates under Section 9.1 above:

(a)        each Party must redeliver to the furnishing Party all documents, work papers, and other material of the other Party relating to the transactions contemplated by this Agreement, whether obtained before or after Execution;

(b)        all obligations of the Parties under this Agreement terminate, except as set forth in this Section 9.2;

(c)        neither Party has any liability to the other Party except for any obligation to pay any damages (which may be limited to the Deposit under subsection (e) below) awarded by the Court associated with a Party's breach of this Agreement ("Damages");

(d)        except for any Damages, each Party bears its own expenses incurred in connection with the negotiation, preparation, execution, and performance of this Agreement;

(e)        if Seller terminates this Agreement because Buyer fails to close without justification and Seller is unable to close a transaction for the Acquired Assets to another buyer pursuant to a Back-Up Bid (as contemplated by the Bid Procedures), Seller may seek an order from the Court for specific performance of this Agreement, including instructing the Deposit Agent to pay Seller the Deposit as liquidated damages on account of Buyer's breach;

(f)        unless used to pay Damages to Seller, the Deposit Agent must return the Deposit to the Buyer within one Business Day of the date of termination; and

(g)        the Deposit Agent's obligations regarding the Deposit under this Section 9.2 survive termination of this Agreement.

**ARTICLE 10**
**MISCELLANEOUS**

**Section 10.1        Assignment; Successors.**  Neither this Agreement nor any of the rights or obligations under it may be assigned by either Party without the other Party's prior written consent, but: (a) Buyer may assign some or all of its rights under this Agreement to any of its Affiliate so long as Buyer remains liable for its obligations; and (b) Buyer may assign its rights under this Agreement as collateral security to any lender providing Buyer with acquisition financing. Subject to the foregoing, this Agreement binds and inures to the benefit of the Parties and their respective representatives, heirs, legatees, successors, and permitted assigns. No other person has any right, benefit, or obligation under this Agreement.

**Section 10.2        Notices.**  All notices, requests, demands, and other communications given under this Agreement must be in writing and are deemed given: (a) if personally delivered, when received; (b) if transmitted by email, on receipt of delivery confirmation; (c) if sent for next-day delivery to a domestic address by recognized overnight delivery service (*e.g.*, Federal Express), on the day after sending; and (c) if sent by certified or registered mail, return receipt requested, when received.  Notices, demands, and communications must be sent to the following addresses:

2837 ib24g801xc

If to Buyer:

CMCC Co. Ltd
Unit 2508A 25th Floor,
Bank of America Tower,
12 Harcourt Road, Central Hong Kong

If to Seller:

Whittier Seafood, LLC
Attn: Aleksey Kozlov
3 Lake Bellevue Drive, Suite 201
Bellevue, WA 98005
Email: Alekseyk@marinefishingint.com


With a copy to:

Bush Kornfeld LLP
601 Union Street, Suite 5000
Seattle, WA 98101
Attn:  Jim Day
Email: jday@bushkornfeld.com


or to any other address or email address as a Party may designate by written notice to the other Party.

        **Section 10.3     Choice of Law; Submission to Jurisdiction.**   This Agreement must be construed and interpreted, and the rights of the parties determined in accordance with, the laws of the State of Alaska.  Each Party irrevocably consents to the service of any process in any action or proceeding arising out of or relating to this Agreement by the mailing of copies of such process to each Party at its address specified in <u>Section 10.2</u> above.  The Parties irrevocably submit to the exclusive jurisdiction of the Court (or any court exercising appellate jurisdiction over the Court) over any dispute arising out of or relating to this Agreement, the Sale Order, or any other agreement or instrument contemplated by or entered into in connection with this Agreement or the Sale Order.  Each Party irrevocably agrees that any claim in respect of any such dispute or proceedings may be heard and determined in the Court.  The Parties irrevocably waive to the fullest extent permitted by applicable law any objection to the venue or any defense of inconvenient forum relating to any such dispute or proceeding brought in the Court.

        **Section 10.4     Entire Agreement; Amendments and Waivers.**   This Agreement, together with all its Exhibits and Schedules, constitutes the entire agreement among the Parties pertaining to this Agreement's subject matter and supersedes all prior agreements, understandings, negotiations, and discussions, whether oral or written, with regard to this Agreement's subject matter.  No amendment of this Agreement is effective unless executed in writing by both Parties.  No waiver of any of this Agreement's provisions is effective unless made in a writing by the waiving Party. No waiver of any single provision of this Agreement constitutes either a waiver of any other of this Agreement's provisions (whether or not similar) or a continuing waiver unless otherwise expressly provided.

        **Section 10.5     Construction.**  The headings and captions of the various Articles and Sections of this Agreement have been inserted solely for purposes of convenience,

are not part of this Agreement, and may not be deemed in any manner to modify, explain, expand, or restrict any of the provisions of this Agreement.  Unless stated to the contrary, all references in this Agreement to Articles, Sections, paragraphs, sentences, or clauses are to the specified Article, Section, paragraph, sentence, or clause of this Agreement, and all references to Exhibits and Schedules are to the specified Exhibits and Schedules attached to this Agreement, all of which constitute a part of this Agreement.  All terms defined in this Agreement have the same meanings in the Exhibits and Schedules except as otherwise provided in the Exhibits and Schedules.

> **Section 10.6      No Third Party Beneficiaries.**  No Person other than the Parties have any rights or claims under this Agreement.

> **Section 10.7      No Waiver.**  The failure of either Party to seek redress for any breach, or to insist on the strict performance, of any covenant or condition of this Agreement by the other Party does not waive the breach or failure to perform nor prevent a subsequent act or omission in violation of, or not strictly complying with, the terms of this Agreement from constituting a default under this Agreement.

> **Section 10.8      Counterparts.**  This Agreement may be executed in one or more counterparts, each of which constitutes an original and all of which, taken together, constitute one instrument.

> **Section 10.9      Delivery by Email.**   This Agreement and any other agreement or instrument entered into in connection with or contemplated by this Agreement, and any amendments, if signed and delivered by email, must be treated in all respects as an original, legally-binding agreement or instrument as if it were the original delivered in person.  No Party may raise the use of email to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through email as a defense to enforceability.

> **Section 10.10      Invalidity.**  The invalidity, illegality, or unenforceability of any portion of any provision of this Agreement or any instrument referred to in this Agreement does not affect the validity, legality, and enforceability of any other portion of any other provision of this Agreement or such instrument.

> **Section 10.11      Further Assurances.**  Without limiting any other rights or obligations of the Parties contained in this Agreement, following the Closing, each Party agrees to execute or cause to be executed any documents, instruments, or conveyances and to take any actions reasonably requested by the other Party to effectuate the purposes of this Agreement including, without limitation, any instruments Buyer reasonably requests to vest Buyer with title to the Acquired Assets in accordance with this Agreement.

> **Section 10.12      Cumulative Remedies.**  All rights and remedies of either Party under this Agreement are cumulative of each other and of every other right or remedy that Party may otherwise have at law or in equity. The exercise of one or more rights or remedies does not affect the concurrent or subsequent exercise of any other rights or remedies.

> **Section 10.13      Currency.**  Except as otherwise expressly provided in this Agreement, all dollar amounts are stated in United States dollars.

2837 ib24g801xc

**Section 10.14**     **Representation by Counsel; Mutual Negotiation.**  Each Party has been represented by or had the opportunity obtain counsel of its choice in negotiating this Agreement.  This Agreement has been negotiated and prepared at the Parties' joint request, direction, and construction, at arm's length, with the advice and participation of counsel, and must be interpreted in accordance with its terms without favor to either Party.

**Section 10.15**     **Post-Closing Dispute Resolution.**  Either Party may submit to the Court any controversy, claim, or dispute arising out of or relating to this Agreement after the Closing that is not resolved within 30 days after written notice to the affected party of such controversy, claim, or dispute.  The Court shall have exclusive jurisdiction to resolve any such controversy, claim, or dispute.  The prevailing Party is entitled to its reasonable attorneys' fees and costs as determined and awarded by the Court.

**Section 10.16**     **Transfer Taxes.**  Buyer is responsible for and must pay any transfer, sales, use, or other such Taxes or fees required to be paid with respect to this Agreement or the sale of the Acquired Assets to Buyer.

The Parties have caused this Agreement to be executed by their respective duly-authorized officer as of the day and year first above written.

**(SIGNATURES ON FOLLOWING PAGE)**

**Whittier Seafood, LLC**


By:_____
    Aleksey Kozlov
Its: Authorized Person



**CMCC Co. Ltd**


By:_____
    Jordan Li
Its:_____

[Signature Page to Asset Purchase Agreement]

## SCHEDULES

Schedule 1.1(i)        Bid Procedures

Schedule 1.1(mm)    Sale Order

Schedule 1.1(cc)      Fisherman Receivables

Schedule 2.1(e)        Equipment [Fixed Asset Schedule]

Schedule 2.1(f)        Real Property

Schedule 2.2            Contracts, Leases and Licenses

Schedule 2.2(e)        Assumed Creditor Liabilities

Schedule 2.6            Allocation of Purchase Price

2837 ib24g801xc

**SCHEDULE 1.1(i)**


**Bid Procedures**

## SCHEDULE 1.1(mm)

**Sale Order**

## SCHEDULE 1.1(cc)

**Fisherman Receivables**

## SCHEDULE 2.1(e)

## Equipment [Fixed Asset Schedule]

1    Sipromatic 620-A SN 6176
2    30 HP Hydraulic Unit with hose
3    Metal Carts
4    Incline Conveyor with Drive motor #1
5    Incline Conveyor with Drive motor #2
6    Incline Conveyor with Drive motor #3
7    Aluminum wash table
8    Rice Lake CW-90X Digital scale with printer
9    Zebra ZT410 Label Printer
10   5'x12' SS table
11   Flex Weigh DMW1V Platform scale
12   Digital Scales
13   3'x7' SS table
14   Ryco 112H Hydrolic Tote Dumper SN 30638
15   Ryco 5' x 6' aluminum landing table with gate
16   2' x 16' aluminum sorting table
17   Ryco 2226B heading maching SN 30742
18   Ryco 645C Gutting maching SN 30767
19   Ryco 226B Heading machine #2
20   Ryco Gutting machine #2
21   Ryco 2' x 34' blood line conveyor
22   Ryco 225 heading machine SN 1935
23   Ryco 618 pocket conveyor SN 932121
24   Ryco 2' x 28' blood line conveyor
25   Ryco 106 12' incline waste conveyor SN 30636
26   1' x 7' incline waste conveyor
27   2' x 17' incline waste conveyor
28   Verticle waste grinder
29   Verticle waste grinder #2
30   Horizontal waste grinding attachment
31   Horizontal waste grinding attachment #2
32   Verticle waste grinder attachment
33   Aluminum catwalk
34   Aluminum catwalk #2
35   2' x 30' chain conveyor
36   3' x 8' incline conveyor
37   Ryan Engineering rotary glazing tank
38   3' x 8' aluminum table
39   3' x 8' incline conveyor #2

| 40 | 1' x 10' belt conveyor |
| 41 | 1' x 5' belt conveyor |
| 42 | 1' x 6' belt conveyor |
| 43 | Ryco automated 6 station auto sorter |
| 44 | Ryco digital controller |
| 45 | Aluminum catwalk around deglazer |
| 46 | Double suction aluminum chain conveyor |
| 47 | Ryco 20HP vacuum pump SN 9414041 |
| 48 | Ozone Int'l ozonator machine |
| 49 | Plastic totes and dollies |
| 50 | Plastic totes and dollies #2 |
| 51 | Plastic totes and dollies #3 |
| 52 | Plastic totes and dollies #4 |
| 53 | Plastic totes and dollies #5 |
| 54 | Freezer racks + base + cookie sheets |
| 55 | Aluminum dock plate |
| 56 | Hydrolic bin dumper |
| 57 | Ener Sys Enforces Forklift battery charger |
| 58 | Ener Sys Enforces Forklift battery charger #2 |
| 59 | Ener Sys Enforces Forklift battery charger #3 |
| 60 | Ener Sys Enforces Forklift battery charger #4 |
| 61 | Chop Saw |
| 62 | Metal conveyor belts #4 |
| 63 | 2' x 6' SS table with cutting board top |
| 64 | 2' x 6' aluminum table |
| 65 | 3' x 4' aluminum table |
| 66 | 3' x 4' aluminum table #2 |
| 67 | North Star 60 Ton ice machine |
| 68 | Freezer system |
| 69 | Mitsubishi FG 25 forklift |
| 70 | Mitsubishi FG 25 forklift #2 |
| 71 | 300 insulated totes |
| 72 | 93 insulated totes & elect |
| 73 | Jackstone Verticle Plate Freezers |
| 74 | 12.6K  QT 600 aluminum freezing Frame & 1 Hil |
| 75 | Tender Wet Pump |
| 76 | 42 insulated totes |
| 77 | 48 Freezer Racks |
| 78 | 29 stacks of racks |
| 79 | 80 Insulated Totes |
| 80 | Hystu FG25 Forklift (SN157692) |
| 81 | Forklift (SN 157894) rotating forks |
| 82 | Polar Insulated Boxes |

| | |
|---|---|
| 83 | Compressor Skids |
| 84 | HYSTU FORKLIFT |
| 85 | 48 insulated totes |
| 86 | Polar Insulated Boxes |
| 87 | Polar Insulated Boxes |
| 88 | Pmt 5 Ikura Roe Line |
| 89 | Nikko Ikura roe Machine |
| 90 | Nikko Ikura Roe Machine |
| 91 | Nikko Ikura Roe Machine |
| 92 | Nikko Ikura Roe Machine |
| 93 | Nikko Ikura Equipment |
| 94 | 76 Bunk Beds |
| 95 | 6 Bench Scales |
| 96 | Plant supplies and equipment baskets liners p |
| 97 | Baskets and Carts |
| 98 | Copper Stiching wire and parts |
| 99 | Tender Wet Pump |
| 100 | Purchase of Forklift |
| 101 | Parts for equipment |
| 102 | Electric Hot Water Pressure Washer max flow- |
| 103 | Commercial Dryer Refurb |
| 104 | MSI Crane scales - 14 each |
| 105 | Semi Auto Strapping Machine |
| 106 | Valor 4000 XW scales - 6 each |
| 107 | Baskets and carts |
| 108 | 1 Flohr Stainless Steel Egg Agitator |
| 109 | Asm Insulated Bins for Plant operations |
| 110 | Roe Line including: Nikko roe Sepa |
| 111 | Baader 189 Fillet Mach |
| 112 | Roe equipment cashiers check |
| 113 | Ice Machine 1991 |
| 114 | WT 11-9 Blast Freezer & Install down |
| 115 | WT 11-14 for down on Salmon Fille |
| 116 | WT for Roe Dryer for WS |
| 117 | Metal Panneling for blast freezer installatio |
| 118 | Roe Line Purchased From Alaska Packaging - As |
| 119 | Marel Fillet Line |
| 120 | Refrigeration Skids Purchased From Delarvas - |
| 121 | #104 12 inch conveyor section to |
| 122 | #104 Sorting Conveyor 24 Wide b |
| 123 | #106 Salmon Roe Sort Conveyor |
| 124 | #645 Salmon Cleaning Machine wi |
| 125 | 4 Forklifts |

| | |
|---|---|
| 126 | 5 Comp Steamtable (Kitchen Equip 05/01/18 |
| 127 | Auto Header/Gutter Machine |
| 128 | Automatic Strapping Machine with |
| 129 | Bought 2008 Mustang 2066 for W |
| 130 | Brecknell Floor Scale |
| 131 | Bunkbed for Housing Unit |
| 132 | Chum Belt |
| 133 | Double Belt conveyor-Deposit for |
| 134 | Double Belt conveyor-Final Payme |
| 135 | Drip pan for the 12 inch wide was |
| 136 | Fish Baskets carts & Equip |
| 137 | Forklift Propane Model: APL02 Se |
| 138 | Forklift Propane Model: FG25HT |
| 139 | Frames for Glazer Leg Extension |
| 140 | Grading System-Deposit for Gradi |
| 141 | Grading System-Final Payment for |
| 142 | Hughes Sat Phone System Refur |
| 143 | Ice Augers |
| 144 | Marel TOTE Dumper model: 8502 |
| 145 | Matress for Bunkhouse |
| 146 | MSI Crane Scale 50001b capacity |
| 147 | New server for Parity Production |
| 148 | Original Cost was $14300.80 pai |
| 149 | Plant/Roe room equipment |
| 150 | Qty 2 of #104 12inch wide 90 deg |
| 151 | Qty 2 of Salmon Basket brake out |
| 152 | Rice Lake Handle Weights Cast Iro 05/24/18 |
| 153 | Roe Room Equipment |
| 154 | Rotator Motor for Forklift |
| 155 | RSW-Deposit for RSW Fish Holdin |
| 156 | RSW-Final Payment for RSW Fish |
| 157 | RSW-Plant Fish Chiller System RS 02/22/18 |
| 158 | Salmon De-heading Machine |
| 159 | Sealing Machines |
| 160 | Spiral Roller for Chum |
| 161 | Stainless Steel Classic Washfount |
| 162 | Stove Adriatic Dickinson |
| 163 | Suction Hose to vaccum the fish f |
| 164 | The Total price is $6976.04 (Bake |
| 165 | Three Used Forklifts (Propane Nis |
| 166 | Totes Lids |
| 167 | Transfer Pump |
| 168 | Two Bradford White 75 gallon Pro |

| | |
|---|---|
| 169 | Used 1992 Jordan Vessel Receiv |
| 170 | Used 1995 Phillips Suction Trap |
| 171 | Used 2005 Hansen Autopurger A |
| 172 | Used RVS Suction Trap/Oil Still El¦ 09/24/18 |
| 173 | Vaconx4C1S010C |
| 174 | Washing Machine and Speed Que |
| 175 | Breakout table and drip pan |
| 176 | Loading Ramp |
| 177 | Fillet Feed Conveyor |
| 178 | NEW LOMA METAL DETECTOR |
| 179 | IQF Fish Baskets |
| 180 | Flow Scale and Infeed |
| 181 | IQF Fish Baskets |
| 182 | Salmon Cleaning Machine |
| 183 | Flow Scale and Infeed |
| 184 | 120 Plastic Totes |
| 185 | APML190L Rollstock Machine |
| 186 | Shipping of Baskets & Carts from the Western |
| 187 | Air hose and banding |
| 188 | PO#182-949 Plant Fish Waste Grinders |
| 189 | PO#182-948 Plant Fish Waste Grinder |
| 190 | Shipped of Fish Pump from Motion & Flow |
| 191 | Shipment of Wet Pump to WS from Ryco#9182 |
| 192 | Cylinder cabinet and rollers |
| 193 | 10% Final Payment for Flow scale & Infeed |
| 194 | Pump Hose for dock PO#182-331 |
| 195 | Reinforced suction fish hose |
| 196 | Belly & Head Knife/Spring Blet/Cylinder/Utili |
| 197 | Fillet Feed Conveyor |
| 198 | Conveyor Belt |
| 199 | Half Wet Pump |
| 200 | Second half Wet Pump |
| 201 | Blast Freezer basket and wheels PO#182-330 |
| 202 | Diagnostic Machine for repair department |
| 203 | Second Shipment of 120 Insulated Totes to WS |
| 204 | First Shipment of 120 Insulated Totes to WS |
| 205 | PO#182-947 BRC Electric Heat Pressure Washer |
| 206 | PO#182-882 Gutting Machine |
| 207 | Worm Machine |
| 208 | Coastline Double Dip Glazer |
| 209 | Small Fish Kit |
| 210 | Ikura Separator From Neptune Dynamic |
| 211 | RD200 Busch Pump |

212    VAP PAC Lable Printer
213    Conveyor Linclined Vacpack
214    Deck Winch with Cable
215    Toe Dumper/Deicing Table
216    Kohler 250 Diesel fuel tank

## SCHEDULE 2.1(f)

## Real Property

Lot 1A, Block 2, CITY OF WHITTIER SUBDIVISION, according to the official plat thereof, filed under Plat No. 2019-86, in the records of the Anchorage (formerly Whittier) Recording District, Third Judicial District, State of Alaska

(the "Lot 1A")

## SCHEDULE 2.2

### Assumed Executory Contracts

**A.      Contracts**

None.

**B.      Leases**

<u>Ground Leases</u>

| Counter Party | Lease Details | Cure Amount |
|---|---|---|
| Alaska Railroad Corporation | Ground Lease related to the  Processing Plant, term expires 4/30/25 (The AARC Lease) | $13,453 |

**C.      Licenses**

None.

2837 ib24g801xc

**SCHEDULE 2.2(e)**

**Assumed Creditor Liabilities**

**None.**

# SCHEDULE 2.6

## Allocation of Purchase Price

| Acquired Asset | Allocation |
|---|---|
| Processing Plant | $1,600,000 |
| Lot 1A | $550,000 |
| The Equipment listed on Schedule 2.1(e) | $2,200,000 |
| Fisherman Receivables | $50,000 |
| Seller's Interest in the Assumed Executory Contracts | $1 |
| Deposits or Prepayments relating to the Assumed Executory Contracts | $1 |
| All of Seller's tangible personal property located at (1) the Processing Plant and (2) Lot 1A, not including the Equipment listed on Schedule 2.1(e) | $1 |

# EXHIBIT B

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("**Agreement**") is entered into as of this 10th day of February by and between CMCC Co. Ltd, a private limited company incorporated under the laws of Hong Kong ("**Buyer**"), on the one hand, and Silver Wave, LLC, a Washington Limited Liability Company ("**Seller**" or "**Silver Wave**"), on the other hand. (Each of Buyer and Seller is a "**Party**" and both are the "**Parties**").

## RECITALS:

A.      On August 19, 2024 ("**Petition Date**"), Silver Wave commenced the Chapter 11 Case by filing a voluntary petition for relief under chapter 7 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Alaska (the "**Court**"), and assigned case no. 24-00144 (the "**Bankruptcy Case**").

C.      Buyer desires to purchase from Seller, and Seller desires to sell, convey, assign and transfer to Buyer the Acquired Assets (defined below) pursuant to, *inter alia*, section 363 of the Bankruptcy Code, in the manner and subject to the terms and conditions set forth herein.

D.      The transaction(s) contemplated by this Agreement are subject to the approval of the Bankruptcy Court, pursuant to section 363 of the Bankruptcy Code, and may only be consummated pursuant to a final, non-appealable order entered by the Bankruptcy Court in the Chapter 11 Case approving the terms of this Agreement (the "**Sale Order**").

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE 1
## DEFINITIONS

**Section 1.1      Defined Terms.**  In addition to the capitalized terms defined elsewhere in this Agreement, the following terms have the following meanings:

(a)      "Acquired Assets" has the meaning set forth in Section 2.1.

(b)      "Agreement" has the meaning set forth in the Preamble.

(c)      "Bid Procedures" means the Bid Procedures approved by the Court on or about January 14, 2025, in the form attached as Schedule 1.1(c), that govern the process and procedures for another interested buyer to submit a bid higher than the Buyer's offer contained herein,

(d)      "Books and Records" means all books and records pertaining to the Acquired Assets of any kind, wherever located.

[Signature Page to Asset Purchase Agreement]

(e)    "<u>Business Day</u>" means any day excluding Saturday, Sunday, any legal holiday under the laws of the State of Alaska or a day on which banks located in the State of Alaska are required by law or other governmental action to close.

(f)    "<u>Buyer</u>" has the meaning set forth in the Preamble.

(g)    "<u>Closing</u>" has the meaning set forth in <u>Section 3.1</u>.

(h)    "<u>Closing Date</u>" means the date on which Closing occurs, which shall be the earlier of April 30, 2025 or ten calendar days after entry of the Sale Order, unless a later date is agreed to by the Seller and Buyer in writing.

(i)    "<u>Damages</u>" has the meaning set forth in <u>Section 9.2(d).</u>

(j)    "<u>Deposit</u>" has the meaning set forth in <u>Section 2.4</u>.

(k)    "<u>Deposit Agent</u>" means the law firm of Bush Kornfeld LLP.

(l)    "<u>Excluded Assets</u>" has the meaning set forth in <u>Section 2.2</u>.

(m)    "<u>Execution</u>" means the time that both Buyer and Seller have executed this Agreement.

(n)    "<u>Governmental Authority</u>" means any foreign or United States federal, state, or local government, governmental regulatory, or administrative authority, agency, or commission, or any court, tribunal, or judicial or arbitral body.

(o)    "<u>Knowledge</u>" means the actual knowledge of the Party's officers after reasonable inquiry.

(p)    "<u>Liabilities</u>" mean all liabilities and obligations (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, due or not yet due), including all liabilities for Taxes with respect to periods before the Closing Date, including periods before the Petition Date.

(q)    "<u>Lien</u>" means any lien (statutory or otherwise), hypothecation, encumbrance, security interest, interest, mortgage, deed of trust, pledge, restriction, charge, instrument, license, preference, priority, security agreement, Tax (including foreign, federal, state, or local Tax), order of any Governmental Authority, of any kind including, without limitation: (i) any assignment or deposit arrangement in the nature of a security device; (ii) any claim based on the theory that Buyer is a successor of Seller; and (iii) any leasehold interest, license, or other right, in favor of a third party or Seller, to use any portion of the Acquired Assets, whether secured or unsecured, choate or inchoate, contingent or non-contingent.

(r)    Reserved.

(s)    "<u>Party</u>" or "<u>Parties</u>" has the meaning set forth in the preamble to this Agreement.

2837 ib24gb01sh

(t)        "Permit" means all licenses, permits, franchises, approvals, authorizations, consents or orders of, filings with, or notifications to, any Governmental Authority, whether foreign, provincial, municipal, federal, state, or local, necessary for the past or present conduct or operation of Seller's business.

(u)        "Person" means any individual, corporation, partnership, limited liability company, trust, association, joint venture, or other entity of any kind.

(v)        "Personal Property Taxes" has the meaning set forth in Section 3.4(a).

(w)        "Purchase Price" has the meaning set forth in Section 2.4(a).

(x)        "Purchase Price Allocation Schedule" has the meaning set forth in Section 2.6.

(y)        "Representative" means any attorney, accountant, agent, independent contractor, or other representative.

(z)        "Sale Hearing" means the hearing of the Court to approve this Agreement and its contemplated transactions.

(aa)        "Sale Order" means the order of the Court, in the form and substance attached as Schedule 1.1(aa) hereto (or, if revised, reasonably acceptable to Buyer), entered by the Court pursuant to section 363(b) of the Bankruptcy Code: (i) approving this Agreement and its contemplated transactions; (ii) approving the sale of the Acquired Assets to Buyer free and clear of all Liens pursuant to section 363(f) of the Bankruptcy Code; (iii) finding that Buyer is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code; (iv) confirming that Buyer is acquiring the Acquired Assets free and clear of the Unassumed Liabilities; and (v) retaining jurisdiction of the Court to interpret and enforce the terms and provisions of this Agreement and the Sale Order.

(bb)        "Schedules" means the Schedules attached to this Agreement.

(cc)        "Tax" means any tax, duty, charge, fee, levy, penalty, or other assessment imposed by any Governmental Authority, including income, profit, provisional, salary, estate, excise, property, sales, use, occupation, transfer, franchise, payroll, windfall or other profits, alternative minimum, gross receipts, intangibles, capital stock, estimated, employment, unemployment compensation or net worth, environmental, ad valorem, stamp, value-added or gains tax, capital duty, registration and documentation fees, custom duties, tariffs and similar charges, withholding, payroll, social security contributions or charges, disability, or other taxes (including any fee, assessment or other charge in the nature of or in lieu of any tax), including any interest, penalties, or additions attributable thereto, and any liability to make payment by way of reimbursement, recharge, indemnity, damages or management charge related to taxes and regardless of whether such amounts are chargeable directly or primarily against Seller.

(dd)        "Unassumed Liabilities" has the meaning provided for in Section 2.4.

(ee)        "Vessels" has the meaning provided for in Section 2.1(b).

2837 ib24gb01sh

## ARTICLE 2
## PURCHASE AND SALE

**Section 2.1**        **Transfer of Assets.**   Pursuant to the terms and conditions of this Agreement, at the Closing Seller will sell, convey, transfer, assign, and deliver (or cause to be sold, conveyed, transferred, assigned, and delivered) to Buyer, free and clear of all Liens, and Buyer will acquire and accept from Seller, all right, title, and interest in and to, the following assets (collectively, the "Acquired Assets"):

(a)     The vessels set forth in Schedule 2.1(b) (the "Vessels");

**Section 2.2**        **Excluded Assets.**   Notwithstanding anything to the contrary in this Agreement, all assets that are not Acquired Assets are retained by Seller and are not being sold or assigned to Buyer under this Agreement (the "Excluded Assets").

**Section 2.3**        **No Other Liabilities Assumed.**   Other than as set forth in this Agreement, Buyer shall not assume or be bound by or be obligated or responsible for any duties, responsibilities, commitments, expenses, obligations or any other Liability of Seller (the "Unassumed Liabilities").

**Section 2.4**        **Purchase Price.**

(a)     _Purchase Price_.   The "Purchase Price" for the Acquired Assets shall be $63,000, to be paid, in cash, at Closing.

(i)     _Deposit_.   Before or contemporaneously with Execution, Buyer has paid to Deposit Agent $6,300, to be held and released in accordance with the terms of this Agreement (the "Deposit").

**Section 2.5**        **Allocation Schedule.**   The Parties agree that the Purchase Price will be allocated among the Acquired Assets in accordance with their relative fair market values as set forth in Schedule 2.5 in compliance with the Bid Procedures. If the Parties are unable to resolve the issues concerning Purchase Price allocation by agreement, they shall submit the allocation matter to the Court for final determination in conjunction with the Sale Notice and Motion, which determination shall be binding and not subject to appeal.  Seller and Buyer must prepare mutually-acceptable and substantially identical initial and supplemental Internal Revenue Service Forms 8594 "Asset Acquisition Statements under 1060" consistent with the Purchase Price Allocation Schedule (giving effect to mutually agreed-on adjustments through the allocations set forth in the Purchase Price Allocation Schedule as a result of any required adjustments to the Purchase Price).

## ARTICLE 3
## CLOSING

**Section 3.1**        **Closing.**   On the terms and conditions set forth in this Agreement and in the Sale Order, the closing of the transactions contemplated by this Agreement (the "Closing") will be completed virtually by the parties or held at the offices of Bush Kornfeld LLP, 601 Union Street, Suite 5000, Seattle, Washington (or other location identified by Seller) no later than the Closing Date, if all conditions set forth in ARTICLE 7 and ARTICLE 8 below are either satisfied

or waived.  The Parties agree to expeditiously seek approval of the Sale Order.  Notwithstanding the foregoing, the Closing may be held at another time and place mutually agreeable to the Parties.

**Section 3.2**  **Actions at Closing.**

(a)  <u>Documents and Possession</u>.  At Closing, Seller must deliver or cause to be delivered to Buyer:

(i)  a bill of sale in the form of Coast Guard Form CG-1340 for each Vessel that is an Acquired Asset; and

(ii)  a copy of the Sale Order.

(b)  <u>Payment</u>.  Buyer must deliver to Seller the Purchase Price (determined in accordance with <u>ARTICLE 2</u>) *less* an amount equal to the Deposit by wire transfer at Closing of immediately available funds to the account that Seller designates in writing not less than one Business Day before the Closing.

(c)  <u>Form of Documents</u>.  If a form of any document to be delivered under this Agreement is not attached as an exhibit to this Agreement, that document must be created, executed, and delivered in form and substance and in a manner reasonably and mutually satisfactory to the Parties.

**Section 3.3**  **Transaction Expenses.**  Except as expressly provided in this Agreement, each Party bears its own costs and expenses, including attorney, accountant, and other independent contractor fees, in connection with the execution and negotiation of this Agreement and the consummation of its contemplated transactions.

**Section 3.4**  **Prorations.**

(a)  <u>Personal Property Taxes</u>.  Ad valorem personal property taxes associated with the Acquired Assets (the "<u>Personal Property Taxes</u>") that are periodically imposed and are payable for a tax period that includes (but does not end on) the Closing Date are prorated as of the Closing Date. Seller bears the proportion of, and has the sole responsibility for, such taxes equal to a fraction, the numerator of which is equal to the number of days elapsed from the beginning of the applicable tax period to the Closing Date and the denominator of which is the number of days in the entire applicable tax period. Buyer is responsible for the remainder.

(b)  <u>Post-Closing Tax Responsibility</u>.  Unless otherwise provided to the contrary in this Agreement, Buyer is solely responsible for Taxes relating to the Acquired Assets applicable to or arising from the Post-Closing Period, including any transfer taxes, and the Seller is solely responsible for Taxes relating to the Acquired Assets applicable to or arising before the Closing.

(c)  <u>Prorations Generally.</u>  If any of the items described above cannot be finally apportioned at the Closing because of the unavailability of the amounts to be apportioned or otherwise, or are incorrectly apportioned at or after Closing, such items must be apportioned or reapportioned, as the case may be, as soon as practicable after the Closing or the date such error is discovered or the event giving rise to an apportionment or reapportionment occurs, as applicable.

**Section 3.5     Possession and Risk of Loss.**  Buyer will be deemed to have taken possession of all Acquired Assets, wherever located, on the Closing Date.  Buyer assumes all risk of loss by fire or other casualty and all risks relating to all the Acquired Assets on the Closing Date and after.

# ARTICLE 4
## SELLER'S REPRESENTATIONS AND WARRANTIES

As an inducement to Buyer to enter into this Agreement, Seller represents and warrants to Buyer that:

**Section 4.1     Organization and Authorization.**  Seller has all necessary power and authority to enter into this Agreement and has taken all company action necessary to execute and deliver this Agreement, to consummate the transactions contemplated by this Agreement, and to perform Seller's obligations under this Agreement. No other company proceedings on Seller's part are necessary to authorize the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated by this Agreement.  This Agreement has been duly executed and delivered by Seller and is a valid and binding obligation of Seller, enforceable against it in accordance with its terms.  Each agreement or instrument that has been or will be entered into or executed and delivered by Seller in connection with the transactions contemplated by this Agreement has been (or will be) duly authorized, executed and delivered by Seller, and is (or will be when authorized, executed and delivered) a valid and binding obligation of Seller, enforceable against it in accordance with its terms.

**Section 4.2     No Violation.**  Except to the extent not enforceable due to operation of applicable bankruptcy law or the Sale Order, the execution, delivery, and performance of this Agreement and the consummation of its contemplated transactions by Seller do not and will not require any authorization, consent, approval, exemption, or other action by or notice or declaration to, or filing with, any court or administrative or other Governmental Authority or any third party, including, without limitation, under the provisions of Seller's operating agreement or other constitutive documents.

**Section 4.3     Governmental Consents and Approvals.**  Except for the Sale Order, to Seller's Knowledge, there are no consents, waivers, agreements, approvals, permits, or authorizations of, or declarations, filings, notices, or registrations to or with, any Governmental Authority required to be made or obtained by Seller in connection with the execution, delivery, and performance of this Agreement and the consummation of its contemplated transactions.

**Section 4.4     Title to Assets.**

(a)     Seller has good and marketable title to the Acquired Assets.

(b)     Subject to Court approval, Seller has the power and the right to sell, assign, and transfer, and Seller will sell and deliver to Buyer and, on consummation of the transactions contemplated by this Agreement, Buyer will acquire, good and marketable title to the Acquired Assets free and clear of all Liens.

**Section 4.5** **As Is.** Except as expressly set forth in this Agreement, the Acquired Assets are sold "*__As Is, Where Is__*." Except for the representations and warranties expressly set forth in this <u>ARTICLE 4</u>, Seller neither makes nor implies any other representation or warranty, including a warranty of fitness for a particular purpose or a warranty of merchantability.

**Section 4.6** **Personal Property Taxes.** All Personal Property Taxes that are the responsibility of Seller under <u>Section 3.4</u> above have been paid or will be paid in full as of the Closing.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF BUYER

As an inducement to Seller to enter into this Agreement, Buyer represents and warrants to Seller that:

**Section 5.1** **Organization.** Buyer is a corporation duly organized, validly existing, and in good standing under the laws of the Special Administrative Region of Hong Kong, China.

**Section 5.2** **Authorization.** Buyer has all necessary power and authority to enter into this Agreement and has taken all company action necessary to execute and deliver this Agreement, to consummate the transactions contemplated by this Agreement, and to perform Buyer's obligations under this Agreement. No other company proceedings on Buyer's part are necessary to authorize the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated by this Agreement. This Agreement has been duly executed and delivered by Buyer and is a valid and binding obligation of Buyer, enforceable against it in accordance with its terms. Each agreement or instrument that has been or will be entered into or executed and delivered by Buyer in connection with the transactions contemplated by this Agreement has been (or will be) duly authorized, executed and delivered by Buyer, and is (or will be when authorized, executed and delivered) a valid and binding obligation of Buyer, enforceable against it in accordance with its terms.

**Section 5.3** **Governmental Consents and Approvals.** To Buyer's Knowledge, other than the Sale Order, no consent, waiver, agreement, approval, permit, or authorization of, or declaration, filing, notice or registration to or with, any United States federal or state governmental or regulatory authority is required to be made or obtained by Buyer in connection with the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated by this Agreement.

**Section 5.4** **No Violation.** The execution and delivery of this Agreement and the other agreements specified in it and the consummation of the transactions contemplated by this Agreement do not and will not (a) violate any provision of Buyer's organizational documents or (b) conflict with or violate any statute or law, or any judgment, decree, order, regulation, or rule of any court or Governmental Authority binding on or applicable to Buyer or by which the property or assets of Buyer are bound or affected.

## ARTICLE 6
## ADDITIONAL COVENANTS

**Section 6.1        Further Assurances.**

(a)        Buyer and Seller shall use commercially reasonable efforts to timely obtain any consent, provide necessary information, or address any other issues required for the consummation of the transactions contemplated by this Agreement.

(b)        Buyer and Seller will execute any documents and use commercially reasonable efforts to take or cause to be taken all actions necessary, proper, or advisable to consummate the transactions contemplated by this Agreement but neither Buyer nor Seller is required to make any payments to any party, except as set forth in this Agreement.

## ARTICLE 7
## CONDITIONS TO SELLER'S OBLIGATIONS

The obligation of Seller to sell the Acquired Assets and to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or before the Closing Date, of each of the following conditions, any of which Seller may waive (in whole or in part) in accordance with Section 10.4 below.

**Section 7.1        Covenants and Representations.**  Each of Buyer's representations and warranties contained in ARTICLE 5 above are true in all material respects as of the Closing Date as though made on that date (except that representations and warranties explicitly made as of a specific date need only be true as of that specific date), and the Buyer has performed in all material respects all covenants, agreements, and conditions required by this Agreement to be performed, satisfied, and complied with by Buyer on or before the Closing.

**Section 7.2        Litigation.**  No action, suit, or other proceeding is pending before any Governmental Authority seeking or threatening to restrain, seek damages in respect of, or prohibit the consummation of the transactions contemplated by this Agreement.

**Section 7.3        Court Approval.**  The Court has entered the Sale Order.

**Section 7.4        Closing.**  The Closing has occurred on or before the Closing Date.

**Section 7.5        Closing of the Whittier Transaction**.  The closing of the transaction with Buyer and Whittier Seafood LLC (the "Whittier Transaction") related to the Asset Purchase Agreement dated _____ (the "Whittier APA") concerning the Processing Plant, Lot 1A, and Equipment (as those terms are defined in the Whittier APA) shall close on or before the Closing of the transaction contemplated by this Agreement, or simultaneously therewith.

**Section 7.6        Deliveries.**  On or before the Closing Date, Buyer has delivered to Seller all of the following:

(a)        a certificate from Buyer in a form reasonably satisfactory to Seller, dated as of the Closing Date, stating that the conditions specified in Section 7.1 above have been satisfied; and

(b)        the Purchase Price.

## ARTICLE 8
## CONDITIONS TO BUYER'S OBLIGATIONS

The obligations of Buyer to purchase the Acquired Assets and to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or before the Closing Date, of each of the following conditions, any of which Buyer may waive (in whole or in part) in accordance with Section 10.4 below:

**Section 8.1    Representations, Warranties and Covenants.**    Each of Seller's representations and warranties contained in ARTICLE 4 above are true in all material respects as of the Closing Date as though made on that date (except that representations and warranties that are expressly made as of a specific date need only be true as of that specific date), and the Seller has performed in all material respects all covenants, agreements, and conditions required by this Agreement to be performed, satisfied, and complied with Seller on or before the Closing Date.

**Section 8.2    Litigation.**    No action, suit, or other proceedings is pending before any Governmental Authority seeking or threatening to restrain, seek damages in respect of, or prohibit the consummation of the transactions contemplated by this Agreement.

**Section 8.3    Court Approval.**    The Sale Order shall have been entered on or before April 30, 2025, and shall not be subject to a court order staying the effect of the Sale Order.

**Section 8.4    Approvals and Consents.**    All necessary consents, including any deemed consents as set forth in the Sale Order, have been duly obtained, made or given, and are not subject to the satisfaction of any condition that has not been satisfied or waived.

**Section 8.5    Deliveries.**    On or before the Closing Date, Seller has delivered to Buyer all of the following:

(a)    a certificate in a form reasonably satisfactory to Buyer, dated as of the Closing Date, stating that the conditions specified in Section 8.1 have been satisfied; and

(b)    the documents and instruments called for in Section 3.2(a) above.

## ARTICLE 9
## TERMINATION; REMEDIES

**Section 9.1    Termination.**    This Agreement may be terminated, in writing, at any time before Closing:

(a)    by mutual written consent executed by both Buyer and Seller;

(b)    by Buyer if Seller is in material breach of any material covenant, representation, undertaking or warranty that would prevent a condition in Article 8 from being satisfied, and, if curable, is not cured within ten (10) Business days after written notice from Buyer, or if a condition set forth in ARTICLE 8 is impossible (other than through the failure of Buyer to comply with its obligations under this Agreement) to satisfy and Buyer has not waived such condition in writing on or before the Closing Date;

(c)    by Seller if Buyer is in material breach of any material covenant, representation or warranty that would prevent a condition in Article 7 from being satisfied, and, if curable, is not cured within ten (10) Business days after written notice from Seller, or if it appears that a condition set forth in ARTICLE 7 is impossible (other than through the failure of Seller to comply with its obligations under this Agreement) to satisfy and Seller has not waived such condition in writing on or before the Closing Date; and

(d)    by both Buyer and/or Seller upon Seller's closing of the sale of all or substantially all of the Acquired Assets to a party or parties other than Buyer pursuant to one or more Overbids; and

(e)    by either party if the Closing has not occurred on or before April 30, 2025, or ten days after entry of the Sale Order, whichever is later, unless a later date is agreed in writing by the Parties.

    **Section 9.2        Obligations on Termination.**    If this Agreement terminates under Section 9.1 above:

(a)    each Party must redeliver to the furnishing Party all documents, work papers, and other material of the other Party relating to the transactions contemplated by this Agreement, whether obtained before or after Execution;

(b)    all obligations of the Parties under this Agreement terminate, except as set forth in this Section 9.2;

(c)    neither Party has any liability to the other Party except for any obligation to pay any damages (which may be limited to the Deposit under subsection (e) below) awarded by the Court associated with a Party's breach of this Agreement ("Damages");

(d)    except for any Damages, each Party bears its own expenses incurred in connection with the negotiation, preparation, execution, and performance of this Agreement;

(e)    if Seller terminates this Agreement because Buyer fails to close without justification and Seller is unable to close a transaction for the Acquired Assets to another buyer pursuant to a Back-Up Bid (as contemplated by the Bid Procedures), Seller may seek an order from the Court for specific performance of this Agreement, including instructing the Deposit Agent to pay Seller the Deposit as liquidated damages on account of Buyer's breach;

(f)    unless used to pay Damages to Seller, the Deposit Agent must return the Deposit to the Buyer within one Business Day of the date of termination; and

(g)    the Deposit Agent's obligations regarding the Deposit under this Section 9.2 survive termination of this Agreement.

**ARTICLE 10**
**MISCELLANEOUS**

Section 10.1    **Assignment; Successors.**  Neither this Agreement nor any of the rights or obligations under it may be assigned by either Party without the other Party's prior written consent, but: (a) Buyer may assign some or all of its rights under this Agreement to any of its Affiliate so long as Buyer remains liable for its obligations; and (b) Buyer may assign its rights under this Agreement as collateral security to any lender providing Buyer with acquisition financing. Subject to the foregoing, this Agreement binds and inures to the benefit of the Parties and their respective representatives, heirs, legatees, successors, and permitted assigns. No other person has any right, benefit, or obligation under this Agreement.

Section 10.2    **Notices.**  All notices, requests, demands, and other communications given under this Agreement must be in writing and are deemed given: (a) if personally delivered, when received; (b) if transmitted by email, on receipt of delivery confirmation; (c) if sent for next-day delivery to a domestic address by recognized overnight delivery service (*e.g.*, Federal Express), on the day after sending; and (c) if sent by certified or registered mail, return receipt requested, when received.  Notices, demands, and communications must be sent to the following addresses:

If to Buyer:

CMCC Co. Ltd
Unit 2508A 25th Floor,
Bank of America Tower,
12 Harcourt Road, Central Hong Kong

If to Seller:

Silver Wave, LLC
Attn: Aleksey Kozlov
3 Lake Bellevue Drive, Suite 201
Bellevue, WA 98005
Email: alekseyk@marinefishingint.com

With a copy to:

Bush Kornfeld LLP
601 Union Street, Suite 5000
Seattle, WA 98101
Attn:  Thomas Buford
Email: tbuford@bushkornfeld.com

or to any other address or email address as a Party may designate by written notice to the other Party.

Section 10.3    **Choice of Law; Submission to Jurisdiction.**  This Agreement must be construed and interpreted, and the rights of the parties determined in accordance with, the laws of the State of Alaska.  Each Party irrevocably consents to the service of any process in any action or proceeding arising out of or relating to this Agreement by the mailing of copies of such process to each Party at its address specified in <u>Section 10.2</u> above.  The Parties irrevocably submit to the exclusive jurisdiction of the Court (or any court exercising appellate jurisdiction over the Court) over any dispute arising out of or relating to this Agreement, the Sale Order, or any other agreement or instrument contemplated by or entered into in connection with this Agreement or the Sale Order.  Each Party irrevocably agrees that any claim in respect of any such dispute or proceedings may be

heard and determined in the Court.  The Parties irrevocably waive to the fullest extent permitted by applicable law any objection to the venue or any defense of inconvenient forum relating to any such dispute or proceeding brought in the Court.

**Section 10.4      Entire Agreement; Amendments and Waivers.**  This Agreement, together with all its Exhibits and Schedules, constitutes the entire agreement among the Parties pertaining to this Agreement's subject matter and supersedes all prior agreements, understandings, negotiations, and discussions, whether oral or written, with regard to this Agreement's subject matter.  No amendment of this Agreement is effective unless executed in writing by both Parties. No waiver of any of this Agreement's provisions is effective unless made in a writing by the waiving Party. No waiver of any single provision of this Agreement constitutes either a waiver of any other of this Agreement's provisions (whether or not similar) or a continuing waiver unless otherwise expressly provided.

**Section 10.5      Construction.**  The headings and captions of the various Articles and Sections of this Agreement have been inserted solely for purposes of convenience, are not part of this Agreement, and may not be deemed in any manner to modify, explain, expand, or restrict any of the provisions of this Agreement.  Unless stated to the contrary, all references in this Agreement to Articles, Sections, paragraphs, sentences, or clauses are to the specified Article, Section, paragraph, sentence, or clause of this Agreement, and all references to Exhibits and Schedules are to the specified Exhibits and Schedules attached to this Agreement, all of which  constitute a part of this Agreement.  All terms defined in this Agreement have the same meanings in the Exhibits and Schedules except as otherwise provided in the Exhibits and Schedules.

**Section 10.6      No Third Party Beneficiaries.**  No Person other than the Parties have any rights or claims under this Agreement.

**Section 10.7      No Waiver.**  The failure of either Party to seek redress for any breach, or to insist on the strict performance, of any covenant or condition of this Agreement by the other Party does not waive the breach or failure to perform nor prevent a subsequent act or omission in violation of, or not strictly complying with, the terms of this Agreement from constituting a default under this Agreement.

**Section 10.8      Counterparts.**  This Agreement may be executed in one or more counterparts, each of which constitutes an original and all of which, taken together, constitute one instrument.

**Section 10.9      Delivery by Email.**  This Agreement and any other agreement or instrument entered into in connection with or contemplated by this Agreement, and any amendments, if signed and delivered by email, must be treated in all respects as an original, legally-binding agreement or instrument as if it were the original delivered in person.  No Party may raise the use of email to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through email as a defense to enforceability.

**Section 10.10      Invalidity.**  The invalidity, illegality, or unenforceability of any portion of any provision of this Agreement or any instrument referred to in this Agreement does not affect

the validity, legality, and enforceability of any other portion of any other provision of this Agreement or such instrument.

Section 10.11    Further Assurances.  Without limiting any other rights or obligations of the Parties contained in this Agreement, following the Closing, each Party agrees to execute or cause to be executed any documents, instruments, or conveyances and to take any actions reasonably requested by the other Party to effectuate the purposes of this Agreement including, without limitation, any instruments Buyer reasonably requests to vest Buyer with title to the Acquired Assets in accordance with this Agreement.

Section 10.12    Cumulative Remedies.  All rights and remedies of either Party under this Agreement are cumulative of each other and of every other right or remedy that Party may otherwise have at law or in equity. The exercise of one or more rights or remedies does not affect the concurrent or subsequent exercise of any other rights or remedies.

Section 10.13    Currency.  Except as otherwise expressly provided in this Agreement, all dollar amounts are stated in United States dollars.

Section 10.14    Representation by Counsel; Mutual Negotiation.  Each Party has been represented by counsel of its choice in negotiating this Agreement.  This Agreement has been negotiated and prepared at the Parties' joint request, direction, and construction, at arm's length, with the advice and participation of counsel, and must be interpreted in accordance with its terms without favor to either Party.

Section 10.15    Post-Closing Dispute Resolution.  Either Party may submit to the Court any controversy, claim, or dispute arising out of or relating to this Agreement after the Closing that is not resolved within 30 days after written notice to the affected party of such controversy, claim, or dispute.  The Court shall have exclusive jurisdiction to resolve any such controversy, claim, or dispute.  The prevailing Party is entitled to its reasonable attorneys' fees and costs as determined and awarded by the Court.

Section 10.16    Transfer Taxes.  Buyer is responsible for and must pay any transfer, sales, use, or other such Taxes or fees required to be paid with respect to this Agreement or the sale of the Acquired Assets to Buyer.

The Parties have caused this Agreement to be executed by their respective duly-authorized officer as of the day and year first above written.

**SILVER WAVE, LLC**

By:_____
         Aleksey Kozlov
Its: Authorized Person

2837 ib24gb01sh

**CMCC Co. Ltd**

By: _____
    Jordan Li
Its: _____

## SCHEDULES

Schedule 1.1(c)        Bid Procedures

Schedule 1.1(aa)      Sale Order

Schedule 2.1(b)       Vessels

Schedule 2.5          Allocation of Purchase Price

**SCHEDULE 1.1(c)**


**Bid Procedures**

## SCHEDULE 1.1(aa)

## Sale Order

## SCHEDULE 2.1(b)

### Vessels

| Vessel | Official Number | Location | Status |
|---|---|---|---|
| Esther Point | 546495 | Whittier, AK | Dry docked |
| Lady Angela | 274142 | Seward, AK | Docked |
| Portage Bay | 550249 | Seward, AK | Docked |

2837 ib24gb01sh

**SCHEDULE 2.5**

**Allocation of Purchase Price**

| Acquired Asset | Allocation |
|---|---|
| Esther Point | $8,000 |
| Lady Angela | $45,000 |
| Portage Bay | $10,000 |

2837 ib24gb01sh