UNITED STATES BANKRUPTCY COURT
DISTRICT OF ALASKA

In re

WHITTIER SEAFOOD, LLC, [1]

Debtors.

Chapter 11

Lead Case No. 24-00139-GS

Jointly Administered

ORDER (1) APPROVING THE SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES; (2) APPROVING THE ASSIGNMENT OF EXECUTORY CONTRACTS; (3) DETERMINING THAT BUYERS QUALIFY AS GOOD FAITH PURCHASERS UNDER 11 U.S.C. SECTION 363(m); (4) AUTHORIZING DISTRIBTUIONS; AND (5) APPROVING THE VRSALOVIC NOTICE

Hearing Date
DATE: July 10, 2025
TIME:  9:30 a.m.

THIS MATTER came before the Court at hearing on July 10, 2025 (the "Second Sale Hearing"), on the *Second Motion For Order (1) Approving the Sale Of Assets Free and Clear; ( 2) Approving the Assignment of Executory Contracts; (3) Determining Buyers are Good Faith Purchasers; (4) Authorizing Distributions*; *and (5) Approving the Vrsalovic Notice* [ECF No. 405] (the "Second Sale Motion"), filed by debtors Whittier Seafood, LLC ("Whittier") and Silver Wave, LLC ("Silver Wave") (each a "Debtor" and together, the "Debtors"), debtors-in-possession herein. The court, having reviewed the files and records herein, including the Motion, its supporting declarations, the declarations from the Buyers' representatives respecting their good faith in

---

[1] The Debtors are Marine Fishing International, Inc. ("MFI Inc."), Case No. 24-00140; Marine Fishing International, LLC ("MFI LLC"), Case No. 24-00141; Modys, LLC ("Modys"), Case No. 24-00142; Salacia, LLC ("Salacia"), Case No. 24-00143; Silver Wave, LLC ("Silver Wave"), Case No. 24-00144; and Whittier Seafood, LLC ("Whittier") (collectively, the "Debtors").

ORDER APPROVING SECOND SALE MOTION– Page 1

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

connection with the proposed transactions, and any objections or other responses to the Sale Motion, and having considered the presentations of counsel at the Second Sale Hearing, and deeming itself fully advised, the Court finds and concludes as follows:

A.     On January 14, 2025, the Court entered its *Order Approving Bid Procedures and Form of Notice* [ECF No. 259] (the "Bid Procedures Order"), which governed the procedures to be used in connection with the marketing and sale of Whittier's assets.  Among its provisions, the Bid Procedures Order shortened the notice period for the filing of the Sale Motion to seven days.  *See* ECF No. 259 at 4.

B.     On February 24, 2025, the Debtors filed the *Motion for Order (1) Approving the Sale Of Assets Free and Clear; ( 2) Approving the Assumption and Assignment of Lease; (3) Determining Buyer is Good Faith Purchaser; and (4) Authorizing Distributions* (the "First Sale Motion") along with supporting declarations, *see* ECF Nos. 285-288 and 291, seeking authority to close and consummate the sales of the Debtors' assets (the "Sale") to the Alaska Wild Seafoods, LLC, an Alaskan limited liability company ("Alaska Wild") pursuant to the two the Initial Purchase Agreements, as defined below[2].

C.     In the First Sale Motion, the Debtors sought approval of the sale of the Initial Acquired Assets (as defined and detailed in the Second Sale Motion) pursuant to the terms of two Asset Purchase Agreement[3] (the "First Whittier APA"[4] or the "First Silver Wave APA"[5], as applicable, and together the "Initial Purchase Agreements"), with Alaska Wild (together, the "Initial Sales").

---

[2] CMCC Co. Ltd was the initial buyer under the PSAs. It later assigned its interest and rights under the APAs to Alaska Wild.
[3] Capitalized terms herein have the meaning identified in the Whittier APA or the Silver Wave APA, as applicable, unless otherwise indicated.
[4] Defined in the Second Sale Motion as the "First Whittier Purchase Agreement."
[5] Defined in the Second Sale Motion as the "First Silver Wave Purchase Agreement."

ORDER APPROVING SECOND SALE MOTION– Page 2

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

D.      On February 27, 2025, Alaska Wild advised the Debtors' marketing firm, Hilco Corporate Finance ("Hilco") that it did not want to proceed with the First Silver Wave APA for the purchase of the Vessels. At the Sale Hearing, the Debtors advised the court that they did not intend to seek approval of the First Silver Wave APA, and that that component of the First Sale Motion would be withdrawn.

E.      On March 27, 2025 the court entered the First Sale Order approving the First Whittier APA and the sale of the Whittier Initial Assets free and clear of liens, claims, and encumbrances; approving the assumption and assignment of the ARRC Lease; determining Alaska Wild is a good faith purchaser, and authorizing distributions [ECF No. 316].

F.      The transaction subject to the First Whittier APA did not close, and on April 29, 2025, Whittier terminated the First Whittier APA.

G.      On June 12, 2025, Whittier and Alaska Wild and Silver Wave and Alaska Whitecap entered into purchase and sale agreements (the "Second Whittier APA" and the "Second Silver Wave APA" and together, the "Second APAs")[6].

H.      The Sellers have demonstrated good, sufficient, and sound business reasons and compelling circumstances to enter into the Second APAs and sell the Acquired Assets under sections 363 and 365 of the Bankruptcy Code, and such actions are appropriate and reasonable exercises of Sellers' business judgment and in the best interests of Sellers, their estates, and creditors and other parties in interest.  Such business reasons include, but are not limited to, the facts that (i) the Second APAs and terms thereof constitute the highest and/or best offer for the Acquired Assets, (ii) no other person or entity or group of persons or entities has offered to purchase the Acquired Assets for greater

---

[6] Defined in the Second Sale Motion as the "Second Whittier Purchase Agreement," the "Second Silver Wave Purchase Agreement," and the "Second Purchase Agreements," respectively.

ORDER APPROVING SECOND SALE MOTION– Page 3

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

1   economic value to Sellers' estate than the Buyers, and (iii) the Proposed Sales pursuant to the terms of

2   the Second APAs will present the best opportunity to realize the value of the Sellers' assets.

3       I.       The provisions in the proposed *Notice of Proposed Sale of Real Property Free and*

4   *Clear of Lien of Vrsalovic Deed of Trust, and Objection to Claim* (the "Vrsalovic Notice") related to

5   the Vrsalovic DOT set forth herein are sufficient and adequate to provide notice to parties in interest

6   to the Vrsalovic DOT of Whittier's intent to sell Lots 6-9 free and clear of the Vrsalovic DOT and an

7   opportunity to assert a Notice of Unpaid Lien.

8       J.       On July 1, 2025, the Debtors filed their *Certificate of Service* [ECF No. 411], which

9   evidences that notice of the Second Sale Motion was disseminated on July 1, 2025.  The Sellers have

10   provided proper, timely, adequate and sufficient notice of the Second Sale Motion and the Second Sale

11   Hearing consistent with the notice requirements of the Bid Procedures Order.

12       K.       This court has jurisdiction over the Second Sale Motion pursuant to 28 U.S.C. §§ 157

13   and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(N) over which the

14   court has jurisdiction to enter a final order.  Venue is proper in this district and this court under 28

15   U.S.C. § 1408.  The Second Sale Motion was properly before the court at the Second Sale Hearing.

16       L.       For the reasons stated on the record at the Second Sale Hearing, which are incorporated

17   herein by this reference pursuant to Bankruptcy Rule 7052, the court finds and concludes that the relief

18   requested in the Second Sale Motion is reasonable, appropriate and in the best interests of the Sellers,

19   their estates, and creditors and all parties in interest, and that the legal and factual bases set forth in

20   the Second Sale Motion and at the Second Sale Hearing establish just cause for the relief granted

21   herein, and that the Second Sale Motion should be granted.

22       Now, therefore,

23

ORDER APPROVING SECOND SALE MOTION– Page 4

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

IT IS HEREBY ORDERED as follows:

1.      The *Second Motion For Order (1) Approving the Sale Of Assets Free and Clear; ( 2) Approving the Assignment of Executory Contracts; (3) Determining Buyers are Good Faith Purchasers; (4) Authorizing Distributions*; *and (5) Approving the Vrsalovic Notice* [ECF No. 405] is GRANTED.

2.      The terms and conditions of the Second APAs, copies of which are attached hereto as Exhibit A and B, are APPROVED.

3.      All objections and responses to the Second Sale Motion or the relief requested therein, that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections and responses, are overruled on the merits and denied with prejudice.

4.      Pursuant to section 363(b) of the Bankruptcy Code, and upon and subject to the Closing and the Buyers' performance of each of its obligations under the Second APAs, including but not limited to payment of the Purchase Price, Sellers are hereby authorized and directed to take any and all actions necessary or appropriate to perform under, consummate, implement, and effectuate the Second APAs, and to execute and deliver any and all instruments and documents that may be reasonably necessary or desirable to implement and effectuate the terms of the Second APAs, this Order and the Sale, and to take all further actions as may be reasonably requested by the Buyers for the purpose of assigning, transferring, granting, conveying, and conferring to the Buyer, or reducing to possession, the Acquired Assets, including any and all rights appurtenant to or necessary for the operation or utilization of the Acquired Assets, or as may be necessary or appropriate to the performance of the Sellers' obligations as contemplated by the Second APA, without any further corporate action or order of this court.

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

5.     Bankruptcy Code section 363(f) is satisfied, in that (among other reasons) each entity with an interest in the Acquired Assets consents to the sale.  Accordingly, the Acquired Assets shall be sold and conveyed to Buyer free and clear of all interests, obligations, rights, encumbrances, pledges, liens (including without limitation, mechanics', materialmens' and other consensual and nonconsensual liens and statutory liens), mortgages, deeds of trust, security interests, claims (including, any "claim" as defined in section (5) of the Bankruptcy Code) (collectively, "Interests").  Any and all Interests shall attach to the proceeds of the Sale ultimately attributable to the Purchased Assets in which such creditor alleges an Interest, in the same order of priority, subject to distribution provisions set forth in the APA.

6.     The Buyers would not have entered into the Second APAs and would not consummate the Sale, thus adversely affecting the Sellers' estates and its creditors, if the Sale were not free and clear of all Interests, or if the Buyers would be, or in the future could be, liable for any such Interests.

7.     Based on the record herein, including the Declarations of Jue Li [ECF No. 418] and Li Zhang [ECF No. 419], the Buyers qualify for and shall be granted all protections of Bankruptcy Code section 363(m).

8.     In connection with the Closing, to the extent any of the Assumed Executory Contracts are unassumed, Whittier is authorized and directed to assume and assign each of the Assumed Executory Contracts to Alaska Wild free and clear of all Interests.  Such payments (if any) of the Cure Amounts shall (a) effect a cure of all defaults existing thereunder as of the Closing Date, (b) compensate for any actual pecuniary loss to such non-Debtors party resulting from such default, and (c) together with the assumption of the Assumed Executory Contracts by the Alaska Wild, constitute adequate assurance of future performance thereof.  Alaska Wild shall then have assumed the Assumed

ORDER APPROVING SECOND SALE MOTION– Page 6

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

1   Executory Contracts and, pursuant to section 365(f) of the Bankruptcy Code, the assignment by

2   Whittier of such Assumed Executory Contracts shall not be a default thereunder.

3         9.      Except as otherwise expressly provided in the Second APAs or this Order, (i) the

4   Buyers shall not have any liability or other obligation of the Sellers arising under or related to any of

5   the Acquired Assets that accrued, existed or was alleged or asserted, whether known or unknown, as

6   of the Closing; and (ii) the Sellers shall not have any liability or other obligation arising under or

7   related to any of the Acquired Assets that accrued, existed or was alleged or asserted, whether known

8   or unknown, on and after the Closing.

9         10.     Except as provided in paragraphs 11 and 12 of this Order, the Sellers shall be

10  authorized and directed to pay directly at Closing to the recipients the following approximate

11  amounts, the final amounts which shall be finalized through escrow as of the Closing Date:

12        a.      From the proceeds of the Whittier Acquired Assets:

| Recipient | Amount |
| --- | --- |
| Hilco | $3,260.37 |
| Ferguson Enterprises | $5,632.64 |
| Begich Towers Association | $45,000 |
| ARRC | $21,861 |
| Cathay Bank | $2,700,000 |
| Whittier's Unsecured Creditors | $130,290.34 |

17        b.      From the proceeds of the Silver Wave Acquired Assets:

| Recipient | Amount |
| --- | --- |
| City of Whittier | $2,972.97 |
| Boat Works of Alaska | $2,000.00 |
| Mark Quinn | $450.00 |
| Seward Boat Harbor | $400.00 |
| Storm Chasers Marine Services, Inc. | $2,200.00 |
| Cathay | $41,429.67 |

Where applicable, disbursement amounts may be subject to a payoff statement as of the

Closing Date.

ORDER APPROVING SECOND SALE MOTION– Page 7

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

11.     Sellers are authorized to withhold the following to be held by the Plan Administrator (together, the "Escrowed Funds"):

    a.     From the proceeds of the Whittier Acquired Assets:

        (1)     $200,000 for the payment of transfer taxes, to be held by the Plan Administrator until payment of the transfer taxes become due, the balance of which shall be distributed to Cathay Bank;

        (2)     $37,412 for Quarterly Fees payable to the US Trustee to be held by the Plan Administrator until the Quarterly Fees become due;

        (3)     $350,000, to be held until the Vrsalovic Notice provisions set forth below have been satisfied, at which time such funds will be distributed to Cathay Bank;

        (4)     $600,000, on account of Hilco's claim for its Commission pending further order of the Court; and

        (5)     $500,000, to fund the Protective Advances as set forth in the Plan.  This amount may be reduced if the Plan Administrator and Cathay Bank approve a budget for the payment of such expenses, with any surplus funds being then distributed to Cathay Bank.

    b.     From the proceeds of the Silver Wave Acquired Assets, $252 for Quarterly Fees payable to the US Trustee to be held by the Plan Administrator until the Quarterly Fees become due.

12.     Distributions payable to unsecured creditors shall be held in escrow by the Plan Administrator until the later of the allowance of unsecured claims and the closing of the sale of the Salacia Plant as provided in the Plan.

13.     The form of the Vrsalovic Notice attached hereto as Exhibit C is approved.

Bush Kornfeld llp
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

14.     The following provisions shall apply to the Vrsalovic Deed of Trust:

a.     Within three business days of the entry of this Order, Whittier shall serve the Vrsaolivc Notice upon Mrs. Vrsalovic via U.S. Mail to her last known address. A copy of the Vrsalovic Notice shall also be published once in the *Anchorage Daily News*, a newspaper of general circulation in Anchorage, Alaska, within 10 business days following entry of this Order.

b.     The Vrsalovic Notice shall provide notice to the parties identified therein that they have thirty (30) days from the later of (a) the date of mailing or (b) the date of publication to file a "Notice of Unpaid Lien" with the Bankruptcy Court, to assert any outstanding claim secured by the Vrsalovic DOT.

c.     Whittier shall reserve $350,000 from the proceeds of the sale of the Whittier Acquired Assets (the "Vrsalovic Reserve"), as set forth in paragraph 11 of this Order, pending further order of the Court resolving any timely-filed Notice of Unpaid Lien.

d.     If no Notice of Unpaid Lien is filed by the applicable deadline, Whittier or its counsel shall file a declaration that (1)  describes the steps it took to serve the Vrsalovic Notice on Mrs. Vrsalovic and Mr. Vrsalovic's successors in interest; and (2) confirming it received no response to the Vrsalovic Notice, or that any response received indicated the Vrsalovic Loan had been paid in full, as applicable (the "Vrsalovic Compliance Declaration").

e.     Upon filing the Vrsalovic Compliance Declaration, the Vrsalovic DOT shall be deemed satisfied and sale of Lots 6-9 will be free and clear of the Vrsalovic DOT pursuant to 11 U.S.C. § 363(f) without further order of the court. In such event, Whittier shall be authorized to release the Vrsalovic Reserve for distribution without further order of this court.

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

15.     This Order constitutes a final and appealable order within the meaning of 28 U.S.C.

§ 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under

Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by

Bankruptcy Rule 7054, this court expressly finds that there is no just reason for delay in the

implementation of this Order and that waiver of any applicable waiting period is appropriate.

DATED this 11th day of July, 2025.

BY THE COURT

/s/ Gary Spraker
GARY SPRAKER
United States Bankruptcy Judge

Presented by:

BUSH KORNFELD LLP

By    /s/ Lesley Bohleber
  James L. Day, (admitted *pro hac vice*)
  Lesley Bohleber, (admitted *pro hac vice*)
Attorneys for Debtors-in-Possession

Serve:  T. Buford, Esq.
        L. Bohleber, Esq.
        J. Day, Esq.
        G. Fox, Esq.
        D. Neu, Esq.
        M. Parise, Esq.
        L. Thornton, Esq.
        J. Torgerson, Esq.
        J. Kaplan, Esq.
        R. Murphy, Esq.
        M. Mills, Esq.
        T. Brannon, Esq.
        A. Ivanov, Esq.
        G. Pitts, Esq.
        J.M. Palomares, Esq.
        F. Rasch, Esq.
        J. Welch, Esq.
        K. Evans, Esq.
        U.S. Trustee
        ECF Participants via NEF

ORDER APPROVING SECOND SALE MOTION– Page 10

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

EXHIBIT A

### ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("**Agreement**") is entered into as of this 12th day of June, 2025, by and between The Alaska Wild Seafoods LLC, an Alaska limited liability company ("**Buyer**"), on the one hand, and Whittier Seafood, LLC, an Alaska Limited Liability Company ("**Seller**" or "**Whittier**"), on the other hand. (Each of Buyer and Seller is a "**Party**" and both are the "**Parties**").

### RECITALS:

A.     On August 19, 2024 ("**Petition Date**"), Whittier commenced the Chapter 11 Case by filing a voluntary petition for relief under chapter 7 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Alaska (the "**Court**"), and assigned case no. 24-00139 (the "**Bankruptcy Case**").

B.     Buyer desires to purchase from Seller, and Seller desires to sell, convey, assign and transfer to Buyer the Acquired Assets (defined below) pursuant to, *inter alia*, section 363 of the Bankruptcy Code, in the manner and subject to the terms and conditions set forth herein.

C.     The transaction(s) contemplated by this Agreement are subject to the approval of the Bankruptcy Court, pursuant to section 363 of the Bankruptcy Code, and may only be consummated pursuant to a final, non-appealable order entered by the Bankruptcy Court in the Chapter 11 Case approving the terms of this Agreement (the "**Sale Order**").

D.     Prior to the date of this Agreement, the Parties executed an Asset Purchase Agreement dated March 25, 2025, covering some of the Acquired Assets (as defined below) (the "**Prior Agreement**").  For the avoidance of doubt, the Parties agree that the Prior Agreement has been terminated and is of no further force and effect, and agree that there is no liability on the part of either Party as a result of such termination.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### ARTICLE 1
### DEFINITIONS

**Section 1.1      Defined Terms.**  In addition to the capitalized terms defined elsewhere in this Agreement, the following terms have the following meanings:

(a)     "Accounts Receivable" means any amounts owed to Seller by a Customer. For the avoidance of doubt, Fisherman Receivables shall not be deemed to be Accounts Receivable.

(b)     "Acquired Assets" has the meaning set forth in Section 2.1.

(c)     "Administrative Books and Records" means any Books and Records as necessary to allow Seller to complete administration of the Bankruptcy Case, including but not

[Signature Page to Asset Purchase Agreement]

limited to completion of any required Tax returns, review and resolution of claims filed in the Bankruptcy Case, pursuit of any claims against third parties, administering any rights under insurance policies, and other similar issues necessary to complete administration of the Bankruptcy Case.

(d)      "Agreement" has the meaning set forth in the Preamble.

(e)      "ARRC Lease" means the ground lease for the real property upon which the Processing Plant sits, located on the north side of Whittier Street between Glacier and Eastern Streets in Whittier, Alaska, that is the subject of the ground lease between Alaska Railroad Corporation ("ARRC") and Great Pacific Seafoods, Inc. dated October 22, 1990, ARRC Contract No. 6299, as amended by Supplements 1, 2, 3, and 4 dated October 24, 1990; December 17, 1991; July 7, 2008; May 8, 2017 respectively; and as assigned to Seller pursuant to the Assignment of Lease by Operation of Law, Supplement No. 4 to ARRC contract No.6299; and thereafter administered as ARRC Contract No. 0286 as amended by Supplement No 1 to ARRC Contract No. 0286 dated June 29, 2018, all subject to Section 8.5 below.

(f)      "Assumed Executory Contracts" has the meaning set forth in Section 2.2(a).

(g)      "Assumed Lease" has the meaning set forth in Section 2.2(a).

(h)      "Assumed Liabilities" means the obligations under the Assumed Executory Contracts and other obligations assumed by the Buyer as set forth in Section 2.2, below.

(i)      "Begich Towers Condo Units" Nine condos in Begich Towers, 100 Kenai Street, Whittier, Alaska, Units 206 , 402. 406, 413, 609, 702, 807, 814, and 1001.

(j)      "Begich Towers Assessments" means monthly dues, assessments, and other costs owed to Begich Towers Condominium Association of Apartment Owners, Inc. as of the Closing Date, on account of the Begich Towers Condo Units and Unit 209.

(k)      "Bid Procedures" means the Bid Procedures filed with the Court on December 5, 2024, in the form attached as Schedule 1.1(i), that govern the process and procedures for another interested buyer to submit a bid higher than the Buyer's offer contained herein, including an auction to the extent that one or more higher bids are submitted.

(l)      "Bid Procedures Order" means the order of the Court entered on January 14, 2025 that approved the Bid Procedures.

(m)      "Books and Records" means all books and records pertaining to the Acquired Assets of any kind, wherever located.

(n)      "Business Day" means any day excluding Saturday, Sunday, any legal holiday under the laws of the State of Alaska or a day on which banks located in the State of Alaska are required by law or other governmental action to close.

(o)      "Buyer" has the meaning set forth in the Preamble.

2

(p)  "Closing" has the meaning set forth in Section 3.1.

(q)  "Closing Date" means the date on which Closing occurs, which shall be the earlier of June 13, 2025, or ten days after entry of the Sale Order, unless a different date is agreed to by the Seller and Buyer in writing.

(r)  "Cure Costs" means cure obligations, costs, and fees due with respect to the Assumed Executory Contracts in the amounts set forth on Schedule 2.2;

(s)  "Customer" means each of Seller's customers.

(t)  "Damages" has the meaning set forth in Section 9.2(d).

(u)  "Deposit" has the meaning set forth in Section 2.5.

(v)  "Deposit Agent" means the law firm of Bush Kornfeld LLP.

(w)  "Excluded Assets" has the meaning set forth in Section 2.3.

(x)  "Execution" means the time that both Buyer and Seller have executed this Agreement.

(y)  "Existing Contract" means any oral or written contract, agreement, real or personal property lease, sublease, license, distribution arrangement, sale and purchase agreement, or purchase and sale order to which Seller is a party.

(z)  "Fisherman Receivables" means certain outstanding obligations from individuals pursuant to certain promissory notes, harvest advance agreements, and/or preferred ship mortgages in favor of Seller as set forth in Schedule 1.1(w).  For the avoidance of doubt, the Fisherman Receivables do not include such obligations owed to Silver Wave, LLC.

(aa)  "Governmental Authority" means any foreign or United States federal, state, or local government, governmental regulatory, or administrative authority, agency, or commission, or any court, tribunal, or judicial or arbitral body.

(bb)  "Knowledge" means the actual knowledge of the Party's officers after reasonable inquiry.

(cc)  "Lease" means the leases to which Seller is a party listed on Schedule 2.2.

(dd)  "Liabilities" mean all liabilities and obligations (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, due or not yet due), including all liabilities for Taxes with respect to periods before the Closing Date, including periods before the Petition Date.

(ee)  "License" means the licenses to which Seller is a licensor listed on Schedule 2.2.

3

2837 if02eq01v3

(ff)     "Lien" means any lien (statutory or otherwise), hypothecation, encumbrance, security interest, interest, mortgage, deed of trust, pledge, restriction, charge, instrument, license, preference, priority, security agreement, Tax (including foreign, federal, state, or local Tax), order of any Governmental Authority, of any kind including, without limitation: (i) any assignment or deposit arrangement in the nature of a security device; (ii) any claim based on the theory that Buyer is a successor of Seller; and (iii) any leasehold interest, license, or other right, in favor of a third party or Seller, to use any portion of the Acquired Assets, whether secured or unsecured, choate or inchoate, contingent or non-contingent.

(gg)     "Party" or "Parties" has the meaning set forth in the preamble to this Agreement.

(hh)     "Permit" means all licenses, permits, franchises, approvals, authorizations, consents or orders of, filings with, or notifications to, any Governmental Authority, whether foreign, provincial, municipal, federal, state, or local, necessary for the past or present conduct or operation of Seller's business.

(ii)     "Person" means any individual, corporation, partnership, limited liability company, trust, association, joint venture, or other entity of any kind.

(jj)     "Property Taxes" has the meaning set forth in Section 3.4(a).

(kk)     "Processing Plant" means the building and improvements situated on the real property that is subject to the ARRC Lease.

(ll)     "Purchase Price" has the meaning set forth in Section 2.5(a).

(mm)     "Purchase Price Allocation Schedule" has the meaning set forth in Section 2.6.

(nn)     "Representative" means any attorney, accountant, agent, independent contractor, or other representative.

(oo)     "Sale Hearing" means the hearing of the Court to approve this Agreement and its contemplated transactions.

(pp)     "Sale Order" means the order of the Court, in the form and substance attached as Schedule 1.1(mm) hereto (or, if revised, acceptable to Buyer), entered by the Court pursuant to section 363(b) of the Bankruptcy Code: (i) approving this Agreement and its contemplated transactions; (ii) approving the sale of the Acquired Assets to Buyer free and clear of all Liens pursuant to section 363(f) of the Bankruptcy Code; (iii) approving Seller's assumption and assignment to Buyer of the Assumed Executory Contracts pursuant to section 365 of the Bankruptcy Code;  (iv) assuming and  assigning the Assumed Executory Contracts such that the Assumed Executory Contracts will be in full force and effect from and after the Closing; (v) finding that Buyer is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code; (vi) confirming that Buyer is acquiring the Acquired Assets free and clear of the Unassumed Liabilities; and (vii) retaining jurisdiction of the Court to interpret and enforce the terms and provisions of this Agreement and the Sale Order.

4

(qq)    "Schedules" means the Schedules attached to this Agreement.

(rr)    "Tax" means any tax, duty, charge, fee, levy, penalty, or other assessment imposed by any Governmental Authority, including income, profit, provisional, salary, estate, excise, property, sales, use, occupation, transfer, franchise, payroll, windfall or other profits, alternative minimum, gross receipts, intangibles, capital stock, estimated, employment, unemployment compensation or net worth, environmental, ad valorem, stamp, value-added or gains tax, capital duty, registration and documentation fees, custom duties, tariffs and similar charges, withholding, payroll, social security contributions or charges, disability, or other taxes (including any fee, assessment or other charge in the nature of or in lieu of any tax), including any interest, penalties, or additions attributable thereto, and any liability to make payment by way of reimbursement, recharge, indemnity, damages or management charge related to taxes and regardless of whether such amounts are chargeable directly or primarily against Seller.

(ss)    "Tenant Deposits" means the sum of $5,700, constituting the security deposits held by Seller for the benefit of tenants of Seller at the Begich Towers Condo Units plus Unit 209.

(tt)    "Title Company" means Stewart Title of Alaska.

(uu)    "Unassumed Liabilities" has the meaning provided for in Section 2.4.

(vv)    "Unit 209" means condominium Unit 209 in Begich Towers, 100 Kenai Street, Whittier, Alaska.

(ww)    "Vehicles" means all of Seller's vehicles, whether or not permitted for street use, including without limitation the snow plow, skip loader, vans and trucks as set forth on Schedule 2.2(l).

## ARTICLE 2
## PURCHASE AND SALE

**Section 2.1        Transfer of Assets.**  Pursuant to the terms and conditions of this Agreement, at the Closing Seller will sell, convey, transfer, assign, and deliver (or cause to be sold, conveyed, transferred, assigned, and delivered) to Buyer, free and clear of all Liens, and Buyer will acquire and accept from Seller, all right, title, and interest in and to, the following assets (collectively, the "Acquired Assets"):

(a)    all Seller's interests in and under the Assumed Executory Contracts;

(b)    the Processing Plant;

(c)    all deposits or prepayments relating to the Assumed Executory Contracts, including the Tenant Deposits;

(d)    except in connection with the Seller's rights, defenses and objections in connection to claims filed in the Bankruptcy Case, all of Seller's rights, claims, credits, immunities,

5

2837 if02eq01v3

defenses, or rights of set-off against third parties (excluding former and present employees of Seller) relating to the Acquired Assets including, but not limited to, unliquidated rights under warranties;

(e)    all of Seller's equipment including, but not limited to, all the equipment described on Schedule 2.1(e), and including all computers, cameras, and other electronic devices (and for the avoidance of doubt including all passcodes, usernames and similar means of access);

(f)    all of Seller's real property described on Schedule 2.1(f);

(g)    all of Seller's Fisherman Receivables described on Schedule 1.1(cc); and

(h)    all of Seller's tangible personal property located at (1) the Processing Plant and (2) the real property described on Schedule 2.1(f) not described above and except for Excluded Assets, as set forth in Section 2.3.

(i)    Seller's book of business, including Customer and supplier lists;

(j)    all of Seller's personnel records related to individuals employed by Seller since January 1, 2023;

(k)    all of Seller's Vehicles, including without limitation those set forth on schedule 2.2(l);

(l)    all of Seller's Books and Records relating to any of the Acquired Assets, including copies of all permits and licenses whether or not transferable and whether or not expired (including import and export permits and USDA permits and inspection reports), including without limitation those listed on Schedule 2.2, but excluding the Administrative Books and Records; and

(m)    all other personal property used in connection with the Processing Plant or the other real and personal property transferred hereunder including packaging and other materials.

**Section 2.2    Assignment and Assumption of Executory Contracts and Liabilities.**

(a)    Schedule 2.2 sets forth each Contract, Lease, and License to be assumed by Seller and assigned to Buyer at Closing.  Each Lease set forth on Schedule 2.2 is referred to in this Agreement as an "Assumed Lease."  Each Contract set forth on Schedule 2.2 is referred to in this Agreement as an "Assumed Contract."  Each License set forth on Schedule 2.2 is referred to in this Agreement as an "Assumed License." Together, the Assumed Contracts, Assumed Leases, and Assumed Licenses are referred to in this Agreement as the "Assumed Executory Contracts." Notwithstanding anything to the contrary herein, Buyer has the right in its sole and absolute discretion to remove any Assumed Executory Contract from Schedule 2.2 prior to the Sale Hearing and with respect to such Assumed Executory Contract so removed from Schedule 2.2.

(b)    On the Closing Date, Seller shall assume and assign to Buyer the Assumed Executory Contracts and Buyer shall pay in full the Cure Costs related to the ARRC Lease.

6

(c)     Buyer assumes all Seller's obligations arising under the Assumed Executory Contracts after Closing.

(d)     Buyer assumes the following liabilities related to the Acquired Assets:  all claims arising after Closing.

(e)     Buyer assumes, at Closing, all obligations to pay the amounts due to the creditors specified on Schedule 2.2(e).

(f)     This <u>Section 2.2</u> does not limit any claims or defenses Buyer may have against any party other than Seller.  The transactions contemplated by this Agreement in no way expand the rights or remedies of any third party against Buyer or Seller as compared with the rights and remedies such third party would have had against Seller absent the Bankruptcy Case had Buyer not assumed such Assumed Liabilities.  Buyer shall indemnify Seller with respect to the Assumed Liabilities, including defense of any action by any third party to seek recovery from Seller of the Assumed Liabilities.

**Section 2.3     Excluded Assets.**  Notwithstanding anything to the contrary in this Agreement, all assets that are not Acquired Assets, including the following assets are retained by Seller and are not being sold or assigned to Buyer under this Agreement (the "<u>Excluded Assets</u>"):

(a)     cash, cash equivalents, deposits (other than the Tenant Deposits), investment securities, and bank accounts;

(b)     all Existing Contracts that are not Assumed Executory Contracts;

(c)     the Administrative Books and Records, and other documents relating solely to the organization, maintenance, and existence of Seller as limited liability company;

(d)     all refunds, rebates, credits, and other amounts due to Seller related to any Taxes or that arise out of Seller's operation of its business;

(e)     all benefit plans to which Seller is a party and all related rights except to the extent assumed by Buyer;

(f)     all causes of action held by Seller before the Closing other than the Fisherman Receivables and warranty and similar rights relating to the Acquired Assets,  including, but not limited to, all actions arising under the Bankruptcy Case;

(g)     all rights under any insurance policy maintained by Seller;

(h)     Seller's ownership in any subsidiary;

(i)     any rights of Seller under this Agreement;

(j)     The anhydrous ammonia tank on Sellers Property (MSI 375-25 or MSI375-97), which is the property of Multifrost, Inc.; and

7

(k)     Accounts Receivable other than the Fisherman Receivables.

**Section 2.4     No Other Liabilities Assumed.**  Other than the Assumed Liabilities, the Cure Costs, or as otherwise set forth in this Agreement, Buyer shall not assume or be bound by or be obligated or responsible for any duties, responsibilities, commitments, expenses, obligations or any other Liability of Seller (the "Unassumed Liabilities").

**Section 2.5     Purchase Price.**

(a)     Purchase Price.  The "Purchase Price" for the Acquired Assets shall be $4,613,456 and is comprised of: i) $4,591,594.29 to be paid, in cash, at Closing; and ii) the total Cure Amounts in the amount of $21,861.71  to be paid by Buyer.

(i)     Deposit.  Buyer has paid to Deposit Agent $440,000 to be held and released in accordance with the terms of this Agreement (the "Deposit").

(ii)     Balance of Purchase Price.  The balance of the Purchase Price shall be delivered to the Escrow Agent in immediately available funds one Business Day of Closing.

(b)     Begich Towers Assessments.   At the Closing, the Begich Towers Assessments shall be paid out of the Purchase Price.

(c)     Tenant Deposits.  At the Closing, the Tenant Deposits shall be paid over to Buyer, or the amount of the Tenant Deposits will be credited toward the Purchase Price.

**Section 2.6     Allocation Schedule.**  The Parties agree that the Purchase Price will be allocated among the Acquired Assets in accordance with their relative fair market values as set forth in Schedule 2.6 in compliance with the Bid Procedures. If the Parties are unable to resolve the issues concerning Purchase Price allocation by agreement, they shall submit the allocation matter to the Court for final determination in conjunction with the Sale Notice and Motion, which determination shall be binding and not subject to appeal.  Seller and Buyer must prepare mutually-acceptable and substantially identical initial and supplemental Internal Revenue Service Forms 8594 "Asset Acquisition Statements under 1060" consistent with the Purchase Price Allocation Schedule (giving effect to mutually agreed-on adjustments through the allocations set forth in the Purchase Price Allocation Schedule as a result of any required adjustments to the Purchase Price).

**ARTICLE 3**
**CLOSING**

**Section 3.1     Closing.**  On the terms and conditions set forth in this Agreement and in the Sale Order, the closing of the transactions contemplated by this Agreement (the "Closing") will be completed virtually by the parties or held at the offices of Bush Kornfeld LLP, 601 Union Street, Suite 5000, Seattle, Washington (or other location identified by Seller) no later than the Closing Date if all conditions set forth in ARTICLE 7 and ARTICLE 8 below are either satisfied or waived.  The Parties agree to expeditiously seek approval of the Sale Order. Notwithstanding the foregoing, the Closing may be held at another time and place mutually agreeable to the Parties.

8

**Section 3.2          Actions at Closing.**

(a)          <u>Documents and Possession</u>.  At Closing, Seller must deliver or cause to be delivered to Buyer:

(i)          one or more bills of sale, assignments, deeds, documents necessary to transfer the Acquired Assets, all consistent with the terms of this Agreement and otherwise in a form reasonably acceptable to Buyer, conveying in the aggregate all of the Acquired Assets, duly executed by Seller;

(ii)          a copy of the Sale Order;

(iii)          the Books and Records relating to the Acquired Assets;

(iv)          the Tenant Deposits (either directly or through a credit toward the Purchase Price);

(v)          an affirmative undertaking (which shall survive the Closing) from Seller that there are no current obligations of Seller as landlord under any of the Begich Towers Condo Leases or the lease to Unit 209, and the list of Tenant Deposits is accurate and complete; and

(vi)          appropriate documents providing for the assumption and assignment of the Assumed Executory Contracts duly executed by Seller.

(b)          <u>Payment</u>.  Buyer must deliver to Escrow the Purchase Price (determined in accordance with <u>Section 2.5</u>) *less* an amount equal to the Deposit by wire transfer of immediately available funds not less than one Business Day before the Closing.

(c)          <u>Form of Documents</u>.  If a form of any document to be delivered under this Agreement is not attached as an exhibit to this Agreement, that document must be created, executed, and delivered in form and substance and in a manner reasonably and mutually satisfactory to the Parties.

**Section 3.3          Transaction Expenses.**  Except as expressly provided in this Agreement, each Party bears its own costs and expenses, including attorney, accountant, and other independent contractor fees, in connection with the execution and negotiation of this Agreement and the consummation of its contemplated transactions.

**Section 3.4          Prorations.**

(a)          <u>Property Taxes</u>.  Ad valorem personal property and real property taxes associated with the Acquired Assets (the "<u>Property Taxes</u>") that are periodically imposed and are payable for a tax period that includes (but does not end on) the Closing Date are prorated as of the Closing Date. Seller bears the proportion of, and has the sole responsibility for, such taxes equal to a fraction, the numerator of which is equal to the number of days elapsed from the beginning of the applicable tax period to the Closing Date and the denominator of which is the number of days in the entire applicable tax period. Buyer is responsible for the remainder.

9

(b)      Post-Closing Tax Responsibility.  Unless otherwise provided to the contrary in this Agreement, Buyer is solely responsible for Property Taxes relating to the Acquired Assets applicable to or arising from the Post-Closing Period, the Seller is solely responsible for Property Taxes relating to the Acquired Assets applicable to or arising before the Closing.

(c)      Utilities.  Seller must attempt to obtain final meter readings for utilities at the locations that are the subject of Assumed Leases and other all real property listed on Schedules 2.1(f) and 2.2 as of the Closing Date and must pay for all utilities to the Closing Date.  If it is not practicable to obtain the meter reading for any utility as of the Closing Date or there are un-metered utilities, then as soon as all such utility bills are finally received, Seller and Buyer must, on a pro rata basis using the actual number of days of the year and month that have elapsed as of the Closing Date (including the Closing Date), pay their respective shares of such bills.

(d)      Prorations Generally; Percentage Rents.

(i)      Any other payments with respect to the Assumed Leases, including all common area costs and costs under the Assumed Leases, must be prorated between Buyer and Seller on the Closing Date or as soon after as is reasonably practicable with the Seller responsible for the prorated portion of any such payments through the day before the Closing Date.  Seller is responsible for any penalties and interest payable for rent or other items under each Assumed Lease when due as a result of Seller's underpayment or late payment before the Closing. Buyer is responsible for any such amounts in respect of the Post-Closing Period.

(ii)      If any of the items described above cannot be finally apportioned at the Closing because of the unavailability of the amounts to be apportioned or otherwise, or are incorrectly apportioned at or after Closing, such items must be apportioned or reapportioned, as the case may be, as soon as practicable after the Closing or the date such error is discovered or the event giving rise to an apportionment or reapportionment occurs, as applicable.

(iii)      For purposes of calculating prorations, the Seller is deemed to have possession of the real property listed on Schedule 2.2(f) and the real property subject of an Assumed Lease up to and including the Closing Date. All such prorations must be made on the basis of the actual number of days of the year and month elapsed as of the Closing.

Section 3.5      Possession and Risk of Loss.  Buyer will be deemed to have taken possession of the premises listed on Schedule 2.2(f) and the premises that are the subject of the Assumed Leases (each, an "Assumed Leased Location"), together with title and possession of all Acquired Assets, wherever located, on the Closing Date.  Buyer assumes all risk of loss by fire or other casualty and all risks relating to all the Acquired Assets and the Assumed Leased Locations on the Closing Date and after.

Section 3.6      Closing Escrow.  The Closing will be accomplished through an escrow to be established jointly by the Parties with the Title Company pursuant to escrow instructions reasonably acceptable to the Title Company and each of the Parties.

10

2837 if02eq01v3

# ARTICLE 4
## SELLER'S REPRESENTATIONS AND WARRANTIES

As an inducement to Buyer to enter into this Agreement, Seller represents and warrants to Buyer that:

**Section 4.1    Organization and Authorization.**  Subject to entry of the Sale Order, Seller has all necessary power and authority to enter into this Agreement and has taken all company action necessary to execute and deliver this Agreement, to consummate the transactions contemplated by this Agreement, and to perform Seller's obligations under this Agreement. No other company proceedings on Seller's part are necessary to authorize the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated by this Agreement.  This Agreement has been duly executed and delivered by Seller and is a valid and binding obligation of Seller, enforceable against it in accordance with its terms.  Each agreement or instrument that has been or will be entered into or executed and delivered by Seller in connection with the transactions contemplated by this Agreement has been (or will be) duly authorized, executed and delivered by Seller, and is (or will be when authorized, executed and delivered) a valid and binding obligation of Seller, enforceable against it in accordance with its terms.

**Section 4.2    No Violation.**  Except to the extent not enforceable due to operation of applicable bankruptcy law or the Sale Order, the execution, delivery, and performance of this Agreement and the consummation of its contemplated transactions by Seller do not and will not  require any authorization, consent, approval, exemption, or other action by or notice or declaration to, or filing with, any court or administrative or other Governmental Authority or any third party, including, without limitation, under the provisions of Seller's operating agreement or other constitutive documents.

**Section 4.3    Governmental Consents and Approvals.**  Except for the Sale Order, to Seller's Knowledge, there are no consents, waivers, agreements, approvals, permits, or authorizations of, or declarations, filings, notices, or registrations to or with, any Governmental Authority required to be made or obtained by Seller in connection with the execution, delivery, and performance of this Agreement and the consummation of its contemplated transactions.

**Section 4.4    Title to Assets.**

(a)    Seller has good and marketable title to the Acquired Assets.

(b)    Subject to Court approval, Seller has the power and the right to sell, assign, and transfer, and Seller will sell and deliver to Buyer and, on consummation of the transactions contemplated by this Agreement, Buyer will acquire, good and marketable title to the Acquired Assets free and clear of all Liens.

**Section 4.5    Representation Regarding Begich Towers Condo Leases**. As of the date of this Agreement four Begich Towers Condo Units plus Unit 209 are leased as set forth in Schedule 2.2. Except for the Begich Towers Assessments, which shall be paid in full through Escrow from the Purchase Price, and the Tenant Deposits, Seller represents and warrants that no other amounts are due and owing related to any of the Begich Towers Condo Units. Seller represents and warrants that Schedules 2.2 and 2.2(e) accurately reflect the leased Begich Towers

11

Condo Units and the amount of the related Tenant Deposits. Seller's representations and warranties in this Section 4.5 shall survive the Closing.

        **Section 4.6**       **As Is.** Except as expressly set forth in this Agreement, the Acquired Assets are sold "***As Is, Where Is***." Except for the representations and warranties expressly set forth in this <u>ARTICLE 4</u>, Seller neither makes nor implies any other representation or warranty, including a warranty of fitness for a particular purpose or a warranty of merchantability, in connection with any of the Acquired Assets.

        **Section 4.7**       **Property Taxes.** All Property Taxes that are the responsibility of Seller under <u>Section 3.4</u> above have been paid or will be paid in full as of the Closing.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF BUYER

        As an inducement to Seller to enter into this Agreement, Buyer represents and warrants to Seller that:

        **Section 5.1**       **Organization.** Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Alaska.

        **Section 5.2**       **Authorization.** Buyer has all necessary power and authority to enter into this Agreement and has taken all company action necessary to execute and deliver this Agreement, to consummate the transactions contemplated by this Agreement, and to perform Buyer's obligations under this Agreement. No other company proceedings on Buyer's part are necessary to authorize the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated by this Agreement. This Agreement has been duly executed and delivered by Buyer and is a valid and binding obligation of Buyer, enforceable against it in accordance with its terms. Each agreement or instrument that has been or will be entered into or executed and delivered by Buyer in connection with the transactions contemplated by this Agreement has been (or will be) duly authorized, executed and delivered by Buyer, and is (or will be when authorized, executed and delivered) a valid and binding obligation of Buyer, enforceable against it in accordance with its terms.

        **Section 5.3**       **Governmental Consents and Approvals.** To Buyer's Knowledge, other than the Sale Order, no consent, waiver, agreement, approval, permit, or authorization of, or declaration, filing, notice or registration to or with, any United States federal or state governmental or regulatory authority is required to be made or obtained by Buyer in connection with the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated by this Agreement.

        **Section 5.4**       **No Violation.** The execution and delivery of this Agreement and the other agreements specified in it and the consummation of the transactions contemplated by this Agreement do not and will not (a) violate any provision of Buyer's organizational documents or (b) conflict with or violate any statute or law, or any judgment, decree, order, regulation, or rule of any court or Governmental Authority binding on or applicable to Buyer or by which the property or assets of Buyer are bound or affected.

12

## ARTICLE 6
## ADDITIONAL COVENANTS

**Section 6.1**      **Further Assurances.**

(a)      Buyer and Seller shall use commercially reasonable efforts to timely obtain any consent, provide necessary information, or address any other issues required for the consummation of the transactions contemplated by this Agreement, including without limitation actions required after the Closing.

(b)      Buyer and Seller will execute any documents and use commercially reasonable efforts to take or cause to be taken all actions necessary, proper, or advisable to consummate the transactions contemplated by this Agreement but neither Buyer nor Seller is required to make any payments to any party, except as set forth in this Agreement.

(c)      Notwithstanding the Closing and the transfer of computers and servers to Buyer in accordance with this Agreement, Buyer shall provide access to or otherwise make available to Seller such transferred computers and servers as are necessary to allow Seller to complete its required Tax returns and the administration of the Bankruptcy case.

## ARTICLE 7
## CONDITIONS TO SELLER'S OBLIGATIONS

The obligation of Seller to sell the Acquired Assets and to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or before the Closing Date, of each of the following conditions, any of which Seller may waive (in whole or in part) in accordance with Section 10.4 below.

**Section 7.1**      **Covenants and Representations.**      Each of Buyer's representations and warranties contained in ARTICLE 5 above are true in all material respects as of the Closing Date as though made on that date (except that representations and warranties explicitly made as of a specific date need only be true as of that specific date), and the Buyer has performed in all material respects all covenants, agreements, and conditions required by this Agreement to be performed, satisfied, and complied with by Buyer on or before the Closing.

**Section 7.2**      **Litigation.**   No action, suit, or other proceeding is pending before any Governmental Authority seeking or threatening to restrain, seek damages in respect of, or prohibit the consummation of the transactions contemplated by this Agreement.

**Section 7.3**      **Court Approval.**   The Court has entered the Sale Order.

**Section 7.4**      **Closing.**   The Closing has occurred on or before the Closing Date.

**Section 7.5**      **Purchase Price.**   Buyer has delivered the Purchase Price as set forth in Section 2.5 above.

13

**Section 7.6** **Deliveries.** On or before the Closing Date, Buyer has delivered to Seller a certificate from Buyer in a form reasonably satisfactory to Seller, dated as of the Closing Date, stating that the conditions specified in <u>Section 7.1</u> above have been satisfied.

# ARTICLE 8
## CONDITIONS TO BUYER'S OBLIGATIONS

The obligations of Buyer to purchase the Acquired Assets and to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or before the Closing Date, of each of the following conditions, any of which Buyer may waive (in whole or in part) in accordance with <u>Section 10.4</u> below:

**Section 8.1** **Representations, Warranties and Covenants.** Each of Seller's representations and warranties contained in <u>ARTICLE 4</u> above are true in all material respects as of the Closing Date as though made on that date (except that representations and warranties that are expressly made as of a specific date need only be true as of that specific date), and the Seller has performed in all material respects all covenants, agreements, and conditions required by this Agreement to be performed, satisfied, and complied with Seller on or before the Closing Date.

**Section 8.2** **Litigation.** No action, suit, or other proceedings is pending before any Governmental Authority seeking or threatening to restrain, seek damages in respect of, or prohibit the consummation of the transactions contemplated by this Agreement.

**Section 8.3** **Court Approval.** The Sale Order shall have been entered and shall not be subject to a court order staying the effect of the Sale Order.

**Section 8.4** **Approvals and Consents.** All necessary consents, including any deemed consents as set forth in the Sale Order, have been duly obtained, made or given, and are not subject to the satisfaction of any condition that has not been satisfied or waived.

**Section 8.5** **Replacement ARRC Lease**. One or more agreements among ARRC, Seller, and Buyer have been entered into under which the ARRC Lease is assumed and assigned to Buyer and then terminated, or the ARRC Lease is simply terminated, and a new ARRC Lease with substantially the same economic terms has been executed by ARRC and Buyer, as well as a new ARRC Discharge Pipeline Permit, all placed in escrow with the Title Company, subject to the occurrence of the Closing, all containing terms and provisions acceptable to ARRC and to Buyer (and to Seller as applicable).

**Section 8.6** **Issuance of Title Policy**. The Title Company has confirmed to Buyer the issuance of a title policy covering all of the owned real property and the ARRC Lease including the Processing Plant, in form and substance acceptable to Buyer.

**Section 8.7** **Deliveries.** On or before the Closing Date, Seller has delivered to Buyer all of the following:

(a) a certificate in a form reasonably satisfactory to Buyer, dated as of the Closing Date, stating that the conditions specified in <u>Section 8.1</u> have been satisfied; and

14

(b) the documents and instruments called for in <u>Section 3.2(a)</u> above.

## ARTICLE 9
## TERMINATION; REMEDIES

**Section 9.1     Termination.**  This Agreement may be terminated, in writing, at any time before Closing:

(a)     by mutual written consent executed by both Buyer and Seller;

(b)     by Buyer if Seller is in material breach of any material covenant, representation, undertaking or warranty that would prevent a condition in Article 8 from being satisfied, and, if curable, is not cured within ten (10) Business days after written notice from Buyer, or if a condition set forth in ARTICLE 8 is impossible (other than through the failure of Buyer to comply with its obligations under this Agreement) to satisfy and Buyer has not waived such condition in writing on or before the Closing Date;

(c)     by Seller if Buyer is in material breach of any material covenant, representation or warranty that would prevent a condition in Article 7 from being satisfied, and, if curable, is not cured within ten (10) Business days after written notice from Seller, or if it appears that a condition set forth in ARTICLE 7 is impossible (other than through the failure of Seller to comply with its obligations under this Agreement) to satisfy and Seller has not waived such condition in writing on or before the Closing Date; and

(d)     by both Buyer and/or Seller upon Seller's closing of the sale of all or substantially all of the Acquired Assets to a party or parties other than Buyer pursuant to one or more Overbids; and

(e)     by either party if the Closing has not occurred on or before July 31, 2025, unless a later date is agreed in writing by the Parties.

**Section 9.2     Obligations on Termination.**  If this Agreement terminates under <u>Section 9.1</u> above:

(a)     each Party must redeliver to the furnishing Party all documents, work papers, and other material of the other Party relating to the transactions contemplated by this Agreement, whether obtained before or after Execution;

(b)     all obligations of the Parties under this Agreement terminate, except as set forth in this Section 9.2;

(c)     neither Party has any liability to the other Party except for any obligation to pay any damages (which may be limited to the Deposit under subsection (e) below) awarded by the Court associated with a Party's breach of this Agreement ("<u>Damages</u>");

(d)     except for any Damages, each Party bears its own expenses incurred in connection with the negotiation, preparation, execution, and performance of this Agreement;

15

(e)     if Seller terminates this Agreement because Buyer fails to close without justification and Seller is unable to close a transaction for the Acquired Assets to another buyer pursuant to a Back-Up Bid (as contemplated by the Bid Procedures), Seller may seek an order from the Court instructing the Deposit Agent to pay Seller the Deposit as liquidated damages on account of Buyer's breach;

(f)     unless used to pay Damages to Seller, the Deposit Agent must return the Deposit to the Buyer within one Business Day of the date of termination; and

(g)     the Deposit Agent's obligations regarding the Deposit under this Section 9.2 survive termination of this Agreement.

## ARTICLE 10
## MISCELLANEOUS

**Section 10.1     Assignment; Successors.**  Neither this Agreement nor any of the rights or obligations under it may be assigned by either Party without the other Party's prior written consent, but: (a) Buyer may assign some or all of its rights under this Agreement to any of its Affiliates so long as Buyer remains liable for its obligations; and (b) Buyer may assign its rights under this Agreement as collateral security to any lender providing Buyer with acquisition financing. Subject to the foregoing, this Agreement binds and inures to the benefit of the Parties and their respective representatives, heirs, legatees, successors, and permitted assigns. No other person has any right, benefit, or obligation under this Agreement.

**Section 10.2     Notices.**     All notices, requests, demands, and other communications given under this Agreement must be in writing and are deemed given: (a) if personally delivered, when received; (b) if transmitted by email, on receipt of delivery confirmation; (c) if sent for next-day delivery to a domestic address by recognized overnight delivery service (*e.g.*, Federal Express), on the day after sending; and (c) if sent by certified or registered mail, return receipt requested, when received.  Notices, demands, and communications must be sent to the following addresses:

| If to Buyer: | If to Seller: |
|---|---|
| The Alaska Wild Seafoods LLC | Whittier Seafood, LLC |
| 821 N St., Suite 102 | Attn: Aleksey Kozlov |
| Anchorage, AK  99501 | 3 Lake Bellevue Drive, Suite 201 |
| Email:  jordonlee164@gmail.com | Bellevue, WA 98005 |
| caquatico@gmail.com | Email: Alekseyk@marinefishingint.com |

16

With a copy to:                          With a copy to:

Perkins Coie LLP                         Bush Kornfeld LLP
1201 Third Avenue, 49th floor            601 Union Street, Suite 5000
Seattle, WA 98101                        Seattle, WA 98101
Attn:  Alan D. Smith                     Attn:  Jim Day
Email:  adsmith@perkinscoie.com          Email:  jday@bushkornfeld.com

or to any other address or email address as a Party may designate by written notice to the other Party.

Section 10.3   **Choice of Law; Submission to Jurisdiction.**   This Agreement must be construed and interpreted, and the rights of the parties determined in accordance with, the laws of the State of Alaska, except to the extent the Bankruptcy Code (11 U.S.C. §§ 101 et seq.) governs.  Each Party irrevocably consents to the service of any process in any action or proceeding arising out of or relating to this Agreement by the mailing of copies of such process to each Party at its address specified in Section 10.2 above.  The Parties irrevocably submit to the exclusive jurisdiction of the Court (or any court exercising appellate jurisdiction over the Court) over any dispute arising out of or relating to this Agreement, the Sale Order, or any other agreement or instrument contemplated by or entered into in connection with this Agreement or the Sale Order.  Each Party irrevocably agrees that any claim in respect of any such dispute or proceedings may be heard and determined in the Court.  The Parties irrevocably waive to the fullest extent permitted by applicable law any objection to the venue or any defense of inconvenient forum relating to any such dispute or proceeding brought in the Court.

Section 10.4   **Entire Agreement; Amendments and Waivers.**   This Agreement, together with all its Exhibits and Schedules, constitutes the entire agreement among the Parties pertaining to this Agreement's subject matter and supersedes all prior agreements, understandings, negotiations, and discussions, whether oral or written, with regard to this Agreement's subject matter.  No amendment of this Agreement is effective unless executed in writing by both Parties.  No waiver of any of this Agreement's provisions is effective unless made in a writing by the waiving Party. No waiver of any single provision of this Agreement constitutes either a waiver of any other of this Agreement's provisions (whether or not similar) or a continuing waiver unless otherwise expressly provided.

Section 10.5   **Construction.**   The headings and captions of the various Articles and Sections of this Agreement have been inserted solely for purposes of convenience, are not part of this Agreement, and may not be deemed in any manner to modify, explain, expand, or restrict any of the provisions of this Agreement.  Unless stated to the contrary, all references in this Agreement to Articles, Sections, paragraphs, sentences, or clauses are to the specified Article, Section, paragraph, sentence, or clause of this Agreement, and all references to Exhibits and Schedules are to the specified Exhibits and Schedules attached to this Agreement, all of which constitute a part of this Agreement.  All terms defined in this Agreement have the same meanings in the Exhibits and Schedules except as otherwise provided in the Exhibits and Schedules.

17

Section 10.6     **No Third Party Beneficiaries.**  No Person other than the Parties have any rights or claims under this Agreement.

Section 10.7     **No Waiver.**  The failure of either Party to seek redress for any breach, or to insist on the strict performance, of any covenant or condition of this Agreement by the other Party does not waive the breach or failure to perform nor prevent a subsequent act or omission in violation of, or not strictly complying with, the terms of this Agreement from constituting a default under this Agreement.

Section 10.8     **Counterparts.**  This Agreement may be executed in one or more counterparts, each of which constitutes an original and all of which, taken together, constitute one instrument.

Section 10.9     **Delivery by Email.**  This Agreement and any other agreement or instrument entered into in connection with or contemplated by this Agreement, and any amendments, if signed and delivered by email, must be treated in all respects as an original, legally-binding agreement or instrument as if it were the original delivered in person.  No Party may raise the use of email to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through email as a defense to enforceability.

Section 10.10     **Invalidity.**  The invalidity, illegality, or unenforceability of any portion of any provision of this Agreement or any instrument referred to in this Agreement does not affect the validity, legality, and enforceability of any other portion of any other provision of this Agreement or such instrument.

Section 10.11     **Further Assurances.**  Without limiting any other rights or obligations of the Parties contained in this Agreement, following the Closing, each Party agrees to execute or cause to be executed any documents, instruments, or conveyances and to take any actions reasonably requested by the other Party to effectuate the purposes of this Agreement including, without limitation, any instruments Buyer reasonably requests to vest Buyer with title to the Acquired Assets in accordance with this Agreement.

Section 10.12     **Cumulative Remedies.**  All rights and remedies of either Party under this Agreement are cumulative of each other and of every other right or remedy that Party may otherwise have at law or in equity. The exercise of one or more rights or remedies does not affect the concurrent or subsequent exercise of any other rights or remedies.

Section 10.13     **Currency.**  Except as otherwise expressly provided in this Agreement, all dollar amounts are stated in United States dollars.

Section 10.14     **Representation by Counsel; Mutual Negotiation.**  Each Party has been represented by or had the opportunity obtain counsel of its choice in negotiating this Agreement.  This Agreement has been negotiated and prepared at the Parties' joint request, direction, and construction, at arm's length, with the advice and participation of counsel, and must be interpreted in accordance with its terms without favor to either Party.

Section 10.15     **Post-Closing Dispute Resolution.**  Either Party may submit to the Court any controversy, claim, or dispute arising out of or relating to this Agreement after

18

the Closing that is not resolved within 30 days after written notice to the affected party of such controversy, claim, or dispute.  The Court shall have exclusive jurisdiction to resolve any such controversy, claim, or dispute.  The prevailing Party is entitled to its reasonable attorneys' fees and costs as determined and awarded by the Court.

        **Section 10.16**     **Transfer Taxes.**  The parties shall share equally payment of any transfer, sales, use, or other such Taxes or fees required to be paid with respect to this Agreement or the sale of the Acquired Assets to Buyer, except as to the Vehicles.  If such payment can be handled through Escrow the parties will cooperate to such effect.  If such payment is not handled through Escrow the parties will cooperate before and after the Closing in order to accomplish the equal sharing.

        (a)     <u>Transfer Taxes related to the Vehicles</u>. Buyer shall be solely responsible for any transfer, sales, use or other such Taxes or fees required to be paid as a result of the sale of the Vehicles to Buyer.

        The Parties have caused this Agreement to be executed by their respective duly-authorized individuals as of the day and year first above written.

**Whittier Seafood, LLC**

By:_____
    Aleksey Kozlov
Its: Authorized Person

**The Alaska Wild Seafoods LLC**

By:_____
    Jordan (Jue) Li
Its: Authorized Person

19

2837 if02eq01v3

the Closing that is not resolved within 30 days after written notice to the affected party of such controversy, claim, or dispute. The Court shall have exclusive jurisdiction to resolve any such controversy, claim, or dispute. The prevailing Party is entitled to its reasonable attorneys' fees and costs as determined and awarded by the Court.

        **Section 10.16**    **Transfer Taxes.** The parties shall share equally payment of any transfer, sales, use, or other such Taxes or fees required to be paid with respect to this Agreement or the sale of the Acquired Assets to Buyer, except as to the Vehicles. If such payment can be handled through Escrow the parties will cooperate to such effect. If such payment is not handled through Escrow the parties will cooperate before and after the Closing in order to accomplish the equal sharing.

        (a)    Transfer Taxes related to the Vehicles. Buyer shall be solely responsible for any transfer, sales, use or other such Taxes or fees required to be paid as a result of the sale of the Vehicles to Buyer.

    The Parties have caused this Agreement to be executed by their respective duly-authorized individuals as of the day and year first above written.

**Whittier Seafood, LLC**

By: _____

Aleksey Kozlo[v]
Its: Authorized Person

**The Alaska Wild Seafoods LLC**

By: _____

Jordan (Jue) Li
Its: Authorized Person

19

2837 /f02eq01v3

## SCHEDULES

Schedule 1.1(i)          Bid Procedures

Schedule 1.1(mm)      Sale Order

Schedule 1.1(cc)       Fisherman Receivables

Schedule 2.1(e)         Equipment [Fixed Asset Schedule]

Schedule 2.1(f)         Real Property

Schedule 2.1(l)         Vehicles

Schedule 2.2            Contracts, Leases and Licenses

Schedule 2.2(e)         Assumed Creditor Liabilities

Schedule 2.6            Allocation of Purchase Price

**SCHEDULE 1.1(i)**


**Bid Procedures**

2837 if02eq01v3

1  James L. Day, (admitted *pro hac vice*)                    HONORABLE GARY SPRAKER

2  Thomas A. Buford, AK Bar No. 1805046
   Lesley Bohleber, (admitted *pro hac vice*)

3  Bush Kornfeld LLP
   601 Union Street, Suite 5000

4  Seattle, WA 98101-2373
   Telephone: (206)292-2110

5  Fax: (206) 292-2014
   Email: jday@bskd.com;

6  tbuford@bskd.com; lbohleber@bskd.com
   Proposed Attorneys for Debtors

7

8                    UNITED STATES BANKRUPTCY COURT
                     DISTRICT OF ALASKA AT ANCHORAGE

9
   In re                                        Chapter 11
10
   WHITTIER SEAFOOD, LLC, [1]                   Lead Case No. 24-00139
11
                           Debtors.             Jointly Administered
12
                                                **NOTICE OF ENTRY OF ORDER**
13                                              **APPROVING BIDDING AND NOTICE**
                                                **PROCEDURES RELATED TO THE**
14                                              **ASSETS OF WHITTIER SEAFOOD,**
                                                **LLC AND SILVER WAVE, LLC**
15

16          **PLEASE TAKE NOTICE** that on January 14th, 2025, the Court entered an order (the "Bidding
    Procedures Order") approving the following procedures for the selection of a Stalking Horse Bid and
17  the Bid Deadline associated with the sale of the Whittier and Silver Wave's Property [Dtk. 259].

18  ///

19  ///

20  ///

21  ///

22  _____
    [1] The Debtors are Marine Fishing International, Inc. ("MFI Inc."), Case No. 24-00140; Marine Fishing
    International, LLC ("MFI LLC"), Case No. 24-00141; Modys, LLC ("Modys"), Case No. 24-00142; Salacia,
23  LLC ("Salacia"), Case No. 24-00143; Silver Wave, LLC ("Silver Wave"), Case No. 24-00144; and Whittier
    Seafood, LLC ("Whittier") (collectively, the "Whittier Group").

**NOTICE OF ENTRY OF ORDER APPROVING**
**BIDDING AND NOTICE PROCEDURES** – Page 1

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

2837 hk22hm01r6

The approved Bidding Procedures, including pertinent bid submission deadlines, governing the bidding and sale of the Property are attached here to as **Exhibit A**.

DATED this 16th day of January, 2025.

BUSH KORNFELD LLP

By___*/s/ Lesley Bohleber*___
    James L. Day, (admitted *pro hac vice*)
    Thomas A. Buford, AK Bar No. 1805046
    Lesley Bohleber, (admitted *pro hac vice*)
    *Proposed Attorneys for the Debtors*

**NOTICE OF ENTRY OF ORDER APPROVING
BIDDING AND NOTICE PROCEDURES** – Page 2

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

2837 hk22hm01r6

# EXHIBIT A

James L. Day, (admitted *pro hac vice*)                    HONORABLE GARY SPRAKER
Thomas A. Buford, AK Bar No. 1805046
Lesley Bohleber, (admitted *pro hac vice*)
Bush Kornfeld LLP
601 Union Street, Suite 5000
Seattle, WA 98101-2373
Telephone: (206)292-2110
Fax: (206) 292-2014
Email: jday@bskd.com;
tbuford@bskd.com; lbohleber@bskd.com
Proposed Attorneys for Debtors

UNITED STATES BANKRUPTCY COURT

DISTRICT OF ALASKA AT ANCHORAGE

| | |
|---|---|
| In re | Chapter 11 |
| WHITTIER SEAFOOD, LLC, [1] | Lead Case No. 24-00139 |
| Debtors. | Jointly Administered |
| | BIDDING PROCEDURES FOR THE SALE OF THE WHITTIER AND SILVER WAVE PROPERTY |

  The following terms and procedures ("Bidding Procedures") shall govern the bidding

process, auction (the "Auction"), if applicable, and sale to one or more third-party buyers of the

assets of Whittier and Silver Wave (collectively, the "Sellers") as conducted by the Sellers through

their investment banker Hilco Corporate Finance ("Hilco") in the above referenced chapter 11

---

[1] The Debtors are Marine Fishing International, Inc. ("MFI Inc."), Case No. 24-00140; Marine Fishing International, LLC ("MFI LLC"), Case No. 24-00141; Modys, LLC ("Modys"), Case No. 24-00142; Salacia, LLC ("Salacia"), Case No. 24-00143; Silver Wave, LLC ("Silver Wave"), Case No. 24-00144; and Whittier Seafood, LLC ("Whittier") (collectively, the "Whittier Group").

bankruptcy proceedings. If there is any discrepancy between these Bidding Procedures and marketing materials previously shared with any potential bidders, these Bidding Procedures shall prevail.

### Description of the Property

The Sellers, through Hilco, are soliciting bids for the assets of the Sellers, which includes the following:

- For Whittier, a 26,000 square foot food processing plant; a 32,000 square foot building that contains the roe house, kitchen, cafeteria, rec room, and maintenance shop; 10 condominiums in the Begich Towers; two VIP condominiums; a 40-person bunkhouse; 26-eight person bunkhouses with showers; warehousing and storage units; and certain inventory and non-fixed assets.

- For Silver Wave, three sailing vessels, including the Lady Angela, the Esther Point, and the Portage Bay; and certain receivables.

All assets in this section shall be deemed to be the "Property."

### Important Dates and Deadlines

The following dates and deadlines shall be and hereby are established, each as may be extended by the Sellers or their counsel and without further order from the Bankruptcy Court:

| Event | Date/Deadline |
|---|---|
| File and Serve Notice of Bidding Procedures | Two business days following entry of the order approving Notice of Bidding Procedures and Bidding Procedures |
| Indication of Interest and/or Stalking Horse Bid Deadline (the "Initial Deadline") | Monday January 13, 2025 at 5:00 p.m. Alaska Time |
| File and Serve Notice of Selection of Stalking Horse Bid (if applicable) and/or Auction Notice ("Stalking Horse Designation Deadline") | Monday January 27, 2025 at 5:00 p.m. Alaska Time |

**Bidding Procedures Whittier Seafood, LLC and Silver Wave, LLC** 2

| Deadline for Submission of Materials to become a Qualified Bidder ("Qualified Bid Deadline") | Monday February 10, 2025 at 5:00 p.m. Alaska Time |
|---|---|
| Auction (if necessary) | Friday February 14, 2025 at 12:00 p.m. Alaska Time |
| File and Serve Sale Notice and Motion | As soon as reasonably practical following (1) the conclusion of Auction (if necessary); or (2) February 18, 2025, if no Auction is necessary |
| Sale Hearing (subject to the Court's availability) | Not less than 7 (seven) days after the date of the Notice of Hearing on Sale Motion subject to the Court's availability |
| Sale Close | As soon as practical after entry of the Sale Order |

**Submission of Indication of Interest**

Each party who intends to submit a bid on or before the Qualified Bid Deadline (an "Interested Party") shall submit the following by the Initial Deadline:

      (a)     A term sheet summarizing the material terms of any potential bid;

      (b)     Disclosure of the source of funds sufficient to close the transaction;

      (c)     A description of the Property for which the Interested Party intends to submit a bid; and

      (d)     A statement indicating whether or the Interested Party will serve as a Stalking Horse Bidder.

(the "Indication of Interest").

The submission of an Indication of Interest shall not obligate an Interested Party to submit a bid by the Qualified Bid Deadline.

Any Stalking Horse Bid must meet the requirements to be designated as a Qualified Bid as defined below.

**Bidding Procedures Whittier Seafood, LLC and Silver Wave, LLC**        3

2837 ia09kv01dc

**Reporting of Indication of Interest**

On or before Thursday January 16, 2025, Sellers shall provide a report to Cathay Bank and the Official Unsecured Creditors' Committee of Whitter (the "Committee"), through their respective counsel, containing a report of each Indication of Interest received (the "Indication of Interest Report") including, for each Indication of Interest, the bid amount and the Property that is the subject of the bid, including allocation of purchase price if available. The Indication of Interest Report and the contents thereof shall remain confidential among the Sellers, Hilco, Cathay Bank, and the Committee until the earlier of (i) the filing of a Sale Notice and Motion or (ii) February 19, 2025.

**Submission of Bids and Qualified Bidders**

Each bidder (a "Prospective Bidder") interested in purchasing some portion or all of the Property must meet the requirements set forth herein and thereafter will be deemed a "Qualified Bidder" with a "Qualified Bid" by the Sellers; provided, however, each party that holds liens against certain Property is automically deemed a Qualified Bidder with regard to its respective collateral. To become a Qualified Bidder, a Prospective Bidder shall, on or before the Qualified Bid Deadline, deliver the following written information by email or hard copy to the Bid Notice Parties (as defined below):

(a) **Identity of the Proposed Buyer and Investor:** The name, the jurisdiction of the organization, and a description of the entity that is intended to be the buyer, as well as its ultimate parent entity, any other relevant affiliates, and any proposed co-investors or other relevant parties that would be participating in the proposed transaction. In addition, the name of the proponent of the bid and identification of an officer or representative who is fully and completely authorized in

**Bidding Procedures Whittier Seafood, LLC and Silver Wave, LLC**  4

all respects to appear, act on behalf of, and legally bind such proponent (an "Authorized Representative").

(b)    **APA and Other Transaction Documents:**  An asset purchase agreement that is in substantially the same form as the Form APA (defined below), if any, with a redlined version to show clearly any revisions or changes to the Form APA (an "Asset Purchase Agreement"), along with any other transaction documents pursuant to which the Prospective Bidder proposes to effectuate the sale.  The transaction documents shall identify the specific assets of the Property being purchased and any executory contracts and unexpired leases of the Sellers that the bidder wishes to have assumed and assigned to it pursuant to the sale, including proposed payment of any applicable cure amounts due.

(c)    **Purchase Price:**  The proposed purchase price must be in U.S. dollars or in the form of a credit bid, with any non-cash consideration set forth in detail, including proposed assumption of liabilities and/or cure costs, if any. If the proposed purchase price includes a form of consideration other than cash, the Prospective Bidder must provide details necessary to value the non-cash consideration, and the Sellers shall value the non-cash consideration to determine the non-cash consideration's value as part of the proposed purchase price. The bid must include proof of financial ability to consummate the sale in a timely manner. To the extent a successful credit bid would require a Prospective Bidder to satisfy senior liens or encumbrances with cash at closing, Sellers may require the Prospective Bidder to offer evidence of its ability to provide the required cash at closing.

(i)    Allocation of Purchase Price.  Each Qualified Bid must include an allocation of the purchase price that identifies the asset to be purchased and the amount of the purchase price to be allocated to a particular asset, including following, as applicable: (1) Whittier

**Bidding Procedures Whittier Seafood, LLC and Silver Wave, LLC**                    5

real property, including the Whitter Plant; (2) Whitter equipment; (3) each of the Silver Wave Vessels; and (4) Silver Wave receivables.

     (d)     **Good Faith Deposit:**  Each Qualified Bid must be accompanied by a good faith deposit (each, a "Good Faith Deposit") in the form of cash (or other form acceptable to the Sellers in their sole discretion) in an amount equal to ten percent (10%) of the proposed purchase price for the applicable assets. Each bid, with all of the aforementioned information, shall be delivered to the following parties (collectively, the "Bid Notice Parties"):

- Investment Banker for the Sellers, Hilco Corporate Finance, 401 N. Michigan, Suite 1630, Chicago, IL 60611 (Attn: Teri Stratton (tstratton@hilcocf.com), Kyle Herman (kherman@hilcocf.com) and Sanjay Marken (smarken@hilcocf.com));

- Counsel for the Sellers, Bush Kornfeld LLP, 601 Union St., Suite 5000, Seattle, WA 98101 (Attn: Thomas Buford (tbuford@bskd.com), Jim Day (jday@bskd.com) and Lesley Bohleber (lbohleber@bskd.com)).

**Bid Review Process.**

The Sellers will evaluate bids and, based upon its evaluation of the content of each bid, may, as it may deem appropriate and in a manner consistent with applicable law, engage in negotiations with any Prospective Bidder for the purposes of (i) curing any deficiencies in a bid requirements as set forth herein, (ii) improving the terms of the Prospective Bidder's bid, or (iii) otherwise promoting a more competitive bidding and Auction process with the ultimate goal of maximizing the value of the Property.

In evaluating a bid, the Sellers may take into consideration any and all factors that they may deem reasonably pertinent, including (i) the amount of the proposed purchase price and proposed form of consideration; (ii) any Property included in, or excluded from, the bid, including any contracts marked for assumption and assignment; (iii) the value to be provided to the estate under the bid, including the net economic effect on the estates; (iv) any benefit to the estate from

**Bidding Procedures Whittier Seafood, LLC and Silver Wave, LLC**        6

any assumption or waiver of liabilities contemplated by the bid; (v) the structure of the proposed sale transaction and any attendant execution risk, including conditions to, timing of, and certainty of closing, termination provisions, availability of financing, and general financial wherewithal to meet all commitments, and any required governmental approvals; and (vi) the impact of the proposed sale transaction on the Sellers' trade creditors, landlord(s), and any other parties in interest.

The Sellers shall have sole discretion in deeming a bid a Qualified Bid. The Sellers will evaluate timely bids and will notify Prospective Bidders whether they accept the bid as a Qualified Bid, and whether an Auction will be conducted as soon as commercially reasonable following the Qualified Bid Deadline as set forth herein.  No Qualified Bidder shall modify, amend, or withdraw its bid unless for the purposes of increasing the purchase price or otherwise improving the terms of the bid, as determined by the Sellers.

### Minimum Bid Requirements; Stalking Horse Procedure

a)      Whittier may, but is not required to, set a minimum bid for the Whittier Property (the "Minimum Bid Requirement").  The value ascribed to any bid by Whittier must exceed the Minimum Bid Requirement (if any) for such assets in order to be designated a Qualified Bid (as defined below).

b)      The Sellers may, but are not required to, approve a form Asset Purchase Agreement (the "Form APA") for the Property.  The Form APA may be subsequently amended or replaced by the Sellers.

c)      Notwithstanding the foregoing, on or before the Stalking Horse Designation Deadline, Whittier the Sellers may select and designate one or more bids as a stalking horse bid (each, a "Stalking Horse Bid" and any such bidder, a "Stalking Horse Bidder") for some portion

**Bidding Procedures Whittier Seafood, LLC and Silver Wave, LLC**                                    7

or all of the Property.  If the Sellers select one or more Stalking Horse Bids, the Sellers shall file a notice with the Court of the acceptance of such Stalking Horse Bid(s) (the "Stalking Horse Notice").  The Stalking Horse Notice shall include a copy of at least one of the following: (i) all the Stalking Horse Bidders' asset purchase agreements (the "Stalking Horse APA"); (ii) term sheet; or (iii) a summary of the material terms of the Stalking Horse Bid.  The Stalking Horse APA(s) may be deemed to be the Form APA and may replace any prior Form APAs previously approved by the Sellers with respect to the Property subject to the Stalking Horse Bid(s).  The Sellers may agree to a break-up fee equal to 3% of the total sale price, not to exceed $200,000 (as agreed by the Sellers, the "Bid Protections"), without further order from this Court.  The value of a Stalking Horse Bid, plus any Bid Protections and minimum overbid requirements (as set forth below), shall be deemed to be the minimum bid amount for the Property.

d)      In the event Whittier does not designate a Stalking Horse Bid, Whittier may, but is not required to, set forth the Minimum Bid Requirement and minimum requirements to become designated as a Qualified Bidder in the Auction Notice.

e)      Sale of the Property shall be on an as-is, where-is basis, with any material representations and warranties limited to transfer of the Property free and clear of liens, claims, and encumbrances to the fullest extent allowed under applicable law.  The Form APA will reflect the foregoing.

**The Auction**

If the Sellers receive more than one bid for some portion or all of the Property, the Sellers will conduct an Auction for such Property.  If a Stalking Horse Bid is the only bid received in respect of some portion or all of the Property, the Sellers will not conduct an Auction for those

2837 ia09kv01dc

Property and may, but shall not be required to, seek approval of such Stalking Horse Bid by filing a notice with the Court (the "Sale Notice"), as set forth below.

The Auction, if required, shall take place at such time or location as the Sellers may determine, and shall communicate to any Stalking Horse Bidder and any other Qualified Bidder prior to the scheduled time. To be eligible to participate in the Auction, an Authorized Representative of a Qualified Bidder must appear at the Auction. If the Sellers conduct the Auction virtually, they will provide instructions setting forth how to attend the Auction to the participants and other attendees via electronic mail. The Sellers will promptly provide notice (via electronic mail or otherwise) of any change in the date, time, or location of the Auction to Qualified Bidders, and will promptly file notice of such change with the Court.

Only the following persons shall be allowed to appear at the Auction: (i) the Sellers and their professionals, including its counsel and Hilco, certain management of the Sellers as determined by the Sellers, or any other person determined by the Sellers; (ii) Authorized Representatives of Qualified Bidders (and their respective professionals); (iii) one or more representatives of the Official Committee of Unsecured Creditors and its counsel; (iv) an Authorized Representative of Cathay Bank and its counsel; and (v) such other parties as approved by the Sellers.

The Sellers will identify for all Qualified Bidders, including any Stalking Horse Bidder, the highest bid(s) received prior to the Auction.

The Sellers shall have the sole, ultimate discretion with respect to the conduct of the Auction and, among other things, may announce at the Auction any procedural rules, in addition to those set forth in these Bidding Procedures, that it determines to be appropriate under the circumstances (including for example, without limitation, the amount of time allotted to make

2837 ia09kv01dc

subsequent alternative bids, etc.) for conducting the Auction, so long as such additional rules are not inconsistent with these Bidding Procedures.

All bids at the Auction shall be made in the presence of other Qualified Bidders, shall be submitted in writing, signed by the respective Qualified Bidder, and shall contain a certification that the Qualified Bidder (i) has not engaged in any collusion with respect to the sale or bidding (including that it has no agreement with any other Qualified Bidder to control the price) and (ii) its Qualified Bid is the good-faith *bona fide* offer and it intends to consummate the proposed transaction if selected as the winning bidder.

The Sellers reserve the right to adjourn the Auction one or more times to, among other things: (i) facilitate discussions between the Sellers and Qualified Bidders; (ii) allow Qualified Bidders to consider how they wish to proceed; and (iii) provide Qualified Bidders the opportunity to provide the Sellers with such additional evidence as the Sellers may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or quity funding commitments to consummate the proposed transaction at the prevailing overbid amount.

**Determination of Successful Bid and Closing of Transaction**

Upon the conclusion of the Auction, the Sellers shall announce their determination of the highest and best bid(s) (a "Successful Bid" by a "Successful Bidder"). In determining the Successful Bid to submit to the Court for approval, the Sellers shall determine whether a bid of a Qualified Bidder constitutes the highest and/or best offer for some portion or all of the Property. In making this determination, the Sellers may consider any and all factors associated with all bids, including, but not limited to, factors such as the likelihood and ability of proposed buyers to consummate and close a transaction, other timing issues, employment issues, overall value of bids,

2837 ia09kv01dc

contracts and leases assumed by each bid and the impact of those issues on the Sellers' bankruptcy estates and its creditors, and any other factors deemed material to the Sellers.

The Qualified Bidder with the next-highest or otherwise second-best Qualified Bid (the "Back-Up Bid") for some portion or all of the Property, as applicable, at the Auction (if the Auction is conducted), as determined by the Sellers shall be required to serve as a back-up bidder (the "Back-Up Bidder"). The Sellers shall announce the identity of any Back-Up Bidder(s) and the amount and material terms of the Qualified Bid of the Back-Up Bidder(s) at the conclusion of the Auction at the same time the Sellers announce the identity of the Successful Bidder. The Back-Up Bidder(s) shall be required to keep its bid(s) open and irrevocable until the closing of the transaction with the applicable Successful Bidder. The Back-Up Bidder's Good Faith Deposit shall be held in escrow until the closing of the transaction with the applicable Successful Bidder. If a Successful Bidder fails to consummate its Successful Bid, the Sellers may select the applicable Back-Up Bidder as the Successful Bidder, and such Back-Up Bidder shall be deemed a Successful Bidder for all purposes. In such case, the defaulting Successful Bidder's deposit shall be forfeited to the Sellers, and the Sellers specifically reserve the right to seek all available remedies against the defaulting Successful Bidder, including with respect to specific performance.

In the event any Qualified Bidder is declared to be the Successful Bidder and such Qualified Bidder fails to timely perform under the Asset Purchase Agreement, the Sellers and the bankruptcy estate shall retain all rights, remedies, claims for monetary damages, counterclaims, and defenses, including but not limited to the right to seek equitable or injunctive relief.

2837 ia09kv01dc

**Bid Protections**

a)    In the event the Sellers select a Stalking Horse Bidder and any such Stalking Horse Bidder is not the Successful Bidder and the Sellers consummate an alternative transaction(s) ("Alternative Transaction"), the Stalking Horse Bidder shall be entitled to receive from the bankruptcy estate, upon the consummation of such Alternative Transaction, the Bid Protections. Any Stalking Horse Bidder who submits a credit bid shall not be entitled to the Bid Protections.

b)    No liens, security interests, or encumbrances shall attach to the Bid Protections. The Bid Protections shall be paid on a first-priority basis at the closing of the Alternative Transaction and shall be paid prior to any other distributions or payments by the Sellers contemplated in connection with such Alternative Transaction by the Successful Bidder; *provided*, *however*, that if an Alternative Transaction does not close, the Stalking Horse Bidder shall not be entitled to the Bid Protections.

c)    At the time of and provided there is a closing of an Alternative Transaction, the Bid Protections shall constitute an administrative expense of the bankruptcy state and be paid before parties holding liens against the bankruptcy estate assets under 11 U.S.C. §§ 503(b) and 507.

d)    In the event a Stalking Horse Bidder is the Successful Bidder and fails to close the sale without having its performance excused under the terms of the Stalking Horse Bid or with the consent of the Sellers, the Stalking Horse Bidder shall not be entitled to the Bid Protections if an Alternative Transaction is consummated.

2837 ia09kv01dc

**Sale Hearing**

In the event the Sellers designate a Stalking Horse Bidder and the Stalking Horse Bid is the only bid for the Property that are the subject of that Stalking Horse Bid, or there is only one bid for the Property that are the subject of that bid, then there shall be no Auction for such Property, and the Sellers may request that the Court approve the Stalking Horse Bid or sole bid by filing the Sale Notice and Motion with the Court containing the following information, as applicable: (i) a statement that the Auction for the Property has been canceled; (ii) the identity of the Successful Bidder; (iii) either a copy of the Successful Bid or a summary of the material terms of such bid that includes an allocation of the purchase price to any collateral of Cathay Bank that is the subject of the Successful Bid; (iv) the identity of any Back-Up Bidder, (v) the Asset Purchase Agreement or a summary of the material terms of any Back-Up Bid, and (vi) the objection deadline for objections to approval of the sale, which shall be seven (7) calendar days from the date of filing the Sale Notice and Motion.

If no Stalking Horse Bid is made or such a bid is terminated, withdrawn, void, or otherwise not intended to be performed by the Stalking Horse Bidder, or with the consent of the Stalking Horse Bidder, the Sellers shall have full authority to choose an alternative offer for the Property, which offer the Sellers shall present to the Court in the Sale Notice and Motion. Notwithstanding any provision of these Bidding Procedures, the Sellers may, at any point request that the Court approve a sale upon terms presented to the Court in the Sale Notice and Motion.

The Sellers shall be under no obligation to accept any bid that it deems, in its sole discretion, offers a sale price for less than fair market value of the Property.

In the event the Sellers conduct an Auction, the Successful Bid(s), as determined by the Sellers in accordance with these Bidding Procedures, shall be submitted to the Court for approval.

2837 ia09kv01dc

After determining the Successful Bid(s), the Sellers will promptly file with the Court the Sale Notice and Motion containing the following information, as applicable: (i) a statement that the Auction for the Property was conducted; (ii) the identity of the Successful Bidder(s); (iii) either a copy of the Successful Bid(s) or a summary of the material terms of such bid(s) that includes an allocation of the purchase price to any collateral of Cathay Bank that is the subject of the Successful Bid; and (iv) the objection deadline for objections to approval of the sale(s), which shall be seven (7) calendar days from the date of filing the Sale Notice and Motion.

Parties shall have seven (7) calendar days from filing the Sale Notice and Motion to file with the Court and serve an objection to the approval of the sale(s).  If an objection is filed and the parties are unable to resolve such objection consensually, the Sellers will promptly request a hearing to approve the sale(s).

### Reservation of Rights to Modify Bidding Procedures

The Sellers reserve the right, and in a manner consistent with applicable law, to modify these Bidding Procedures, including to, among other things, extend or waive deadlines or other terms and conditions set forth herein; adopt new rules and procedures for conducting the bidding and Auction process so long as any such modifications are disclosed to all Bidders, as applicable; set forth qualified bidder procedures, or otherwise modify these Bidding Procedures to further promote competitive bidding for and maximize the value of the Property.

**Bidding Procedures Whittier Seafood, LLC and Silver Wave, LLC**                     14

2837 ia09kv01dc

**SCHEDULE 1.1(mm)**


**Sale Order**

2837 if02eq01v3

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF ALASKA

In re

WHITTIER SEAFOOD, LLC, [1]

Debtors.

|  |
|---|
| Chapter 11 |
| Lead Case No. 24-00139-GS |
| Jointly Administered |
| ORDER (1) APPROVING SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES; (2) APPROVING ASSUMPTION AND ASSIGNMENT OF ARRC LEASE; (3) DETERMINING THAT BUYER QUALIFIES AS GOOD FAITH PURCHASER UNDER 11 U.S.C. SECTION 363(m); AND (4) AUTHORIZING DISTRIBTUIONS |
| Hearing Date |
| DATE: March 26, 2025 |
| TIME:  9:30 a.m. |

THIS MATTER came before the Court at hearings on March 5, March 14 and March 26, 2025 (collectively, the "Sale Hearing"), on the *Motion For Order (1) Approving the Sale Of Assets Free and Clear; ( 2) Approving the Assumption and Assignment of Lease; (3) Determining Buyer is Good Faith Purchaser; and (4) Authorizing Distributions* [ECF No. 285] (the "Sale Motion"), filed by debtors Whittier Seafood, LLC ("Whittier") and Silver Wave, LLC ("Silver Wave") (each a "Debtor" and together, the "Debtors"), debtors-in-possession herein.  The Court, having reviewed the files and records herein, including the Motion and it supporting declarations, and any objections or other responses to the Sale Motion, and having considered the presentations of counsel at the Sale Hearing, and deeming itself fully advised, the Court finds and concludes as follows:

[1] The Debtors are Marine Fishing International, Inc. ("MFI Inc."), Case No. 24-00140; Marine Fishing International, LLC ("MFI LLC"), Case No. 24-00141; Modys, LLC ("Modys"), Case No. 24-00142; Salacia, LLC ("Salacia"), Case No. 24-00143; Silver Wave, LLC ("Silver Wave"), Case No. 24-00144; and Whittier Seafood, LLC ("Whittier") (collectively, the "Debtors").

ORDER (1) APPROVING THE SALE OF ASSETS FREE AND CLEAR;
( 2) APPROVING THE ASSUMPTION AND ASSIGNMENT OF
LEASE; (3) DETERMINING BUYER IS GOOD FAITH PURCHASER;
AND (4) AUTHORIZING DISTRIBUTIONS – Page 1

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

A.      On January 14, 2025, the Court entered its *Order Approving Bid Procedures and Form of Notice* [ECF No. 259] (the "Bid Procedures Order"), which governed the procedures to be used in connection with the marketing and sale of Whittier's assets.  Among its provisions, the Bid Procedures Order shortened the notice period for the filing of the Sale Motion to seven days.  *See* ECF No. 259 at 4.

B.      On February 24, 2025, the Debtors filed the Sale Motion along with supporting declarations, *see* ECF Nos. 285-288 and 291, seeking authority to close and consummate the sales of the Debtors' assets (the "Sale") to the Buyer (as defined below) pursuant to the APAs.

C.      On February 25, 2025, the Debtors filed their *Certificate of Service* [ECF No. 289], which evidences that notice of the Sale Motion was disseminated on February 25, 2025.  The Debtors have provided proper, timely, adequate and sufficient notice of the Sale Motion and the Sale Hearing consistent with the notice requirements of the Bid Procedures Order.

D.      This Court has jurisdiction over the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(N) over which the Court has jurisdiction to enter a final order.  Venue is proper in this district and this Court under 28 U.S.C. § 1408.  The Sale Motion was properly before the Court at the Sale Hearing.

E.      In the Sale Motion, the Debtors sought approval of the sale of the Acquired Assets (as defined and detailed in the Sale Motion) pursuant to the terms of an Asset Purchase Agreement[2] (the "Whittier APA"[,3] or the "Silver Wave APA"[4], as applicable, and together the "Purchase Agreements"), with CMCC Co. Ltd. ("Initial Buyer") (together, the "Proposed Sales").

---

[2] Capitalized terms herein have the meaning identified in the Whittier APA or the Silver Wave APA, as applicable, unless otherwise indicated.
[3] Defined in the Motion as the "Whittier Purchase Agreement."
[4] Defined in the Motion as the "Silver Wave Purchase Agreement."

ORDER (1) APPROVING THE SALE OF ASSETS FREE AND CLEAR;
( 2) APPROVING THE ASSUMPTION AND ASSIGNMENT OF
LEASE; (3) DETERMINING BUYER IS GOOD FAITH PURCHASER;
AND (4) AUTHORIZING DISTRIBUTIONS – Page 2

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

F.  On February 27, 2025, the Initial Buyer advised the Debtors' marketing firm, Hilco Corporate Finance ("Hilco") that it did not want to proceed with the Silver Wave APA for the purchase of the Vessels. At the Sale Hearing, the Debtors advised the Court that they did not intend to seek approval of the Silver Wave APA, and that that component of the Sale Motion would be withdrawn.

G.  The Initial Buyer, with the Debtors' consent, has assigned its rights under the Whittier APA to a related entity, The Alaska Wild Seafoods, LLC, an Alaskan limited liability company (the "Buyer").

H.  Whittier has demonstrated good, sufficient, and sound business reasons and compelling circumstances to enter into the Whittier APA and sell the Acquired Assets under sections 363 and 365 of the Bankruptcy Code, and such actions are appropriate and reasonable exercises of Whittier's business judgment and in the best interests of Whittier, its estate, and creditors and other parties in interest.  Such business reasons include, but are not limited to, the facts that (i) the Whittier APA and terms thereof constitute the highest and/or best offer for the Acquired Assets, (ii) no other person or entity or group of persons or entities has offered to purchase the Acquired Assets for greater economic value to Whittier's estate than the Buyer, and (iii) the Sale pursuant to the terms of the Whittier APA will present the best opportunity to realize the value of the Whittier's assets.

I.  For the reasons stated on the record at the Sale Hearing, which are incorporated herein by this reference pursuant to Bankruptcy Rule 7052, the Court finds and concludes that the relief requested in the Sale Motion is reasonable, appropriate and in the best interests of Whittier, its estate and creditors and all parties in interest, and that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein, and that the Sale Motion should be granted.  Now, therefore,

IT IS HEREBY ORDERED as follows:

ORDER (1) APPROVING THE SALE OF ASSETS FREE AND CLEAR;
( 2) APPROVING THE ASSUMPTION AND ASSIGNMENT OF
LEASE; (3) DETERMINING BUYER IS GOOD FAITH PURCHASER;
AND (4) AUTHORIZING DISTRIBUTIONS – Page 3

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

1.      The Sale Motion [ECF No. 285] is hereby GRANTED.

2.      The terms and conditions of the Whittier APA, a copy of which is attached hereto as Exhibit A, are hereby APPROVED.

3.      All objections and responses to the Sale Motion or the relief requested therein, that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections and responses, are overruled on the merits and denied with prejudice.

4.      Pursuant to section 363(b) of the Bankruptcy Code, and upon and subject to the Closing and the Buyer's performance of each of its obligations under the Whittier APA, including but limited to payment of the Purchase Price, Whittier is hereby authorized and directed to take any and all actions necessary or appropriate to perform under, consummate, implement, and effectuate the APA, and to execute and deliver any and all instruments and documents that may be reasonably necessary or desirable to implement and effectuate the terms of the Whittier APA, this Order and the Sale, and to take all further actions as may be reasonably requested by the Buyer for the purpose of assigning, transferring, granting, conveying, and conferring to the Buyer, or reducing to possession, the Acquired Assets, including any and all rights appurtenant to or necessary for the operation or utilization of the Acquired Assets, or as may be necessary or appropriate to the performance of Whittier's obligations as contemplated by the Whittier APA, without any further corporate action or order of this Court.

5.      Bankruptcy Code section 363(f) is satisfied, in that (among other reasons) each entity with an interest in the Acquired Assets consents to the sale.  Accordingly, the Acquired Assets shall be sold and conveyed to Buyer free and clear of all interests, obligations, rights, encumbrances, pledges, liens (including without limitation, mechanics', materialmens' and other consensual and nonconsensual liens and statutory liens), mortgages, deeds of trust, security interests, claims

ORDER (1) APPROVING THE SALE OF ASSETS FREE AND CLEAR;
( 2) APPROVING THE ASSUMPTION AND ASSIGNMENT OF
LEASE; (3) DETERMINING BUYER IS GOOD FAITH PURCHASER;
AND (4) AUTHORIZING DISTRIBUTIONS – Page 4

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

(including, any "claim" as defined in section (5) of the Bankruptcy Code) (collectively, "Interests").
Any and all Interests shall attach to the proceeds of the Sale ultimately attributable to the Purchased
Assets in which such creditor alleges an Interest, in the same order of priority, subject to distribution
provisions set forth in the APA.

6.    The Buyer would not have entered into the Whittier APA and would not consummate
the Sale, thus adversely affecting the Whittier estate and its creditors, if the Sale were not free and
clear of all Interests, or if the Buyer would be, or in the future could be, liable for any such Interests.

7.    Based on the record herein, including the Declaration of Jue Li [ECF No. 310], the
Buyer qualifies for and shall be granted all protections of Bankruptcy Code section 363(m).

8.    In connection with the Closing, Whittier is authorized and directed to assume and
assign each of the Assumed Executory Contracts to the Buyer free and clear of all Interests.  Such
payments (if any) of the Cure Amounts shall (a) effect a cure of all defaults existing thereunder as of
the Closing Date, (b) compensate for any actual pecuniary loss to such non-Debtors party resulting
from such default, and (c) together with the assumption of the Assumed Executory Contracts by the
Buyers, constitute adequate assurance of future performance thereof.  The Buyer shall then have
assumed the Assumed Executory Contracts and, pursuant to section 365(f) of the Bankruptcy Code,
the assignment by Whittier of such Assumed Executory Contracts shall not be a default thereunder.

9.    Except as otherwise expressly provided in the Whittier APA or this Order, (i) the
Buyer shall not have any liability or other obligation of the Debtor arising under or related to any of
the Acquired Assets that accrued, existed or was alleged or asserted, whether known or unknown, as
of the Closing; and (ii) the Debtors shall not have any liability or other obligation arising under or
related to any of the Acquired Assets that accrued, existed or was alleged or asserted, whether known
or unknown, on and after the Closing.

ORDER (1) APPROVING THE SALE OF ASSETS FREE AND CLEAR;
( 2) APPROVING THE ASSUMPTION AND ASSIGNMENT OF
LEASE; (3) DETERMINING BUYER IS GOOD FAITH PURCHASER;
AND (4) AUTHORIZING DISTRIBUTIONS – Page 5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

10. The allocation of the Purchase Price for the various Acquired Assets shall be as set forth in <u>Exhibit B</u> hereto, and Whittier shall be authorized and directed to pay directly from the Closing the amounts set forth in Exhibit B to the recipient and in the amounts indicated in Exhibit B, except as provided in paragraphs 11 and 12.

11. Whittier is authorized to carve out from the distribution otherwise payable to Cathay Bank (1) an amount equal to .08 of the Purchase Price for Quarterly Fees payable to the US Trustee; and (2) $200,000 for payment of the prorated Property Taxes and Transfer Taxes as set forth in the Whittier APA (together, the "Escrowed Funds"). The Escrowed Funds shall be held in escrow by Bush Kornfeld, until the Quarterly Fees, Personal Property and Transfer Taxes, as applicable, become due, at which time, Bush Kornfeld is authorized to release payment for the same. Cathay Bank shall retain its liens on the Escrowed Funds until they are paid as set forth herein.

12. Distributions payable to unsecured creditors set forth in Exhibit B shall be held in escrow by Bush Kornfeld until further order of the Court.

13. This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Order and that waiver of any applicable waiting period is appropriate.

DATED this 27th day of March, 2025.

BY THE COURT

/s/ Gary Spraker
GARY SPRAKER
United States Bankruptcy Judge

ORDER (1) APPROVING THE SALE OF ASSETS FREE AND CLEAR;
( 2) APPROVING THE ASSUMPTION AND ASSIGNMENT OF
LEASE; (3) DETERMINING BUYER IS GOOD FAITH PURCHASER;
AND (4) AUTHORIZING DISTRIBUTIONS – Page 6

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

Presented by:

BUSH KORNFELD LLP

By  /s/ Lesley Bohleber
   James L. Day, (admitted *pro hac vice*)
   Lesley Bohleber, (admitted *pro hac vice*)
Attorneys for Debtors-in-Possession


Serve:  T. Buford, Esq.
        L. Bohleber, Esq.
        J. Day, Esq.
        G. Fox, Esq.
        D. Neu, Esq.
        M. Parise, Esq.
        L. Thornton, Esq.
        J. Torgerson, Esq.
        J. Kaplan, Esq.
        R. Murphy, Esq.
        M. Mills, Esq.
        T. Brannon, Esq.
        A. Ivanov, Esq.
        G. Pitts, Esq.
        J.M. Palomares, Esq.
        F. Rasch, Esq.
        J. Welch, Esq.
        K. Evans, Esq.
        U.S. Trustee
        ECF Participants via NEF

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

## SCHEDULE 1.1(cc)

## Fisherman Receivables

| Borrower | Outstanding Amount as of 1.31.25 | Contract Description | Date |
|---|---|---|---|
| Basargin, Konstantin | $9,742.12 | Commercial Note and Security Agreement | 13-Mar-19 |
| Basargin, Planton | $3,973.42 | Commercial Note and Security Agreement | 27-Apr-19 |
| Cannaday, Caleb | $10,151.82 | Harvester Advance Agreement | 16-Mar-21 |
| Konev, Evgeny | $88.66 | Harvester Advance Agreement | 23-Mar-20 |
| Kuzmin, Zinon | $12,341.43 | Harvester Advance Agreement | 13-Apr-20 |
| Reutov, Alfancy | $2,571.19 | Commercial Note and Security Agreement | 6-May-19 |
| Reutov, Varsanofy | $32,353.61 | Amended & Restated Harvester Agreement | 14-Jul-22 |

**Total**  **$71,222.25**

## SCHEDULE 2.1(e)

## Fixed Asset Schedule

### Equipment

| | |
|---|---|
| 1 | Sipromatic 620-A SN 6176 |
| 2 | 30 HP Hydraulic Unit with hose |
| 3 | Metal Carts |
| 4 | Incline Conveyor with Drive motor #1 |
| 5 | Incline Conveyor with Drive motor #2 |
| 6 | Incline Conveyor with Drive motor #3 |
| 7 | Aluminum wash table |
| 8 | Rice Lake CW-90X Digital scale with printer |
| 9 | Zebra ZT410 Label Printer |
| 10 | 5'x12' SS table |
| 11 | Flex Weigh DMW1V Platform scale |
| 12 | Digital Scales |
| 13 | 3'x7' SS table |
| 14 | Ryco 112H Hydrolic Tote Dumper SN 30638 |
| 15 | Ryco 5' x 6' aluminum landing table with gate |
| 16 | 2' x 16' aluminum sorting table |
| 17 | Ryco 2226B heading maching SN 30742 |
| 18 | Ryco 645C Gutting maching SN 30767 |
| 19 | Ryco 226B Heading machine #2 |
| 20 | Ryco Gutting machine #2 |
| 21 | Ryco 2' x 34' blood line conveyor |
| 22 | Ryco 225 heading machine SN 1935 |
| 23 | Ryco 618 pocket conveyor SN 932121 |
| 24 | Ryco 2' x 28' blood line conveyor |
| 25 | Ryco 106 12' incline waste conveyor SN 30636 |
| 26 | 1' x 7' incline waste conveyor |
| 27 | 2' x 17' incline waste conveyor |
| 28 | Verticle waste grinder |
| 29 | Verticle waste grinder #2 |
| 30 | Horizontal waste grinding attachment |
| 31 | Horizontal waste grinding attachment #2 |
| 32 | Verticle waste grinder attachment |
| 33 | Aluminum catwalk |
| 34 | Aluminum catwalk #2 |
| 35 | 2' x 30' chain conveyor |
| 36 | 3' x 8' incline conveyor |
| 37 | Ryan Engineering rotary glazing tank |

| | |
|---|---|
| 38 | 3' x 8' aluminum table |
| 39 | 3' x 8' incline conveyor #2 |
| 40 | 1' x 10' belt conveyor |
| 41 | 1' x 5' belt conveyor |
| 42 | 1' x 6' belt conveyor |
| 43 | Ryco automated 6 station auto sorter |
| 44 | Ryco digital controller |
| 45 | Aluminum catwalk around deglazer |
| 46 | Double suction aluminum chain conveyor |
| 47 | Ryco 20HP vacuum pump SN 9414041 |
| 48 | Ozone Int'l ozonator machine |
| 49 | Plastic totes and dollies |
| 50 | Plastic totes and dollies #2 |
| 51 | Plastic totes and dollies #3 |
| 52 | Plastic totes and dollies #4 |
| 53 | Plastic totes and dollies #5 |
| 54 | Freezer racks + base + cookie sheets |
| 55 | Aluminum dock plate |
| 56 | Hydrolic bin dumper |
| 57 | Ener Sys Enforces Forklift battery charger |
| 58 | Ener Sys Enforces Forklift battery charger #2 |
| 59 | Ener Sys Enforces Forklift battery charger #3 |
| 60 | Ener Sys Enforces Forklift battery charger #4 |
| 61 | Chop Saw |
| 62 | Metal conveyor belts #4 |
| 63 | 2' x 6' SS table with cutting board top |
| 64 | 2' x 6' aluminum table |
| 65 | 3' x 4' aluminum table |
| 66 | 3' x 4' aluminum table #2 |
| 67 | North Star 60 Ton ice machine |
| 68 | Freezer system |
| 69 | Mitsubishi FG 25 forklift |
| 70 | Mitsubishi FG 25 forklift #2 |
| 71 | 300 insulated totes |
| 72 | 93 insulated totes & elect |
| 73 | Jackstone Verticle Plate Freezers |
| 74 | 12.6K  QT 600 aluminum freezing Frame & 1 Hil |
| 75 | Tender Wet Pump |
| 76 | 42 insulated totes |
| 77 | 48 Freezer Racks |
| 78 | 29 stacks of racks |
| 79 | 80 Insulated Totes |
| 80 | Hystu FG25 Forklift (SN157692) |

| | |
|---|---|
| 81 | Forklift (SN 157894) rotating forks |
| 82 | Polar Insulated Boxes |
| 83 | Compressor Skids |
| 84 | HYSTU FORKLIFT |
| 85 | 48 insulated totes |
| 86 | Polar Insulated Boxes |
| 87 | Polar Insulated Boxes |
| 88 | Pmt 5 Ikura Roe Line |
| 89 | Nikko Ikura roe Machine |
| 90 | Nikko Ikura Roe Machine |
| 91 | Nikko Ikura Roe Machine |
| 92 | Nikko Ikura Roe Machine |
| 93 | Nikko Ikura Equipment |
| 94 | 76 Bunk Beds |
| 95 | 6 Bench Scales |
| 96 | Plant supplies and equipment baskets liners p |
| 97 | Baskets and Carts |
| 98 | Copper Stiching wire and parts |
| 99 | Tender Wet Pump |
| 100 | Purchase of Forklift |
| 101 | Parts for equipment |
| 102 | Electric Hot Water Pressure Washer max flow- |
| 103 | Commercial Dryer Refurb |
| 104 | MSI Crane scales - 14 each |
| 105 | Semi Auto Strapping Machine |
| 106 | Valor 4000 XW scales - 6 each |
| 107 | Baskets and carts |
| 108 | 1 Flohr Stainless Steel Egg Agitator |
| 109 | Asm Insulated Bins for Plant operations |
| 110 | Roe Line including: Nikko roe Sepa |
| 111 | Baader 189 Fillet Mach |
| 112 | Roe equipment cashiers check |
| 113 | Ice Machine 1991 |
| 114 | WT 11-9 Blast Freezer & Install down |
| 115 | WT 11-14 for down on Salmon Fille |
| 116 | WT for Roe Dryer for WS |
| 117 | Metal Panneling for blast freezer installatio |
| 118 | Roe Line Purchased From Alaska Packaging - As |
| 119 | Marel Fillet Line |
| 120 | Refrigeration Skids Purchased From Delarvas - |
| 121 | #104 12 inch conveyor section to |
| 122 | #104 Sorting Conveyor 24 Wide b |
| 123 | #106 Salmon Roe Sort Conveyor |

| 124 | #645 Salmon Cleaning Machine wi |
|-----|----------------------------------|
| 125 | 4 Forklifts |
| 126 | 5 Comp Steamtable (Kitchen Equip 05/01/18 |
| 127 | Auto Header/Gutter Machine |
| 128 | Automatic Strapping Machine with |
| 129 | Bought 2008 Mustang 2066 for W |
| 130 | Brecknell Floor Scale |
| 131 | Bunkbed for Housing Unit |
| 132 | Chum Belt |
| 133 | Double Belt conveyor-Deposit for |
| 134 | Double Belt conveyor-Final Payme |
| 135 | Drip pan for the 12 inch wide was |
| 136 | Fish Baskets carts & Equip |
| 137 | Forklift Propane Model: APL02 Se |
| 138 | Forklift Propane Model: FG25HT |
| 139 | Frames for Glazer Leg Extension |
| 140 | Grading System-Deposit for Gradi |
| 141 | Grading System-Final Payment for |
| 142 | Hughes Sat Phone System Refur |
| 143 | Ice Augers |
| 144 | Marel TOTE Dumper model: 8502 |
| 145 | Matress for Bunkhouse |
| 146 | MSI Crane Scale 5000lb capacity |
| 147 | New server for Parity Production |
| 148 | Original Cost was $14300.80 pai |
| 149 | Plant/Roe room equipment |
| 150 | Qty 2 of #104 12inch wide 90 deg |
| 151 | Qty 2 of Salmon Basket brake out |
| 152 | Rice Lake Handle Weights Cast Iro 05/24/18 |
| 153 | Roe Room Equipment |
| 154 | Rotator Motor for Forklift |
| 155 | RSW-Deposit for RSW Fish Holdin |
| 156 | RSW-Final Payment for RSW Fish |
| 157 | RSW-Plant Fish Chiller System RS 02/22/18 |
| 158 | Salmon De-heading Machine |
| 159 | Sealing Machines |
| 160 | Spiral Roller for Chum |
| 161 | Stainless Steel Classic Washfount |
| 162 | Stove Adriatic Dickinson |
| 163 | Suction Hose to vaccum the fish f |
| 164 | The Total price is $6976.04 (Bake |
| 165 | Three Used Forklifts (Propane Nis |
| 166 | Totes Lids |

| | |
|---|---|
| 167 | Transfer Pump |
| 168 | Two Bradford White 75 gallon Pro |
| 169 | Used 1992 Jordan Vessel Receiv |
| 170 | Used 1995 Phillips Suction Trap |
| 171 | Used 2005 Hansen Autopurger A |
| 172 | Used RVS Suction Trap/Oil Still El 09/24/18 |
| 173 | Vaconx4C1S010C |
| 174 | Washing Machine and Speed Que |
| 175 | Breakout table and drip pan |
| 176 | Loading Ramp |
| 177 | Fillet Feed Conveyor |
| 178 | NEW LOMA METAL DETECTOR |
| 179 | IQF Fish Baskets |
| 180 | Flow Scale and Infeed |
| 181 | IQF Fish Baskets |
| 182 | Salmon Cleaning Machine |
| 183 | Flow Scale and Infeed |
| 184 | 120 Plastic Totes |
| 185 | APML190L Rollstock Machine |
| 186 | Shipping of Baskets & Carts from the Western |
| 187 | Air hose and banding |
| 188 | PO#182-949 Plant Fish Waste Grinders |
| 189 | PO#182-948 Plant Fish Waste Grinder |
| 190 | Shipped of Fish Pump from Motion & Flow |
| 191 | Shipment of Wet Pump to WS from Ryco#9182 |
| 192 | Cylinder cabinet and rollers |
| 193 | 10% Final Payment for Flow scale & Infeed |
| 194 | Pump Hose for dock PO#182-331 |
| 195 | Reinforced suction fish hose |
| 196 | Belly & Head Knife/Spring Blet/Cylinder/Utili |
| 197 | Fillet Feed Conveyor |
| 198 | Conveyor Belt |
| 199 | Half Wet Pump |
| 200 | Second half Wet Pump |
| 201 | Blast Freezer basket and wheels PO#182-330 |
| 202 | Diagnostic Machine for repair department |
| 203 | Second Shipment of 120 Insulated Totes to WS |
| 204 | First Shipment of 120 Insulated Totes to WS |
| 205 | PO#182-947 BRC Electric Heat Pressure Washer |
| 206 | PO#182-882 Gutting Machine |
| 207 | Worm Machine |
| 208 | Coastline Double Dip Glazer |
| 209 | Small Fish Kit |

| 210 | Ikura Separator From Neptune Dynamic |
| 211 | RD200 Busch Pump |
| 212 | VAP PAC Lable Printer |
| 213 | Conveyor Linclined Vacpack |
| 214 | Deck Winch with Cable |
| 215 | Toe Dumper/Deicing Table |
| 216 | Kohler 250 Diesel fuel tank |

**Packaging**

All packaging material located at the Whittier Plant or on the Real Property referred on Schedule 2.1(f).

**Computers**

2 Lenovo IdeaCentre A10 All In One Desktop
4 Lenovo IdeaPad Duet 3 Chromebook

**Additional Fixed Assets**

The 26 bunkhouses, condos, warehousing, and storage units referenced on Schedule 2.1(f) to the extent any of such is considered personal property rather than real property, as well as all contents of the foregoing.

**SCHEDULE 2.1(f)**

**Real Property**

1) Lot 1A, Block 2, CITY OF WHITTIER SUBDIVISION, according to the official plat thereof, filed under Plat No. 2019-86, in the records of the Anchorage (formerly Whittier) Recording District, Third Judicial District, State of Alaska ( "Lot 1A");

2) Lots 6, 7, 8 and 9, Block 2, City of Whittier Subdivision Phase One, according to the Official Plat thereof, filed under Plat No. 73-2 in the records of the Anchorage Recording District, Third Judicial District, State of Alaska ("Lots 6-9");

   Including:     The 26 bunkhouses with showers located thereon, and all contents; Two VIP condos located thereon, and all contents; and warehousing and storage units located thereon, and all contents;

3) The Begich Towers Condos.

4) Unit 209.  Buyer acknowledges that title to Unit 209 may be defective and that Seller does not warrant such title.  The deed to Unit 209 will be a quitclaim deed from Seller to Buyer, without representation or warranty.  Seller hereby covenants, on behalf of itself and its principal Alexsey Kozlov, to cooperate with any reasonable requests made by Buyer to clear up such title on behalf of Buyer.

For the avoidance of doubt, Lot 1A, the Processing Plant subject to the ARRC Lease, and Lots 6-9 are all shown on the map appended hereto.

2837 if02eq01v3

## SCHEDULE 2.1(l)

### Vehicles

| Vehicle/Trailer | VIN | Purchase date | Title | Title No. | Vehicle location | Keys |
|---|---|---|---|---|---|---|
| Dodge Truck 2007 | 1D7H016P67J588661 | 4/1/2017 | Y | 5116006 | Whittier Seafood Property | Y |
| 18' flatbed truck 1994 IHC 8100T | 1HTHCAAR4RH593490 | 4/6/2017 | Y | 5102896 | Whittier Seafood Property | Y |
| Utility & great Dane Trailers | | 4/26/2017 | N | | Whittier Seafood Property | |
| 6 reefer trailers | | 4/28/2017 | N | | Whittier Seafood Property | |
| 1994 White GMC Flatbed truck | 4V1JDBRF7RR829735 | 5/5/2017 | Y | 5124986 | Whittier Seafood Property | Y |
| Chevrolet Exp G3500 | | 5/8/2017 | N | | Whittier Seafood Property | |
| 1993 Flatbed (23ft) | 4V1JDBMF9PR817350 | 6/26/2017 | y | 5161303 | Whittier Seafood Property | |
| 2007 Ford F150 truck | 1FTRF14W77KC16842 | 5/4/2018 | Y | 5355236 | Whittier Seafood Property | Y |
| 2006 Freightliner/Columbia/ | 1FUJA6CK0LV83820 | 5/15/2018 | Y | 5407227 | Whittier Seafood Property | Y |
| F-150 Black | 2 FTZF1825YCB19166 | 3/30/2019 | Y | 5529384 | Whittier Seafood Property | Y |
| Dodge Pick up Van Dark Blue | 1D7HU16P87J604536 | 3/30/2019 | Y | 5529385 | Whittier Seafood Property | Y |
| 1998 International Boom Truck | 1HTSCABPSWH473910 | 7/8/2019 | Y | 5721327 | Whittier Seafood Property | Y |
| 2002 Internatiional Boom Truck | 1HTMMAAN92H515186 | 7/14/2019 | Y | 5721328 | Whittier Seafood Property | Y |
| 2005 Kenworth | 1XKADU9X6SJ085724 | 1/27/2021 | Y | 6002742 | Whittier Seafood Property | Y |
| 2012 Ford Edge | 2FMDK4KC1CBA04535 | 10/1/2020 | Y | 589884 | Whittier Seafood Property | Y |
| 1998 Truck FRHT/MEDIUM CON | 1FV3GFAC6WH961012 | 11/4/2020 | Y | 6002740 | Whittier Seafood Property | Y |
| 2014 Freightliner M2 20 TT Reefer Truck | 3ALACXDT4EDGA4905 | 12/21/2020 | Y | 6002741 | Whittier Seafood Property | Y |
| 2008 Savan Van | 1GJHG39K981121306 | 8/21/2021 | Y | 6091445 | Whittier Seafood Property | Y |
| 53 Foot Trailer | | 8/20/2021 | N | | Whittier Seafood Property | |
| 2000 Case 821 Loader | NA | 12/22/2021 | N | | Whittier Seafood Property | Y |

**SCHEDULE 2.2**

**Assumed Executory Contracts**

**A.      Contracts**

None.

**B.      Leases**

**Ground Lease**

| Counter Party | Lease Details | Cure Amount |
|---|---|---|
| Alaska Railroad Corporation | Ground Lease related to the Processing Plant, term expires 4/30/25 (The AARC Lease) | $21,861.71 |

**Begich Towers Leases**

| Unit | Lessee | Term | Cure Amount | Lease Status as of 5/1/2025 | Sale Effect |
|---|---|---|---|---|---|
| 206 | Tamra Foster | 6/1/24 - 9/30/24 | $0 | Lease converted to month to month | Assume and Assign |
| 402 | Turnagain Marine Construction | 5/22/24 - 8/31/24 | $0 | Lease converted to month to month | Assume and Assign |
| 807 | Turnagain Marine Construction | 5/13/24 - 8/31/24 | $0 | Lease converted to month to month | Assume and Assign |
| 1001 | Justin Elvidge | 6/1/24 - 4/30/25 | $0 | Lease converted to month to month | Assume and Assign |

**Unit 209 Lease**

| Unit | Lessee | Term | Cure Amount | Lease Status | Sale Effect |
|---|---|---|---|---|---|
| 209 | Eliana Zimmerman | 1/1/25- 12/31/25 | $0 | Lease runs through December 2025 | Assume and Assign |

2837 if02eq01v3

**C.**     **Licenses and Permits**

**None.**

Buyer has separately provided Seller with copies of all permits and licenses used in connection with the Acquired Assets, none of which are transferrable.

**SCHEDULE 2.2(e)**

**Assumed Liabilities**

The Tenant Deposits as follows:

| Tenant | Unit | Amount |
|--------|------|--------|
| Justin Elvidge | 1001 | $1,400.00 |
| Tamra Foster | 206 | $800.00 |
| Turnagain Marine Construction | 402 | $1,400.00 |
| Turnagain Marine Construction | 807 | $1,400.00 |
| Eliana Zimmerman | 209 | $700.00 |
| | **Total** | **$5,700.00** |

2837 if02eq01v3

# SCHEDULE 2.6

## Allocation of Purchase Price

| Acquired Asset | Allocation |
|---|---|
| Processing Plant | $1,800,000 |
| Lot 1A | $700,000 |
| Lots 6-9, Block 2 | $600,000 |
| Nine Begich Towers Condo Units plus Unit 209 | $950,000 |
| The Equipment listed on Schedule 2.1(e) | $500,000 |
| Fisherman Receivables | $44,955 |
| Seller's Interest in the Assumed Executory Contracts | $1 |
| All of Seller's tangible personal property located at (1) the Processing Plant and (2) Lot 1A, Lots 6-9, excluding the Equipment listed on Schedule 2.1(e) | $1 |
| Other personal property, and Vehicles | $1 |

EXHIBIT B

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("**Agreement**") is entered into as of this 12th day of June, 2025, by and between Alaska Whitecap Seafoods LLC, a Washington limited liability company ("**Buyer**"), on the one hand, and Silver Wave, LLC, a Washington Limited Liability Company ("**Seller**" or "**Silver Wave**"), on the other hand. (Each of Buyer and Seller is a "**Party**" and both are the "**Parties**").

## RECITALS:

A.      On August 19, 2024 ("**Petition Date**"), Silver Wave commenced the Chapter 11 Case by filing a voluntary petition for relief under chapter 7 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Alaska (the "**Court**"), and assigned case no. 24-00144 (the "**Bankruptcy Case**").

C.      Buyer desires to purchase from Seller, and Seller desires to sell, convey, assign and transfer to Buyer the Acquired Assets (defined below) pursuant to, *inter alia*, section 363 of the Bankruptcy Code, in the manner and subject to the terms and conditions set forth herein.

D.      The transaction(s) contemplated by this Agreement are subject to the approval of the Bankruptcy Court, pursuant to section 363 of the Bankruptcy Code, and may only be consummated pursuant to a final, non-appealable order entered by the Bankruptcy Court in the Chapter 11 Case approving the terms of this Agreement (the "**Sale Order**").

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE 1
## DEFINITIONS

**Section 1.1      Defined Terms.**  In addition to the capitalized terms defined elsewhere in this Agreement, the following terms have the following meanings:

(a)      "Acquired Assets" has the meaning set forth in Section 2.1.

(b)      "Agreement" has the meaning set forth in the Preamble.

(c)      "Bid Procedures" means the Bid Procedures filed with the Court on December 5, 2024, in the form attached as Schedule 1.1(c), that govern the process and procedures for another interested buyer to submit a bid higher than the Buyer's offer contained herein.

(d)      "Bid Procedures Order" means the order of the Court entered on January 14, 2025 that approved the Bid Procedures.

2837 if02k301xy

[Signature Page to Asset Purchase Agreement]

(e)　　"Books and Records" means all books and records pertaining to the Acquired Assets, wherever located, including copies of all permits and licenses whether or not transferable and whether or not expired.

(f)　　"Business Day" means any day excluding Saturday, Sunday, any legal holiday under the laws of the State of Alaska or a day on which banks located in the State of Alaska are required by law or other governmental action to close.

(g)　　"Buyer" has the meaning set forth in the Preamble.

(h)　　"Closing" has the meaning set forth in Section 3.1.

(i)　　"Closing Date" means the date on which Closing occurs, which shall be the earlier of June 13, 2025 or ten calendar days after entry of the Sale Order, unless a different date is agreed to by the Seller and Buyer in writing.

(j)　　"Damages" has the meaning set forth in Section 9.2(d).

(k)　　"Deposit" has the meaning set forth in Section 2.4.

(l)　　"Deposit Agent" means the law firm of Bush Kornfeld LLP.

(m)　　"Escrow Agent" means Kim Marine Documentation, Inc.

(n)　　"Excluded Assets" has the meaning set forth in Section 2.2.

(o)　　"Execution" means the time that both Buyer and Seller have executed this Agreement.

(p)　　"Governmental Authority" means any foreign or United States federal, state, or local government, governmental regulatory, or administrative authority, agency, or commission, or any court, tribunal, or judicial or arbitral body.

(q)　　"Knowledge" means the actual knowledge of the Party's officers after reasonable inquiry.

(r)　　"Liabilities" mean all liabilities and obligations (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, due or not yet due), including all liabilities for Taxes with respect to periods before the Closing Date, including periods before the Petition Date.

(s)　　"Lien" means any lien (statutory or otherwise), hypothecation, encumbrance, security interest, interest, mortgage, deed of trust, pledge, restriction, charge, instrument, license, preference, priority, security agreement, Tax (including foreign, federal, state, or local Tax), order of any Governmental Authority, of any kind including, without limitation: (i) any assignment or deposit arrangement in the nature of a security device; (ii) any claim based on the theory that Buyer is a successor of Seller; and (iii) any leasehold interest, license, or other right, in favor of a third

party or Seller, to use any portion of the Acquired Assets, whether secured or unsecured, choate or inchoate, contingent or non-contingent.

(t)    "Party" or "Parties" has the meaning set forth in the preamble to this Agreement.

(u)    "Permit" means all licenses, permits, franchises, approvals, authorizations, consents or orders of, filings with, or notifications to, any Governmental Authority, whether foreign, provincial, municipal, federal, state, or local, necessary for the past or present conduct or operation of Seller's business.

(v)    "Person" means any individual, corporation, partnership, limited liability company, trust, association, joint venture, or other entity of any kind.

(w)    "Personal Property Taxes" has the meaning set forth in Section 3.4(a).

(x)    "Purchase Price" has the meaning set forth in Section 2.4(a).

(y)    "Purchase Price Allocation Schedule" has the meaning set forth in Section 2.6.

(z)    "Representative" means any attorney, accountant, agent, independent contractor, or other representative.

(aa)    "Sale Hearing" means the hearing of the Court to approve this Agreement and its contemplated transactions.

(bb)    "Sale Order" means the order of the Court, in the form and substance attached as Schedule 1.1(bb) hereto (or, if revised, acceptable to Buyer), entered by the Court pursuant to section 363(b) of the Bankruptcy Code: (i) approving this Agreement and its contemplated transactions; (ii) approving the sale of the Acquired Assets to Buyer free and clear of all Liens pursuant to section 363(f) of the Bankruptcy Code; (iii) finding that Buyer is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code; (iv) confirming that Buyer is acquiring the Acquired Assets free and clear of the Unassumed Liabilities; and (v) retaining jurisdiction of the Court to interpret and enforce the terms and provisions of this Agreement and the Sale Order.

(cc)    "Schedules" means the Schedules attached to this Agreement.

(dd)    "Tax" means any tax, duty, charge, fee, levy, penalty, or other assessment imposed by any Governmental Authority, including income, profit, provisional, salary, estate, excise, property, sales, use, occupation, transfer, franchise, payroll, windfall or other profits, alternative minimum, gross receipts, intangibles, capital stock, estimated, employment, unemployment compensation or net worth, environmental, ad valorem, stamp, value-added or gains tax, capital duty, registration and documentation fees, custom duties, tariffs and similar charges, withholding, payroll, social security contributions or charges, disability, or other taxes (including any fee, assessment or other charge in the nature of or in lieu of any tax), including any interest, penalties, or additions attributable thereto, and any liability to make payment by way of

reimbursement, recharge, indemnity, damages or management charge related to taxes and regardless of whether such amounts are chargeable directly or primarily against Seller.

(ee)     "Unassumed Liabilities" has the meaning provided for in Section 2.4.

(ff)     "Vessels" has the meaning provided for in Section 2.1(a).

## ARTICLE 2
## PURCHASE AND SALE

**Section 2.1     Transfer of Assets.**  Pursuant to the terms and conditions of this Agreement, at the Closing Seller will sell, convey, transfer, assign, and deliver (or cause to be sold, conveyed, transferred, assigned, and delivered) to Buyer, free and clear of all Liens, and Buyer will acquire and accept from Seller, all right, title, and interest in and to, the following assets (collectively, the "Acquired Assets"):

(a)     The vessels set forth in Schedule 2.1(a) (the "Vessels");

(b)     All permits and licenses relating to the Vessels to the extent such can be transferred; and

(c)     All Books and Records relating to the Vessels, including copies of all permits and licenses whether or not transferable and whether or not expired.

**Section 2.2     Excluded Assets.**  Notwithstanding anything to the contrary in this Agreement, all assets that are not Acquired Assets are retained by Seller and are not being sold or assigned to Buyer under this Agreement (the "Excluded Assets").

**Section 2.3     No Other Liabilities Assumed.**  Other than as set forth in this Agreement, Buyer shall not assume or be bound by or be obligated or responsible for any duties, responsibilities, commitments, expenses, obligations or any other Liability of Seller (the "Unassumed Liabilities").

**Section 2.4     Purchase Price.**

(a)     Purchase Price.  The "Purchase Price" for the Acquired Assets shall be $63,000, to be paid, in cash, as set forth below.

(i)     Deposit.  Before or contemporaneously with Execution, Buyer has paid to Deposit Agent $6,300, to be held and released in accordance with the terms of this Agreement (the "Deposit")

(ii)     Balance of Purchase Price. The balance of the Purchase Price shall be delivered to the Escrow Agent in immediately available funds no later than one Business Day prior to Closing and shall be held in escrow by the Escrow Agent until Closing.

**Section 2.5     Allocation Schedule.**  The Parties agree that the Purchase Price will be allocated among the Acquired Assets in accordance with their relative fair market values as set

2837 if02k301xy

forth in Schedule 2.5 in compliance with the Bid Procedures. If the Parties are unable to resolve the issues concerning Purchase Price allocation by agreement, they shall submit the allocation matter to the Court for final determination in conjunction with the Sale Notice and Motion, which determination shall be binding and not subject to appeal.  Seller and Buyer must prepare mutually-acceptable and substantially identical initial and supplemental Internal Revenue Service Forms 8594 "Asset Acquisition Statements under 1060" consistent with the Purchase Price Allocation Schedule (giving effect to mutually agreed-on adjustments through the allocations set forth in the Purchase Price Allocation Schedule as a result of any required adjustments to the Purchase Price).

## ARTICLE 3
## CLOSING

**Section 3.1      Closing.**  On the terms and conditions set forth in this Agreement and in the Sale Order, the closing of the transactions contemplated by this Agreement (the "Closing") will be completed virtually by the parties or held at the offices of Bush Kornfeld LLP, 601 Union Street, Suite 5000, Seattle, Washington (or other location identified by Seller) no later than the Closing Date, if all conditions set forth in ARTICLE 7 and ARTICLE 8 below are either satisfied or waived.  The Parties agree to expeditiously seek approval of the Sale Order.  Notwithstanding the foregoing, the Closing may be held at another time and place mutually agreeable to the Parties.

**Section 3.2      Actions at Closing.**

(a)      Documents and Possession.  At Closing, Seller must deliver or cause to be delivered to Buyer:

(i)      a bill of sale in the form of Coast Guard Form CG-1340 for each Vessel that is an Acquired Asset; and

(ii)      a copy of the Sale Order.

(b)      Payment.  Buyer must have delivered to Seller the balance of the Purchase Price (determined in accordance with ARTICLE 2).

(c)      Form of Documents.  If a form of any document to be delivered under this Agreement is not attached as an exhibit to this Agreement, that document must be created, executed, and delivered in form and substance and in a manner reasonably and mutually satisfactory to the Parties.

**Section 3.3      Transaction Expenses.**   Except as expressly provided in this Agreement, each Party bears its own costs and expenses, including attorney, accountant, and other independent contractor fees, in connection with the execution and negotiation of this Agreement and the consummation of its contemplated transactions.

**Section 3.4      Prorations.**

(a)      Personal Property Taxes.  Ad valorem personal property taxes associated with the Acquired Assets (the "Personal Property Taxes") that are periodically imposed and are payable for a tax period that includes (but does not end on) the Closing Date are prorated as of the

2837 if02k301xy

Closing Date. Seller bears the proportion of, and has the sole responsibility for, such taxes equal to a fraction, the numerator of which is equal to the number of days elapsed from the beginning of the applicable tax period to the Closing Date and the denominator of which is the number of days in the entire applicable tax period. Buyer is responsible for the remainder.

(b)     Post-Closing Tax Responsibility.  Unless otherwise provided to the contrary in this Agreement, Buyer is solely responsible for Taxes relating to the Acquired Assets applicable to or arising from the Post-Closing Period, including Transfer Taxes, and the Seller is solely responsible for Taxes relating to the Acquired Assets applicable to or arising before the Closing.

(c)     Moorage Fees. Seller has prepaid moorage fees for LADY ANGELA and PORTAGE BAY to Seward Boat Harbor through October 1, 2025, and October 4, 2025, respectively. The moorage shall be prorated as of the Closing Date.

(d)     Prorations Generally.  If any of the items described above cannot be finally apportioned at the Closing because of the unavailability of the amounts to be apportioned or otherwise, or are incorrectly apportioned at or after Closing, such items must be apportioned or reapportioned, as the case may be, as soon as practicable after the Closing or the date such error is discovered or the event giving rise to an apportionment or reapportionment occurs, as applicable.

**Section 3.5     Possession and Risk of Loss.**  Buyer will be deemed to have taken possession of all Acquired Assets, wherever located, on the Closing Date.  Buyer assumes all risk of loss by fire or other casualty and all risks relating to all the Acquired Assets on the Closing Date and after.

**Section 3.6     Closing Escrow**.  The Closing will be accomplished through an escrow to be established jointly by the Parties with the Escrow Agent pursuant to escrow instructions reasonably acceptable to the Escrow Agent and each of the Parties.

## ARTICLE 4
## SELLER'S REPRESENTATIONS AND WARRANTIES

As an inducement to Buyer to enter into this Agreement, Seller represents and warrants to Buyer that:

**Section 4.1     Organization and Authorization.**  Subject to the entry of the Sale Order, Seller has all necessary power and authority to enter into this Agreement and has taken all company action necessary to execute and deliver this Agreement, to consummate the transactions contemplated by this Agreement, and to perform Seller's obligations under this Agreement. No other company proceedings on Seller's part are necessary to authorize the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated by this Agreement.  This Agreement has been duly executed and delivered by Seller and is a valid and binding obligation of Seller, enforceable against it in accordance with its terms.  Each agreement or instrument that has been or will be entered into or executed and delivered by Seller in connection with the transactions contemplated by this Agreement has been (or will be) duly authorized, executed and delivered by Seller, and is (or will be when authorized, executed and delivered) a valid and binding obligation of Seller, enforceable against it in accordance with its terms.

2837 if02k301xy

**Section 4.2     No Violation.**  Except to the extent not enforceable due to operation of applicable bankruptcy law or the Sale Order, the execution, delivery, and performance of this Agreement and the consummation of its contemplated transactions by Seller do not and will not require any authorization, consent, approval, exemption, or other action by or notice or declaration to, or filing with, any court or administrative or other Governmental Authority or any third party, including, without limitation, under the provisions of Seller's operating agreement or other constitutive documents.

**Section 4.3     Governmental Consents and Approvals.**  Except for the Sale Order, to Seller's Knowledge, there are no consents, waivers, agreements, approvals, permits, or authorizations of, or declarations, filings, notices, or registrations to or with, any Governmental Authority required to be made or obtained by Seller in connection with the execution, delivery, and performance of this Agreement and the consummation of its contemplated transactions.

**Section 4.4     Title to Assets.**

(a)     Seller has good and marketable title to the Acquired Assets.

(b)     Subject to Court approval, Seller has the power and the right to sell, assign, and transfer, and Seller will sell and deliver to Buyer and, on consummation of the transactions contemplated by this Agreement, Buyer will acquire, good and marketable title to the Acquired Assets free and clear of all Liens.

**Section 4.5     As Is.**  Except as expressly set forth in this Agreement, the Acquired Assets are sold "***As Is, Where Is***." Except for the representations and warranties expressly set forth in this <u>ARTICLE 4</u>, Seller neither makes nor implies any other representation or warranty, including a warranty of fitness for a particular purpose or a warranty of merchantability.

**Section 4.6     Personal Property Taxes.**  All Personal Property Taxes that are the responsibility of Seller under <u>Section 3.4</u> above have been paid or will be paid in full as of the Closing.

# ARTICLE 5
# REPRESENTATIONS AND WARRANTIES OF BUYER

As an inducement to Seller to enter into this Agreement, Buyer represents and warrants to Seller that:

**Section 5.1     Organization.**  Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of Alaska.

**Section 5.2     Authorization.**  Buyer has all necessary power and authority to enter into this Agreement and has taken all company action necessary to execute and deliver this Agreement, to consummate the transactions contemplated by this Agreement, and to perform Buyer's obligations under this Agreement. No other company proceedings on Buyer's part are necessary to authorize the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated by this Agreement. This Agreement has been duly executed and delivered by Buyer and is a valid and binding obligation of Buyer, enforceable

against it in accordance with its terms.  Each agreement or instrument that has been or will be entered into or executed and delivered by Buyer in connection with the transactions contemplated by this Agreement has been (or will be) duly authorized, executed and delivered by Buyer, and is (or will be when authorized, executed and delivered) a valid and binding obligation of Buyer, enforceable against it in accordance with its terms.

**Section 5.3    Governmental Consents and Approvals.**  To Buyer's Knowledge, other than the Sale Order, no consent, waiver, agreement, approval, permit, or authorization of, or declaration, filing, notice or registration to or with, any United States federal or state governmental or regulatory authority is required to be made or obtained by Buyer in connection with the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated by this Agreement.

**Section 5.4    No Violation.**  The execution and delivery of this Agreement and the other agreements specified in it and the consummation of the transactions contemplated by this Agreement do not and will not (a) violate any provision of Buyer's organizational documents or (b) conflict with or violate any statute or law, or any judgment, decree, order, regulation, or rule of any court or Governmental Authority binding on or applicable to Buyer or by which the property or assets of Buyer are bound or affected.

**ARTICLE 6**
**ADDITIONAL COVENANTS**

**Section 6.1    Further Assurances.**

(a)    Buyer and Seller shall use commercially reasonable efforts to timely obtain any consent, provide necessary information, or address any other issues required for the consummation of the transactions contemplated by this Agreement.

(b)    Buyer and Seller will execute any documents and use commercially reasonable efforts to take or cause to be taken all actions necessary, proper, or advisable to consummate the transactions contemplated by this Agreement but neither Buyer nor Seller is required to make any payments to any party, except as set forth in this Agreement.

**ARTICLE 7**
**CONDITIONS TO SELLER'S OBLIGATIONS**

The obligation of Seller to sell the Acquired Assets and to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or before the Closing Date, of each of the following conditions, any of which Seller may waive (in whole or in part) in accordance with Section 10.4 below.

**Section 7.1    Covenants and Representations.**  Each of Buyer's representations and warranties contained in ARTICLE 5 above are true in all material respects as of the Closing Date as though made on that date (except that representations and warranties explicitly made as of a specific date need only be true as of that specific date), and the Buyer has performed in all material respects all covenants, agreements, and conditions required by this Agreement to be performed, satisfied, and complied with by Buyer on or before the Closing.

**Section 7.2**        **Litigation.**  No action, suit, or other proceeding is pending before any Governmental Authority seeking or threatening to restrain, seek damages in respect of, or prohibit the consummation of the transactions contemplated by this Agreement.

**Section 7.3**        **Court Approval.**  The Court has entered the Sale Order.

**Section 7.4**        **Closing.**  The Closing has occurred on or before the Closing Date.

**Section 7.5**        **Closing of the Whittier Transaction**. The closing of the transaction with The Alaska Wild Seafoods LLC and Whittier Seafood LLC (the "Whittier Transaction") related to the Asset Purchase Agreement dated of even date herewith (the "Whittier APA") concerning the Processing Plant, certain real property, and Equipment and other personal property (as those terms are defined in the Whittier APA) shall close on or before the Closing of the transaction contemplated by this Agreement, or simultaneously therewith.

**Section 7.6**        **Purchase Price.** Buyer has delivered the Purchase Price as set forth in Section 2.4 above.

**Section 7.7**        **Deliveries.**  On or before the Closing Date, Buyer has delivered to Seller all of the following:

(a)        a certificate from Buyer in a form reasonably satisfactory to Seller, dated as of the Closing Date, stating that the conditions specified in Section 7.1 above have been satisfied.

# ARTICLE 8
## CONDITIONS TO BUYER'S OBLIGATIONS

The obligations of Buyer to purchase the Acquired Assets and to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or before the Closing Date, of each of the following conditions, any of which Buyer may waive (in whole or in part) in accordance with Section 10.4 below:

**Section 8.1**        **Representations, Warranties and Covenants.**  Each of Seller's representations and warranties contained in ARTICLE 4 above are true in all material respects as of the Closing Date as though made on that date (except that representations and warranties that are expressly made as of a specific date need only be true as of that specific date), and the Seller has performed in all material respects all covenants, agreements, and conditions required by this Agreement to be performed, satisfied, and complied with Seller on or before the Closing Date.

**Section 8.2**        **Litigation.**  No action, suit, or other proceedings is pending before any Governmental Authority seeking or threatening to restrain, seek damages in respect of, or prohibit the consummation of the transactions contemplated by this Agreement.

**Section 8.3**        **Court Approval.**  The Sale Order shall have been entered on or before April 30, 2025, and shall not be subject to a court order staying the effect of the Sale Order.

2837 if02k301xy

**Section 8.4        Approvals and Consents.**  All necessary consents, including any deemed consents as set forth in the Sale Order, have been duly obtained, made or given, and are not subject to the satisfaction of any condition that has not been satisfied or waived.

**Section 8.5        Deliveries.**  On or before the Closing Date, Seller has delivered to Buyer all of the following:

(a)        a certificate in a form reasonably satisfactory to Buyer, dated as of the Closing Date, stating that the conditions specified in <u>Section 8.1</u> have been satisfied;

(b)        documentation sufficient to allow Buyer to obtain immediate possession of the Vessels from their respective docks or drydocks, free and clear of any dockage fees as well as all other Liens, including documents evidencing no obligations on Buyer's part; and

(c)        the documents and instruments called for in <u>Section 3.2(a)</u> above.

## ARTICLE 9
## TERMINATION; REMEDIES

**Section 9.1        Termination.**  This Agreement may be terminated, in writing, at any time before Closing:

(a)        by mutual written consent executed by both Buyer and Seller;

(b)        by Buyer if Seller is in material breach of any material covenant, representation, undertaking or warranty that would prevent a condition in Article 8 from being satisfied, and, if curable, is not cured within ten (10) Business days after written notice from Buyer, or if a condition set forth in ARTICLE 8 is impossible (other than through the failure of Buyer to comply with its obligations under this Agreement) to satisfy and Buyer has not waived such condition in writing on or before the Closing Date;

(c)        by Seller if Buyer is in material breach of any material covenant, representation or warranty that would prevent a condition in Article 7 from being satisfied, and, if curable, is not cured within ten (10) Business days after written notice from Seller, or if it appears that a condition set forth in ARTICLE 7 is impossible (other than through the failure of Seller to comply with its obligations under this Agreement) to satisfy and Seller has not waived such condition in writing on or before the Closing Date; and

(d)        by both Buyer and/or Seller upon Seller's closing of the sale of all or substantially all of the Acquired Assets to a party or parties other than Buyer pursuant to one or more Overbids; and

(e)        by either party if the Closing has not occurred on or before April 30, 2025, or ten days after entry of the Sale Order, whichever is later, unless a later date is agreed in writing by the Parties.

**Section 9.2        Obligations on Termination.**  If this Agreement terminates under <u>Section 9.1</u> above:

(a)      each Party must redeliver to the furnishing Party all documents, work papers, and other material of the other Party relating to the transactions contemplated by this Agreement, whether obtained before or after Execution;

(b)      all obligations of the Parties under this Agreement terminate, except as set forth in this Section 9.2;

(c)      neither Party has any liability to the other Party except for any obligation to pay any damages awarded by the Court associated with a Party's breach of this Agreement ("Damages");

(d)      except for any Damages, each Party bears its own expenses incurred in connection with the negotiation, preparation, execution, and performance of this Agreement;

(e)      if Seller terminates this Agreement because Buyer fails to close without justification and Seller is unable to close a transaction for the Acquired Assets to another buyer pursuant to a Back-Up Bid (as contemplated by the Bid Procedures), Seller may seek an order from the Court instructing the Deposit Agent to pay Seller the Deposit as liquidated damages on account of Buyer's breach;

(f)      unless used to pay Damages to Seller, the Deposit Agent must return the Deposit to the Buyer within one Business Day of the date of termination; and

(g)      the Deposit Agent's obligations regarding the Deposit under this Section 9.2 survive termination of this Agreement.

## ARTICLE 10
## MISCELLANEOUS

**Section 10.1      Assignment; Successors.**  Neither this Agreement nor any of the rights or obligations under it may be assigned by either Party without the other Party's prior written consent, but: (a) Buyer may assign some or all of its rights under this Agreement to any of its Affiliate so long as Buyer remains liable for its obligations; and (b) Buyer may assign its rights under this Agreement as collateral security to any lender providing Buyer with acquisition financing. Subject to the foregoing, this Agreement binds and inures to the benefit of the Parties and their respective representatives, heirs, legatees, successors, and permitted assigns. No other person has any right, benefit, or obligation under this Agreement.

**Section 10.2      Notices.**  All notices, requests, demands, and other communications given under this Agreement must be in writing and are deemed given: (a) if personally delivered, when received; (b) if transmitted by email, on receipt of delivery confirmation; (c) if sent for next-day delivery to a domestic address by recognized overnight delivery service (*e.g.*, Federal Express), on the day after sending; and (c) if sent by certified or registered mail, return receipt requested, when received.  Notices, demands, and communications must be sent to the following addresses:

| | |
|---|---|
| If to Buyer: | If to Seller: |
| Alaska Whitecap Seafoods LLC | |
| 821 N St., Suite 102 | Silver Wave, LLC |
| Anchorage, AK 99501 | Attn: Aleksey Kozlov |
| Email: jordonlee164@gmail.com | 3 Lake Bellevue Drive, Suite 201 |
| caquatico@gmail.com | Bellevue, WA 98005 |
| | Email: alekseyk@marinefishingint.com |
| | |
| With a copy to: | With a copy to: |
| | |
| Perkins Coie | Bush Kornfeld LLP |
| 1201 Third Ave., Suite 4900 | 601 Union Street, Suite 5000 |
| Seattle, WA 98101 | Seattle, WA 98101 |
| Attn: Alan Smith | Attn: Jim Day |
| Emal: adsmith@perkinscoie.com | Email: jday@bushkornfeld.com |

or to any other address or email address as a Party may designate by written notice to the other Party.

Section 10.3    **Choice of Law; Submission to Jurisdiction.**  This Agreement must be construed and interpreted, and the rights of the parties determined in accordance with, the laws of the State of Alaska, except to the extent the Bankruptcy Code (11 U.S.C. §§ 101 et seq.) governs. Each Party irrevocably consents to the service of any process in any action or proceeding arising out of or relating to this Agreement by the mailing of copies of such process to each Party at its address specified in Section 10.2 above.  The Parties irrevocably submit to the exclusive jurisdiction of the Court (or any court exercising appellate jurisdiction over the Court) over any dispute arising out of or relating to this Agreement, the Sale Order, or any other agreement or instrument contemplated by or entered into in connection with this Agreement or the Sale Order. Each Party irrevocably agrees that any claim in respect of any such dispute or proceedings may be heard and determined in the Court.  The Parties irrevocably waive to the fullest extent permitted by applicable law any objection to the venue or any defense of inconvenient forum relating to any such dispute or proceeding brought in the Court.

Section 10.4    **Entire Agreement; Amendments and Waivers.**  This Agreement, together with all its Exhibits and Schedules, constitutes the entire agreement among the Parties pertaining to this Agreement's subject matter and supersedes all prior agreements, understandings, negotiations, and discussions, whether oral or written, with regard to this Agreement's subject matter.  No amendment of this Agreement is effective unless executed in writing by both Parties. No waiver of any of this Agreement's provisions is effective unless made in a writing by the waiving Party. No waiver of any single provision of this Agreement constitutes either a waiver of any other of this Agreement's provisions (whether or not similar) or a continuing waiver unless otherwise expressly provided.

Section 10.5    **Construction.**  The headings and captions of the various Articles and Sections of this Agreement have been inserted solely for purposes of convenience, are not part of

this Agreement, and may not be deemed in any manner to modify, explain, expand, or restrict any of the provisions of this Agreement.  Unless stated to the contrary, all references in this Agreement to Articles, Sections, paragraphs, sentences, or clauses are to the specified Article, Section, paragraph, sentence, or clause of this Agreement, and all references to Exhibits and Schedules are to the specified Exhibits and Schedules attached to this Agreement, all of which constitute a part of this Agreement.  All terms defined in this Agreement have the same meanings in the Exhibits and Schedules except as otherwise provided in the Exhibits and Schedules.

**Section 10.6**    **No Third Party Beneficiaries.**  No Person other than the Parties have any rights or claims under this Agreement.

**Section 10.7**    **No Waiver.**  The failure of either Party to seek redress for any breach, or to insist on the strict performance, of any covenant or condition of this Agreement by the other Party does not waive the breach or failure to perform nor prevent a subsequent act or omission in violation of, or not strictly complying with, the terms of this Agreement from constituting a default under this Agreement.

**Section 10.8**    **Counterparts.**  This Agreement may be executed in one or more counterparts, each of which constitutes an original and all of which, taken together, constitute one instrument.

**Section 10.9**    **Delivery by Email.**  This Agreement and any other agreement or instrument entered into in connection with or contemplated by this Agreement, and any amendments, if signed and delivered by email, must be treated in all respects as an original, legally-binding agreement or instrument as if it were the original delivered in person.  No Party may raise the use of email to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through email as a defense to enforceability.

**Section 10.10**    **Invalidity.**  The invalidity, illegality, or unenforceability of any portion of any provision of this Agreement or any instrument referred to in this Agreement does not affect the validity, legality, and enforceability of any other portion of any other provision of this Agreement or such instrument.

**Section 10.11**    **Further Assurances.**  Without limiting any other rights or obligations of the Parties contained in this Agreement, following the Closing, each Party agrees to execute or cause to be executed any documents, instruments, or conveyances and to take any actions reasonably requested by the other Party to effectuate the purposes of this Agreement including, without limitation, any instruments Buyer reasonably requests to vest Buyer with title to the Acquired Assets in accordance with this Agreement.

**Section 10.12**    **Cumulative Remedies.**  All rights and remedies of either Party under this Agreement are cumulative of each other and of every other right or remedy that Party may otherwise have at law or in equity. The exercise of one or more rights or remedies does not affect the concurrent or subsequent exercise of any other rights or remedies.

**Section 10.13**    **Currency.**  Except as otherwise expressly provided in this Agreement, all dollar amounts are stated in United States dollars.

**Section 10.14     Representation by Counsel; Mutual Negotiation.**  Each Party has been represented by counsel of its choice in negotiating this Agreement.  This Agreement has been negotiated and prepared at the Parties' joint request, direction, and construction, at arm's length, with the advice and participation of counsel, and must be interpreted in accordance with its terms without favor to either Party.

**Section 10.15     Post-Closing Dispute Resolution.**  Either Party may submit to the Court any controversy, claim, or dispute arising out of or relating to this Agreement after the Closing that is not resolved within 30 days after written notice to the affected party of such controversy, claim, or dispute.  The Court shall have exclusive jurisdiction to resolve any such controversy, claim, or dispute.  The prevailing Party is entitled to its reasonable attorneys' fees and costs as determined and awarded by the Court.

**Section 10.16     Transfer Taxes.**  .Buyer is responsible for and must pay any transfer, sales, use, or other such Taxes or fees required to be paid with respect to this Agreement or the sale of the Acquired Assets to Buyer.

The Parties have caused this Agreement to be executed by their respective duly-authorized individuals as of the day and year first above written.

**SILVER WAVE, LLC**

By:_____
　　Aleksey Kozlov
Its: Authorized Person

**Alaska Whitecap Seafoods LLC**

By:_____
　　Li Zhang
Its: Authorized Person

2837 if02k301xy

**Section 10.14    Representation by Counsel; Mutual Negotiation.** Each Party has been represented by counsel of its choice in negotiating this Agreement. This Agreement has been negotiated and prepared at the Parties' joint request, direction, and construction, at arm's length, with the advice and participation of counsel, and must be interpreted in accordance with its terms without favor to either Party.

**Section 10.15    Post-Closing Dispute Resolution.** Either Party may submit to the Court any controversy, claim, or dispute arising out of or relating to this Agreement after the Closing that is not resolved within 30 days after written notice to the affected party of such controversy, claim, or dispute. The Court shall have exclusive jurisdiction to resolve any such controversy, claim, or dispute. The prevailing Party is entitled to its reasonable attorneys' fees and costs as determined and awarded by the Court.

**Section 10.16    Transfer Taxes.** .Buyer is responsible for and must pay any transfer, sales, use, or other such Taxes or fees required to be paid with respect to this Agreement or the sale of the Acquired Assets to Buyer.

The Parties have caused this Agreement to be executed by their respective duly-authorized individuals as of the day and year first above written.

**SILVER WAVE, LLC**

By:_____
Aleksey Kozlov
Its: Authorized Person


**Alaska Whitecap Seafoods LLC**

By:_____
Li Zhang
Its: Authorized Person

## SCHEDULES

Schedule 1.1(c)      Bid Procedures

Schedule 1.1(bb)     Sale Order

Schedule 2.1(a)      Vessels

Schedule 2.5       Allocation of Purchase Price

**SCHEDULE 1.1(c)**

**Bid Procedures**

2837 if02k301xy

James L. Day, (admitted *pro hac vice*)
Thomas A. Buford, AK Bar No. 1805046
Lesley Bohleber, (admitted *pro hac vice*)
Bush Kornfeld LLP
601 Union Street, Suite 5000
Seattle, WA 98101-2373
Telephone: (206)292-2110
Fax: (206) 292-2014
Email: jday@bskd.com;
tbuford@bskd.com; lbohleber@bskd.com
Proposed Attorneys for Debtors

HONORABLE GARY SPRAKER

UNITED STATES BANKRUPTCY COURT
DISTRICT OF ALASKA AT ANCHORAGE

| | |
|---|---|
| In re | Chapter 11 |
| WHITTIER SEAFOOD, LLC, [1] | Lead Case No. 24-00139 |
| Debtors. | Jointly Administered |
| | **NOTICE OF ENTRY OF ORDER APPROVING BIDDING AND NOTICE PROCEDURES RELATED TO THE ASSETS OF WHITTIER SEAFOOD, LLC AND SILVER WAVE, LLC** |

**PLEASE TAKE NOTICE** that on January 14th, 2025, the Court entered an order (the "Bidding Procedures Order") approving the following procedures for the selection of a Stalking Horse Bid and the Bid Deadline associated with the sale of the Whittier and Silver Wave's Property [Dtk. 259].

///

///

///

///

---

[1] The Debtors are Marine Fishing International, Inc. ("MFI Inc."), Case No. 24-00140; Marine Fishing International, LLC ("MFI LLC"), Case No. 24-00141; Modys, LLC ("Modys"), Case No. 24-00142; Salacia, LLC ("Salacia"), Case No. 24-00143; Silver Wave, LLC ("Silver Wave"), Case No. 24-00144; and Whittier Seafood, LLC ("Whittier") (collectively, the "Whittier Group").

**NOTICE OF ENTRY OF ORDER APPROVING
BIDDING AND NOTICE PROCEDURES** – Page 1

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

2837 hk22hm01r6

The approved Bidding Procedures, including pertinent bid submission deadlines, governing the bidding and sale of the Property are attached here to as **Exhibit A**.

DATED this 16th day of January, 2025.

BUSH KORNFELD LLP

By    */s/ Lesley Bohleber*
    James L. Day, (admitted *pro hac vice*)
    Thomas A. Buford, AK Bar No. 1805046
    Lesley Bohleber, (admitted *pro hac vice*)
    *Proposed Attorneys for the Debtors*

**NOTICE OF ENTRY OF ORDER APPROVING
BIDDING AND NOTICE PROCEDURES** – Page 2

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

2837 hk22hm01r6

# EXHIBIT A

James L. Day, (admitted *pro hac vice*)
Thomas A. Buford, AK Bar No. 1805046
Lesley Bohleber, (admitted *pro hac vice*)
Bush Kornfeld LLP
601 Union Street, Suite 5000
Seattle, WA 98101-2373
Telephone: (206)292-2110
Fax: (206) 292-2014
Email: jday@bskd.com;
tbuford@bskd.com; lbohleber@bskd.com
Proposed Attorneys for Debtors

HONORABLE GARY SPRAKER

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF ALASKA AT ANCHORAGE

| | |
|---|---|
| In re | Chapter 11 |
| WHITTIER SEAFOOD, LLC, [1] | Lead Case No. 24-00139 |
| Debtors. | Jointly Administered |
| | BIDDING PROCEDURES FOR THE SALE OF THE WHITTIER AND SILVER WAVE PROPERTY |

The following terms and procedures ("Bidding Procedures") shall govern the bidding

process, auction (the "Auction"), if applicable, and sale to one or more third-party buyers of the

assets of Whittier and Silver Wave (collectively, the "Sellers") as conducted by the Sellers through

their investment banker Hilco Corporate Finance ("Hilco") in the above referenced chapter 11

---

[1] The Debtors are Marine Fishing International, Inc. ("MFI Inc."), Case No. 24-00140; Marine Fishing International, LLC ("MFI LLC"), Case No. 24-00141; Modys, LLC ("Modys"), Case No. 24-00142; Salacia, LLC ("Salacia"), Case No. 24-00143; Silver Wave, LLC ("Silver Wave"), Case No. 24-00144; and Whittier Seafood, LLC ("Whittier") (collectively, the "Whittier Group").

bankruptcy proceedings. If there is any discrepancy between these Bidding Procedures and marketing materials previously shared with any potential bidders, these Bidding Procedures shall prevail.

### Description of the Property

The Sellers, through Hilco, are soliciting bids for the assets of the Sellers, which includes the following:

- For Whittier, a 26,000 square foot food processing plant; a 32,000 square foot building that contains the roe house, kitchen, cafeteria, rec room, and maintenance shop; 10 condominiums in the Begich Towers; two VIP condominiums; a 40-person bunkhouse; 26-eight person bunkhouses with showers; warehousing and storage units; and certain inventory and non-fixed assets.

- For Silver Wave, three sailing vessels, including the Lady Angela, the Esther Point, and the Portage Bay; and certain receivables.

All assets in this section shall be deemed to be the "Property."

### Important Dates and Deadlines

The following dates and deadlines shall be and hereby are established, each as may be extended by the Sellers or their counsel and without further order from the Bankruptcy Court:

| Event | Date/Deadline |
|---|---|
| File and Serve Notice of Bidding Procedures | Two business days following entry of the order approving Notice of Bidding Procedures and Bidding Procedures |
| Indication of Interest and/or Stalking Horse Bid Deadline (the "Initial Deadline") | Monday January 13, 2025 at 5:00 p.m. Alaska Time |
| File and Serve Notice of Selection of Stalking Horse Bid (if applicable) and/or Auction Notice ("Stalking Horse Designation Deadline") | Monday January 27, 2025 at 5:00 p.m. Alaska Time |

**Bidding Procedures Whittier Seafood, LLC and Silver Wave, LLC**     2

2837 ia09kv01dc

| Deadline for Submission of Materials to become a Qualified Bidder ("Qualified Bid Deadline") | Monday February 10, 2025 at 5:00 p.m. Alaska Time |
|---|---|
| Auction (if necessary) | Friday February 14, 2025 at 12:00 p.m. Alaska Time |
| File and Serve Sale Notice and Motion | As soon as reasonably practical following (1) the conclusion of Auction (if necessary); or (2) February 18, 2025, if no Auction is necessary |
| Sale Hearing (subject to the Court's availability) | Not less than 7 (seven) days after the date of the Notice of Hearing on Sale Motion subject to the Court's availability |
| Sale Close | As soon as practical after entry of the Sale Order |

**Submission of Indication of Interest**

Each party who intends to submit a bid on or before the Qualified Bid Deadline (an "Interested Party") shall submit the following by the Initial Deadline:

(a)     A term sheet summarizing the material terms of any potential bid;

(b)     Disclosure of the source of funds sufficient to close the transaction;

(c)     A description of the Property for which the Interested Party intends to submit a bid; and

(d)     A statement indicating whether or the Interested Party will serve as a Stalking Horse Bidder.

(the "Indication of Interest").

The submission of an Indication of Interest shall not obligate an Interested Party to submit a bid by the Qualified Bid Deadline.

Any Stalking Horse Bid must meet the requirements to be designated as a Qualified Bid as defined below.

2837 ia09kv01dc

**Reporting of Indication of Interest**

On or before Thursday January 16, 2025, Sellers shall provide a report to Cathay Bank and the Official Unsecured Creditors' Committee of Whitter (the "Committee"), through their respective counsel, containing a report of each Indication of Interest received (the "Indication of Interest Report") including, for each Indication of Interest, the bid amount and the Property that is the subject of the bid, including allocation of purchase price if available. The Indication of Interest Report and the contents thereof shall remain confidential among the Sellers, Hilco, Cathay Bank, and the Committee until the earlier of (i) the filing of a Sale Notice and Motion or (ii) February 19, 2025.

**Submission of Bids and Qualified Bidders**

Each bidder (a "Prospective Bidder") interested in purchasing some portion or all of the Property must meet the requirements set forth herein and thereafter will be deemed a "Qualified Bidder" with a "Qualified Bid" by the Sellers; provided, however, each party that holds liens against certain Property is automically deemed a Qualified Bidder with regard to its respective collateral.  To become a Qualified Bidder, a Prospective Bidder shall, on or before the Qualified Bid Deadline, deliver the following written information by email or hard copy to the Bid Notice Parties (as defined below):

(a)    **Identity of the Proposed Buyer and Investor:**  The name, the jurisdiction of the organization, and a description of the entity that is intended to be the buyer, as well as its ultimate parent entity, any other relevant affiliates, and any proposed co-investors or other relevant parties that would be participating in the proposed transaction.  In addition, the name of the proponent of the bid and identification of an officer or representative who is fully and completely authorized in

**Bidding Procedures Whittier Seafood, LLC and Silver Wave, LLC**                    4

all respects to appear, act on behalf of, and legally bind such proponent (an "Authorized Representative").

(b)      **APA and Other Transaction Documents:**  An asset purchase agreement that is in substantially the same form as the Form APA (defined below), if any, with a redlined version to show clearly any revisions or changes to the Form APA (an "Asset Purchase Agreement"), along with any other transaction documents pursuant to which the Prospective Bidder proposes to effectuate the sale.  The transaction documents shall identify the specific assets of the Property being purchased and any executory contracts and unexpired leases of the Sellers that the bidder wishes to have assumed and assigned to it pursuant to the sale, including proposed payment of any applicable cure amounts due.

(c)      **Purchase Price:**  The proposed purchase price must be in U.S. dollars or in the form of a credit bid, with any non-cash consideration set forth in detail, including proposed assumption of liabilities and/or cure costs, if any. If the proposed purchase price includes a form of consideration other than cash, the Prospective Bidder must provide details necessary to value the non-cash consideration, and the Sellers shall value the non-cash consideration to determine the non-cash consideration's value as part of the proposed purchase price. The bid must include proof of financial ability to consummate the sale in a timely manner. To the extent a successful credit bid would require a Prospective Bidder to satisfy senior liens or encumbrances with cash at closing, Sellers may require the Prospective Bidder to offer evidence of its ability to provide the required cash at closing.

(i)      Allocation of Purchase Price.  Each Qualified Bid must include an allocation of the purchase price that identifies the asset to be purchased and the amount of the purchase price to be allocated to a particular asset, including following, as applicable: (1) Whittier

**Bidding Procedures Whittier Seafood, LLC and Silver Wave, LLC**                    5

real property, including the Whitter Plant; (2) Whitter equipment; (3) each of the Silver Wave Vessels; and (4) Silver Wave receivables.

(d)    **Good Faith Deposit:** Each Qualified Bid must be accompanied by a good faith deposit (each, a "<u>Good Faith Deposit</u>") in the form of cash (or other form acceptable to the Sellers in their sole discretion) in an amount equal to ten percent (10%) of the proposed purchase price for the applicable assets. Each bid, with all of the aforementioned information, shall be delivered to the following parties (collectively, the "<u>Bid Notice Parties</u>"):

- Investment Banker for the Sellers, Hilco Corporate Finance, 401 N. Michigan, Suite 1630, Chicago, IL 60611 (Attn: Teri Stratton (tstratton@hilcocf.com), Kyle Herman (kherman@hilcocf.com) and Sanjay Marken (smarken@hilcocf.com));

- Counsel for the Sellers, Bush Kornfeld LLP, 601 Union St., Suite 5000, Seattle, WA 98101 (Attn: Thomas Buford (tbuford@bskd.com), Jim Day (jday@bskd.com) and Lesley Bohleber (lbohleber@bskd.com)).

**Bid Review Process.**

The Sellers will evaluate bids and, based upon its evaluation of the content of each bid, may, as it may deem appropriate and in a manner consistent with applicable law, engage in negotiations with any Prospective Bidder for the purposes of (i) curing any deficiencies in a bid requirements as set forth herein, (ii) improving the terms of the Prospective Bidder's bid, or (iii) otherwise promoting a more competitive bidding and Auction process with the ultimate goal of maximizing the value of the Property.

In evaluating a bid, the Sellers may take into consideration any and all factors that they may deem reasonably pertinent, including (i) the amount of the proposed purchase price and proposed form of consideration; (ii) any Property included in, or excluded from, the bid, including any contracts marked for assumption and assignment; (iii) the value to be provided to the estate under the bid, including the net economic effect on the estates; (iv) any benefit to the estate from

2837 ia09kv01dc

any assumption or waiver of liabilities contemplated by the bid; (v) the structure of the proposed sale transaction and any attendant execution risk, including conditions to, timing of, and certainty of closing, termination provisions, availability of financing, and general financial wherewithal to meet all commitments, and any required governmental approvals; and (vi) the impact of the proposed sale transaction on the Sellers' trade creditors, landlord(s), and any other parties in interest.

The Sellers shall have sole discretion in deeming a bid a Qualified Bid. The Sellers will evaluate timely bids and will notify Prospective Bidders whether they accept the bid as a Qualified Bid, and whether an Auction will be conducted as soon as commercially reasonable following the Qualified Bid Deadline as set forth herein. No Qualified Bidder shall modify, amend, or withdraw its bid unless for the purposes of increasing the purchase price or otherwise improving the terms of the bid, as determined by the Sellers.

**Minimum Bid Requirements; Stalking Horse Procedure**

a)      Whittier may, but is not required to, set a minimum bid for the Whittier Property (the "Minimum Bid Requirement"). The value ascribed to any bid by Whittier must exceed the Minimum Bid Requirement (if any) for such assets in order to be designated a Qualified Bid (as defined below).

b)      The Sellers may, but are not required to, approve a form Asset Purchase Agreement (the "Form APA") for the Property. The Form APA may be subsequently amended or replaced by the Sellers.

c)      Notwithstanding the foregoing, on or before the Stalking Horse Designation Deadline, Whittier the Sellers may select and designate one or more bids as a stalking horse bid (each, a "Stalking Horse Bid" and any such bidder, a "Stalking Horse Bidder") for some portion

or all of the Property.  If the Sellers select one or more Stalking Horse Bids, the Sellers shall file a notice with the Court of the acceptance of such Stalking Horse Bid(s) (the "<u>Stalking Horse Notice</u>").  The Stalking Horse Notice shall include a copy of at least one of the following: (i) all the Stalking Horse Bidders' asset purchase agreements (the "<u>Stalking Horse APA</u>"); (ii) term sheet; or (iii) a summary of the material terms of the Stalking Horse Bid.  The Stalking Horse APA(s) may be deemed to be the Form APA and may replace any prior Form APAs previously approved by the Sellers with respect to the Property subject to the Stalking Horse Bid(s).  The Sellers may agree to a break-up fee equal to 3% of the total sale price, not to exceed $200,000 (as agreed by the Sellers, the "<u>Bid Protections</u>"), without further order from this Court.  The value of a Stalking Horse Bid, plus any Bid Protections and minimum overbid requirements (as set forth below), shall be deemed to be the minimum bid amount for the Property.

d)    In the event Whittier does not designate a Stalking Horse Bid, Whittier may, but is not required to, set forth the Minimum Bid Requirement and minimum requirements to become designated as a Qualified Bidder in the Auction Notice.

e)    Sale of the Property shall be on an as-is, where-is basis, with any material representations and warranties limited to transfer of the Property free and clear of liens, claims, and encumbrances to the fullest extent allowed under applicable law.  The Form APA will reflect the foregoing.

**<u>The Auction</u>**

If the Sellers receive more than one bid for some portion or all of the Property, the Sellers will conduct an Auction for such Property.  If a Stalking Horse Bid is the only bid received in respect of some portion or all of the Property, the Sellers will not conduct an Auction for those

2837 ia09kv01dc

Property and may, but shall not be required to, seek approval of such Stalking Horse Bid by filing a notice with the Court (the "Sale Notice"), as set forth below.

The Auction, if required, shall take place at such time or location as the Sellers may determine, and shall communicate to any Stalking Horse Bidder and any other Qualified Bidder prior to the scheduled time. To be eligible to participate in the Auction, an Authorized Representative of a Qualified Bidder must appear at the Auction. If the Sellers conduct the Auction virtually, they will provide instructions setting forth how to attend the Auction to the participants and other attendees via electronic mail. The Sellers will promptly provide notice (via electronic mail or otherwise) of any change in the date, time, or location of the Auction to Qualified Bidders, and will promptly file notice of such change with the Court.

Only the following persons shall be allowed to appear at the Auction: (i) the Sellers and their professionals, including its counsel and Hilco, certain management of the Sellers as determined by the Sellers, or any other person determined by the Sellers; (ii) Authorized Representatives of Qualified Bidders (and their respective professionals); (iii) one or more representatives of the Official Committee of Unsecured Creditors and its counsel; (iv) an Authorized Representative of Cathay Bank and its counsel; and (v) such other parties as approved by the Sellers.

The Sellers will identify for all Qualified Bidders, including any Stalking Horse Bidder, the highest bid(s) received prior to the Auction.

The Sellers shall have the sole, ultimate discretion with respect to the conduct of the Auction and, among other things, may announce at the Auction any procedural rules, in addition to those set forth in these Bidding Procedures, that it determines to be appropriate under the circumstances (including for example, without limitation, the amount of time allotted to make

**Bidding Procedures Whittier Seafood, LLC and Silver Wave, LLC**                    9

subsequent alternative bids, etc.) for conducting the Auction, so long as such additional rules are not inconsistent with these Bidding Procedures.

All bids at the Auction shall be made in the presence of other Qualified Bidders, shall be submitted in writing, signed by the respective Qualified Bidder, and shall contain a certification that the Qualified Bidder (i) has not engaged in any collusion with respect to the sale or bidding (including that it has no agreement with any other Qualified Bidder to control the price) and (ii) its Qualified Bid is the good-faith *bona fide* offer and it intends to consummate the proposed transaction if selected as the winning bidder.

The Sellers reserve the right to adjourn the Auction one or more times to, among other things: (i) facilitate discussions between the Sellers and Qualified Bidders; (ii) allow Qualified Bidders to consider how they wish to proceed; and (iii) provide Qualified Bidders the opportunity to provide the Sellers with such additional evidence as the Sellers may require, that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or quity funding commitments to consummate the proposed transaction at the prevailing overbid amount.

**Determination of Successful Bid and Closing of Transaction**

Upon the conclusion of the Auction, the Sellers shall announce their determination of the highest and best bid(s) (a "Successful Bid" by a "Successful Bidder").  In determining the Successful Bid to submit to the Court for approval, the Sellers shall determine whether a bid of a Qualified Bidder constitutes the highest and/or best offer for some portion or all of the Property. In making this determination, the Sellers may consider any and all factors associated with all bids, including, but not limited to, factors such as the likelihood and ability of proposed buyers to consummate and close a transaction, other timing issues, employment issues, overall value of bids,

**Bidding Procedures Whittier Seafood, LLC and Silver Wave, LLC**          10

contracts and leases assumed by each bid and the impact of those issues on the Sellers' bankruptcy estates and its creditors, and any other factors deemed material to the Sellers.

The Qualified Bidder with the next-highest or otherwise second-best Qualified Bid (the "Back-Up Bid") for some portion or all of the Property, as applicable, at the Auction (if the Auction is conducted), as determined by the Sellers shall be required to serve as a back-up bidder (the "Back-Up Bidder"). The Sellers shall announce the identity of any Back-Up Bidder(s) and the amount and material terms of the Qualified Bid of the Back-Up Bidder(s) at the conclusion of the Auction at the same time the Sellers announce the identity of the Successful Bidder. The Back-Up Bidder(s) shall be required to keep its bid(s) open and irrevocable until the closing of the transaction with the applicable Successful Bidder. The Back-Up Bidder's Good Faith Deposit shall be held in escrow until the closing of the transaction with the applicable Successful Bidder. If a Successful Bidder fails to consummate its Successful Bid, the Sellers may select the applicable Back-Up Bidder as the Successful Bidder, and such Back-Up Bidder shall be deemed a Successful Bidder for all purposes. In such case, the defaulting Successful Bidder's deposit shall be forfeited to the Sellers, and the Sellers specifically reserve the right to seek all available remedies against the defaulting Successful Bidder, including with respect to specific performance.

In the event any Qualified Bidder is declared to be the Successful Bidder and such Qualified Bidder fails to timely perform under the Asset Purchase Agreement, the Sellers and the bankruptcy estate shall retain all rights, remedies, claims for monetary damages, counterclaims, and defenses, including but not limited to the right to seek equitable or injunctive relief.

2837 ia09kv01dc

**Bid Protections**

a) In the event the Sellers select a Stalking Horse Bidder and any such Stalking Horse Bidder is not the Successful Bidder and the Sellers consummate an alternative transaction(s) ("Alternative Transaction"), the Stalking Horse Bidder shall be entitled to receive from the bankruptcy estate, upon the consummation of such Alternative Transaction, the Bid Protections. Any Stalking Horse Bidder who submits a credit bid shall not be entitled to the Bid Protections.

b) No liens, security interests, or encumbrances shall attach to the Bid Protections. The Bid Protections shall be paid on a first-priority basis at the closing of the Alternative Transaction and shall be paid prior to any other distributions or payments by the Sellers contemplated in connection with such Alternative Transaction by the Successful Bidder; *provided*, *however*, that if an Alternative Transaction does not close, the Stalking Horse Bidder shall not be entitled to the Bid Protections.

c) At the time of and provided there is a closing of an Alternative Transaction, the Bid Protections shall constitute an administrative expense of the bankruptcy state and be paid before parties holding liens against the bankruptcy estate assets under 11 U.S.C. §§ 503(b) and 507.

d) In the event a Stalking Horse Bidder is the Successful Bidder and fails to close the sale without having its performance excused under the terms of the Stalking Horse Bid or with the consent of the Sellers, the Stalking Horse Bidder shall not be entitled to the Bid Protections if an Alternative Transaction is consummated.

2837 ia09kv01dc

**Sale Hearing**

In the event the Sellers designate a Stalking Horse Bidder and the Stalking Horse Bid is the only bid for the Property that are the subject of that Stalking Horse Bid, or there is only one bid for the Property that are the subject of that bid, then there shall be no Auction for such Property, and the Sellers may request that the Court approve the Stalking Horse Bid or sole bid by filing the Sale Notice and Motion with the Court containing the following information, as applicable: (i) a statement that the Auction for the Property has been canceled; (ii) the identity of the Successful Bidder; (iii) either a copy of the Successful Bid or a summary of the material terms of such bid that includes an allocation of the purchase price to any collateral of Cathay Bank that is the subject of the Successful Bid; (iv) the identity of any Back-Up Bidder, (v) the Asset Purchase Agreement or a summary of the material terms of any Back-Up Bid, and (vi) the objection deadline for objections to approval of the sale, which shall be seven (7) calendar days from the date of filing the Sale Notice and Motion.

If no Stalking Horse Bid is made or such a bid is terminated, withdrawn, void, or otherwise not intended to be performed by the Stalking Horse Bidder, or with the consent of the Stalking Horse Bidder, the Sellers shall have full authority to choose an alternative offer for the Property, which offer the Sellers shall present to the Court in the Sale Notice and Motion. Notwithstanding any provision of these Bidding Procedures, the Sellers may, at any point request that the Court approve a sale upon terms presented to the Court in the Sale Notice and Motion.

The Sellers shall be under no obligation to accept any bid that it deems, in its sole discretion, offers a sale price for less than fair market value of the Property.

In the event the Sellers conduct an Auction, the Successful Bid(s), as determined by the Sellers in accordance with these Bidding Procedures, shall be submitted to the Court for approval.

**Bidding Procedures Whittier Seafood, LLC and Silver Wave, LLC**                    13

2837 ia09kv01dc

After determining the Successful Bid(s), the Sellers will promptly file with the Court the Sale Notice and Motion containing the following information, as applicable: (i) a statement that the Auction for the Property was conducted; (ii) the identity of the Successful Bidder(s); (iii) either a copy of the Successful Bid(s) or a summary of the material terms of such bid(s) that includes an allocation of the purchase price to any collateral of Cathay Bank that is the subject of the Successful Bid; and (iv) the objection deadline for objections to approval of the sale(s), which shall be seven (7) calendar days from the date of filing the Sale Notice and Motion.

Parties shall have seven (7) calendar days from filing the Sale Notice and Motion to file with the Court and serve an objection to the approval of the sale(s).  If an objection is filed and the parties are unable to resolve such objection consensually, the Sellers will promptly request a hearing to approve the sale(s).

### Reservation of Rights to Modify Bidding Procedures

The Sellers reserve the right, and in a manner consistent with applicable law, to modify these Bidding Procedures, including to, among other things, extend or waive deadlines or other terms and conditions set forth herein; adopt new rules and procedures for conducting the bidding and Auction process so long as any such modifications are disclosed to all Bidders, as applicable; set forth qualified bidder procedures, or otherwise modify these Bidding Procedures to further promote competitive bidding for and maximize the value of the Property.

**Bidding Procedures Whittier Seafood, LLC and Silver Wave, LLC**                                          14

2837 ia09kv01dc

# SCHEDULE 1.1(bb)

## Sale Order

2837 if02k301xy

| | |
|---|---|
| | UNITED STATES BANKRUPTCY COURT |
| | DISTRICT OF ALASKA |
| | |
| | Chapter 11 |
| | |
| | Lead Case No. 24-00139-GS |
| | |
| In re | Jointly Administered |
| | |
| | ORDER (1) APPROVING SALE OF |
| | ASSETS FREE AND CLEAR OF LIENS, |
| | CLAIMS AND ENCUMBRANCES; |
| WHITTIER SEAFOOD, LLC, [1] | (2) APPROVING ASSUMPTION AND |
| | ASSIGNMENT OF ARRC LEASE; |
| | (3) DETERMINING THAT BUYER |
| | QUALIFIES AS GOOD FAITH |
| | PURCHASER UNDER 11 U.S.C. |
| Debtors. | SECTION 363(m); AND (4) |
| | AUTHORIZING DISTRIBTUIONS |
| | |
| | Hearing Date |
| | DATE: March 26, 2025 |
| | TIME: 9:30 a.m. |

THIS MATTER came before the Court at hearings on March 5, March 14 and March 26, 2025 (collectively, the "Sale Hearing"), on the *Motion For Order (1) Approving the Sale Of Assets Free and Clear; ( 2) Approving the Assumption and Assignment of Lease; (3) Determining Buyer is Good Faith Purchaser; and (4) Authorizing Distributions* [ECF No. 285] (the "Sale Motion"), filed by debtors Whittier Seafood, LLC ("Whittier") and Silver Wave, LLC ("Silver Wave") (each a "Debtor" and together, the "Debtors"), debtors-in-possession herein. The Court, having reviewed the files and records herein, including the Motion and it supporting declarations, and any objections or other responses to the Sale Motion, and having considered the presentations of counsel at the Sale Hearing, and deeming itself fully advised, the Court finds and concludes as follows:

---

[1] The Debtors are Marine Fishing International, Inc. ("MFI Inc."), Case No. 24-00140; Marine Fishing International, LLC ("MFI LLC"), Case No. 24-00141; Modys, LLC ("Modys"), Case No. 24-00142; Salacia, LLC ("Salacia"), Case No. 24-00143; Silver Wave, LLC ("Silver Wave"), Case No. 24-00144; and Whittier Seafood, LLC ("Whittier") (collectively, the "Debtors").

ORDER (1) APPROVING THE SALE OF ASSETS FREE AND CLEAR;
( 2) APPROVING THE ASSUMPTION AND ASSIGNMENT OF
LEASE; (3) DETERMINING BUYER IS GOOD FAITH PURCHASER;
AND (4) AUTHORIZING DISTRIBUTIONS – Page 1

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

A.     On January 14, 2025, the Court entered its *Order Approving Bid Procedures and Form of Notice* [ECF No. 259] (the "Bid Procedures Order"), which governed the procedures to be used in connection with the marketing and sale of Whittier's assets.  Among its provisions, the Bid Procedures Order shortened the notice period for the filing of the Sale Motion to seven days.  *See* ECF No. 259 at 4.

B.     On February 24, 2025, the Debtors filed the Sale Motion along with supporting declarations, *see* ECF Nos. 285-288 and 291, seeking authority to close and consummate the sales of the Debtors' assets (the "Sale") to the Buyer (as defined below) pursuant to the APAs.

C.     On February 25, 2025, the Debtors filed their *Certificate of Service* [ECF No. 289], which evidences that notice of the Sale Motion was disseminated on February 25, 2025.  The Debtors have provided proper, timely, adequate and sufficient notice of the Sale Motion and the Sale Hearing consistent with the notice requirements of the Bid Procedures Order.

D.     This Court has jurisdiction over the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(N) over which the Court has jurisdiction to enter a final order.  Venue is proper in this district and this Court under 28 U.S.C. § 1408.  The Sale Motion was properly before the Court at the Sale Hearing.

E.     In the Sale Motion, the Debtors sought approval of the sale of the Acquired Assets (as defined and detailed in the Sale Motion) pursuant to the terms of an Asset Purchase Agreement[2] (the "Whittier APA"[,3] or the "Silver Wave APA"[4], as applicable, and together the "Purchase Agreements"), with CMCC Co. Ltd. ("Initial Buyer") (together, the "Proposed Sales").

---

[2] Capitalized terms herein have the meaning identified in the Whittier APA or the Silver Wave APA, as applicable, unless otherwise indicated.
[3] Defined in the Motion as the "Whittier Purchase Agreement."
[4] Defined in the Motion as the "Silver Wave Purchase Agreement."

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

F.     On February 27, 2025, the Initial Buyer advised the Debtors' marketing firm, Hilco Corporate Finance ("Hilco") that it did not want to proceed with the Silver Wave APA for the purchase of the Vessels. At the Sale Hearing, the Debtors advised the Court that they did not intend to seek approval of the Silver Wave APA, and that that component of the Sale Motion would be withdrawn.

G.     The Initial Buyer, with the Debtors' consent, has assigned its rights under the Whittier APA to a related entity, The Alaska Wild Seafoods, LLC, an Alaskan limited liability company (the "Buyer").

H.     Whittier has demonstrated good, sufficient, and sound business reasons and compelling circumstances to enter into the Whittier APA and sell the Acquired Assets under sections 363 and 365 of the Bankruptcy Code, and such actions are appropriate and reasonable exercises of Whittier's business judgment and in the best interests of Whittier, its estate, and creditors and other parties in interest.  Such business reasons include, but are not limited to, the facts that (i) the Whittier APA and terms thereof constitute the highest and/or best offer for the Acquired Assets, (ii) no other person or entity or group of persons or entities has offered to purchase the Acquired Assets for greater economic value to Whittier's estate than the Buyer, and (iii) the Sale pursuant to the terms of the Whittier APA will present the best opportunity to realize the value of the Whittier's assets.

I.     For the reasons stated on the record at the Sale Hearing, which are incorporated herein by this reference pursuant to Bankruptcy Rule 7052, the Court finds and concludes that the relief requested in the Sale Motion is reasonable, appropriate and in the best interests of Whittier, its estate and creditors and all parties in interest, and that the legal and factual bases set forth in the Sale Motion and at the Sale Hearing establish just cause for the relief granted herein, and that the Sale Motion should be granted.  Now, therefore,

IT IS HEREBY ORDERED as follows:

ORDER (1) APPROVING THE SALE OF ASSETS FREE AND CLEAR;
( 2) APPROVING THE ASSUMPTION AND ASSIGNMENT OF
LEASE; (3) DETERMINING BUYER IS GOOD FAITH PURCHASER;
AND (4) AUTHORIZING DISTRIBUTIONS – Page 3

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

1.      The Sale Motion [ECF No. 285] is hereby GRANTED.

2.      The terms and conditions of the Whittier APA, a copy of which is attached hereto as Exhibit A, are hereby APPROVED.

3.      All objections and responses to the Sale Motion or the relief requested therein, that have not been withdrawn, waived, or settled, and all reservations of rights included in such objections and responses, are overruled on the merits and denied with prejudice.

4.      Pursuant to section 363(b) of the Bankruptcy Code, and upon and subject to the Closing and the Buyer's performance of each of its obligations under the Whittier APA, including but limited to payment of the Purchase Price, Whittier is hereby authorized and directed to take any and all actions necessary or appropriate to perform under, consummate, implement, and effectuate the APA, and to execute and deliver any and all instruments and documents that may be reasonably necessary or desirable to implement and effectuate the terms of the Whittier APA, this Order and the Sale, and to take all further actions as may be reasonably requested by the Buyer for the purpose of assigning, transferring, granting, conveying, and conferring to the Buyer, or reducing to possession, the Acquired Assets, including any and all rights appurtenant to or necessary for the operation or utilization of the Acquired Assets, or as may be necessary or appropriate to the performance of Whittier's obligations as contemplated by the Whittier APA, without any further corporate action or order of this Court.

5.      Bankruptcy Code section 363(f) is satisfied, in that (among other reasons) each entity with an interest in the Acquired Assets consents to the sale. Accordingly, the Acquired Assets shall be sold and conveyed to Buyer free and clear of all interests, obligations, rights, encumbrances, pledges, liens (including without limitation, mechanics', materialmens' and other consensual and nonconsensual liens and statutory liens), mortgages, deeds of trust, security interests, claims

ORDER (1) APPROVING THE SALE OF ASSETS FREE AND CLEAR;
( 2) APPROVING THE ASSUMPTION AND ASSIGNMENT OF
LEASE; (3) DETERMINING BUYER IS GOOD FAITH PURCHASER;
AND (4) AUTHORIZING DISTRIBUTIONS – Page 4

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

(including, any "claim" as defined in section (5) of the Bankruptcy Code) (collectively, "Interests"). Any and all Interests shall attach to the proceeds of the Sale ultimately attributable to the Purchased Assets in which such creditor alleges an Interest, in the same order of priority, subject to distribution provisions set forth in the APA.

6.     The Buyer would not have entered into the Whittier APA and would not consummate the Sale, thus adversely affecting the Whittier estate and its creditors, if the Sale were not free and clear of all Interests, or if the Buyer would be, or in the future could be, liable for any such Interests.

7.     Based on the record herein, including the Declaration of Jue Li [ECF No. 310], the Buyer qualifies for and shall be granted all protections of Bankruptcy Code section 363(m).

8.     In connection with the Closing, Whittier is authorized and directed to assume and assign each of the Assumed Executory Contracts to the Buyer free and clear of all Interests.  Such payments (if any) of the Cure Amounts shall (a) effect a cure of all defaults existing thereunder as of the Closing Date, (b) compensate for any actual pecuniary loss to such non-Debtors party resulting from such default, and (c) together with the assumption of the Assumed Executory Contracts by the Buyers, constitute adequate assurance of future performance thereof.  The Buyer shall then have assumed the Assumed Executory Contracts and, pursuant to section 365(f) of the Bankruptcy Code, the assignment by Whittier of such Assumed Executory Contracts shall not be a default thereunder.

9.     Except as otherwise expressly provided in the Whittier APA or this Order, (i) the Buyer shall not have any liability or other obligation of the Debtor arising under or related to any of the Acquired Assets that accrued, existed or was alleged or asserted, whether known or unknown, as of the Closing; and (ii) the Debtors shall not have any liability or other obligation arising under or related to any of the Acquired Assets that accrued, existed or was alleged or asserted, whether known or unknown, on and after the Closing.

ORDER (1) APPROVING THE SALE OF ASSETS FREE AND CLEAR;
( 2) APPROVING THE ASSUMPTION AND ASSIGNMENT OF
LEASE; (3) DETERMINING BUYER IS GOOD FAITH PURCHASER;
AND (4) AUTHORIZING DISTRIBUTIONS – Page 5

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

10. The allocation of the Purchase Price for the various Acquired Assets shall be as set forth in Exhibit B hereto, and Whittier shall be authorized and directed to pay directly from the Closing the amounts set forth in Exhibit B to the recipient and in the amounts indicated in Exhibit B, except as provided in paragraphs 11 and 12.

11. Whittier is authorized to carve out from the distribution otherwise payable to Cathay Bank (1) an amount equal to .08 of the Purchase Price for Quarterly Fees payable to the US Trustee; and (2) $200,000 for payment of the prorated Property Taxes and Transfer Taxes as set forth in the Whittier APA (together, the "Escrowed Funds"). The Escrowed Funds shall be held in escrow by Bush Kornfeld, until the Quarterly Fees, Personal Property and Transfer Taxes, as applicable, become due, at which time, Bush Kornfeld is authorized to release payment for the same. Cathay Bank shall retain its liens on the Escrowed Funds until they are paid as set forth herein.

12. Distributions payable to unsecured creditors set forth in Exhibit B shall be held in escrow by Bush Kornfeld until further order of the Court.

13. This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just reason for delay in the implementation of this Order and that waiver of any applicable waiting period is appropriate.

DATED this 27th day of March, 2025.

BY THE COURT

/s/ Gary Spraker
GARY SPRAKER
United States Bankruptcy Judge

ORDER (1) APPROVING THE SALE OF ASSETS FREE AND CLEAR;
( 2) APPROVING THE ASSUMPTION AND ASSIGNMENT OF
LEASE; (3) DETERMINING BUYER IS GOOD FAITH PURCHASER;
AND (4) AUTHORIZING DISTRIBUTIONS – Page 6

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

1     Presented by:

2     BUSH KORNFELD LLP

3     By   /s/ *Lesley Bohleber*
       James L. Day, (admitted *pro hac vice*)
4       Lesley Bohleber, (admitted *pro hac vice*)
     Attorneys for Debtors-in-Possession

5

6     Serve:  T. Buford, Esq.
          L. Bohleber, Esq.
7          J. Day, Esq.
          G. Fox, Esq.
8          D. Neu, Esq.
          M. Parise, Esq.
9          L. Thornton, Esq.
          J. Torgerson, Esq.
10         J. Kaplan, Esq.
          R. Murphy, Esq.
11         M. Mills, Esq.
          T. Brannon, Esq.
12         A. Ivanov, Esq.
          G. Pitts, Esq.
13         J.M. Palomares, Esq.
          F. Rasch, Esq.
14         J. Welch, Esq.
          K. Evans, Esq.
15         U.S. Trustee
          ECF Participants via NEF

16

17

18

19

20

21

22

23

ORDER (1) APPROVING THE SALE OF ASSETS FREE AND CLEAR;
( 2) APPROVING THE ASSUMPTION AND ASSIGNMENT OF
LEASE; (3) DETERMINING BUYER IS GOOD FAITH PURCHASER;
AND (4) AUTHORIZING DISTRIBUTIONS – Page 7

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

**SCHEDULE 2.1(a)**

**Vessels**

| Vessel | Official Number | Location | Status |
|---|---|---|---|
| Esther Point | 546495 | Whittier, AK | Dry docked |
| Lady Angela | 274142 | Seward, AK | Docked |
| Portage Bay | 550249 | Seward, AK | Docked |

## SCHEDULE 2.5

### Allocation of Purchase Price

| Acquired Asset | Allocation |
|---|---|
| Esther Point | $8,000 |
| Lady Angela | $45,000 |
| Portage Bay | $10,000 |

2837 if02k301xy

EXHIBIT C

James L. Day, (admitted *pro hac vice*)
Lesley Bohleber, (admitted *pro hac vice*)
Bush Kornfeld LLP
601 Union Street, Suite 5000
Seattle, WA 98101-2373
Telephone: (206)292-2110
Fax: (206) 292-2014
Email: jday@bskd.com;
tbuford@bskd.com; lbohleber@bskd.com
Attorneys for Debtors

UNITED STATES BANKRUPTCY COURT
DISTRICT OF ALASKA

| | |
|---|---|
| In re | Chapter 11 |
| WHITTIER SEAFOOD, LLC, [1] | Lead Case No. 24-00139-GS |
| Debtors. | Jointly Administered |
| | **NOTICE OF PROPOSED SALE OF REAL PROPERTY FREE AND CLEAR OF LIEN OF VRSALOVIC DEED OF TRUST, AND OBJECTION TO CLAIM** |

    **TO:      JAN VRSALOVIC**
    **AND TO:    ALL SUCCESSORS IN INTEREST TO RICARDO VRSALOVIC**

**A.    NOTICE OF PROPOSED SALE FREE AND CLEAR OF LIENS**

    **PLEASE TAKE NOTICE** that Whittier Seafood, LLC (the "Debtor") has filed a motion with the United States Bankruptcy Court for the District of Alaska seeking approval of the sale of the following real property located in Whittier, Alaska, free and clear of all liens, claims, encumbrances, and interests, including any interest claimed under a deed of trust dated June 5, 2018, in favor of Ricardo and Jan Vrsalovic securing an obligation in the original amount of $350,000 (the "Vrsalovic DOT"), duly recorded against the below referenced Real Property in the records of the Anchorage Recording District, Third Judicial District, State of Alaksa, Serial Number 2018-020557-0.

---

[1] The Debtors are Marine Fishing International, Inc. ("MFI Inc."), Case No. 24-00140; Marine Fishing International, LLC ("MFI LLC"), Case No. 24-00141; Modys, LLC ("Modys"), Case No. 24-00142; Salacia, LLC ("Salacia"), Case No. 24-00143; Silver Wave, LLC ("Silver Wave"), Case No. 24-00144; and Whittier Seafood, LLC ("Whittier") (collectively, the "Debtors").

**NOTICE OF PROPOSED SALE OF REAL PROPERTY FREE AND CLEAR OF LIEN OF VRSALOVIC DEED OF TRUST, AND OBJECTION TO CLAIM**
    **– Page 1**

Bush Kornfeld llp
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

**Property Address:** 34 Billings Street, Whittier, Alaska 99693

**Legal Description:**

Lots 6, 7, 8 and 9, Block 2, CITY OF WHITTIER SUBDIVISION, PHASE ONE, according to the official plat thereof, filed under Plat No. 73-2, in the records of the Anchorage Recording District, Third Judicial District, State of Alaska.

(the "Property")

The Debtor's records reflect that all obligations under the promissory note secured by the Vrsalovic DOT have been fully satisfied, and that no balance remains owing, but the Vrsalovic DOT has not been released.

**YOU ARE HEREBY NOTIFIED** that, in connection with the sale of the Property, the Debtor will reserve, for a limited period of time, **$350,000** from the sale proceeds (the "Vrsalovic Reserve") that would otherwise be paid to the Debtor's creditors, pending further order of the Bankruptcy Court.

**IF YOU BELIEVE THAT AN AMOUNT REMAINS DUE AND OWING UNDER THE VRSALOVIC DOT AND THE UNDERLYING PROMISSORY NOTE, YOU MUST FILE A WRITTEN STATEMENT ENTITLED "NOTICE OF UNPAID LIEN" WITH THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF ALASKA, STATING THE AMOUNT ALLEGEDLY UNPAID AND THE BASIS FOR THE CLAIM.**

You must file the Notice of Unpaid Lien by **[DATE- 30 days from date of notice]**.

**Court Address for Filing:**
Clerk of the Bankruptcy Court
U.S. Bankruptcy Court for the District of Alaska
Old Federal Building
605 West 4th Avenue, Room 138
Anchorage, AK 99501

IF NO NOTICE OF UNPAID LIEN IS TIMELY FILED, THE SALE OF THE PROPERTY WILL BE DEEMED **FREE AND CLEAR OF THE VRSALOVIC DOT** PURSUANT TO 11 U.S.C. § 363(F), AND THE VRSALOVIC RESERVE MAY BE RELEASED BY FURTHER ORDER OF THE COURT.

**B.      OBJECTION TO CLAIM**

      **NOTICE IS HEREBY GIVEN THAT** the Debtor objects to your claim in this bankruptcy case.

      **Your claim may be reduced, modified, or eliminated**.  You should read these papers carefully and discuss them with your attorney, if you have one.

NOTICE OF PROPOSED SALE OF REAL PROPERTY FREE AND CLEAR OF LIEN OF VRSALOVIC DEED OF TRUST, AND OBJECTION TO CLAIM
– Page 2

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104

If you do not want the court to eliminate or change your claim, then on or before **[Date], 2025** (the "Response Deadline"), you or your attorney must:

> • File with the Court a written response to the objection, explaining your position at the following address:

> Clerk of the Bankruptcy Court
> U.S. Bankruptcy Court for the District of Alaska
> Old Federal Building
> 605 West 4th Avenue, Room 138
> Anchorage, AK 99501

> • If your written response is mailed to the court for filing, you must mail it early enough so that the court will receive it on or before the Response Deadline.

> • You must also mail a copy of your written response to the undersigned attorney at the address provided below on or before the Response Deadline.

> • Attend the hearing on the objection, which will be separately scheduled for a date following on or before the Response Deadline.

IF YOU OR YOUR ATTORNEY DO NOT TAKE THE STEPS OUTLINED ABOVE, THE COURT MAY DECIDE THAT YOU DO NOT OPPOSE THE OBJECTION TO YOUR CLAIM.

## **SUMMARY OF OBJECTION**

The Debtor, pursuant to (among other bases) 11 U.S.C. section 502(b)(1) and Bankruptcy Rule 3007, objects to the allowance of any claim in favor of Ricardo Vrsalovic, Jan Vrsalovic, or either of their heirs, successors and assigns (collectively, "Vraslovic"), on the basis that any such claim has been fully satisfied.  The Debtor therefore asks that the Court disallow any claim in favor of Vraslovic with prejudice and authorize the release of the Vraslovic Reserve.

DATED this ____st day of _____, 2025.

BUSH KORNFELD LLP

By____/s/ Lesley Bohleber____
James L. Day, (admitted *pro hac vice*)
Lesley Bohleber, (admitted *pro hac vice*)
*Attorneys for the Debtors*

**NOTICE OF PROPOSED SALE OF REAL PROPERTY FREE AND CLEAR OF LIEN OF VRSALOVIC DEED OF TRUST, AND OBJECTION TO CLAIM**
– Page 3

BUSH KORNFELD LLP
LAW OFFICES
601 Union St., Suite 5000
Seattle, Washington 98101-2373
Telephone (206) 292-2110
Facsimile (206) 292-2104