Gregory R. Fox, WSBA No. 30559*
James B. Zack, WSBA No. 48122*
Alena Ivanov, WSBA No. 59900*
BALLARD SPAHR LLP
1301 2nd Ave, Suite 2800
Seattle, WA 98101-2930
Telephone: (206) 223-7000
foxg@ballardspahr.com
zackj@ballardspahr.com
ivanova@ballardspahr.com
*Admitted Pro Hac Vice

Michael J. Parise, ABA No. 7906044
BALLARD SPAHR LLP
1600 A Street, Suite 304
Anchorage, AK 99503-2648
Tel: (907) 264-3322
parisem@ballardspahr.com

Attorneys for Cathay Bank

HONORABLE GARY SPRAKER

UNITED STATES BANKRUPTCY COURT
DISTRICT OF ALASKA

In re

WHITTIER SEAFOOD, LLC *et al*.,[1]

Debtor.

Chapter 11

Lead Case No. 24-00139
Jointly Administered

**CATHAY'S OBJECTION TO KOZLOV'S MOTION TO REMOVE HILCO AS INVESTMENT BANKER, TERMINATE AUTHORITY OF PLAN ADMINISTRATOR TO CONDUCT THE SALE AND MARKETING OF THE SALACIA ASSETS OR CHANGE PLAN ADMINISTRATOR, AND REQUIRE ACCOUNTING**

---

[1] The Debtors are Marine Fishing International, Inc., Case No. 24-00140; Marine Fishing International, LLC, Case No. 24-00141; Modys, LLC, Case No. 24-00142; Salacia, LLC, Case No. 24-00143; Silver Wave, LLC, Case No. 24-00144; and Whittier Seafood, LLC.

CATHAY'S OBJECTION TO KOZLOV'S MOTION TO REMOVE
INVESTMENT BANKER AND TERMINATE PLAN ADMINISTRATOR - i

BALLARD SPAHR LLP
1301 2ND AVE, SUITE 2800
SEATTLE, WA 98101-2930
206.223.7000 FAX: 206.223.7107

I.      INTRODUCTION & RELIEF REQUESTED ................................................................1

II.     STATEMENT OF FACTS ...........................................................................................1

        A.      The Debtors & Kozlov .....................................................................................1

        B.      Pre-Petition Defaults, Forbearance, and Litigation .........................................2

        C.      The Confirmed Plans .......................................................................................2

                1.      The Debtors Plan ....................................................................................4

                2.      The Kozlov Plan .....................................................................................5

        D.      Debtors Plan Marketing, Sales, and Distributions ..........................................5

                1.      Whittier ..................................................................................................5

                2.      Salacia ....................................................................................................6

                3.      Modys .....................................................................................................7

        E.      Kozlov Plan Marketing, Sales, and Distributions ...........................................8

                1.      Cle Elum Lots ........................................................................................8

                2.      Bellevue Condo ......................................................................................8

                3.      Hickory ...................................................................................................8

                4.      Bellevue Residence ................................................................................8

                5.      Arizona Property ....................................................................................9

        F.      Cathay's Allowed Claim and Distributions .....................................................9

        G.      The Debtors Depleted All of Cathay's Cash Collateral .................................10

III.    ISSUES PRESENTED ..............................................................................................11

IV.     EVIDENCE RELIED UPON ....................................................................................11

V.      ARGUMENT .............................................................................................................11

        A.      The Debtors Plan Does Not Include a Mechanism to Replace the Plan
                Administrator or Hilco .................................................................................12

        B.      The Plan Administrator and Hilco Have Complied with Their Duties
                and Roles Under the Debtors Plan ...............................................................14

                1.      The Plan Administrator Has Complied with its Duties Under the
                        Debtors Plan ........................................................................................14

                2.      Hilco Has Complied with its Role Under the Debtors Plan ...........16

                3.      The Sale Prices for the Salacia Plant and Salacia Equipment
                        Established Their Actual Market Value .............................................17

        C.      Kozlov's Request to Replace the Plan Administrator and Hilco and
                Re-Start the Salacia Marketing and Sale Process is Not Feasible .......22

        D.      Kozlov Lacks Standing in the Debtors Bankruptcy ...........................24

        E.      Kozlov's History of Requesting Relief that Cannot be Granted ........25

VI.     CONCLUSION ..........................................................................................................26

CATHAY'S OBJECTION TO KOZLOV'S MOTION TO REMOVE
INVESTMENT BANKER AND TERMINATE PLAN ADMINISTRATOR - ii

BALLARD SPAHR LLP
1301 2ND AVE, SUITE 2800
SEATTLE, WA 98101-2930
206.223.7000 FAX: 206.223.7107

## I.   INTRODUCTION & RELIEF REQUESTED

Cathay Bank ("Cathay") objects to the motion filed by Aleksey Kozlov ("Kozlov") seeking to unilaterally modify the consensually-confirmed plan by (i) removing the Stapleton Group (the "Plan Administrator") and Hilco Corporate Finance ("Hilco") from their respective roles that are expressly assigned to them in the plan, (ii) replacing them with Kozlov's preferred plan administrator and broker, and (iii)  re-starting and extending the plan's marketing and sale process (the "Motion").  ECF No. 499.

The Motion should be denied, because (A) the confirmed plan does not include a mechanism to replace the Plan Administrator or Hilco, (B) the Plan Administrator and Hilco have complied with their duties and roles under the confirmed plan, including marketing and selling assets, (C) Kozlov's request to re-start and extend the plan's already-completed marketing and sale process is not feasible; and (D) Kozlov lacks standing to request modifications to the confirmed plan in this case.

## II.   STATEMENT OF FACTS

### A.   The Debtors & Kozlov.

Kozlov indirectly owns six business entities that are each debtors in the above-captioned jointly-administered lead case (collectively, the "Debtors"):  Whittier Seafood, LLC ("Whittier"), Salacia, LLC ("Salacia"), Modys, LLC ("Modys"), and three other Debtors with insignificant assets.  The Debtors' and Kozlov's primary assets include:

| Asset | Owner | Debtor Value (Scheduled) | Debtor Value (Appraised)[2] | Cathay Value (Appraised)[3] | Sale Price (Actual) |
|---|---|---|---|---|---|
| Whittier Plant | Whittier | 26,914,773 | n/a | n/a | 4,613,456 |
| Salacia Plant | Salacia | 51,621,450 | 37,000,000 | 20,400,000 | 10,500,000 |
| Salacia Equipment | Salacia | 19,282,674 | 11,097,800 | n/a | 2,500,000 |
| Modys Building | Modys | 4,411,795 | n/a | n/a | n/a |

[2] Appraisals by Kidder Matthews and James G. Murphy, Inc.  ECF No. 227-228.

[3] Appraisal by CBRE.  ECF No. 258.

CATHAY'S OBJECTION TO KOZLOV'S MOTION TO REMOVE
INVESTMENT BANKER AND TERMINATE PLAN ADMINISTRATOR - 1

BALLARD SPAHR LLP
1301 2ND AVE, SUITE 2800
SEATTLE, WA 98101-2930
206.223.7000 FAX: 206.223.7107

| Asset | Owner | Debtor Value (Scheduled) | Debtor Value (Appraised)[2] | Cathay Value (Appraised)[3] | Sale Price (Actual) |
|-------|-------|-------|-------|-------|-------|
| Cle Elum Lots | Kozlov | 1,420,000 | n/a | n/a | 1,050,000 |
| Bellevue Condo | Kozlov | 1,738,000 | n/a | n/a | 1,575,000 |
| Hickory | Kozlov | 850,000 | n/a | n/a | n/a |
| Bellevue Residence | Kozlov | 7,500,000 | n/a | n/a | n/a |
| Arizona Property | Kozlov | 7,600,000 | n/a | n/a | n/a |
| Matterhorn | Kozlov | n/a | n/a | n/a | n/a |

**B.**     **Pre-Petition Defaults, Forbearance, and Litigation.**

In February 2023, Cathay, the Debtors, Kozlov, and affiliates of the Debtors entered into a loan transaction whereby Cathay extended credit facilities to the Debtors, guaranteed by Kozlov (the "Loan").  Later in the first quarter of 2023, the Debtors and Kozlov defaulted on their respective obligations to Cathay.  In September 2023, Cathay, the Debtors, and Kozlov entered into a forbearance agreement.

On February 15, 2024, Cathay provided the Debtors and Kozlov with notice of defaults and imposed the default interest rate.  In June 2024, Cathay accelerated the Loan obligations.  In July 2024, Cathay filed complaints in King County Superior Court (i) against the Debtor, seeking a money judgment and prejudgment writs of attachment, and (ii) against the Business Debtors, seeking appointment of a general receiver.

To stay Cathay's lawsuits and anticipated receivership, on August 19, 2024, the Debtors filed chapter 11 bankruptcy petitions (the "Debtors Bankruptcy"); and on August 20, 2024, the day before the hearing on Cathay's motion for prejudgment writs of attachment, Kozlov filed his own chapter 11 bankruptcy petition (the "Kozlov Bankruptcy").

**C.**     **The Confirmed Plans.**

The Debtors were not operating when they commenced the Debtors Bankruptcy in 2024. The Whittier Plant had not operated since 2023, and the Salacia Plant was unfinished and never operated.  From the outset of the Debtors Bankruptcy, Cathay advocated for the Debtors to quickly sell their assets to mitigate its interest accrual and repay its Loan, whereas the Debtors resisted while ostensibly seeking a "capital raise" parallel to marketing their assets for sale.  To that end,

CATHAY'S OBJECTION TO KOZLOV'S MOTION TO REMOVE
INVESTMENT BANKER AND TERMINATE PLAN ADMINISTRATOR - 2

BALLARD SPAHR LLP
1301 2ND AVE, SUITE 2800
SEATTLE, WA 98101-2930
206.223.7000 FAX: 206.223.7107

the Debtors engaged Hilco to "market all or a portion of the Debtors' real property and equipment for sale or a capital raise." ECF No. 158. After months in bankruptcy without any prosect of a "capital raise," the Debtors eventually proposed a plan that was met with objections by Cathay and other creditors, and that plan never passed the disclosure statement stage.

Meanwhile, from the outset of the Kozlov Bankruptcy, Kozlov asserted that Cathay was his only creditor, and stated that he intended to propose a plan "shortly after" the Debtors proposed their plan, and the "main impact" of Kozlov's plan "would be to re-affirm the guaranty" of Cathay's claim "as restructured" under the Debtors' separate plan. Kozlov also asserted that he had previously transferred substantially all of his assets to his non filing spouse, for no consideration. To that end, Kozlov (i) proposed two plans that were met with objections by Cathay, and never passed the disclosure statement stage, and (ii) strategically concealed and later revealed unscheduled unsecured claims as a potential means for confirming a plan over Cathay's objections, leading Cathay's affiliate to purchase an unscheduled claim and form a committee in the Kozlov Bankruptcy (the "Kozlov Committee").

After six months in bankruptcy, without the Debtors or Kozlov selling or paying anything to Cathay, or progressing toward confirmable plans, the Court ordered the parties to mediation to negotiate plan terms. Throughout *months* of mediation, the Debtors and Kozlov were collectively represented by three law firms, Cathay and the Kozlov Committee were represented by their own respective law firms, and the Whittier unsecured creditors committee (the "Whittier Committee") was represented by one law firm and one financial advisor. In other words, all parties were well-represented by competent professionals throughout every step of the plan negotiation and drafting process, with the added benefit of an experienced, dedicated, settlement judge facilitating a global resolution of all issues across both the Debtors Bankruptcy and the Kozlov Bankruptcy.

Cathay and the Debtors, and the Kozlov Committee and Kozlov, collectively emerged from mediation with plan support agreements as the predicates to confirming consensual plans (the "Debtors Plan" and the "Kozlov Plan"). Through subsequent negotiations, the Whittier Committee

CATHAY'S OBJECTION TO KOZLOV'S MOTION TO REMOVE
INVESTMENT BANKER AND TERMINATE PLAN ADMINISTRATOR - 3

BALLARD SPAHR LLP
1301 2ND AVE, SUITE 2800
SEATTLE, WA 98101-2930
206.223.7000 FAX: 206.223.7107

and other initially-objecting creditors also consented to the Debtors' Plan, and both plans were ultimately confirmed with unanimous support.

1.      The Debtors Plan.[4]

The Debtors Plan provides for (i) Cathay's allowed claim in the principal amount of $22,960,132.47 as of the effective date, May 31, 2025 ("Cathay's Claim"), with post-confirmation interest accruing on Cathay's Claim at 13.25% per annum, and secured by the Whittier Plant, Salacia Plant, Salacia Equipment, and Modys Building, among other collateral; (ii) the Whittier Plant to be sold promptly after confirmation, the Salacia Plant and Salacia Equipment to be sold by October 15, 2025, and the Modys Building to be sold by November 30, 2025, otherwise the expressly identified and agreed-upon Plan Administrator would assume responsibility for each of those sales; (iii) expressly identified and agreed-upon brokers – *Hilco for Whittier and Salacia, and Kidder Matthews for Modys* – to market and sell the Debtors' assets;[5] (iv) complete transparency for Cathay and the Plan Administrator throughout the marketing and sale processes, including access to all information regarding marketing materials, buyer interest, purchase offers, and weekly update meetings with the applicable brokers; and (v) a $500,000 cash collateral reserve for Cathay and the Plan Administrator to coordinate funding limited expenses necessary to bridge the gap between plan confirmation and completing the Debtors' Plan's asset sales within the proscribed timeline.  *See*, *generally*, Debtors Plan at VII (Means for Execution of the Plan).

---

[4] ECF No. 368 (Debtors Plan); ECF No. 386 (order confirming Debtors Plan).

[5] *See*, *e.g.*, Debtors Plan at VII.D ("…**with the assistance of Hilco**, the Debtors had already commenced marketing efforts for sales of Whittier assets and the Salacia Plant and Salacia Equipment… In addition, the Debtors have listed the Modys Building for sale **with the assistance of Kidder Mathews**."); *id*. at VII.E.3 (Plan Administrator may assume responsibility for marketing and selling the Salacia Plant and Salacia Equipment "**with the assistance of Hilco**."); *id*. at II.A.96 ("Plan Administrator" defined as "**The Stapleton Group**") (emphasis added).

CATHAY'S OBJECTION TO KOZLOV'S MOTION TO REMOVE
INVESTMENT BANKER AND TERMINATE PLAN ADMINISTRATOR - 4

BALLARD SPAHR LLP
1301 2ND AVE, SUITE 2800
SEATTLE, WA 98101-2930
206.223.7000 FAX: 206.223.7107

2.    The Kozlov Plan.[6]

The Kozlov Plan provides for an orderly liquidation of Kozlov's real property portfolio and liens in favor of Cathay on all properties (except Matterhorn):

| Kozlov Property | Listing Price | Listing Date | Sale Date |
|---|---|---|---|
| Cle Elum Lots | 1,600,000 | n/a | July 11, 2025 |
| Bellevue Condo | 1,738,000 | May 9, 2025 | October 16, 2025 |
| Hickory | 850,000 | August 15, 2025 | November 15, 2025 |
| Bellevue Residence | 7,500,000 | October 16, 2025 | December 31, 2025 |
| Arizona Property | 7,600,000 | December 31, 2025 | April 30, 2026 |
| Matterhorn | n/a | n/a | n/a |

*See*, *generally*, Kozlov Plan at XIV (The Plan Administrator and the Properties).

Regarding distributions, the Kozlov Plan effectively provides for (i) net sale proceeds from the Cle Elum Lots to be distributed to Kozlov's administrative claims, and (ii) net sale proceeds from the other Kozlov properties to be distributed first to Kozlov, in the amount of $30,000 plus 20% of the applicable net proceeds, and second to Cathay, in the amount of the remaining net proceeds.  The Kozlov Plan also provides for the Plan Administrator to assume responsibility for marketing and selling any Kozlov properties that remain unsold past the applicable sale date.

**D.    Debtors Plan Marketing, Sales, and Distributions.**

1.    Whittier:  Marketing, Sale, and Distributions.

On July 11, 2025, the Court entered an order authorizing Whittier and an affiliate to sell substantially all their assets (including the Whittier Plant and related vessels) for the aggregate sale price of $4,613,456 (the "Whittier Sale").  ECF No. 424.  The distribution of Whittier Sale proceeds included (i) $2,700,000 distributed and applied to Cathay's Claim on July 29, 2025, (ii) $55,490.05 distributed and applied to Cathay's Claim on August 1, 2025, (iii) $350,000 distributed and applied to Cathay's Claim on September 24, 2025, and (iv) $500,000 distributed directly to the Plan Administrator from closing, and not applied to Cathay's Claim, to fund post-confirmation expenses pursuant to Cathay-approved budgets and the Debtors Plan.

---

[6] Kozlov Bankruptcy, ECF No. 225 (Kozlov Plan).

CATHAY'S OBJECTION TO KOZLOV'S MOTION TO REMOVE
INVESTMENT BANKER AND TERMINATE PLAN ADMINISTRATOR - 5

BALLARD SPAHR LLP
1301 2ND AVE, SUITE 2800
SEATTLE, WA 98101-2930
206.223.7000 FAX: 206.223.7107

2.  Salacia: Marketing, Sales, and Anticipated Distributions.

Pursuant to the Debtors' Plan, (i) the Debtors listed the Salacia Plant and Salacia Equipment for sale with the assistance of Hilco as broker, pursuant to the terms of Hilco Court-approved employment; and (ii) commenced weekly meetings with Cathay and the Whittier Committee to provide updates regarding marketing, buyer interest, and purchase offers (collectively, the "Salacia Marketing and Sale Process").  The Debtors Plan's transparency provisions ensured that the Plan Administrator was fully prepared to assume responsibility for the Salacia Marketing and Sale Process at any time, and ensured that Cathay was informed of potential "cause" for the Plan Administrator to assume that responsibility sooner than October 2025.

By July 2025, Cathay became aware of multiple forms of "cause" for the Plan Administrator to assume responsibility for the Salacia Marketing and Sale Process, and filed a motion seeking that relief in accordance with the Debtors Plan.  ECF No. 426.  On the eve of that hearing, (i) Kozlov terminated the Debtors' bankruptcy counsel, who had apparently refused to oppose Cathay's motion, and (ii) Kozlov purported to terminate Hilco and engage Kidder Matthews as the broker assisting with the Salacia Marketing and Sale Process.  ECF No. 449.  In addition to those actions by Kozlov, the "cause" cited by Cathay included (iii) Kozlov preventing Hilco from attending tours with prospective buyers, (iv) Kozlov preventing Hilco from communicating with certain prospective buyers, and Kozlov communicating with prospective buyers about alternative transactions that are not contemplated by the Debtors Plan, and (v) Kozlov selling Salacia Equipment without authority or consent.  The Whittier Committee joined Cathay's motion, and no creditors (or the Debtors) objected.  ECF No. 448.

After the Court granted Cathay's motion, the Plan Administrator (i) encouraged Kidder Matthews to assist with finding a buyer by offering Kidder Matthews the same buyer-side broker commission as other buyer-side brokers were offered, but Kidder Matthews was either unable or unwilling to produce a buyer; and (ii) requested a proposal for Murphy to market and sell the Salacia Equipment, but Murphy informed the Plan Administrator that, notwithstanding Murphy's earlier $11 million appraisal, the Salacia Equipment would actually sell for between $2.83 and

CATHAY'S OBJECTION TO KOZLOV'S MOTION TO REMOVE
INVESTMENT BANKER AND TERMINATE PLAN ADMINISTRATOR - 6

$3.76 million "approximate auction gross numbers before expenses" including Murphy's commission and costs, in part because the Salacia Equipment is not "machine shop, woodworking, heavy equipment, trucks, or more common everyday equipment."  ECF No. 508.

The Plan Administrator and Hilco continued soliciting bids for the Salacia Plant and Salacia Equipment, ultimately obtaining a stalking horse bid of $7.25 million for the Salacia Plant and a $2.5 million purchase offer for the Salacia Equipment.  The $7.25 million stalking horse bid successfully induced overbids, a competitive auction, and a $10.5 million purchase price for the Salacia Plant from the same buyer that had already agreed to purchase the Salacia Equipment.  The $10.5 million Salacia Plant sale and the $2.5 million Salacia Equipment sale are pending Court approval, and scheduled to close in mid-October 2025.

3.     Modys:  Marketing, and Anticipated Sale and Distribution.

The Debtors Plan's transparency provisions require Kidder Matthews, as broker for the Modys Building, to provide Cathay and the Plan Administrator with copies of all marketing materials within three business days of the commencement of marketing, and to conduct weekly group calls as to the status of the marketing and sales process.  Kidder Matthews initially failed to comply with any of those transparency requirements.  On September 16, 2025, Cathay's counsel emailed the Debtors' new counsel, informing them of the Debtors Plan's transparency requirements and requesting information from Kidder Matthews.  The Debtors' new counsel never responded, but Kozlov's counsel did, eventually facilitating the delivery of marketing materials and offer updates.  *See* Zack Decl. Ex. A.

While Kidder Matthews still has not conducted any meetings with Cathay and the Plan Administrator (weekly or otherwise), Cathay generally understands that the Debtors remain on track to close sale of the Modys Building before November 30, 2025, which is the Debtors Plan's deadline where responsibility for selling the Modys Building would automatically transfer to the Plan Administrator "with the assistance of a broker approved by Cathay."  Debtors Plan at VII.E.6.

CATHAY'S OBJECTION TO KOZLOV'S MOTION TO REMOVE
INVESTMENT BANKER AND TERMINATE PLAN ADMINISTRATOR - 7

BALLARD SPAHR LLP
1301 2ND AVE, SUITE 2800
SEATTLE, WA 98101-2930
206.223.7000 FAX: 206.223.7107

**E.      Kozlov Plan Marketing, Sales, and Distributions.**

1.      Cle Elum Lots:  Marketing, Sales, and Anticipated Distributions.

The Cle Elum Lots were listed and marketed by a broker approved by Cathay and the Court. On July 11, 2025, and July 29, 2025, respectively, Kozlov closed sales of the Cle Elum Lots, for sale prices of $425,000 and $625,000, respectively (each 65% of Kozlov's list prices).  In contravention of the Kozlov Plan's terms, Kozlov requested that the Court authorize a $30,000 distribution to Kozlov from the net proceeds of the first lot sale, and the Court denied that request. The net proceeds from the Cle Elum Lots sales remain in Kozlov's counsel's trust account.  Cathay anticipates those proceeds will be distributed to Kozlov's administrative claims, without any being available for distribution to Cathay.

2.      Bellevue Condo:  Marketing, Sale, and Distributions.

On September 29, 2025, Kozlov closed a sale of the Bellevue Condo for $1.575 million. The net proceeds were distributed in accordance with the Kozlov Plan:  *First*, $324,390 to Kozlov, representing $30,000 plus 20% of net proceeds; *second*, $779,868 to Cathay's affiliate, to pay off its claim and first-position lien against the Modys Building; and *third*, $398,641.24 to Cathay, to apply to Cathay's Claim.

3.      Hickory:  Marketing, and Anticipated Sale and Distributions.

On August 15, 2025, Kozlov listed Hickory for sale with a listing price of $995,000.  The deadline for Kozlov to sell Hickory is November 15, 2025.  Cathay is not aware of any further details regarding the Hickory marketing and sale process, but assumes that Kozlov remains on track to close a sale before the Kozlov Plan's deadline.

4.      Bellevue Residence:  Anticipated Marketing, Sale, and Distributions.

October 16, 2025 is the deadline for Kozlov to list the Bellevue Residence for sale with a listing price of at least $7,500,000.  Cathay is not aware of any further details regarding the Bellevue Residence listing, marketing, and sale process, but assumes that Kozlov remains on track to list the Bellevue Residence for sale before the Kozlov Plan's deadline.  December 31, 2025 is

the deadline for Kozlov to close a sale of the Bellevue Residence, and distribute net proceeds in accordance with the Kozlov Plan.

5.    Arizona Property:  Anticipated Marketing, Sale, and Distributions.

December 31, 2025 is the deadline for Kozlov to list the Arizona Property for sale with a listing price of at least $7,600,000.  Cathay is not aware of any further details regarding the Arizona Property listing, marketing, and sale process, but assumes that Kozlov remains on track to list the Arizona Property for sale before the Kozlov Plan's listing deadline.  April 30, 2026 is the deadline for Kozlov to close a sale of the Arizona Property, and distribute net proceeds in accordance with the Kozlov Plan.

**F.    Cathay's Allowed Claim and Distributions.**

Cathay's Claim has effectively remained stagnant for twenty months, with a balance exceeding $20 million for the entire fourteen-month post-petition period to date, despite continuous assurances from the Debtors and Kozlov to Cathay and the Court that the Debtors would easily be able to pay Cathay and all other creditors in full:[7]

- *Twenty months ago*, when Cathay first imposed its contractual default interest rate on February 15, 2024, the principal balance of the Loan obligation was **$19,326,374**.

- *Fourteen months ago*, when the Debtors filed bankruptcy on August 19, 2025, the balance of the Loan obligation was **$20,489,919**.

- *Five months ago*, when the Debtors Plan was confirmed, effective May 31, 2025, Cathay's Claim was allowed and fixed by the Court's confirmation order in the agreed principal amount of **$22,960,132**.

- *As of hearing on the Motion*, on October 9, 2025, having received and applied aggregate post-confirmation distributions of $3,504,131, the balance of Cathay's Claim is **$20,502,902**, and continuing to accrue interest at the plan rate of 13.25% per annum (*i.e.*, over $250,000 of interest per month).

---

[7] *See*, *e.g.*, Kozlov Bankruptcy at ECF No. 115 (order extending exclusivity in part because "[t]he debtors collectively maintain that Cathay is well oversecured and in no significant danger of not being paid all of its debts, including interest and fees.")

CATHAY'S OBJECTION TO KOZLOV'S MOTION TO REMOVE
INVESTMENT BANKER AND TERMINATE PLAN ADMINISTRATOR - 9

BALLARD SPAHR LLP
1301 2ND AVE, SUITE 2800
SEATTLE, WA 98101-2930
206.223.7000 FAX: 206.223.7107



*See* Ramirez Decl. ¶ 2 (Cathay's Claim).

**G.    The Non-Operating Debtors Depleted All of Cathay's Cash Collateral.**

In August 2024, the non-operating Debtors entered bankruptcy holding $1,345,567 of Cathay's cash collateral.  From the petition date in mid-August 2024 through confirmation of the Debtors Plan in the end of May 2025, the Debtors depleted all of Cathay's cash collateral.  The Debtors also received income/revenue during that period from sources like lagging receivables and selling Cathay's equipment collateral without Cathay's consent or Court authority.  As of confirmation, the Debtors had already depleted Cathay's cash collateral in the aggregate by greater than $1.3 million net, and greater than $2.6 million gross.  Then, under the Debtors Plan, Cathay reserved and permitted the Debtors to use an additional $500,000 of cash collateral to complete the Salacia Marketing and Sale Process by mid-October.

It should also be noted that the Debtors depleted all of Cathay's cash collateral pre-confirmation (i) without making any periodic payments or other distributions to Cathay; (ii) without paying estate professionals, whose allowed and unpaid fees total hundreds of thousands of dollars; (iii) while paying Kozlov salary totaling at least $75,000; and (iv) while Kozlov depleted over $500,000 of cash in the Kozlov Bankruptcy funding a lavish lifestyle and maintaining a luxury residential real estate portfolio that produces no income.

CATHAY'S OBJECTION TO KOZLOV'S MOTION TO REMOVE
INVESTMENT BANKER AND TERMINATE PLAN ADMINISTRATOR - 10

BALLARD SPAHR LLP
1301 2ND AVE, SUITE 2800
SEATTLE, WA 98101-2930
206.223.7000 FAX: 206.223.7107

Now the Debtors are completely out of cash.  Cathay will not reserve or advance any more funds, and will not consent to any further use of its cash collateral (if any exists).  To be clear: after mid-October, there is no more cash for the Debtors to continue carrying unsold assets.



### III.   ISSUES PRESENTED

1. Whether the Debtors Plan includes mechanisms to replace the Plan Administrator or Hilco;

2. Whether the Plan Administrator and Hilco have satisfied their respective duties and roles under the Debtors Plan;

3. Whether Kozlov's proposal to re-start and extend the Salacia Marketing and Sale Process with a Kozlov-selected plan administrator and a Kozlov-selected broker is feasible; and

4. Whether Kozlov has standing to request modifications to the Debtors Plan;

### IV.   EVIDENCE RELIED UPON

This Objection relies upon the Declarations of Jose Ramirez and James Zack, and exhibits thereto, filed concurrently herewith; the Debtors Plan and the Kozlov Plan; and the other papers and pleadings on file in the Debtors Bankruptcy and the Kozlov Bankruptcy.

### V.   ARGUMENT

The Motion should be denied, because (A) under the jointly proposed and consensually confirmed Debtors Plan, there is no mechanism for any party to replace the Plan Administrator or

Hilco, (B) under the Debtors Plan, the Plan Administrator and Hilco have complied with their proscribed duties and roles, (C) Kozlov's request to re-start and extend the already-completed Salacia Marketing and Sale Process is not feasible; and (D) under Section 1109 of the Bankruptcy Code, Kozlov lacks standing in the Debtors Bankruptcy to request post-confirmation modifications to the Debtors Plan.

**A.** **The Debtors Plan Does Not Include a Mechanism to Replace the Plan Administrator or Hilco.**

The Debtors Plan was drafted, agreed upon, and proposed jointly by the Debtors and Cathay through a collaborative drafting process that followed months of back-and-forth written term sheets among multiple law firms, consistent oversight and assistance from a Court-appointed settlement judge, and Court approval of plan support agreements. Every step of the way, the terms discussed by the parties and ultimately incorporated into the plan support agreement and Debtors Plan included expressly identifying The Stapleton Group and the Plan Administrator, and Hilco as the broker responsible for the Salacia Marketing and Sale Process. It is not a mistake that the Debtors agreed to the plan support agreement and Debtors Plan that (i) identifies the "Plan Administrator" as "The Stapleton Group" and references the Plan Administrator a combined 88 times, (ii) identifies Hilco as the broker responsible for assisting with the Salacia Marketing and Sale Process and references Hilco a combined 35 times, (iii) includes a mechanism for the Plan Administrator to assume responsibility for the Salacia Marketing and Sale Process "with the assistance of Hilco" either by a date certain or sooner for cause, but *does not* include any mechanism for the Plan Administrator or Hilco to be removed or replaced by any party. These liquidation provisions were material to Cathay's willingness to support the Debtors Plan. Further demonstrating the intentionality of those plan provisions regarding the Plan Administrator's roles and Hilco's roles, the Debtors Plan also identifies Kidder Matthews as the Cathay-approved broker responsible for assisting with the Modys Building marketing and sale process.

Now, for the first time, Kozlov asserts that the Plan Administrator and Hilco were expressly assigned roles in the Debtors Plan "despite Mr. Kozlov's misgivings he expressed to the attorney

CATHAY'S OBJECTION TO KOZLOV'S MOTION TO REMOVE
INVESTMENT BANKER AND TERMINATE PLAN ADMINISTRATOR - 12

BALLARD SPAHR LLP
1301 2ND AVE, SUITE 2800
SEATTLE, WA 98101-2930
206.223.7000 FAX: 206.223.7107

for the business debtors." Motion at p. 3. Cathay finds this difficult to believe, but it is completely irrelevant either way. Kozlov signed the plan support agreement and the Debtors Plan six times each as an authorized representative for the Debtors, and supported confirmation of the Debtors Plan.

In the Motion, Kozlov argues that "[t]he Court may exercise oversight of a plan's representatives and remove such representatives even where, as here, the plan is silent as to the standards for removal," citing *Mabvax* in support of that proposition. Motion at p. 4. However, that is not what *Mabvax* involved or held.

Rather, in *Mabvax*, (i) the plan administrator was an equity holder of the debtor; (ii) all creditor claims had been satisfied, such that the plan administrator's remaining responsibilities were exclusively focused on generating recoveries for preferred and common equity holders; (iii) preferred equity holders requested that the plan administrator be removed and replaced for lack of disinterestedness, breach of fiduciary duty of loyalty, and failure to comply with plan provisions, because the plan administrator had not yet made a distribution to preferred equity holders while continuing to seek recoveries that would benefit common equity holders; and, most importantly, (iv) the *Mabvax* court denied the motion because the disinterestedness standards do not apply to a plan administrator, the movants had not alleged that the equity-holding plan administrator had engaged in self-dealing, and the plan administrator had complied with the plan. *See In re Mabvax Therapeutics Holdings, Inc.*, 2023 WL 4038575, at *7 (Bankr. D. Del. June 15, 2023) (holding that "the Plan Administrator is not required to be disinterested," "the Plan Administrator owes fiduciary duties to all creditors, not just the preferred shareholders," and "the Motion to Remove fails to allege facts sufficient to justify the removal of the Plan Administrator for failure to comply with the Plan.")

In this case, the creditor body for whom the Plan Administrator was appointed do not support removal or replacement, nor does the Debtors Plan include any mechanism for Kozlov or any other party to remove and replace the Plan Administrator or Hilco. Moreover, the Plan Administrator and Hilco have each complied with the Debtors Plan's provisions and have

diligently marked the assets under their control through a professional and lengthy liquidation process.

**B.      The Plan Administrator and Hilco Have Complied with Their Duties and Roles Under the Debtors Plan.**

The Debtors Plan was carefully crafted by the Debtors, Cathay, and other parties in interest to ensure that the Plan Administrator's duties and Hilco's roles are clearly defined.  The Plan Administrator and Hilco have complied with their respective duties and roles under the Debtors Plan.  Moreover, the actual sale prices obtained for the Salacia Plant and Salacia Equipment are indicative of those assets' market value following a commercially reasonable sale process (despite Kozlov's persistent interference), and not indicative of any wrongdoing or substandard work by the Plan Administrator or Hilco.

1.      The Plan Administrator Has Complied with its Duties Under the Debtors Plan.

The Plan Administrator has certain duties under the Debtors Plan that have already arisen, and certain duties that have yet to arise.  The Plan Administrator has complied with all of its duties that have already arisen:

- Debtors Plan at VII.D:  Pending sales of the Salacia Plant and Salacia Equipment will result in net proceeds less than the amount necessary to pay each of the allowed claims with an interest in Salacia, requiring the Plan Administrator to file and serve motions to approve the sales.

  *Compliance:  The Plan Administrator has filed and served sale motions for the Salacia Plant and the Salacia Equipment.*

- Debtors Plan at VII.E.1:  The Plan Administrator is required to (i) use its best efforts to collect or compromise the "SW Receivables," and (ii) not distribute any proceeds therefrom until after the Salacia Plant, Salacia Equipment, and Modys Building are sold.

  *Compliance:  The Plan Administrator has been attempting to collect or compromise the receivables, and has not distributed any proceeds therefrom.*

- Debtors Plan at VII.E.3-4:  The Plan Administrator is required to "assume sole responsibility for promptly liquidating any portion of the Salacia Plant or Salacia Equipment that has not sold by such date, with the assistance of Hilco, including

exclusive discretion to accept offers and sell Salacia assets as a whole or piecemeal," either (i) automatically after October 15, 2025, or (ii) sooner if Cathay or the Whittier Committee establishes "cause," after notice and a hearing.

*Compliance:  On August 7, 2025, the Court entered an order finding cause for the Plan Administrator to immediately assume responsibility for the Salacia Marketing and Sale Process, and following entry of that order, the Plan Administrator has endeavored to promptly liquidate the Salacia Plant and Salacia Equipment with the assistance of Hilco, and the Plan Administrator has exercised its exclusive discretion to accept offers and sell Salacia assets as a whole or piecemeal.*

- Debtors Plan at VII.E.8:  Following the Debtors Plan's effective date (May 31, 2025), the Plan Administrator has sole authority to administer the Debtors' cash and payment of expenses, including (i) requesting authority from Cathay to use cash collateral pursuant to a proposed budget, and (ii) reporting actual-to-budget variances to Cathay.

*Compliance:  Despite Kozlov's persistent interference with the Debtors' cash and payment of expenses, Cathay is satisfied that the Plan Administrator has maintained exclusive control over the Debtors post-confirmation cash and payment of expenses, all in accordance with Cathay-approved budgets, and has provided the requisite actual-to-budget reporting to Cathay.*

- Debtors Plan at VII.F:  In anticipation of the Plan Administrator assuming responsibility for the Salacia Marketing and Sale Process, the Plan Administrator was afforded the same "transparency" as Cathay and other interested parties in the Salacia Marketing and Sale Process, including receiving copies of all marketing materials, copies of all indications of interest and offers, and participating in weekly meetings with Hilco.

*Compliance:  The Plan Administrator received all marketing and sale materials, and participated in the weekly meetings with Hilco, intentionally to ensure a seamless transition if/when the Plan Administrator eventually assumed responsibility for the Salacia Marketing and Sale Process; and to that end, the transition of that responsibility from the Debtors to the Plan Administrator in August 2024 was seamless.*

- Debtors Plan at VII.G.3:  The Plan Administrator is required to serve as the Debtors Plan's disbursing agent.

*Compliance:  The Plan Administrator has complied with all provisions governing the Debtors Plan's complex holdbacks, reserves, and distribution schemes.*

- Debtors Plan at VII.I:  The Plan Administrator is required to maintain insurance coverage for the Debtors.

*Compliance:  The Plan Administrator has actively maintained insurance coverage for the Debtors, including Salacia and Modys*.

Kozlov is apparently upset that the Plan Administrator has complied with the Debtors Plan too well:  the Debtors Plan requires the Plan Administrator to sell the Salacia Plant and the Salacia Equipment *with the assistance of Hilco*, not an alternative broker that Kozlov now prefers.[8]

      2.        <u>Hilco Has Complied with its Role Under the Debtors Plan</u>.

Hilco's role under the Debtors Plan is two-fold: (i) "assist" the Debtors or Plan Administrator – whichever is responsible at a given time – with the Salacia Marketing and Sale Process, and (ii) conduct weekly "transparency" meetings with Cathay and other specified parties. Hilco has fulfilled those roles.

Under the direction of the Debtors (and later the Plan Administrator), Hilco assisted with executing bid procedures that were prepared by the Debtors.  While the Motion asserts that Hilco "did not meet" certain bid procedure deadlines and extended deadlines "without a court order," the Motion intentionally omits the portion of the bid procedures deadlines section that expressly states that each deadline "may be extended by the Seller or its counsel and without further order from the Bankruptcy Court."  *See* ECF No. 408 at p. 3.  Under the direction of the Plan Administrator, with the assistance of Hilco, and with notice to interested buyers, deadlines were extended (i) when there were no qualified bids, (ii) to obtain a stalking horse bid, and (iii) to obtain competing qualified bids for an auction.  From Cathay's perspective, the discretion exercised by the Plan Administrator and Hilco to extend deadlines was appropriate under the circumstances, as recognized by Cathay approving additional cash use to facilitate those extensions.

Conversely, Kozlov's proposed replacement broker, Kidder Matthews, has (i) struggled to comply with the Debtors Plan's most basic provisions governing its limited role related to the Modys Building marketing and sale process, including prompt transparency to Cathay and the Plan

---

[8] Cathay understands that, months ago, the Plan Administrator incentivized Kidder Matthews to assist with finding a buyer by offering a buyer-side broker commission (the same as other buyer-side brokers were offered), but Kidder Matthews was either unable or unwilling to produce a buyer.

Administrator,[9] (ii) violated the Debtors Plan provisions requiring Hilco to assist with the Salacia Marketing and Sale Process when Kidder Matthews purportedly accepted an engagement from Kozlov on the eve of the hearing to remove Kozlov's influence from the sale process, despite the complete lack of authority under the Business Plan for such an engagement [ECF No. 449]; (iii) failed to bring any prospective buyers to the Plan Administrator and Hilco, despite being offered the same buyer-side commissions as other buyer-side brokers that were actively involved in the Salacia Marketing and Sale Process; and (iv) lost all credibility with Cathay when it appraised the Salacia Plant at $37 million when the Debtors and Kozlov were desperate for a valuation exceeding all creditor claims to oppose pending dispositive motions.

   3. <u>The Sale Prices for the Salacia Plant and Salacia Equipment Established Their Actual Market Value.</u>

"The price obtained in a commercially reasonable sale is not *evidence* of the market value, which can be discounted or thrown out. It *is* the market value." *Matter of Excello Press, Inc.*, 890 F.2d 896, 905 (7th Cir. 1989) (emphasis in original). "[T]hird-party evidence (such as an appraiser's estimate)… is at best second-best. What someone pays in a commercially reasonable sale is the market price; an appraisal (that is, what an expert thinks someone would pay in a commercially reasonable sale) is useful only when the price of such a sale cannot be got at directly." *Id*.

"[A]ppraisals by qualified experts represent a prediction about the amount that an arms-length, commercially reasonable sales transaction would yield in the future… However, an appraisal is not as persuasive as a commercially reasonable sale of an asset which conclusively establishes the market value of that asset.'" *In re Scimeca Found., Inc.*, 497 B.R. 753, 775 (Bankr. E.D. Pa. 2013) (internal quotations omitted) (bankruptcy trustee "advertised in the real estate

---

[9] *See*, *e.g.*, Zack Decl., Ex. A (emails to Debtors' counsel requesting compliance with the Debtors' and Kidder Matthews' obligations under the Debtors Plan's transparency provisions for the Modys Building marketing and sale process, which the Debtors' counsel ignored, but Kozlov's counsel eventually responded to on behalf of the Debtors).

community, resulting in many inquiries; a number of prospective purchasers inspected the property; and four to five hired their own experts to evaluate the property's worth and to decide whether to make an offer.  Despite these efforts only two offers were received… the trustee then unsuccessfully tried to obtain competing bids and hold an auction").

"[A]ctual bargained-for sale prices developed in arm's length circumstances are better evidence of the market than theoretical or hypothetically divined appraised values," and appraisals are even "less instructive" when they reflect "one or another degree of result orientation."  *In re Bayonne Med. Ctr.*, 07-15195 MS, 2011 WL 5900960, at *28 (Bankr. D.N.J. Nov. 1, 2011).

For bankruptcy estate asset sales, one of the most reliable ways to establish actual market value is a stalking horse and auction process.  "The very role and value of a stalking horse bidder is to indicate to others that the assets being sold have value—at least in the eyes of the stalking horse bidder.  It is this expression of value that is intended to attract other buyers to a competitive bidding process." *In re Watertech Holdings, LLC*, 619 B.R. 324, 337 (Bankr. D.S.C. 2020).

Objecting parties often "overlook that all marketing efforts must reveal to prospective purchasers that the property is being sold through a bankruptcy process." *Scimeca*, 497 B.R. at 775.  "Where a bankruptcy trustee is under some constraints to sell estate property, the value obtained is likely to reflect those constraints." *Id*.

In this case, the Plan Administrator and Hilco conducted a commercially reasonable Salacia Marketing and Sale Process, including (i) exposing the Salacia Plant and Salacia Equipment to the broad market of potential buyers and buyer-side brokers, (ii) responding to inquiries and information requests and facilitating tours, (iii) following Court-approved and publicly-noticed bid procedures to solicit offers, and using sound business judgment to extend deadlines and communicate with interested buyer as necessary to obtain qualified bids, (iv) obtaining a stalking horse bidder for the Salacia Plant, (v) conducting a live auction with multiple qualified bidders and competitive bidding for the Salacia Plant, and obtaining a final sale price that is 145% of the original stalking horse bid from a third-party bidder, and (vi) obtaining a sale price for the Salacia

CATHAY'S OBJECTION TO KOZLOV'S MOTION TO REMOVE
INVESTMENT BANKER AND TERMINATE PLAN ADMINISTRATOR - 18

BALLARD SPAHR LLP
1301 2ND AVE, SUITE 2800
SEATTLE, WA 98101-2930
206.223.7000 FAX: 206.223.7107

Equipment that aligns with the Debtors' own appraiser's more recent estimate of the Salacia Equipment's actual market value.

Conversely, the Debtors' $37 million appraisal for the Salacia Plant and $11 million appraisal for the Salacia Equipment (together, the "Debtors' $48 Million Appraisal") was highly "result oriented," as the Debtors' $48 Million Appraisal was obtained and relied upon for (i) the Debtors to oppose a pending motion for relief from stay regarding the Salacia Plant, (ii) Kozlov to oppose a pending motion to appoint a trustee to conduct an orderly liquidation of his individual assets, and (iii) the Debtors and Kozlov to advocate in unison for Kozlov to retain all of his assets until after the Debtors sell all of their assets.

i.      The Debtors' $48 Million Appraisal was Result Oriented.

From the outset of the Debtors Bankruptcy and the Kozlov Bankruptcy, the Debtors' counsel, Kozlov's counsel, and Kozlov's spouse's counsel argued in unison that the Debtors would easily be able to pay all creditors in full, and return a significant surplus to the Debtors' equity holders, based on their opinions that the aggregate value of the Debtors' assets exceeded $100 million (based on the Debtors' scheduled values).

Cathay has always been skeptical of the Debtors' and their professionals' self-serving valuations of the Debtors' assets. For example, when the Debtors were opposing Cathay's motion for relief from stay, they needed an appraised value for the Salacia Plant and the Salacia Equipment to support their narrative that all creditors will easily get paid in full. The Debtors employed and obtained appraisals from Kidder Matthews valuing the Salacia Plant at $37 million and from James G. Murphy, Inc. ("Murphy") valuing the Salacia Equipment at $11 million. ECF No. 227-228.

Similarly, when Cathay moved for the appointment of an independent chapter 11 trustee in the Kozlov Bankruptcy to investigate Kozlov's fraudulent transfer to his non-filing spouse, and propose a confirmable plan premised on an orderly liquidation of Kozlov's $20 million real property portfolio — two things Kozlov was expressly unwilling to do — Kozlov's counsel, Kozlov's spouse's counsel, *and the Debtors' counsel* argued in unison that Kozlov should be excused from immediately avoiding his fraudulent transfers or liquidating any of Kozlov's assets

because they had obtained the Debtors' $48 Million Appraisal.  Notably, the Debtors' counsel was the most vocal in prioritizing Kozlov's individual interests over the interests of the Debtors' own estates and their unsecured creditors:

> [Cathay's trustee motion] and the sort of companion motion for relief from stay in the business entities cases were both, to give the bank its due, filed prior to [the Debtors' $48 million] appraisal. Now, Your Honor hasn't embraced that appraisal at 100 percent dollars.  That's fine.  It is somebody's opinion, but if it's off by 25 percent, the bank is still overwhelmingly collateralized just in one source…

> It's clear that, one thing that [Cathay] can't be intellectually honest with is what they want is a trustee to come in and start selling off all of Mr. Kozlov's non-exempt assets.  That's what they think is going to be the fastest way to get this thing done.  **I don't represent Mr. Kozlov, but I can make the following observations that are in the record**.  First of all, as others have said, they did not bargain for Mr. Kozlov to be a borrower or a co-borrower.  He is a guarantor among five, six guarantors.  They also did not bargain for Mr. Kozlov to collateralize that guaranty, so they are an unsecured creditor at his estate.  And for [Cathay] to say, "we want a trustee because of all these crazy inconsistencies, and we're so confused," which seems to be a status that's exclusive to them, **what they really want is they want a trustee to start selling assets, and that is enormously inappropriate the fourth month into the case, when there is already a path by which this bank is going to be repaid in short order, from the collateral it actually bargained for.  So [the Debtors] would support this motion being denied**…

> If a plan that fully pays a creditor is feasible, it doesn't make a difference where the money comes from.  So, **for [Cathay] to say that Mr. Kozlov as a matter of law needs to contribute, and he is not doing this, we need a trustee in place to start liquidating these assets, there's just no legal support for that position**.  I get it, his guaranty is triggered.  I mean, the loan has been in default for a while, that's true, but he is remaining as a guarantor.

Kozlov Bankruptcy at ECF No. 75 (audio recording of December 20, 2024 hearing) at 38:45-39:10, 39:25-40:40, 41:15-41:50 (emphasis added) (Debtors' counsel's arguments in opposition to Cathay's motion seeking a chapter 11 trustee in the Kozlov Bankruptcy).

CATHAY'S OBJECTION TO KOZLOV'S MOTION TO REMOVE
INVESTMENT BANKER AND TERMINATE PLAN ADMINISTRATOR - 20

BALLARD SPAHR LLP
1301 2ND AVE, SUITE 2800
SEATTLE, WA 98101-2930
206.223.7000 FAX: 206.223.7107

The Court was always more cautious with its optimism that the Debtors' $48 Million Appraisal made it *possible*, but not certain, that the Debtors could pay all creditors in full:

> [A]n appraisal is an opinion of value, that's all it is an opinion, those opinions may be right, those opinions may be wrong. I haven't seen or heard the appraisal to understand what the basis was. So I get [Kozlov's] point, I think it's a wonderful development, and hopefully will mean that if the business entities proceed on their path to confirmation they should have no problem finding a buyer. I'm not so sure. I'll be interested in hearing the market, who the players are, what the price may be, expected time on the market, we'll get all of that I assume at confirmation. But **I don't think banging the drum that we got a $48 million valuation is the end all be all, especially when nothing is set to happen in any definitive time frame, which I think is part of the bank's problem here**…
>
> We have a shuttered fish plant in Whittier, and we have a partially constructed fish plant in Washington. I'm letting you know the basis for my skepticism…

*Id*. at 26:15-27:25, 44:30-44:45 (emphasis added); *see also*, *e.g.*, ECF No. 253 (audio recording of January 7, 2025 hearing) at 38:25-38:35 ("Market analysis would seem to be what's really going to drive it. Is there a fish that's going to bite on that hook?").

The result-oriented nature of the Debtors' $48 Million Appraisal is further highlighted by subsequent developments regarding selling the Salacia Equipment. When the Debtors needed a high appraisal, Murphy valued the Salacia Equipment at $11 million. However, when Murphy was later approached to actually sell the Salacia Equipment, Murphy estimated that it could actually sell the Salacia Equipment for between $2.83 and $3.76 million "approximate auction gross numbers before expenses" including Murphy's commission and costs. ECF No. 508. The ultimate $2.5 million sale price for the Salacia Equipment in significantly less than the appraised value asserted by Murphy when the Debtors and Kozlov needed an advantage in litigation, but the $2.5 million sale price aligns well with Murphy's later estimate of gross sale prices when faced with actually selling the Salacia Equipment.

CATHAY'S OBJECTION TO KOZLOV'S MOTION TO REMOVE
INVESTMENT BANKER AND TERMINATE PLAN ADMINISTRATOR - 21

BALLARD SPAHR LLP
1301 2ND AVE, SUITE 2800
SEATTLE, WA 98101-2930
206.223.7000 FAX: 206.223.7107

ii.   The Salacia Plant and Salacia Equipment Sales Establish Actual Value.

Months after obtaining the Debtors' $48 Million Appraisal, the Debtors negotiated, agreed to, proposed, and confirmed the Debtors Plan jointly with Cathay, primarily predicated on implementing the Salacia Marketing and Sale Process "with the assistance of Hilco." As explained above, the Plan Administrator and Hilco complied with all of their respective duties and roles under the Debtors Plan, including weekly transparency meetings where Cathay remained fully informed throughout the process, and Cathay was ultimately satisfied that the Salacia Plant and Salacia Equipment were fully exposed to the market of prospective buyers (and buyer-side brokers) in a commercially reasonable manner.

It is also important to note that Cathay reserved rights to credit bid and automatically qualified as a bidder, but never bid: all parties have always been focused on generating the broadest market interest and finding the third-party buyer(s) willing to pay the most for the Salacia Plant and the Salacia Equipment. The commercially reasonable Sale and Marketing Process assured Cathay that there was no unrealized upside to credit bidding for this collateral above the actual prices that prospective buyers were ultimately willing to pay.

As the Debtors Plan was designed by the Debtors and Cathay to do, the market established the actual value of the Salacia Plant ($10.5 million) and the Salacia Equipment ($2.5 million).

C.   **Kozlov's Request to Replace the Plan Administrator and Hilco and Re-Start the Salacia Marketing and Sale Process is Not Feasible.**

The Motion requests that the Court remove and replace the Plan Administrator and Hilco, and re-start the Salacia Marketing and Sale Process with Kozlov's preferred plan administrator (Northmarq Advisory Services) and Kozlov's preferred broker (Kidder Matthews). None of that relief is available under the Debtors Plan, and even if it were, the Motion fails to address many feasibility concerns.

Northmarq Advisory Services ("Northmarq") knows almost nothing about the Salacia Marketing and Sale Process other than the Debtors' $48 Million Appraisal and the $7.25 Million Stalking Horse, and misstates other facts about the depth of the marketing process, yet readily

parrots Kozlov's conclusions that "[the Plan Administrator] has [not] entered into a commercially reasonable transaction or obtained a fair and reasonable price for the Salacia assets," and "leaving the sale and marketing of the Salacia assets to [Hilco] will [not] maximize the recoveries for the Debtors' creditors." ECF No. 501. Northmarq did not even wait for the stalking horse-induced auction to conclude before declaring the sale commercially unreasonable. Northmarq's general ignorance and misstatements are not surprising, as Kozlov has been separated from the Salacia Marketing and Sale Process since early August.

Nevertheless, Northmarq proposes to charge the Debtors' estate $300 per hour to "send RFPs to the 3 leading national industrial brokers with large presences in Seattle – CBRE, JLL, and Colliers – as well as Kidder Mathews," "give tours to all 4 parties," engage one (obviously Kidder Matthews), and conduct the Salacia Marketing and Sale Process "in approximately 6 months." ECF No. 501.

Meanwhile, completely contradicting Northmarq's ostensible impartiality, Kozlov has already selected Kidder Matthews as his preferred broker for Northmarq to engage, and Kidder Matthews proposes to charge the Debtors' estate a 2% commission (on top of the commission and fees that Hilco is already entitled to) to run a "four to six months" process. ECF No. 502, 521.

The Motion must be denied, because Kozlov fails to reconcile the time and expense of his proposed modifications to the Debtors Plan with the lack of any cash to fund his proposed modifications to the Debtors Plan. The Motion *completely ignores* the significant costs associated with Kozlov's proposal, and that the Debtors have absolutely no cash remaining to fund the Salacia Marketing and Sale Process past mid-October 2025: (i) over $1.35 million of post-confirmation interest that would continue to accrue on Cathay's Claim over the next six months, (ii) Northmarq's $300 per hour compensation for six months, and Kidder Matthews' 2% commission, and (iii) over $1 million dollars of taxes, insurance, security, and other carrying costs that must be paid with cash in the ordinary course, among other expenses and risks associated with Kozlov's half-baked proposal. Kozlov makes no attempt at projecting the actual costs associated with his proposed modifications to the Debtors Plan, and he fails to identify any source of funding.

**D.     Kozlov Lacks Standing in the Debtors Bankruptcy.**

Under Section 1109 of the Bankruptcy Code, the parties with a right to appear and be heard on issues in the Debtors Bankruptcy include "the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee." 11 U.S.C. § 1109(b). The Debtors and their direct equity holders have standing; the Debtors' indirect equity holders do not.

Kozlov is the trustee of Chatsworth Venture Fund, a trust that holds a single asset, all membership interest in Worldwide Seafood Solutions, LLC, which is the sole member of North Star Capital Solutions, LLC ("North Star Capital") and Worldwide Seafoods PNW, LLC, which collectively hold the majority of the equity interests in the Debtors. *See* Kozlov Bankruptcy, ECF No. 16.

North Star Capital's direct equity interest in Salacia is classified in the Debtors Plan; however, North Star Capital is a corporate entity that has not appeared in the Debtors Bankruptcy through independent counsel.

Kozlov is not a creditor or a direct equity holder of the Debtors. Kozlov is not a party to the Debtors Plan in his individual capacity; he signed the Debtor Plan six times, but only in his capacity as an "authorized person" of the Debtors. In the Debtors Bankruptcy, Kozlov is merely the trustee of a trust that is at least three levels removed from any direct equity interests in the Debtors. The Debtors' direct equity holders are corporations that are each classified in the Debtors Plan, but none have appeared through counsel in the Debtors Bankruptcy. Cathay is not aware of any substantive consolidation among Kozlov and those intermediary equity holders, although the Motion's argument for Kozlov's standing effectively consolidates all levels of direct and indirect equity holders into one, making it seem as though Salacia is owned directly by Chatsworth Venture Fund. *See*, *e.g.*, Motion at p. 3 ("Kozlov is essentially the representative of the majority of equity security holders and therefore a party in interest for all purposes in these bankruptcy cases.")

At the hearing on Cathay's motion for the Plan Administrator to assume responsibility for the Salacia Marketing and Sale Process, the Court allowed Kozlov's counsel to appear and argue,

CATHAY'S OBJECTION TO KOZLOV'S MOTION TO REMOVE
INVESTMENT BANKER AND TERMINATE PLAN ADMINISTRATOR - 24

BALLARD SPAHR LLP
1301 2ND AVE, SUITE 2800
SEATTLE, WA 98101-2930
206.223.7000 FAX: 206.223.7107

presumably because (i) Kozlov caused the Debtors to terminate their counsel on the eve of the hearing, intentionally leaving no one to argue on behalf of the Debtors, and (ii) that motion was predicated on actions taken by Kozlov in his personal capacity that were adverse to the Debtors.

Now the Debtors have engaged new counsel. Despite the Debtors engaging new counsel, subsequent attempts by Cathay to communicate with the Debtors' new counsel directly about matters related to the Debtors Plan have only been routed back through Kozlov's counsel. From Cathay's perspective, Kozlov's counsel has assumed primary representation of the Debtors in the Debtors Bankruptcy.

Kozlov and his counsel should not be permitted to continue requesting relief and arguing in the Debtors Bankruptcy. The Debtors and their own counsel are the only Kozlov-related parties with standing to request relief related to the Debtors Plan and the Debtors Bankruptcy.

**E.      Kozlov's History of Requesting Relief that Cannot be Granted.**

The Motion is at least the third time that Kozlov has requested relief that cannot be granted, forcing Cathay to incur expenses objecting, and forcing the Court to tell Kozlov "no."

*First*, Kozlov requested an extension of his exclusivity deadline for proposing a plan after that deadline had passed. Cathay objected, explaining that such relief cannot be granted, Kozlov continued to request that relief, and the Court denied it.

*Second*, Kozlov requested a distribution from a Cle Elum Lot sale that deviated from the express terms of the Kozlov Plan. Cathay objected, explaining that such relief cannot be granted, Kozlov continued to request that relief, and the Court denied it.

*Now*, Kozlov is requesting a complete re-write of the Debtors Plan sections regarding the Salacia Marketing and Sale Process, Plan Administrator, and Hilco – relief that cannot be granted (and that Kozlov lacks standing to even request). The Court must again deny it.

Kozlov's disregard for settled law and confirmed plans is creating an undue burden for Cathay and other parties in interest, and Cathay reserves all rights to seek reimbursement for its expenses associated with opposing Kozlov's inappropriate requests for relief.

CATHAY'S OBJECTION TO KOZLOV'S MOTION TO REMOVE
INVESTMENT BANKER AND TERMINATE PLAN ADMINISTRATOR - 25

BALLARD SPAHR LLP
1301 2ND AVE, SUITE 2800
SEATTLE, WA 98101-2930
206.223.7000 FAX: 206.223.7107

## VI.   CONCLUSION

For these reasons, Cathay respectfully request that the Court deny the Motion.

DATED: October 7, 2025.

BALLARD SPAHR LLP


By /s/James B. Zack
   Gregory R. Fox, WSBA No. 30559*
   Michael J. Parise, ABA No. 7906044
   James B. Zack, WSBA No. 48122*
   Alena Ivanov, WSBA No. 59900*
Attorneys for Cathay Bank

*Admitted Pro Hac Vice

CATHAY'S OBJECTION TO KOZLOV'S MOTION TO REMOVE
INVESTMENT BANKER AND TERMINATE PLAN ADMINISTRATOR - 26

BALLARD SPAHR LLP
1301 2ND AVE, SUITE 2800
SEATTLE, WA 98101-2930
206.223.7000 FAX: 206.223.7107

CERTIFICATE OF SERVICE

The undersigned hereby certifies that (1) on October 7, 2025, a true and correct copy of the foregoing document was served electronically through the ECF system as indicated on the Notice of Electronic Filing, including the following persons:

> Debtors
> U.S. Trustee
> Registered ECF Participants

and that (2) on October 7, 2025, I caused a true and correct copy of the foregoing document to be deposited in the United States mail in Seattle, Washington, via First Class U.S. Mail, addressed to:

> William A. Earnhart
> Birch Horton Bittner & Cherot
> 510 L Street, Suite 700
> Anchorage, AK 99501

By:  */s/James B. Zack*
     James B. Zack, Ballard Spahr LLP

CATHAY'S OBJECTION TO KOZLOV'S MOTION TO REMOVE
INVESTMENT BANKER AND TERMINATE PLAN ADMINISTRATOR - 27

BALLARD SPAHR LLP
1301 2ND AVE, SUITE 2800
SEATTLE, WA 98101-2930
206.223.7000 FAX: 206.223.7107