Brian T. Peterson, *Pro Hac Vice*
K&L GATES LLP
925 Fourth Avenue, Suite 2900
Seattle, WA  98104-1158
(206) 623-7580

HONORABLE GARY SPRAKER

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES BANKRUPTCY COURT
DISTRICT OF ALASKA AT ANCHORAGE

In re:

WHITTIER SEAFOOD, LLC

Debtors[1].

Chapter 11
Case No.  24-00139

DECLARATION OF BETSY LANDOLL IN
SUPPORT OF (I) MOTION FOR ORDER
APPROVING SALE OF SALCIA PLANT
FREE AND CLEAR; AND (II) PLAN
ADMINISTRATOR'S OBJECTION TO
MOTION TO REMOVE HILCO AS
INVESTMENT BANKER, TERMINATE
AUTHORITY OF PLAN ADMINISTRATOR
TO CONDUCT THE SALE AND
MARKETING OF THE SALACIA ASSETS
OR CHANGE PLAN ADMINISTRATOR,
AND REQUIRE ACCOUNTING

I, Besty Landoll, declare as follows:

1.      I am a Director at The Stapleton Group (the "Plan Administrator"). I am over

eighteen (18) years of age, and I am competent in all ways to testify. Unless otherwise stated, I make

the following statements based on my personal knowledge. I submit this Declaration in support of

the Plan Administrator's (i) *Motion for Order Approving the Sale of Salacia Plant Free and Clear*

*of All Liens, Claims, Interests, and Encumbrances* ("Salacia Plant Sale Motion"); and (ii) the Plan

---

[1] The Debtors are Marine Fishing International, Inc. ("MFI Inc."), Case No. 24-00140; Marine Fishing
International, LLC ("MFI LLC"), Case No. 24-00141; Modys, LLC ("Modys"), Case No. 24-00142; Salacia,
LLC ("Salacia"), Case No. 24-00143; Silver Wave, LLC ("Silver Wave"), Case No. 24-00144; and Whittier
Seafood, LLC ("Whittier") (collectively, the "Whittier Group").

DECLARATION OF BETSY LANDOLL IN SUPPORT OF
(I) MOTION TO APPROVE SALE OF SALACIA PLANT;
AND (II) OBJECTION TO PLAN MODIFICATION
MOTION - 1
1602725932.1

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Administrator's objection (the "Objection") to the *Motion to Remove Hilco As Investment Banker, Terminate Authority of Plan Administrator to Conduct the Sale and Marketing of the Salacia Assets or Change Plan Administrator, and Require Accounting* (the "Plan Modification Motion") filed by Aleksey N. Kozlov at Dkt. No. 499.

2.    On June 5, 2025, the Court entered its *Order Confirming Debtors' Fourth Amended Joint Plan of Reorganization* [Dkt. No. 386] (the "Confirmation Order"). The Plan is primarily predicated on marketing and selling the Salacia Plan and the Equipment, with Hilco's assistance. *See, e.g.*, Plan at VII.D (Means for Execution of the Plan).

3.    The Court-approved bid procedures that provide a timeline for marketing and sales of the Salacia Plant and Equipment that included a June-July marketing and buyer diligence period, August bid submissions and early-September sale hearing and closing. *See* Dkt. No. 408 at p. 3. The Court-approved bid procedures for the sale of the Salacia Plant and Equipment give the Plan Administrator the discretion to "extend or waive deadlines or other terms and conditions" set forth therein, so long as modifications are disclosed to all bidders. *See* Dkt. No. 381.

4.    Under the Plan, there is a limited amount of cash, in the form of protective advances extended by Cathay Bank, available to fund a sale and marketing of the Salacia assets. *See* Plan, Article VII.E. Cathay Bank has approved a cash collateral budget through October 17, 2025, but has not approved a cash collateral budget beyond that date.

5.    The continued marketing of the Salacia assets requires ongoing operational expenses that must be paid from Cathay Bank's cash collateral with their consent. This includes expenses associated with contractors, utilities, and security at the Salacia Plant. I have learned that the insurance policy for the Salacia assets will expire on November 1, 2025, and according to the Debtor, the annual premium is $264,924. I have received a quote for a 60-day extension, which would cost the estate $42,737. I have made additional requests to an alternative reputable broker for quotes as well.

DECLARATION OF BETSY LANDOLL IN SUPPORT OF
(I) MOTION TO APPROVE SALE OF SALACIA PLANT;
AND (II) OBJECTION TO PLAN MODIFICATION
MOTION - 2
1602725932.1

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

6.     On July 16, 2025, Cathay Bank filed a motion requesting that the Plan Administrator be vested with authority to control the sale process for cause, on account of the Debtor's interference with the marketing and sale efforts. On the eve of the hearing, the Debtor attempted to terminate Hilco's engagement. The Court granted the motion, and on August 7, 2025, the Court entered its *Order Appointing Plan Administrator to Assume Responsibility for Salacia Marketing and Sale Process* [Dkt. No. 459] (the "Appointment Order"), which vested the Plan Administrator with exclusive responsibility for marketing and selling the Salacia Plant and the Salacia Equipment in accordance with the Confirmation Order.

7.     After the Court entered the Appointment Order, I had discussions with both Hilco and Kidder Mathews regarding the marketing and sale of the Salacia assets to determine the best path forward for the post-confirmation estate of Salacia. On or about August 7, 2025, I had a telephone conversation with Matt Hagen of Kidder Mathews. This telephone call was twenty-one minutes long as evidenced by Exhibit A attached hereto. Mr. Hagen informed me that Kidder Mathews would need 4-6 months to market the Salacia Plant for sale. Mr. Hagen did not offer discrete examples of ways that Kidder Mathews would improve the marketing of the Salacia assets. As included in Matthew Hagen's Supplemental Declaration at Dkt. No. 521, Mr. Hagen mentioned that the sale process was not ideal for attracting buyers. Mr. Hagen's comment around the sale process led me to believe, however, that Mr. Hagen did not grasp that the sale process was pre-determined and approved by this Court, and suggested to me that he did not have experience selling properties out of bankruptcy. Also, during that call, Matt Hagen informed me that they had not engaged in efforts to prepare the assets for sale because they had difficulty obtaining information from the Debtors regarding the Salacia assets.

8.     The Plan Administrator determined that Hilco, which has a competent and experienced real estate brokerage division, is competent and capable and would maximize the value received for the Salacia assets. Moreover, if the Plan Administrator were to engage an alternative

DECLARATION OF BETSY LANDOLL IN SUPPORT OF
(I) MOTION TO APPROVE SALE OF SALACIA PLANT;
AND (II) OBJECTION TO PLAN MODIFICATION
MOTION - 3
1602725932.1

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

broker it would only lead to additional delay, additional operational expenses (including Plan Administrator fees), and interest accrual on Cathay's secured loan. A sudden termination of Hilco could also lead to confusion among interested purchasers who were touring the Salacia Plant and communicating with Hilco regarding the submission of bids. Additionally, the Plan, by its terms, provides for Hilco to act as broker for the Salacia assets. Thus, the Plan Administrator concluded that the Plan does not allow the Plan Administrator to unilaterally terminate Hilco's engagement.

9.      Even if the Plan allowed the Plan Administrator to unilaterally terminate Hilco's engagement, Hilco's engagement requested by the Debtors and approved by the Court entitles them to a guaranteed minimum fee. In particular, the terms of Hilco's engagement entitle Hilco to (i) a monthly fee of $25,000; and (ii) a "Sale Transaction Fee" equal to the greater of $500,000 or 3.0% of the Transaction Value across all of the Debtors' assets. *See* Dkt. No. 159. Fifty percent of the monthly fees paid to Hilco are credited to the Transaction Fee. *Id.*  For all of these reasons, the Plan Administrator determined that it was in the best interests of the post-confirmation estate of Salacia, LLC to continue to utilize Hilco's services consistent with the terms of the Plan.

10.      On August 15, 2025, I emailed a termination letter from my counsel to Matt Hagen of Kidder Mathews, that withdrew any engagement of Kidder Mathews that Mr. Kozlov attempted to accomplish. Attached hereto as Exhibit B is the email thread with Mr. Hagen in which he confirmed that Kidder Mathews was *not* the selling broker for the Salacia assets. I understand that Hilco contacted Kidder Mathews on numerous occasions to see if they could represent a buyer for the Salacia assets. Even though Kidder Mathews mentions a buyer in their email, they did not locate and represent a buyer with respect to any of the Salacia assets.

11.      On August 15, 2025, I was informed by Hilco that Mr. Kozlov appeared for a tour being conducted by Hilco with an interested buyer for the Salacia assets and had instructed the interested buyer to not take pictures of the Salacia warehouse facility. Attached hereto as Exhibit C

DECLARATION OF BETSY LANDOLL IN SUPPORT OF
(I) MOTION TO APPROVE SALE OF SALACIA PLANT;
AND (II) OBJECTION TO PLAN MODIFICATION
MOTION - 4
1602725932.1

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

is an email I sent to Mr. Kozlov telling him to immediately refrain from further interference with Hilco's sale process.

12.     Pursuant to and in accordance with the Bidding Procedures, the Plan Administrator received a Qualified Bid from The Conversion of R.C.C.I. (the "Buyer") for substantially all of the Salacia equipment, in the amount of $2,500,000. The Buyer wired a deposit to the Plan Administrator in the amount of $300,000. It was the highest and best bid received by the Plan Administrator and includes an offer to acquire substantially all of the Salacia equipment, including the Tanks, as that term is defined in the Bidding Procedures (collectively, the "Salacia Equipment"). The Plan Administrator has filed a motion seeking approval of the sale of the Salacia Equipment.

13.     The Plan Administrator received a Qualified Bid from SCT Investments, Ltd. ("SCT") in the amount of $7,250,000 for the Salacia main plant and warehouse (the "Salacia Plant"). It was the highest and best Qualified Bid received by the Plan Administrator. The Plan Administrator entered into an agreement with SCT to designate them as Stalking Horse and continued to market the Salacia Plant for sale in an effort to obtain a higher bid and hold an auction. The Plan Administrator therefore set a further continued bid deadline of October 1, 2025, in order to maximize the value obtained for the Salacia Plant.

14.     The Plan Administrator discussed the Plan Administrator's sale and marketing efforts with Cathay Bank. Cathay Bank did not agree to consent to the use of cash collateral and provide additional cash advances to the Plan Administrator to engage a new broker and/or continue the marketing of the Salacia Plant beyond October 1, 2025. Accordingly, it would not be possible for the Plan Administrator to hire Kidder Mathews to engage in additional marketing efforts with respect to the Salacia assets.

15.     The Plan Administrator received Qualified Bids from Red Chamber and Silver Bay Seafoods, LLC in advance of the auction. I attended the auction on behalf of the Plan Administrator on October 3, 2025. Red Chamber and Silver Bay Seafoods, LLC, together with SCT, participated in

DECLARATION OF BETSY LANDOLL IN SUPPORT OF
(I) MOTION TO APPROVE SALE OF SALACIA PLANT;
AND (II) OBJECTION TO PLAN MODIFICATION
MOTION - 5
1602725932.1

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

the auction. In addition, counsel for the Unsecured Creditors Committee and its financial advisor attended the auction. Cathay Bank attended the auction and announced that it was a Qualified Bidder, but that it would not be submitting any bid for the Salacia Plant. The Plan Administrator designated Red Chamber as the Winning Bidder with a bid of $10,500,000 after multiple rounds of bidding. The Plan Administrator designated SCT as the Backup Bidder, with an offer for the Salacia Plant in the amount of $9,982,500. Pursuant to the agreement with SCT, to the extent that the transaction closes with Red Chamber, SCT will be entitled to a break-up fee in the amount of $217,500.

16.     I believe that it is in the best interests of the post-confirmation estate of Salacia, LLC to consummate sale of the Salacia Plant to Red Chamber for $10,500,000 in accordance with the terms of the APA attached hereto as Exhibit D. I further believe that the proposed transaction is a value-maximizing transaction that is in the best interests of creditors. Continued marketing of the Salacia Plant may not return a meaningfully higher price for the assets. Additionally, there is no additional unencumbered cash to allow a lengthier sale and marketing process for the Salacia Plant. The Plan Administrator requests that the Court approve the sale transaction with Red Chamber; award SCT the break-up fee in the amount of $217,500; and authorize disbursement of the sale proceeds as set forth in the proposed order submitted in connection with the Salacia Plant Sale Motion.

17.     Mr. Kozlov requested accounting information from the Plan Administrator as shown in the emails attached hereto as Exhibit E. As demonstrated by this email correspondence, I asked for more details about what he was looking for and the basis of his request. I never received a response back from Mr. Kozlov. The Plan Administrator is justifiably concerned that his requests have been made solely on the basis of critiquing the Plan Administrator's efforts to date. Mr. Kozlov asserts in his declaration at Dkt. No. 503 that these items are needed for his tax reporting. Even if Mr. Kozlov needs such information, he does not need the information presently.

DECLARATION OF BETSY LANDOLL IN SUPPORT OF
(I) MOTION TO APPROVE SALE OF SALACIA PLANT;
AND (II) OBJECTION TO PLAN MODIFICATION
MOTION - 6
1602725932.1

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

18.     The Plan Administrator is focused on maximizing value for the Salacia Plant and Equipment before the end of October. Mr. Kozlov's requests for financial information and his Plan Modification Motion are both unproductive distractions that increase the Plan Administrator's fees and reduce distributions to creditors in this case. Under the Plan, the Plan Administrator is required to report to Cathay Bank, which we have on a frequent basis.

19.     Much of the information referred to by Mr. Kozlov has been provided already, or is being provided in connection with this Declaration. The Plan Administrator attached its invoice for August services in connection with the motion to approve the Salacia Equipment Motion. The Plan Administrator's invoice for September services is attached hereto as Exhibit F. The Plan Administrator requests that the Court's order approving the Salacia Plant Sale Motion authorize disbursement of sales proceeds in satisfaction of the Plan Administrator's September fees and in accordance with the terms of the Plan. Mr. Kozlov has asked for an accounting of the Whittier Sales proceeds in the Plan Modification Motion. Attached hereto as Exhibit G is a spreadsheet describing an account of the Whittier sales proceeds. Mr. Kozlov also complains that the Plan Administrator has not provided a W-9 to the Debtors. Mr. Kozlov has not made that request to the Plan Administrator previously and has not explained why the Plan Administrator would need to provide a W-9 from the Stapleton Group in order for the Debtors to complete their tax returns next year.

20.     There is no basis for Mr. Kozlov to seek "disgorgement" of fees paid to the Plan Administrator. Mr. Kozlov is not a creditor in this case and has no right to receive any of the funds being administered by the Plan Administrator, which are subject to the lien of Cathay Bank but are authorized to be paid under the terms of the Plan. The Plan Administrator's fees comply with the terms of the budget approved by Cathay Bank and are therefore proper under the Plan.

DECLARATION OF BETSY LANDOLL IN SUPPORT OF
(I) MOTION TO APPROVE SALE OF SALACIA PLANT;
AND (II) OBJECTION TO PLAN MODIFICATION
MOTION - 7
1602725932.1

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

1    I declare under the penalty of perjury under the laws of the United States that the foregoing is

2    true and correct to the best of my knowledge.

3       EXECUTED this 8th day of October at Austin, Texas.

4

5       /s/ *Betsy L*

6       Betsy Landoll

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF BETSY LANDOLL IN SUPPORT OF
(I) MOTION TO APPROVE SALE OF SALACIA PLANT;
AND (II) OBJECTION TO PLAN MODIFICATION
MOTION - 8
1802725932.1

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

*EXHIBIT A*



*EXHIBIT B*

| | |
|---|---|
| **From:** | Matt Hagen |
| **To:** | Betsy Landoll |
| **Subject:** | RE: Salacia Follow-up |
| **Date:** | Monday, August 18, 2025 3:16:04 PM |
| **Attachments:** | image002.png |
| | image003.png |

CAUTION EXTERNAL

Hello Betsy,

Good afternoon!   Thank you for the email and per your request, we acknowledge that we are not acting as the selling broker for this asset.

We'll continue to discuss the opportunity with our buyer and will submit should they choose to do so.

Have a great week!

Talk to you soon,

**Matthew Hagen, SIOR**
Executive Vice President | Shareholder
**KIDDER MATHEWS**
500 108th Ave NE, Suite 2400, Bellevue, WA 98004
**T** .425.283.5782 | **c** 206.571.1829
matt.hagen@kidder.com | vcard | profile | **kidder.com**

**From:** Betsy Landoll <Betsy.Landoll@jsheld.com>
**Sent:** Friday, August 15, 2025 4:10 PM
**To:** Matt Hagen <matt.hagen@kidder.com>
**Subject:** Salacia Follow-up

**This Message Is From an External Sender**
This message came from outside your organization.

Hi Matt,

Appreciate your time today. As discussed, I've attached the termination letter for Salacia. If you could confirm receipt and acknowledge that Kidder is not acting as broker pursuant to the Listing Agreement that would be appreciated.

Below are the key dates related to the sale process. **The qualified bid deadline is Thursday, August 28th.** More details are included in the process letter and offering memo attached. Please note that we are paying buyer brokers and request that you include your commission fee in your client's offer.

## Key Dates

| Event | Date/Deadline |
|---|---|
| File and Serve Notice of Selection of Stalking Horse Bid (if applicable) and/or Auction Notice ("Stalking Horse Designation Deadline") | Friday, August 22, 2025 at 5:00 p.m. Alaska Time |
| Deadline for Submission of Materials to become a Qualified Bidder ("Qualified Bid Deadline") | Thursday August 28, 2025 at 5:00 p.m. Alaska Time |
| Auction (if necessary) | Wednesday September 3, 2025 (time and location TBD) |
| File and Serve Sale Notice and Motion (if necessary) | No later than Monday September 8, 2025 at 5:00 p.m. Alaska Time |
| Sale Hearing (if necessary) (subject to the Court's availability) | Not less than 7 (seven) days after the date of the Notice of Hearing on Sale Motion subject to the Court's availability |
| Sale Close | As soon as practical after entry of the Sale Order. |

Hope you have a great weekend --- and the weather clears up!

Best,
Betsy

**Betsy Landoll** | Director
Stapleton Group, a part of J.S. Held LLC
515 S. Flower Street, 18th Floor, Los Angeles, CA 90071
Office 512-704-6686

**email** | **stapletoninc.com**

Stapleton Group has joined J.S. Held's Strategic Advisory practice. **Click here to learn more.**



This email message is intended only for the recipient to whom it is addressed and may contain information that is privileged or confidential. Nothing contained in this email (1) constitutes an offer or a solicitation to buy or sell any security or other financial instrument or (2) provides tax, legal, insurance or investment advice. If you are not the intended recipient of this email, any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender and permanently delete all copies that you may have. J.S. Held, its affiliates and subsidiaries are not certified public accounting firm(s) and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. Securities offered through PM Securities, LLC, d/b/a Phoenix IB or Ocean Tomo Investments, a part of J.S. Held, member FINRA/ SIPC. All rights reserved.

*EXHIBIT C*

| | |
|---|---|
| **From:** | Betsy Landoll |
| **To:** | Aleksey Kozlov |
| **Cc:** | Michelle Papenfuss; David Stapleton; Peterson, Brian T. |
| **Bcc:** | Marken, Sanjay |
| **Subject:** | Salacia Tours - Please do not attend |
| **Date:** | Friday, August 15, 2025 12:23:00 PM |
| **Attachments:** | image001.png |
| **Importance:** | High |

Hi Aleksey,

I just called you – Please do not attend the buyer tours at Salacia. We just need Glenn in attendance. Buyers are allowed to take photos. Please do not interfere.

Thank you,

Betsy

**Betsy Landoll** | Director

Stapleton Group, a part of J.S. Held LLC

515 S. Flower Street, 18th Floor, Los Angeles, CA 90071

Office 512-704-6686

**email** | **stapletoninc.com**

Stapleton Group has joined J.S. Held's Strategic Advisory practice. **Click here to learn more.**



This email message is intended only for the recipient to whom it is addressed and may contain information that is privileged or confidential. Nothing contained in this email (1) constitutes an offer or a solicitation to buy or sell any security or other financial instrument or (2) provides tax, legal, insurance or investment advice. If you are not the intended recipient of this email, any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender and permanently delete all copies that you may have. J.S. Held, its affiliates and subsidiaries are not certified public accounting firm(s) and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. Securities offered through PM Securities, LLC, d/b/a Phoenix IB or Ocean Tomo Investments, a part of J.S. Held, member FINRA/ SIPC. All rights reserved.

*EXHIBIT D*

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("Agreement") is entered into as of this 7th day of October by and between The Conversion of R.C.C.I., LLC, a California limited liability company, or its assignee ("Buyer"), on the one hand, and The Stapleton Group in its capacity as Plan Administrator for Salacia, LLC, a ("Seller" or "Salacia"), on the other hand (each of Buyer and Seller is a "Party" and both are the "Parties").

## RECITALS:

A.    On August 19, 2024 ("Petition Date"), Salacia commenced the Chapter 11 Case by filing a voluntary petition for relief under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Alaska (the "Court") and assigned case no. 24-00143.

B.    Salacia's bankruptcy case is jointly administered under Case No. 24-00139 (the "Bankruptcy Case"). The Court entered an order in the Bankruptcy Case on August 7, 2025, providing that the Plan Administrator shall assume and hold exclusive responsibility for marketing and selling the Salacia Plant and the Salacia Equipment in accordance with the Debtors' Fourth Amended Joint Plan of Reorganization.

C.    Buyer desires to purchase from Seller, and Seller desires to sell, convey, assign and transfer to Buyer the Acquired Assets (defined below) pursuant to, *inter alia*, section 363 of the Bankruptcy Code, in the manner and subject to the terms and conditions set forth herein.

D.    To the extent the sale proceeds generated from the transaction contemplated by this Agreement (the "Transaction") are insufficient to pay Salacia's secured creditors in full as set forth in the Bidding Procedures (Defined in Section 1.1), the Transaction is subject to the approval of the Bankruptcy Court, pursuant to section 363 of the Bankruptcy Code, and may only be consummated pursuant to a final, non-appealable order entered by the Bankruptcy Court in the Chapter 11 Case approving the terms of this Agreement (the "Sale Order").

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

## ARTICLE 1
## DEFINITIONS

**Section 1.1       Defined Terms.**  In addition to the capitalized terms defined elsewhere in this Agreement, the following terms have the following meanings:

(a)    "Accounts Receivable" means any amounts owed to Seller by a Customer.

(b)    "Acquired Assets" has the meaning set forth in Section 2.1.

(c)    "Acquired Real Property" means the Real Property that Buyer is purchasing under this Agreement as set forth on Schedule 2.1(a).

2837 ie22jf01yw
1605224738.1

(d)    "<u>Administrative Books and Records</u>" means any Books and Records as necessary to allow Seller to complete administration of the Bankruptcy Case, including but not limited to completion of any required Tax returns, review and resolution of claims filed in the Bankruptcy Case, pursuit of any claims against third parties, administering any rights under insurance policies, and other similar issues necessary to complete administration of the Bankruptcy Case.

(e)    "<u>Agreement</u>" has the meaning set forth in the Preamble.

(f)    "<u>Assumed Executory Contracts</u>" has the meaning set forth in <u>Section 2.2(a)</u>.

(g)    "<u>Assumed Lease</u>" has the meaning set forth in <u>Section 2.2(a)</u>.

(h)    "<u>Assumed Liabilities</u>" means the obligations under the Assumed Executory Contracts and other obligations assumed by the Buyer as set forth in Section 2.2, below.

(i)    "<u>Bid Procedures</u>" means the Bid Procedures approved by the Court in the form attached as Schedule 1.1(i), that govern the process and procedures for another interested buyer to submit a bid higher than the Buyer's offer contained herein, including an auction to the extent that one or more higher bids are submitted.

(j)    "<u>Books and Records</u>" means all books and records pertaining to the Acquired Assets of any kind, wherever located.

(k)    "<u>Business Day</u>" means any day excluding Saturday, Sunday, any legal holiday under the laws of the State of Washington or a day on which banks located in the State of Washington are required by law or other governmental action to close.

(l)    "<u>Buyer</u>" has the meaning set forth in the Preamble.

(m)    "<u>Closing</u>" has the meaning set forth in <u>Section 3.1</u>.

(n)    "<u>Closing Date</u>" means the date on which Closing occurs, which shall be the after entry of the Sale Order and no later than October 31, 2025, unless a different date is agreed to by the Seller and Buyer in writing.

(o)    "<u>Cure Costs</u>" means cure obligations, costs, and fees due with respect to the Assumed Executory Contracts in the amounts set forth on Schedule 2.2;

(p)    "<u>Damages</u>" has the meaning set forth in <u>Section 9.2(d).</u>

(q)    "<u>Deposit</u>" has the meaning set forth in <u>Section 2.5</u>.

(r)    "<u>Deposit Agent</u>" means the The Stapleton Group or such Deposit Agent as agreed to by Buyer and Seller.

(s)    "<u>Excluded Assets</u>" has the meaning set forth in <u>Section 2.3</u>.

(t)    "<u>Execution</u>" means the time that both Buyer and Seller have executed this Agreement.

(u)    "Existing Contract" means any oral or written contract, agreement, real or personal property lease, sublease, license, distribution arrangement, sale and purchase agreement, or purchase and sale order to which Seller is a party.

(v)    "Governmental Authority" means any foreign or United States federal, state, or local government, governmental regulatory, or administrative authority, agency, or commission, or any court, tribunal, or judicial or arbitral body.

(w)    "Knowledge" means the actual knowledge of the Party's officers after reasonable inquiry.

(x)    "Lease" means the leases to which Seller is a party listed on Schedule 2.2.

(y)    "Liabilities" mean all liabilities and obligations (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, due or not yet due), including all liabilities for Taxes with respect to periods before the Closing Date, including periods before the Petition Date.

(z)    "License" means the licenses to which Seller is a licensor listed on Schedule 2.2.

(aa)    "Lien" means any lien (statutory or otherwise), hypothecation, encumbrance, security interest, interest, mortgage, deed of trust, pledge, restriction, charge, instrument, license, preference, priority, security agreement, Tax (including foreign, federal, state, or local Tax), order of any Governmental Authority, of any kind including, without limitation: (i) any assignment or deposit arrangement in the nature of a security device; (ii) any claim based on the theory that Buyer is a successor of Seller; and (iii) any leasehold interest, license, or other right, in favor of a third party or Seller, to use any portion of the Acquired Assets, whether secured or unsecured, choate or inchoate, contingent or non-contingent.

(bb)    "Party" or "Parties" has the meaning set forth in the preamble to this Agreement.

(cc)    "Permit" means all licenses, permits, franchises, approvals, authorizations, consents or orders of, filings with, or notifications to, any Governmental Authority, whether foreign, provincial, municipal, federal, state, or local, necessary for the past or present conduct or operation of Seller's business.

(dd)    "Person" means any individual, corporation, partnership, limited liability company, trust, association, joint venture, or other entity of any kind.

(ee)    "Personal Property Taxes" has the meaning set forth in Section 3.4(a).

(ff)    "Purchase Price" has the meaning set forth in Section 2.5(a).

(gg)    "Purchase Price Allocation Schedule" has the meaning set forth in Section 2.6.

(hh)    "Real Property" means one or more parcels located in Marysville, Washington, comprised of the following six parcels:  310533-004-007-00, 310533-004-030-00, 310533-004-009-00, 310533-004-005-00, 310533-004-004-00, and 300504-001-025-00.

2837 ie22jf01yw
1605224738.1

(ii)    "Representative" means any attorney, accountant, agent, independent contractor, or other representative.

(jj)    "Sale Hearing" means the hearing of the Court to approve this Agreement and its contemplated Transaction, to the extent Court approval of the Transaction is required.

(kk)    "Sale Order" means, to the extent Court approval of the Transaction is required, the order of the Court, in the form and substance attached as Schedule 1.1(kk) hereto (or, if revised, reasonably acceptable to Buyer), entered by the Court pursuant to section 363(b) of the Bankruptcy Code: (i) approving this Agreement and its contemplated transactions; (ii) approving the sale of the Acquired Assets to Buyer free and clear of all Liens pursuant to section 363(f) of the Bankruptcy Code; (iii) approving Seller's assumption and assignment to Buyer of the Assumed Executory Contracts pursuant to section 365 of the Bankruptcy Code; (iv) assuming and assigning the Assumed Executory Contracts such that the Assumed Executory Contracts will be in full force and effect from and after the Closing; (v) finding that Buyer is a good-faith purchaser entitled to the protections of section 363(m) of the Bankruptcy Code; (vi) confirming that Buyer is acquiring the Acquired Assets free and clear of the Unassumed Liabilities; and (vii) retaining jurisdiction of the Court to interpret and enforce the terms and provisions of this Agreement and the Sale Order.

(ll)    "Schedules" means the Schedules attached to this Agreement.

(nn)    "Tax" means any tax, duty, charge, fee, levy, penalty, or other assessment imposed by any Governmental Authority, including income, profit, provisional, salary, estate, excise, property, sales, use, occupation, transfer, franchise, payroll, windfall or other profits, alternative minimum, gross receipts, intangibles, capital stock, estimated, employment, unemployment compensation or net worth, environmental, ad valorem, stamp, value-added or gains tax, capital duty, registration and documentation fees, custom duties, tariffs and similar charges, withholding, payroll, social security contributions or charges, disability, or other taxes (including any fee, assessment or other charge in the nature of or in lieu of any tax), including any interest, penalties, or additions attributable thereto, and any liability to make payment by way of reimbursement, recharge, indemnity, damages or management charge related to taxes and regardless of whether such amounts are chargeable directly or primarily against Seller.

(oo)    "Title Company" means Stewart Title Guaranty Company.

(pp)    "Unassumed Liabilities" has the meaning provided for in Section 2.4.

## ARTICLE 2
## PURCHASE AND SALE

**Section 2.1       Transfer of Assets.**  Pursuant to the terms and conditions of this Agreement, at the Closing Seller will sell, convey, transfer, assign, and deliver (or cause to be sold, conveyed, transferred, assigned, and delivered) to Buyer, free and clear of all Liens, and Buyer will acquire and accept from Seller, all right, title, and interest in and to, the following assets (collectively, the "Acquired Assets"):

(a) The Acquired Real Property described on Schedule 2.1(a), including the following real estate parcels:310533-004-007-00, 310533-004-030-00, 310533-004-009-00, 310533-004-005-00, 310533-004-004-00, and 300504-001-025-00, along with the main plant and warehouse;

(b) The Equipment described on Schedule 2.1(b);

(c) Books and Records related to the Acquired Assets;

(d) except in connection with the Seller's rights, defenses and objections in connection to claims filed in the Bankruptcy Case, all of Seller's rights, claims, credits, immunities, defenses, or rights of set-off against third parties (excluding former and present employees of Seller) relating to the Acquired Assets including, but not limited to, unliquidated rights under warranties;

**Section 2.2** **Assignment and Assumption of Executory Contracts and Liabilities and Liens.**

(a) Schedule 2.2 sets forth each Contract, Lease, and License to be assumed by Seller and assigned to Buyer at Closing.  Each Lease set forth on Schedule 2.2 is referred to in this Agreement as an "Assumed Lease."  Each Contract set forth on Schedule 2.2 is referred to in this Agreement as an "Assumed Contract."  Each License set forth on Schedule 2.2 is referred to in this Agreement as an "Assumed License." Each Lien set forth on Schedule 2.2 is referred to in this Agreement as an "Assumed Lien."  Together, the Assumed Contracts and the Assumed Licenses are referred to in this Agreement as the "Assumed Executory Contracts."  Notwithstanding anything to the contrary herein, Buyer has the right in its sole and absolute discretion to remove any Assumed Executory Contract from Schedule 2.2 prior to the Sale Hearing  and with respect to such Assumed Executory Contract so removed from Schedule 2.2, *however,* the Cure Costs associated with any Assumed Executory Contract removed prior to Closing shall be added to the cash portion of the Purchase Price set forth in Section 2.5(a).

(b) On the Closing Date, Seller shall assume and assign to Buyer the Assumed Executory Contracts and Buyer shall pay in full the Cure Costs related to the Assumed Executory Contracts.

(c) Buyer assumes all Seller's obligations arising under the Assumed Executory Contracts after Closing.

(d) Buyer assumes the following liabilities related to the Acquired Assets arising before or after Closing, as specified: i) warranties whenever arising; and ii) all other claims arising after Closing.

(e) Buyer assumes, at Closing, all obligations to pay the amounts due to the creditors specified on Schedule 2.2(e).

(f) This Section 2.2 does not limit any claims or defenses Buyer may have against any party other than Seller.  The transactions contemplated by this Agreement in no way expand the rights or remedies of any third party against Buyer or Seller as compared with the rights

2837 ie22jf01yw
1605224738.1

and remedies such third party would have had against Seller absent the Bankruptcy Case had Buyer not assumed such Assumed Liabilities. Buyer shall indemnify Seller with respect to the Assumed Liabilities, including defense of any action by any third party to seek recovery from Seller of the Assumed Liabilities.

Section 2.3      **Excluded Assets.**  Notwithstanding anything to the contrary in this Agreement, all assets that are not Acquired Assets, including the following assets are retained by Seller and are not being sold or assigned to Buyer under this Agreement (the "Excluded Assets"):

(a)      cash, cash equivalents, deposits (except those described in Section 2.1 above, investment securities, and bank accounts;

(b)      all Existing Contracts that are not Assumed Executory Contracts;

(c)      the Administrative Books and Records, and other documents relating solely to the organization, maintenance, and existence of Seller as limited liability company;

(d)      all Permits;

(e)      Seller's personnel records;

(f)      all refunds, rebates, credits, and other amounts due to Seller related to any Taxes or that arise out of Seller's operation of its business;

(g)      all benefit plans to which Seller is a party and all related rights except to the extent assumed by Buyer;

(h)      all causes of action held by Seller before the Closing including, but not limited to, all actions arising under the Bankruptcy Case;

(i)      all rights under any insurance policy maintained by Seller;

(j)      Seller's ownership in any subsidiary;

(k)      the Tanks;

(l)      any rights of Seller under this Agreement; and

(m)      the Additional Excluded Assets listed in Schedule 2.3.

Section 2.4      **No Other Liabilities Assumed.**  Other than the Assumed Liabilities, the Cure Costs, or as otherwise set forth in this Agreement, Buyer shall not assume or be bound by or be obligated or responsible for any duties, responsibilities, commitments, expenses, obligations or any other Liability of Seller (the "Unassumed Liabilities").

Section 2.5      **Purchase Price.**

(a)      Purchase Price.  The "Purchase Price" for the Acquired Assets shall be $10,500,000 to be paid, in cash, at Closing; ii) the total amounts set forth in Schedule 2.2(e) in the amount of nill to be assumed by Buyer; and iii) the total Cure Amounts in the amount of nill to be paid by Buyer.

2837 ie22jf01yw
1605224738.1

(i)    Deposit.  Before or contemporaneously with Execution, Buyer has paid to Deposit Agent $1,050,000 to be held and released in accordance with the terms of this Agreement (the "Deposit") and fully applicable to the Purchase Price.

**Section 2.6    Allocation Schedule.**  The Parties agree that the Purchase Price will be allocated among the Acquired Assets in accordance with their relative fair market values as set forth in Schedule 2.6 in compliance with the Bid Procedures. If the Parties are unable to resolve the issues concerning Purchase Price allocation by agreement, they shall submit the allocation matter to the Court for final determination in conjunction with the Sale Notice and Motion, which determination shall be binding and not subject to appeal.  Seller and Buyer must prepare mutually-acceptable and substantially identical initial and supplemental Internal Revenue Service Forms 8594 "Asset Acquisition Statements under 1060" consistent with the Purchase Price Allocation Schedule (giving effect to mutually agreed-on adjustments through the allocations set forth in the Purchase Price Allocation Schedule as a result of any required adjustments to the Purchase Price).

## ARTICLE 3
## CLOSING

**Section 3.1    Closing.**  On the terms and conditions set forth in this Agreement and in the Sale Order, the closing of the transactions contemplated by this Agreement (the "Closing") will be completed virtually by the parties or held at the offices of K&L Gates LLP, 925 Fourth Ave, Suite 2900, Seattle, Washington (or other location identified by Seller) no later than October 31, 2025, if all conditions set forth in ARTICLE 7 and ARTICLE 8 below are either satisfied or waived.  The Parties agree to expeditiously seek approval of the Sale Order.  Notwithstanding the foregoing, the Closing may be held at another time and place mutually agreeable to the Parties.

**Section 3.2    Actions at Closing.**

(a)    Documents and Possession.  At Closing, Seller must deliver or cause to be delivered to Buyer:

(i)    one or more bills of sale, assignments, Deeds of Trust, and/or documents necessary to transfer the Acquired Assets, all consistent with the terms of this Agreement and otherwise in a form reasonably acceptable to Buyer, conveying in the aggregate all of the Acquired Assets, duly executed by Seller;

(ii)    if the Transaction requires Court approval, a copy of the Sale Order;

(iii)    the Books and Records relating to the Acquired Assets; and

(iv)    appropriate documents providing for the assumption and assignment of the Assumed Executory Contracts duly executed by Seller.

2837 ie22jf01yw
1605224738.1

(b)    <u>Payment</u>.  Buyer must deliver to Seller the Purchase Price (determined in accordance with <u>Section 2.5</u>) *less* an amount equal to the Deposit by wire transfer at Closing of immediately available funds to the account that Seller designates in writing not less than one Business Day before the Closing.

(c)    <u>Form of Documents</u>.  If a form of any document to be delivered under this Agreement is not attached as an exhibit to this Agreement, that document must be created, executed, and delivered in form and substance and in a manner reasonably and mutually satisfactory to the Parties.

**Section 3.3        Transaction Expenses.**  Except as expressly provided in this Agreement, each Party bears its own costs and expenses, including attorney, accountant, and other independent contractor fees, in connection with the execution and negotiation of this Agreement and the consummation of its contemplated transactions.

**Section 3.4        Prorations.**

(a)    <u>Personal Property Taxes</u>.  Ad valorem personal property taxes associated with the Acquired Assets (the "<u>Personal Property Taxes</u>") that are periodically imposed and are payable for a tax period that includes (but does not end on) the Closing Date are prorated as of the Closing Date. Seller bears the proportion of, and has the sole responsibility for, such taxes equal to a fraction, the numerator of which is equal to the number of days elapsed from the beginning of the applicable tax period to the Closing Date and the denominator of which is the number of days in the entire applicable tax period. Buyer is responsible for the remainder.

(b)    <u>Post-Closing Tax Responsibility</u>.  Unless otherwise provided to the contrary in this Agreement, Buyer is solely responsible for Taxes relating to the Acquired Assets applicable to or arising from the Post-Closing Period, including any transfer taxes, and the Seller is solely responsible for Taxes relating to the Acquired Assets applicable to or arising before the Closing.

(c)    <u>Utilities</u>.  Seller must attempt to obtain final meter readings for utilities at the locations that are the subject of Assumed Leases and the Acquired Real Property as of the Closing Date and must pay for all utilities to the Closing Date.  If it is not practicable to obtain the meter reading for any utility as of the Closing Date or there are un-metered utilities, then as soon as all such utility bills are finally received, Seller and Buyer must, on a pro rata basis using the actual number of days of the year and month that have elapsed as of the Closing Date (including the Closing Date), pay their respective shares of such bills.

(d)    <u>Prorations Generally; Percentage Rents</u>.

(i)    Any other payments with respect to the Assumed Leases, including all common area costs and costs under the Assumed Leases, must be prorated between Buyer and Seller on the Closing Date or as soon after as is reasonably practicable with the Seller responsible for the prorated portion of any such payments through the day before the Closing Date.  Seller is responsible for any penalties and interest payable for rent or other items under each Assumed Lease when due as a result of Seller's underpayment or late payment before the Closing. Buyer is responsible for any such amounts in respect of the Post-Closing Period.

(ii)    If any of the items described above cannot be finally apportioned at the Closing because of the unavailability of the amounts to be apportioned or otherwise, or are incorrectly apportioned at or after Closing, such items must be apportioned or reapportioned, as the case may be, as soon as practicable after the Closing or the date such error is discovered or the event giving rise to an apportionment or reapportionment occurs, as applicable.

(iii)    For purposes of calculating prorations, the Seller is deemed to have possession of the real property listed on Schedule 2.2 and the real property subject of an Assumed Lease up to and including the Closing Date. All such prorations must be made on the basis of the actual number of days of the year and month elapsed as of the Closing.

**Section 3.5    Possession and Risk of Loss.**  Buyer will be deemed to have taken possession of the premises listed on Schedule 2.2 and the premises that are the subject of the Assumed Leases (each, an "Assumed Leased Location"), together with title and possession of all Acquired Assets, wherever located, on the Closing Date.  Buyer assumes all risk of loss by fire or other casualty and all risks relating to all the Acquired Assets and the Assumed Leased Locations on the Closing Date and after.

**Section 3.6    Closing Escrow.**  The Closing will be accomplished through an escrow to be established jointly by the Parties with the Title Company pursuant to escrow instructions reasonably acceptable to the Title Company and each of the Parties.

# ARTICLE 4
# SELLER'S REPRESENTATIONS AND WARRANTIES

As an inducement to Buyer to enter into this Agreement, Seller represents and warrants to Buyer that:

**Section 4.1    Organization and Authorization.**  Seller has all necessary power and authority to enter into this Agreement and has taken all company action necessary to execute and deliver this Agreement, to consummate the transactions contemplated by this Agreement, and to perform Seller's obligations under this Agreement. No other company proceedings on Seller's part are necessary to authorize the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated by this Agreement.  This Agreement has been duly executed and delivered by Seller and is a valid and binding obligation of Seller, enforceable against it in accordance with its terms.  Each agreement or instrument that has been or will be entered into or executed and delivered by Seller in connection with the transactions contemplated by this Agreement has been (or will be) duly authorized, executed and delivered by Seller, and is (or will be when authorized, executed and delivered) a valid and binding obligation of Seller, enforceable against it in accordance with its terms.

**Section 4.2    No Violation.**  Except to the extent not enforceable due to operation of applicable bankruptcy law or the Sale Order, the execution, delivery, and performance of this Agreement and the consummation of its contemplated transactions by Seller do not and will not require any authorization, consent, approval, exemption, or other action by or notice or declaration to, or filing with, any court or administrative or other Governmental Authority or any third party,

2837 ie22jf01yw
1605224738.1

including, without limitation, under the provisions of Seller's operating agreement or other constitutive documents.

**Section 4.3        Governmental Consents and Approvals.**  Except for the Sale Order, to Seller's Knowledge, there are no consents, waivers, agreements, approvals, permits, or authorizations of, or declarations, filings, notices, or registrations to or with, any Governmental Authority required to be made or obtained by Seller in connection with the execution, delivery, and performance of this Agreement and the consummation of its contemplated transactions.

### Section 4.4        Title to Assets.

(a)        Seller has good and marketable title to the Acquired Assets.

(b)        Subject to Court approval, Seller has the power and the right to sell, assign, and transfer, and Seller will sell and deliver to Buyer and, on consummation of the transactions contemplated by this Agreement, Buyer will acquire, good and marketable title to the Acquired Assets free and clear of all Liens.

**Section 4.5        As Is.**  Except as expressly set forth in this Agreement, the Acquired Assets are sold "***As Is, Where Is***." Except for the representations and warranties expressly set forth in this ARTICLE 4, Seller neither makes nor implies any other representation or warranty, including a warranty of fitness for a particular purpose or a warranty of merchantability.

**Section 4.6        Personal Property Taxes.**  All Personal Property Taxes that are the responsibility of Seller under Section 3.4 above have been paid or will be paid in full as of the Closing.

### ARTICLE 5
### REPRESENTATIONS AND WARRANTIES OF BUYER

As an inducement to Seller to enter into this Agreement, Buyer represents and warrants to Seller that:

**Section 5.1        Organization.**  Buyer is a corporation duly organized, validly existing, and in good standing under the laws of the Province of British Columbia, Canada

**Section 5.2        Authorization.**  Buyer has all necessary power and authority to enter into this Agreement and has taken all company action necessary to execute and deliver this Agreement, to consummate the transactions contemplated by this Agreement, and to perform Buyer's obligations under this Agreement. No other company proceedings on Buyer's part are necessary to authorize the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated by this Agreement. This Agreement has been duly executed and delivered by Buyer and is a valid and binding obligation of Buyer, enforceable against it in accordance with its terms. Each agreement or instrument that has been or will be entered into or executed and delivered by Buyer in connection with the transactions contemplated by this Agreement has been (or will be) duly authorized, executed and delivered by Buyer, and is (or will be when authorized, executed and delivered) a valid and binding obligation of Buyer, enforceable against it in accordance with its terms.

**Section 5.3     Governmental Consents and Approvals.**  To Buyer's Knowledge, other than the Sale Order, no consent, waiver, agreement, approval, permit, or authorization of, or declaration, filing, notice or registration to or with, any United States federal or state governmental or regulatory authority is required to be made or obtained by Buyer in connection with the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated by this Agreement.

**Section 5.4     No Violation.**  The execution and delivery of this Agreement and the other agreements specified in it and the consummation of the transactions contemplated by this Agreement do not and will not (a) violate any provision of Buyer's organizational documents or (b) conflict with or violate any statute or law, or any judgment, decree, order, regulation, or rule of any court or Governmental Authority binding on or applicable to Buyer or by which the property or assets of Buyer are bound or affected.

**ARTICLE 6**
**ADDITIONAL COVENANTS**

**Section 6.1     Further Assurances.**

(a)     Buyer and Seller shall use commercially reasonable efforts to timely obtain any consent, provide necessary information, or address any other issues required for the consummation of the transactions contemplated by this Agreement.

(b)     Buyer and Seller will execute any documents and use commercially reasonable efforts to take or cause to be taken all actions necessary, proper, or advisable to consummate the transactions contemplated by this Agreement but neither Buyer nor Seller is required to make any payments to any party, except as set forth in this Agreement.

**ARTICLE 7**
**CONDITIONS TO SELLER'S OBLIGATIONS**

The obligation of Seller to sell the Acquired Assets and to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or before the Closing Date, of each of the following conditions, any of which Seller may waive (in whole or in part) in accordance with Section 10.4 below.

**Section 7.1     Covenants and Representations.** Each of Buyer's representations and warranties contained in ARTICLE 5 above are true in all material respects as of the Closing Date as though made on that date (except that representations and warranties explicitly made as of a specific date need only be true as of that specific date), and the Buyer has performed in all material respects all covenants, agreements, and conditions required by this Agreement to be performed, satisfied, and complied with by Buyer on or before the Closing.

**Section 7.2     Litigation.** No action, suit, or other proceeding is pending before any Governmental Authority seeking or threatening to restrain, seek damages in respect of, or prohibit the consummation of the transactions contemplated by this Agreement.

2837 ie22jf01yw
1605224738.1

**Section 7.3    Court Approval.**  If the Transaction requires Court approval, the Court has entered the Sale Order.

**Section 7.4    Closing.**  The Closing has occurred on or before October 31, 2025, or ten calendar days after entry of the Sale Order, whichever is later.

**Section 7.5    Deliveries.**  On or before the Closing Date, Buyer has delivered to Seller all of the following:

(a)    a certificate from Buyer in a form reasonably satisfactory to Seller, dated as of the Closing Date, stating that the conditions specified in Section 7.1 above have been satisfied; and

(b)    the Purchase Price.

# ARTICLE 8
# CONDITIONS TO BUYER'S OBLIGATIONS

The obligations of Buyer to purchase the Acquired Assets and to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or before the Closing Date, of each of the following conditions, any of which Buyer may waive (in whole or in part) in accordance with Section 10.4 below:

**Section 8.1    Representations, Warranties and Covenants.**  Each of Seller's representations and warranties contained in ARTICLE 4 above are true in all material respects as of the Closing Date as though made on that date (except that representations and warranties that are expressly made as of a specific date need only be true as of that specific date), and the Seller has performed in all material respects all covenants, agreements, and conditions required by this Agreement to be performed, satisfied, and complied with Seller on or before the Closing Date.

**Section 8.2    Litigation.**  No action, suit, or other proceedings is pending before any Governmental Authority seeking or threatening to restrain, seek damages in respect of, or prohibit the consummation of the transactions contemplated by this Agreement.

**Section 8.3    Court Approval.**  The Sale Order shall have been entered on or before October 31, 2025, and shall not be subject to a court order staying the effect of the Sale Order.

**Section 8.4    Approvals and Consents.**  All necessary consents, including any deemed consents as set forth in the Sale Order, have been duly obtained, made or given, and are not subject to the satisfaction of any condition that has not been satisfied or waived.

**Section 8.5    Deliveries.**  On or before the Closing Date, Seller has delivered to Buyer all of the following:

(a)    a certificate in a form reasonably satisfactory to Buyer, dated as of the Closing Date, stating that the conditions specified in Section 8.1 have been satisfied; and

12

(b)      the documents and instruments called for in <u>Section 3.2(a)</u> above.

## ARTICLE 9
## TERMINATION; REMEDIES

**Section 9.1      Termination.**   This Agreement may be terminated, in writing, at any time before Closing:

(a)      by mutual written consent executed by both Buyer and Seller;

(b)      by Buyer if Seller is in material breach of any material covenant, representation, undertaking or warranty that would prevent a condition in Article 8 from being satisfied, and, if curable, is not cured within ten (10) Business days after written notice from Buyer, or if a condition set forth in ARTICLE 8 is impossible (other than through the failure of Buyer to comply with its obligations under this Agreement) to satisfy and Buyer has not waived such condition in writing on or before the Closing Date;

(c)      by Seller if Buyer is in material breach of any material covenant, representation or warranty that would prevent a condition in Article 7 from being satisfied, and, if curable, is not cured within ten (10) Business days after written notice from Seller, or if it appears that a condition set forth in ARTICLE 7 is impossible (other than through the failure of Seller to comply with its obligations under this Agreement) to satisfy and Seller has not waived such condition in writing on or before the Closing Date; and

(d)      by both Buyer and/or Seller upon Seller's closing of the sale of all or substantially all of the Acquired Assets to a party or parties other than Buyer pursuant to one or more Overbids and as ordered by the Court; and

(e)      by  Buyer if the Closing has not occurred on or before October 31, 2025, or ten days after entry of the Sale Order, whichever is later, unless a later date is agreed in writing by the Parties.

**Section 9.2      Obligations on Termination.**    If this Agreement terminates under <u>Section 9.1</u> above:

(a)      each Party must redeliver to the furnishing Party all documents, work papers, and other material of the other Party relating to the transactions contemplated by this Agreement, whether obtained before or after Execution;

(b)      all obligations of the Parties under this Agreement terminate, except as set forth in this Section 9.2;

(c)      neither Party has any liability to the other Party except for any obligation to pay any damages (which may be limited to the Deposit under subsection (e) below) awarded by the Court associated with a Party's breach of this Agreement ("<u>Damages</u>");

(d)      except for any Damages, each Party bears its own expenses incurred in connection with the negotiation, preparation, execution, and performance of this Agreement;

13

(e)     if Seller terminates this Agreement due solely to an uncured default of the Buyer to close without justification and Seller is unable to close a transaction for the Acquired Assets to another buyer pursuant to a Back-Up Bid (as contemplated by the Bid Procedures), Seller may seek an order from the Court for specific performance of this Agreement, or instructing the Deposit Agent to pay Seller the Deposit as liquidated damages on account of Buyer's breach. Any such request for an order must be done via an adversary proceeding and not otherwise;

(f)     unless used to satisfy any order to pay Damages to Seller as set forth in Section 9.2(e) above, the Deposit Agent must return the Deposit to the Buyer within one Business Day of the date of termination; and

(g)     the Deposit Agent's obligations regarding the Deposit under this Section 9.2 survive termination of this Agreement.

## ARTICLE 10
## MISCELLANEOUS

**Section 10.1    Assignment; Successors.** Neither this Agreement nor any of the rights or obligations under it may be assigned by either Party without the other Party's prior written consent, but: (a) Buyer may assign some or all of its rights under this Agreement to any of its Affiliate so long as Buyer remains liable for its obligations; and (b) Buyer may assign its rights under this Agreement as collateral security to any lender providing Buyer with acquisition financing. Subject to the foregoing, this Agreement binds and inures to the benefit of the Parties and their respective representatives, heirs, legatees, successors, and permitted assigns. No other person has any right, benefit, or obligation under this Agreement.

**Section 10.2    Notices.** All notices, requests, demands, and other communications given under this Agreement must be in writing and are deemed given: (a) if personally delivered, when received; (b) if transmitted by email, on receipt of delivery confirmation; (c) if sent for next- day delivery to a domestic address by recognized overnight delivery service (*e.g.*, Federal Express), on the day after sending; and (c) if sent by certified or registered mail, return receipt requested, when received. Notices, demands, and communications must be sent to the following addresses:

| If to Buyer: | If to Seller: |
|---|---|
| Conversion of RCCI, LLC<br>1912 E Vernon Ave.,<br>Vernon, CA 90058<br>msk@redchamber.com | The Stapleton Group<br>515 S. Flower St, 18th Floor,<br>Los Angeles, CA 90071<br>betsy.landoll@jsheld.com |

2837 ie22jf01yw
1605224738.1

With copy to:

David L. Prince, Esq.
1912 E Vernon Ave., Ste. 100
Los Angeles, CA 90058
dlp@redchamber.com

With a copy to:

K&L Gates LLP
925 Fourth Ave, Suite 2900
Seattle, WA 98104
Attn:  Brian Peterson
Email: brian.peterson@klgates.com

or to any other address or email address as a Party may designate by written notice to the other Party.

**Section 10.3      Choice of Law; Submission to Jurisdiction.** This Agreement must be construed and interpreted, and the rights of the parties determined in accordance with, the laws of the State of Washington. Each Party irrevocably consents to the service of any process in any action or proceeding arising out of or relating to this Agreement by the mailing of copies of such process to each Party at its address specified in <u>Section 10.2</u> above. The Parties irrevocably submit to the exclusive jurisdiction of the Court (or any court exercising appellate jurisdiction over the Court) over any dispute arising out of or relating to this Agreement, the Sale Order, or any other agreement or instrument contemplated by or entered into in connection with this Agreement or the Sale Order. Each Party irrevocably agrees that any claim in respect of any such dispute or proceedings may be heard and determined in the Court. The Parties irrevocably waive to the fullest extent permitted by applicable law any objection to the venue or any defense of inconvenient forum relating to any such dispute or proceeding brought in the Court.

**Section 10.4   Entire Agreement; Amendments and Waivers.** This Agreement, together with all its Exhibits and Schedules, constitutes the entire agreement among the Parties pertaining to this Agreement's subject matter and supersedes all prior agreements, understandings, negotiations, and discussions, whether oral or written, with regard to this Agreement's subject matter. No amendment of this Agreement is effective unless executed in writing by both Parties. No waiver of any of this Agreement's provisions is effective unless made in a writing by the waiving Party. No waiver of any single provision of this Agreement constitutes either a waiver of any other of this Agreement's provisions (whether or not similar) or a continuing waiver unless otherwise expressly provided.

**Section 10.5      Construction.** The headings and captions of the various Articles and Sections of this Agreement have been inserted solely for purposes of convenience, are not part of this Agreement, and may not be deemed in any manner to modify, explain, expand, or restrict any of the provisions of this Agreement. Unless stated to the contrary, all references in this Agreement to Articles, Sections, paragraphs, sentences, or clauses are to the specified Article, Section, paragraph, sentence, or clause of this Agreement, and all references to Exhibits and Schedules are to the specified Exhibits and Schedules attached to this Agreement, all of which constitute a part of this Agreement. All terms defined in this Agreement have the same meanings in the Exhibits and Schedules except as otherwise provided in the Exhibits and Schedules.

**Section 10.6      No Third Party Beneficiaries.**  No Person other than the Parties have any rights or claims under this Agreement.

**Section 10.7      No Waiver.**  The failure of either Party to seek redress for any breach, or to insist on the strict performance, of any covenant or condition of this Agreement by the other Party does not waive the breach or failure to perform nor prevent a subsequent act or omission in violation of, or not strictly complying with, the terms of this Agreement from constituting a default under this Agreement.

**Section 10.8    Counterparts.**  This Agreement may be executed in one or more counterparts, each of which constitutes an original and all of which, taken together, constitute one instrument.

**Section 10.9    Delivery by Email.**  This Agreement and any other agreement or instrument entered into in connection with or contemplated by this Agreement, and any amendments, if signed and delivered by email, must be treated in all respects as an original, legally- binding agreement or instrument as if it were the original delivered in person.  No Party may raise the use of email to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through email as a defense to enforceability.

**Section 10.10      Invalidity.**  The invalidity, illegality, or unenforceability of any portion of any provision of this Agreement or any instrument referred to in this Agreement does not affect the validity, legality, and enforceability of any other portion of any other provision of this Agreement or such instrument.

**Section 10.11      Further Assurances.**  Without limiting any other rights or obligations of the Parties contained in this Agreement, following the Closing, each Party agrees to execute or cause to be executed any documents, instruments, or conveyances and to take any actions reasonably requested by the other Party to effectuate the purposes of this Agreement including, without limitation, any instruments Buyer reasonably requests to vest Buyer with title to the Acquired Assets in accordance with this Agreement.

**Section 10.12      Cumulative Remedies.**  All rights and remedies of either Party under this Agreement are cumulative of each other and of every other right or remedy that Party may otherwise have at law or in equity. The exercise of one or more rights or remedies does not affect the concurrent or subsequent exercise of any other rights or remedies.

**Section 10.13      Currency.**  Except as otherwise expressly provided in this Agreement, all dollar amounts are stated in United States dollars.

**Section 10.14      Representation by Counsel; Mutual Negotiation.**  Each Party has been represented by counsel of its choice in negotiating this Agreement.  This Agreement has been negotiated and prepared at the Parties' joint request, direction, and construction, at arm's length, with the advice and participation of counsel, and must be interpreted in accordance with its terms without favor to either Party.

**Section 10.15    Post-Closing Dispute Resolution.**  Either Party may submit to the Court any controversy, claim, or dispute arising out of or relating to this Agreement after the

Closing that is not resolved within 30 days after written notice to the affected party of such controversy, claim, or dispute. The Court shall have exclusive jurisdiction to resolve any such controversy, claim, or dispute. The prevailing Party is entitled to its reasonable attorneys' fees and costs as determined and awarded by the Court.

      **Section 10.16    Transfer Taxes.** Buyer is responsible for and must pay any transfer, sales, use, or other such Taxes or fees required to be paid with respect to the sale of the Acquired Assets to Buyer but only to the extent of such Taxes are assessed due to the sale of the Acquired Assets, but not otherwise.

      The Parties have caused this Agreement to be executed by their respective duly-authorized officer as of the day and year first above written.

**(SIGNATURES ON FOLLOWING PAGE)**

1603224738.1

**THE STAPLETON GROUP AS PLAN**
**ADMINISTRATOR FOR SALACIA, LLC**


By:_____
Its: _____


**THE CONVERSION OF R.C.C.I., LLC**


By:_____
Its:_____

## SCHEDULES

Schedule 1.1(i)        Bid Procedures

Schedule 1.1(kk)       Sale Order

Schedule 2.1(a)        Acquired Real Property

Schedule 2.1(b)        Equipment

Schedule 2.2           Contracts, Leases and Licenses

Schedule 2.2(e)        Assumed Creditor Liabilities

Schedule 2.6           Allocation of Purchase Price

**SCHEDULE 1.1(i)**

**Bid Procedures**

# SCHEDULE 1.1(kk)

## Sale Order

## SCHEDULE 2.1(a)

### Acquired Real Property

**Legal Description:**

Lots 20 through 23, and Tracts 95 through 99, inclusive of Smokey Point Commerce Center Binding Site Plan recorded under Recording No. 9302055003 in Volume 1 of Binding Site Plans, Pages 279 through 284, records of Snohomish County, Washington. (Being a portion of the Northeast quarter of Section 4, Township 30 North, Range 5 East, W.M., and a portion of the Southeast quarter of Section 33, Township 31 North, Range 5 East, W.M., in Snohomish County, Washington).

Situate in the County of Snohomish, State of Washington

**Abbreviated Legal:** Lts. 20-23 & Tracts 95-99, Smokey Point Commerce Center BSP. Rec. No. 9302055003, SNOHOMISH Cty., Wa.

**Parcel No(s):** 310533-004-007-00, 310533-004-030-00, 310533-004-009-00, 310533-004-005-00, 310533-004-004-00, and 300504-001-025-00

**Purported Address:** 14101 45th Ave. NE, Marysville, WA 98271

2837 ie22jf01yw
1603224738.1

### SCHEDULE 2.1(b)

### Equipment

All trade fixtures and regular fixtures affixed to Main Plant and Warehouse as well as affixed in all parcels of land in schedule 2.1(a), including but not limited to:

- Mycom VMD250 W/500HP Motor (Ammonia Compressor) **-** 1 Unit

- Vilter VSS1051 500 HP Screw Compressor (Ammonia Compressor) **-** 1 Unit

- 450HP Mycom Mod 250VMD (Ammonia Compressor) **-** 2 Units

- 500HP Mycom Mod 250VMD (Ammonia Compressor) **-** 1 Unit

- 20 RDB 222 Frick Booster W/125 HP Motors (Ammonia Compressor) **-** 2 Unit

- RDB 546 Frick Booster W/300HP Motor (Ammonia Compressor) **-** 1 Unit

- LPR Receiver W/Teikoku Pumps 8x14 (Ammonia Tank) **-** 1 Unit

- Vertical Low Temp (Ammonia Tank) **-** 1 Unit

- Vertical Med Temp Accumulator (Ammonia Tank) **-** 1 Unit

- Evapco CPA  Unit (New) (Supplies Sanitary Air to Plant and Provides Room Cooling) **-** 1 Unit

- Evapco CPA Units (used) (Supplies Sanitary Air to Plant and Provides Room Cooling) **-** 2 Units

- Fire Pump (Diesel Powered) **-** 1 Unit

- Electrical Transformer **-** 1 Unit

- Electrical Transformer **-** 1 Unit

Equipment stored outside of the main plant in the image below (the "External Equipment Yard") other than the Additional Excluded Equipment.



## SCHEDULE 2.2

### Assumed Executory
### Contracts/Leases/Licenses/Liens

**A.     Contracts**

     None.

**B.     Leases**

     None.

**C.     Licenses**

**None (subject to
Buyer's
confirmation).**

**D.     Liens**

     None.

## SCHEDULE 2.2(e)

## Assumed Creditor Liabilities

**None.**

## SCHEDULE 2.3

### Additional Excluded Equipment

Dantech Freezers  (Freezers are complete with belting, housing, evaporators, and fans ‑ unassembled) ‑ 4 units

Triangle ‑ Ishida Scales  (Scales for bagging equipment) ‑ 4 units

Tann Corp ‑ RTO ‑ Smoke Filter (Complete except catwalk and smoke stack need installed) ‑ 1 Unit

Tann Corp ‑ RTO Spare Parts ‑ 1 Package

Nothum * see below for package details

*PivoFlex 40 (Expandable Conveyor) - 4 Units*

*VersaCoat 40HDX Package  (Breader) - 3 Units*

*SuperFelx 40HDX Package  (Breader Crumb Machine) - 1 Unit*

*BatterPro 40HDX (with waterfall)  (Batter applicator) - 2 Units*

*BatterPro 40HDX (with tempura star roller)  (Batter applicator) - 1 Unit*

*BatterPro 40HDX  (Batter Applicator) - 1 Unit*

*NC40-144 Cooling Conveyor  (Conveyors with Fan) - 3 Unit*

*PankoPro 40HP package  (Panko Breader) - I Unit*

*ProTherm 40-30 Package with Teflon feed (Fryers) - 3 Units*

*Spare Parts (Misc) - 1 Package*

Oberlin Oil Filters (Fryer Oil Filtration) ‑ 3 Units

Fulton Thermal Boiler  (Heats Fryer Oil) ‑ 1 Unit

Fulton Steam Boiler  (Generates Steam for Processing) ‑ 1 Unit

Columbia Hydronics (Lochnivar water heaters one for processing and one for freezer defrost) ‑ 2 Units

1603224738.1

Group of computer controlled bucket weighers, (14) pool hoppers, (14) weigh hoppers, feed conveyor, discharge chute, touch screen controls (unused still in original packaging)

GMC flatbed truck, V8, gas, 5 spd, wood bed

GEHL Dynalift 4x4x4 telescopic forklift, 4-stage boom, cushion tires, (2) stabilizers, cab, 4F/4R, joystick controls, bucket attachment

Western gallon fuel cube

GK 2-unit bathroom trailer w/handwash station, propane fired water heater

Yale 4,800 lb cap. Solid tired forklift, 194" 3-stage mast, side shift, propane

Containers

Lincoln Ranger portable welder and generator

Group of steel table, JET bandsaw, vise, shelter, stands, sawhorses & misc.

BILJAX scaffold system w/(10) walk boards, uprights, stairs, cross pieces & accessories

Group of (2) FROST FIGHTER IDH 500QR oil/diesel portable heaters

Group of jobox w/mini torch set, (3) tig welders & misc. shop supplies

MARKLIFT electric scissor lift

KUBOTA RTV X900 4X4 side by side, diesel, canopy

MATHEY DEARMAN portable pipe beveler

Group of shop area to include: BAILEIGH R-M40 rolls, (2) drill presses, vise, MILLER welder,sandblast cabinet, air compressor, parts washer, steel table, jobox, GRIZZLY press & misc. shop, supplies

Club Cadet Zero Turn ride on mower

COPPERLOY AS16-70 16,000 lb cap. Portable aluminum forklift ramp, s/n:68999-1

Group of (2) 40' containers w/shelter

Spokane Stainless Technologies - 9,657 Gallon Water Tank - 1 unit

Spokane Stainless Technologies - 10,312 Gallon Fry Oil Storage Tanks - 2 units

Spokane Stainless Technologies - 834 Gallon Fry Oil Tanks - 6 units

**SCHEDULE 2.6**

**Allocation of Purchase Price**

| Acquired Asset | Allocation of Purchase Price |
|---|---|
| Acquired Real Property | TBD |
| The Equipment | TBD |

*EXHIBIT E*

| | |
|---|---|
| **From:** | Betsy Landoll |
| **To:** | Aleksey Kozlov |
| **Cc:** | Kaplan, John S.; Michelle Papenfuss |
| **Subject:** | RE: Financial report for June, July, August 2025 [SR-ACTIVE.FID5912853] |
| **Date:** | Monday, September 15, 2025 5:12:00 PM |
| **Attachments:** | image001.png |
| | image002.png |

Hi Aleksey,

The Plan does not require that the Plan Administrator provide you with detailed financial reports. Can you explain the basis for your request so we can better understand what level of information sharing is appropriate under the circumstances and any timing concerns with respect to the same?

Best,

Betsy

**Betsy Landoll** | Director

J.S. Held LLC

3267 Bee Caves Rd, #191, Austin, TX 78746

Office +1 512 704 6686

**vcard** | **email** | **jsheld.com**



Read more about our recent acquisitions of MorrisAnderson and Stapleton Group, strengthening our resources and capabilities in Strategic Advisory.

This email message is intended only for the recipient to whom it is addressed and may contain information that is privileged or confidential. Nothing contained in this email (1) constitutes an offer or a solicitation to buy or sell any security or other financial instrument or (2) provides tax, legal, insurance or investment advice. If you are not the intended recipient of this email, any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender and permanently delete all copies that you may have. J.S. Held, its affiliates and subsidiaries are not certified public accounting firm(s) and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. Securities offered through PM Securities, LLC, d/b/a Phoenix IB or Ocean Tomo Investments, a part of J.S. Held, member FINRA/ SIPC. All rights reserved.

**From:** Aleksey Kozlov <alekseyk@marinefishingint.com>
**Sent:** Friday, September 12, 2025 12:57 PM
**To:** Betsy Landoll <Betsy.Landoll@jsheld.com>; Michelle Papenfuss <Michelle.Papenfuss@jsheld.com>
**Cc:** Kaplan, John S. <john.kaplan@stoel.com>
**Subject:** Fw: Financial report for June, July, August 2025 [SR-ACTIVE.FID5912853]

CAUTION EXTERNAL

Betsy

Please, provide a financial report for June, July and August 2025, how much finance was spent indicating the paid invoices, including your company's invoice with a breakdown.

Thank you, Aleksey

---

**From:** Aleksey Kozlov <alekseyk@marinefishingint.com>
**Sent:** Sunday, August 17, 2025 12:36 PM
**To:** Betsy Landoll <Betsy.Landoll@jsheld.com>; Controller <controller@marinefishingint.com>
**Cc:** Michelle Papenfuss <Michelle.Papenfuss@jsheld.com>; Kaplan, John S. <john.kaplan@stoel.com>
**Subject:**

Betsy

Please, provide a financial report for June, July 2025, how much finance was spent indicating the paid invoices, including your company's invoice with a breakdown.
Please, note that we need to receive all relevant documents immediately after payment. My team must complete the work on receiving unconditional Lien release for each vendor .

Thank you, Aleksey

---

**From:** Betsy Landoll <Betsy.Landoll@jsheld.com>
**Sent:** Thursday, August 14, 2025 8:34 AM
**To:** Aleksey Kozlov <alekseyk@marinefishingint.com>
**Cc:** Michelle Papenfuss <Michelle.Papenfuss@jsheld.com>; David Stapleton <David.Stapleton@jsheld.com>; Kaplan, John S. <john.kaplan@stoel.com>
**Subject:** Phase I

Hi Aleksey,


Do you have Phase I and preliminary title reports for Salacia? If not, please let me know ASAP. If so, please provide.


Thank you,

Betsy


**Betsy Landoll** | Director

Stapleton Group, a part of J.S. Held LLC

515 S. Flower Street, 18th Floor, Los Angeles, CA 90071

Office 512-704-6686


**email** | **stapletoninc.com**

Stapleton Group has joined J.S. Held's Strategic Advisory practice. **Click here to learn more.**



This email message is intended only for the recipient to whom it is addressed and may contain information that is privileged or confidential. Nothing contained in this email (1) constitutes an offer or a solicitation to buy or sell any security or other financial instrument or (2) provides tax, legal, insurance or investment advice. If you are not the intended recipient of this email, any use, dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please immediately notify the sender and permanently delete all copies that you may have. J.S. Held, its affiliates and subsidiaries are not certified public accounting firm(s) and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. Securities offered through PM Securities, LLC, d/b/a Phoenix IB or Ocean Tomo Investments, a part of J.S. Held, member FINRA/ SIPC. All rights reserved.

*EXHIBIT F*



| | |
|---|---|
| **Invoice No:** | INV-01US-0310140 |
| **Date:** | 10/8/2025 |
| **Due date:** | 10/8/2025 |
| **Payment Terms:** | Due Upon Receipt |
| **Bill Through Date:** | 9/30/2025 |

**J.S. Held LLC - US**
**50 Jericho Quadrangle**
**Ste 117**
**Jericho, NY 11753**
**United States**

Phone: 516.621.2900
Tax ID #: 47-3291463

## INVOICE

| **PROJECT NO.** | **PROJECT NAME** |
|---|---|
| 250700458 | Whittier Seafood, LLC |

**SUMMARY OF PROFESSIONAL SERVICES RENDERED:**

| Staff Member | Total Hours | Rate | Amount |
|---|---|---|---|
| **STRATEGIC ADVISORY** | | | |
| Alicia Rodmel | 5.00 | 275.00 | 1,375.00 |
| Betsy Landoll | 30.60 | 495.00 | 15,147.00 |
| Chuck Nguyen | 6.90 | 325.00 | 2,242.50 |
| David Stapleton | 15.80 | 615.00 | 9,717.00 |
| Jake Diiorio | 1.60 | 575.00 | 920.00 |
| Michelle Papenfuss | 50.50 | 425.00 | 21,462.50 |
| Yenni Liang | 6.00 | 325.00 | 1,950.00 |
| **TOTAL STRATEGIC ADVISORY** | **116.40** | | **52,814.00** |
| **TOTAL PROFESSIONAL SERVICES RENDERED:** | **116.40** | | **$ 52,814.00 USD** |

**PROFESSIONAL SERVICES RENDERED:**

| Date | Staff Member | Description | Hours |
|---|---|---|---|
| 9/2/2025 | Betsy Landoll | Confer w/ MP re: wire deposits. Review emails from MP re; payments and accounting. | 0.40 |
| 9/2/2025 | Betsy Landoll | Conf. call w/ S. Marken and T. Stratton re: next steps. T/C w/ S. Marken re: buyer question. Review bids and terms provided. | 1.70 |
| 9/2/2025 | David Stapleton | Debrief and strategize w/ team and Hilco. Emails and legal issues re: APA, deposit. Confer w/ team. | 1.40 |



|  | Invoice No: | INV-01US-0310140 |
|---|---|---|
|  | Date: | 10/8/2025 |
|  | Due date: | 10/8/2025 |
|  | Payment Terms: | Due Upon Receipt |
|  | Bill Through Date: | 9/30/2025 |

**J.S. Held LLC - US**
**50 Jericho Quadrangle**
**Ste 117**
**Jericho, NY 11753**
**United States**

Phone: 516.621.2900
Tax ID #: 47-3291463

## INVOICE

| PROJECT NO. | PROJECT NAME |
|---|---|
| 250700458 | Whittier Seafood, LLC |

| Date | Staff Member | Description | Hours |
|---|---|---|---|
| 9/2/2025 | Michelle Papenfuss | T/C w/ Hilco, B. Peterson, DS and EL re: auction update. Follow up as required. | 1.10 |
| 9/2/2025 | Michelle Papenfuss | T/C w/ YL re: banking account. Review bids and summary sheet. Review A/P and F/U on delayed payments. Coordinate for wire releases. Monitor bank activity and F/U as required. Update files with bids and record transactions. | 2.30 |
| 9/2/2025 | Yenni Liang | Confer w/ EWB re: online banking. T/C w/ MP and S. Han Jeon re: incoming wires. Confer w/ SB and MA re: outgoing wires. Provide confirmations to MP. Review wires. | 1.00 |
| 9/3/2025 | Betsy Landoll | Messages w/ S. Marken re: bids. Confer w/ DS re: same. | 0.40 |
| 9/3/2025 | Chuck Nguyen | Prepare bank reconciliation. Confer w/ AR re: recording preauthorized payments. | 0.30 |
| 9/3/2025 | David Stapleton | Update w/ Hilco. Update w/ BL. Review issues. | 0.90 |
| 9/3/2025 | Michelle Papenfuss | Provide breakout of invoices processed to debtor. Review latest A/P request and update files. Request missing documentation. Prepare file and explanation to B. Peterson. Review account for wires. F/U w/ S. Marken re: deposits. T/C w/ YL re: EWB setup. | 2.80 |
| 9/3/2025 | Yenni Liang | Confer w/ EWB re: new incoming wires and online banking. EWB Online administration for multiple users. T/C w/ MP re: wires, bank rec and MMA. Process funds transfer. | 1.50 |
| 9/3/2025 | Alicia Rodmel | Process A/P. Set up new vendor. | 0.60 |
| 9/4/2025 | Betsy Landoll | Review and provide edits to email for A/R collections. Confer w/ MP re: A/R status. | 0.40 |
| 9/4/2025 | Betsy Landoll | Review Phase I report provided by Cathay. Conf. call w/ Hilco re: bid status and next steps. | 0.60 |

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.



| | | |
|---|---|---|
| **Invoice No:** | INV-01US-0310140 | |
| **Date:** | 10/8/2025 | |
| **Due date:** | 10/8/2025 | |
| **Payment Terms:** | Due Upon Receipt | |
| **Bill Through Date:** | 9/30/2025 | |

**J.S. Held LLC - US**
**50 Jericho Quadrangle**
**Ste 117**
**Jericho, NY 11753**
**United States**

Phone: 516.621.2900
Tax ID #: 47-3291463

## INVOICE

| PROJECT NO. | PROJECT NAME |
|---|---|
| 250700458 | Whittier Seafood, LLC |

| Date | Staff Member | Description | Hours |
|---|---|---|---|
| 9/4/2025 | Chuck Nguyen | Review, revise and approve vendors setup. Review, post and record outgoing ACH payments for multiple invoices. Perform bank reconciliation. | 0.70 |
| 9/4/2025 | David Stapleton | T/C w/ EL. Review emails from Hilco. Prepare for and attend call w/ bank. | 0.90 |
| 9/4/2025 | Michelle Papenfuss | Update interest calculations on SW Receivables. Draft example email to debtors and confer w/ EL. Edit to each recipients emails. Follow up individually with all SW Receivables. Schedule meetings. | 1.50 |
| 9/4/2025 | Michelle Papenfuss | Provide invoices to accounting. Review bank transactions. T/C w/ Hilco and Cathay re: sale process update. F/U re: coverage after G. Rossi departure. Confer w/ EL. Continue F/U w/ SW Receivables. | 1.70 |
| 9/4/2025 | Yenni Liang | Process funds transfer. Review wire. Provide wire instruction to CN. | 0.40 |
| 9/5/2025 | Betsy Landoll | Confer w/ MP re: buyer deposit. F/U w/ S. Marken re: status of sale. Emails w/ Atty. Peterson re: update. | 0.30 |
| 9/5/2025 | Chuck Nguyen | Review and approve vendor setup. Review, post and record outgoing ACH payments for multiple invoices. | 0.60 |
| 9/5/2025 | David Stapleton | Review sale issues. Confer w/ team. | 0.50 |
| 9/5/2025 | Michelle Papenfuss | Prepare and submit request to Cathay bank re: SW Receivables discount threshold. F/U w/ J. Zack re: same. T/C w/ EL re: case update. F/U w/ Salacia team re: A/P request. Updates re: sale process. | 1.10 |
| 9/6/2025 | Betsy Landoll | T/C w/ S. Marken re: strategy for current offers. | 0.70 |
| 9/7/2025 | Michelle Papenfuss | Coordinate w/ SW Receivable debtors re: calls on Monday. | 0.10 |



| | |
|---|---|
| **Invoice No:** | INV-01US-0310140 |
| **Date:** | 10/8/2025 |
| **Due date:** | 10/8/2025 |
| **Payment Terms:** | Due Upon Receipt |
| **Bill Through Date:** | 9/30/2025 |

**J.S. Held LLC - US**
**50 Jericho Quadrangle**
**Ste 117**
**Jericho, NY 11753**
**United States**

Phone: 516.621.2900
Tax ID #: 47-3291463

## INVOICE

| PROJECT NO. | PROJECT NAME |
|---|---|
| 250700458 | Whittier Seafood, LLC |

| Date | Staff Member | Description | Hours |
|---|---|---|---|
| 9/8/2025 | David Stapleton | Meeting w/ Hilco. Update w/ team. | 0.30 |
| 9/8/2025 | Michelle Papenfuss | Reach out to SW Receivables debtors. Confer w/ A. Kozlov re: Salacia building coverage. Update w/ C. Rossi. Review and prepare A/P request to EL. | 1.20 |
| 9/8/2025 | Michelle Papenfuss | Review agreements with SW Receivable parties. T/C w/ SP re: collection efforts. T/C w/ E. Carrillo re: loan outstanding. T/C w/ T. Magnusson re: SW Receivable. F/U w/ EL. T/C w/ M. Kuzmin re: SW Receivable and F/U settlement offer. | 1.40 |
| 9/9/2025 | Alicia Rodmel | Process A/P. Set up new vendor. Process wires. | 1.30 |
| 9/9/2025 | Chuck Nguyen | Review and approve vendor setup. Review outgoing wire. | 0.30 |
| 9/9/2025 | David Stapleton | Review progress and status. Update w/ team. Plan next steps. | 0.40 |
| 9/9/2025 | Michelle Papenfuss | T/C w/ DS re: Salacia sale. Review contract and fees. T/C w/ Hilco, EL and B. Peterson re: Salacia. Update to DS re: Hilco call. F/U w/ Cathay bank re: AutoCAD. | 1.50 |
| 9/9/2025 | Michelle Papenfuss | Provide requested documents to I. Leversee. Process A/P online payments. Provide statements to AR to record. Update reporting. AP follow up. Confer w/ G. Rossi re: outstanding payments. New invoice review from Salacia. Review A/P w/ C. Rossi. | 1.60 |
| 9/9/2025 | Yenni Liang | Review wire. | 0.20 |
| 9/10/2025 | Chuck Nguyen | Review outgoing wires. Review, post and record outgoing ACH payment. | 0.60 |
| 9/10/2025 | David Stapleton | Confer w/ EL and MP. Review issues and emails. | 0.40 |

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.



|  |  |
|---|---|
| **Invoice No:** | INV-01US-0310140 |
| **Date:** | 10/8/2025 |
| **Due date:** | 10/8/2025 |
| **Payment Terms:** | Due Upon Receipt |
| **Bill Through Date:** | 9/30/2025 |

**J.S. Held LLC - US**
**50 Jericho Quadrangle**
**Ste 117**
**Jericho, NY 11753**
**United States**

Phone: 516.621.2900
Tax ID #: 47-3291463

## INVOICE

| PROJECT NO. | PROJECT NAME |
|---|---|
| 250700458 | Whittier Seafood, LLC |

| Date | Staff Member | Description | Hours |
|---|---|---|---|
| 9/10/2025 | Michelle Papenfuss | T/C w/ D. Scheiber re: projected analysis. Confer w/ EL. Review information. T/C w/ G. Rossi re: permit required and AutoCAD. F/U w/ G. Rossi re: same. | 0.70 |
| 9/10/2025 | Yenni Liang | Review various wires. | 0.50 |
| 9/11/2025 | Betsy Landoll | Emails w/ insurance broker re: policy renewals. | 0.20 |
| 9/11/2025 | Betsy Landoll | Conf. call w/ Hilco and Cathay Bank re: sales update. Review emails from MP re: waterfall. | 1.00 |
| 9/11/2025 | David Stapleton | Review and discuss progress. | 0.40 |
| 9/11/2025 | Michelle Papenfuss | F/U w/ Hilco re: update on discussions. Review Plan Support Agreement from Cathay Bank. Confer w/ EL. T/C w/ Hilco re: sales process. F/U w/ EL. Coordinate w/ G. Rossi re: contact from interested parties. F/U w/ Hilco. | 1.80 |
| 9/11/2025 | Michelle Papenfuss | Update A/P and budget with actuals and expand timeline, evaluate and communicate contractor needs to A. Kozlov. | 2.50 |
| 9/12/2025 | Alicia Rodmel | Process A/P. | 0.80 |
| 9/12/2025 | Betsy Landoll | T/C w/ DS re: bid status. Review emails from S. Marken re: current update. | 0.60 |
| 9/12/2025 | Betsy Landoll | Review plan for properties under plan. Review emails from D. Scheiber re: Modys and other. Confer w/ MP re: same. | 0.80 |
| 9/12/2025 | Chuck Nguyen | Review, post and record outgoing wire payments for several invoices. | 0.60 |
| 9/12/2025 | David Stapleton | Review issues w/ EL. Emails w/ counsel. | 0.30 |
| 9/12/2025 | Michelle Papenfuss | Updates to budget. T/Cs w/ EL re: case update and budget analysis. Review adjusted estimates related to budget. F/U w/ T. Cady re: estimated premium. | 1.20 |



| | |
|---|---|
| **Invoice No:** | INV-01US-0310140 |
| **Date:** | 10/8/2025 |
| **Due date:** | 10/8/2025 |
| **Payment Terms:** | Due Upon Receipt |
| **Bill Through Date:** | 9/30/2025 |

**J.S. Held LLC - US**
**50 Jericho Quadrangle**
**Ste 117**
**Jericho, NY 11753**
**United States**

Phone: 516.621.2900
Tax ID #: 47-3291463

## INVOICE

| PROJECT NO. | PROJECT NAME |
|---|---|
| 250700458 | Whittier Seafood, LLC |

| Date | Staff Member | Description | Hours |
|---|---|---|---|
| 9/12/2025 | Yenni Liang | Review wire confirmation and overpayment. Confer w/ AR re: same. | 0.20 |
| 9/15/2025 | Alicia Rodmel | Process A/P. Set up new vendor. | 0.70 |
| 9/15/2025 | Betsy Landoll | Review contractors' payment. T/Cs to I. Blackburn re: insurance. | 0.40 |
| 9/15/2025 | Betsy Landoll | T/C w/ Atty. Peterson re: sale process and advances. Create clean APA and share w/ S. Marken. Review draft email and budget from MP. | 1.30 |
| 9/15/2025 | Betsy Landoll | Review updated APA, timeline and budget. Conf. call w/ S. Marken and Atty. Peterson re: updated sale process. | 2.50 |
| 9/15/2025 | Chuck Nguyen | Review, revise, post and record outgoing wire payment. Review and approve vendors setup. | 0.50 |
| 9/15/2025 | David Stapleton | Review sale process. Confer w/ team. Confer w/ Hilco. Meetings w/ EL. Plan re: same. | 1.20 |
| 9/15/2025 | Michelle Papenfuss | Review requested A/P from Salacia team and related invoices. Prepare invoice request and confer w/ EL. Send confirmation of payment receipts to AR. Submit wire and check request. Update Salacia team on invoices processed. | 1.30 |
| 9/15/2025 | Michelle Papenfuss | F/U w/ S. Marken and B. Peterson re: timeline of sale. Process approved online A/P payments. F/U re: insurance. T/C w/ DS re: case update. T/C w/ Hilco, B. Peterson, DS and EL re: auction and closing timeline. T/C w/ EL re: budget and timeline. | 2.10 |
| 9/15/2025 | Michelle Papenfuss | Update budget file and drat communication to Cathay Bank. Confer w/ EL. Complete budget adjustments to revised deadline date. Updates to C. Rossi and A. Kozlov re: contractor hours. Review response from J. Zack and confer w/ EL. | 2.50 |



| | |
|---|---|
| **Invoice No:** | INV-01US-0310140 |
| **Date:** | 10/8/2025 |
| **Due date:** | 10/8/2025 |
| **Payment Terms:** | Due Upon Receipt |
| **Bill Through Date:** | 9/30/2025 |

**J.S. Held LLC - US**
**50 Jericho Quadrangle**
**Ste 117**
**Jericho, NY 11753**
**United States**

Phone: 516.621.2900
Tax ID #: 47-3291463

## INVOICE

| PROJECT NO. | PROJECT NAME |
|---|---|
| 250700458 | Whittier Seafood, LLC |

| Date | Staff Member | Description | Hours |
|---|---|---|---|
| 9/16/2025 | Betsy Landoll | T/C w/ Atty. Peterson re: plan and responsibilities. Review emails re: same. | 0.50 |
| 9/16/2025 | Betsy Landoll | Review plan and emails from S. Marken. Conf. call w/ S. Marken and lender re: equipment and real estate sales. Confer w/ MP and DS re: same. T/Cs w/ S. Marken re: buyers and marketing. | 2.60 |
| 9/16/2025 | Chuck Nguyen | Review and approve vendor setup. Review outgoing wire. Review, post and record outgoing ACH payments. | 0.70 |
| 9/16/2025 | Jake Diiorio | Review and approve A/P. | 0.20 |
| 9/16/2025 | Michelle Papenfuss | Input incoming invoices into A/P tracker. Review response to budget from J. Zack. AutoCAD review and coordination w/ G. Rossi. Review EL budget updates and return copy. Review and respond to emails. | 0.70 |
| 9/16/2025 | Michelle Papenfuss | T/C w/ DS and EL re: budget and priority of claims. F/U T/C w/ EL. Review documents and draft message to B. Peterson. Review Stalking Horse draft and provide redline to B. Peterson. Send revised budget draft to EL. | 1.60 |
| 9/16/2025 | Michelle Papenfuss | Review of plan for distribution priority. Review emails and files from D. Schiber to prep for call. T/C w/ Cathay Bank, J. Zack, B. Peterson, DS and EL re: revised timeline. F/U T/C w/ DS, EL and B. Peterson re: same. Update to budget w/ requested edits. | 2.00 |
| 9/16/2025 | Yenni Liang | Review wire. | 0.20 |
| 9/16/2025 | Alicia Rodmel | Process wire. Process A/P. | 0.80 |
| 9/17/2025 | Betsy Landoll | Messages w/ G. Rossi re: equipment location. Review files and images provided. T/C w/ S. Marken re: same. | 0.60 |

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.



| | |
|---|---|
| **Invoice No:** | INV-01US-0310140 |
| **Date:** | 10/8/2025 |
| **Due date:** | 10/8/2025 |
| **Payment Terms:** | Due Upon Receipt |
| **Bill Through Date:** | 9/30/2025 |

**J.S. Held LLC - US**
**50 Jericho Quadrangle**
**Ste 117**
**Jericho, NY 11753**
**United States**

Phone: 516.621.2900
Tax ID #: 47-3291463

## INVOICE

| PROJECT NO. | PROJECT NAME |
|---|---|
| 250700458 | Whittier Seafood, LLC |

| Date | Staff Member | Description | Hours |
|---|---|---|---|
| 9/17/2025 | Betsy Landoll | Review APA edits from buyer and stalking horse motion. Edit stalking horse motion and APA re: equipment. | 1.50 |
| 9/17/2025 | Betsy Landoll | T/Cs w/ S. Marken re: APA comments. Confer w/ MP re: equipment excluded. T/C w/ Atty. Peterson re: stalking horse and sale update. | 2.30 |
| 9/17/2025 | Chuck Nguyen | Review and approve vendor setup. Review, post and process in-house check and outgoing ACH payment. | 0.50 |
| 9/17/2025 | David Stapleton | Meetings w/ EL. Review draft filings. T/C w/ Hilco. Comments to filings. Confer w/ EL. Approve same. | 2.20 |
| 9/17/2025 | Michelle Papenfuss | Confirm and record outgoing payments. Review SCT edits to APA. Confer w/ EL. Follow up on SW Receivable Recipients. Review equipment list and F/U w/ G. Rossi. T/C w/ G. Rossi re: equipment. T/C w/ EL re: same. Update files and messages. | 1.40 |
| 9/18/2025 | Betsy Landoll | Review emails from MP re: insurance and other A/P. Messages w/ I. Blackburn re: insurance. | 0.30 |
| 9/18/2025 | Betsy Landoll | Emails w/ Atty. Peterson and S. Marken re: sale and marketing to prospects. Conf. call w/ Hilco and Cathay re: update on sale process. Confer w/ DS re: same. | 1.50 |
| 9/18/2025 | David Stapleton | Meeting w/ EL. Review issues prepare for call. Attend call w/ Hilco. Review issues. Debrief w/ EL. | 1.40 |
| 9/18/2025 | Michelle Papenfuss | T/C w/ Hilco, B. Peterson, J. Zack, Cathay, DS and EL re: sales process. | 0.50 |
| 9/18/2025 | Michelle Papenfuss | Review Stalking Horse motion. Update files and send requested files to I. Leversee. Reconcile invoices. Review surety bond information and commercial policy and confer w/ EL. F/U w/ I. Leversee and C. Rossi. F/U w/ J. Zack re: | 0.70 |



| | |
|---|---|
| **Invoice No:** | INV-01US-0310140 |
| **Date:** | 10/8/2025 |
| **Due date:** | 10/8/2025 |
| **Payment Terms:** | Due Upon Receipt |
| **Bill Through Date:** | 9/30/2025 |

**J.S. Held LLC - US**
**50 Jericho Quadrangle**
**Ste 117**
**Jericho, NY 11753**
**United States**

Phone: 516.621.2900
Tax ID #: 47-3291463

## INVOICE

| **PROJECT NO.** | **PROJECT NAME** |
|---|---|
| 250700458 | Whittier Seafood, LLC |

| Date | Staff Member | Description | Hours |
|---|---|---|---|
| | | same. | |
| 9/19/2025 | Betsy Landoll | Edit and review equipment APA. Emails w/ S. Marken re: same. Confer w/ MP re: same. | 0.40 |
| 9/19/2025 | David Stapleton | Work w/ team. Updates on equipment, etc. | 0.40 |
| 9/19/2025 | Jake Diiorio | Review and approve wires. | 0.20 |
| 9/19/2025 | Michelle Papenfuss | Confer w/ DS re: Vrsalovic escrow balance. Confer w/ BL re: case status. Confer w/ S. Marken and B. Peterson re: equipment APA close date. | 0.60 |
| 9/19/2025 | Michelle Papenfuss | Review documents provided by J. Kaplan. Confirm wire instructions with Cathay bank, review banking and set up internal wire processes. Edits to APA for B. Peterson. Review escrow deposits and adjust reporting. Coordinate w/ G. Rossi re: plant tour. | 1.20 |
| 9/19/2025 | Yenni Liang | Process funds transfer and obtain approval. Confer w/ EWB and JD re: dual control. | 0.20 |
| 9/20/2025 | Michelle Papenfuss | T/C w/ Sanjay re: tours and scheduling, Coordinate w/ G. Rossi re: tours and weekly schedule. Send summary email to team. F/U w/ S. Marken. | 0.40 |
| 9/22/2025 | Chuck Nguyen | Confer w/ MP re: outgoing wire status. Create same day wire. Review, post and record outgoing ACH payment. | 0.60 |
| 9/22/2025 | David Stapleton | Meetings w/ team re: all issues. Update on Hilco, sales, process. | 0.40 |
| 9/22/2025 | Jake Diiorio | Review and release wires. Confer w/ YL re: same. | 0.20 |
| 9/22/2025 | Michelle Papenfuss | F/U w. J. Zack re: wire instructions for Vrsalovic payment. Coordinate w/ AR re: release of payment. F/U w/ I. Blackburn re: updates required to Mody's commercial liability policy. | 1.10 |



| | |
|---|---|
| **Invoice No:** | INV-01US-0310140 |
| **Date:** | 10/8/2025 |
| **Due date:** | 10/8/2025 |
| **Payment Terms:** | Due Upon Receipt |
| **Bill Through Date:** | 9/30/2025 |

**J.S. Held LLC - US**
**50 Jericho Quadrangle**
**Ste 117**
**Jericho, NY 11753**
**United States**

Phone: 516.621.2900
Tax ID #: 47-3291463

## INVOICE

| **PROJECT NO.** | **PROJECT NAME** |
|---|---|
| 250700458 | Whittier Seafood, LLC |

| Date | Staff Member | Description | Hours |
|---|---|---|---|
| | | Review A/P submissions from I Leversee. | |
| 9/23/2025 | Betsy Landoll | Confer w/ MP re: update on sales. Emails w S. Marken re: sales process. Review outreach tracker provided by S. Marken. T/C w M. Hogan re: sale. | 2.10 |
| 9/23/2025 | David Stapleton | Review process and emails. Confer w/ EL and team re: next steps. | 0.50 |
| 9/23/2025 | Michelle Papenfuss | T/C w/ EL re: case update. Response to B. Peterson re: sale of equipment questions. Review and respond to emails. | 1.00 |
| 9/23/2025 | Yenni Liang | Confer w/ MP re: outgoing wire. | 0.20 |
| 9/24/2025 | Alicia Rodmel | Confer w/ YL, James at Ballards and MP. Process wire. Confer w/ James from Ballards and MP re: confirmation on payment receipt. | 0.40 |
| 9/24/2025 | Betsy Landoll | Email to M. Hagen re: sale info. Emails w/ Atty. Peterson re: equipment appraisal. Emails w/ S. Marken re: equipment removal timeline. | 1.30 |
| 9/24/2025 | Chuck Nguyen | Review outgoing wire. | 0.20 |
| 9/24/2025 | David Stapleton | Review progress, requests and update w/ EL. | 0.40 |
| 9/24/2025 | Michelle Papenfuss | A/P invoice evaluation and input into system. Payment request to EL. Update and review distribution waterfall and update w/ EL. Update payment instructions for vendors. Review and respond to emails. | 1.40 |
| 9/24/2025 | Michelle Papenfuss | Review contract on equipment purchase and prior soliciting for B. Peterson. Complete verifications for change in wire instructions re: Cathay Bank. Deliver requested files to S. Marken. Confer w/ Da Yang Seafood re: return of deposit for rejected bid. | 1.60 |
| 9/24/2025 | Yenni Liang | T/C w/ D. Villanueva re: wire on hold. T/C w/ MP re: new wire instruction. Confer w/ AR | 0.50 |



A PART OF JS|HELD

| | |
|---|---|
| **Invoice No:** | INV-01US-0310140 |
| **Date:** | 10/8/2025 |
| **Due date:** | 10/8/2025 |
| **Payment Terms:** | Due Upon Receipt |
| **Bill Through Date:** | 9/30/2025 |

**J.S. Held LLC - US**
**50 Jericho Quadrangle**
**Ste 117**
**Jericho, NY 11753**
**United States**

Phone: 516.621.2900
Tax ID #: 47-3291463

## INVOICE

| PROJECT NO. | PROJECT NAME |
|---|---|
| 250700458 | Whittier Seafood, LLC |

| Date | Staff Member | Description | Hours |
|---|---|---|---|
| | | re: new wire. Review outgoing wire. T/c w/ EWB re: confirming wire. | |
| 9/25/2025 | Betsy Landoll | Review S, Marken update on buyers and sales process tracker. Messages w/ S. Marken re: same. | 0.40 |
| 9/25/2025 | Betsy Landoll | Review plan for distributions for equipment. Emails w/ Atty. Peterson re: same. T/C w/ MP re: budget, proceeds and sale process. | 1.20 |
| 9/25/2025 | David Stapleton | Review sale process. Update w/ team. Review issues. Confer w/ EL and team. | 0.40 |
| 9/25/2025 | Michelle Papenfuss | Process online payments, send wire request to Accounting, update A, Kozlov re: contractors. T/C w/ EL re: sales proceeds allocation and Whittier closing. F/U w/ team re: Hilco process update. | 1.60 |
| 9/25/2025 | Yenni Liang | Review wire templates and provide edits. Review and approve wires. | 0.60 |
| 9/26/2025 | Alicia Rodmel | Process wire. Confer w/ YL re: request to transfer funds. | 0.40 |
| 9/26/2025 | Betsy Landoll | Review declaration for equipment sale. Confer w/ MP re: same. Emails w/ S. Marken re: buyer request. | 1.00 |
| 9/26/2025 | Chuck Nguyen | Review and approve PayScan invoice, Post, commit and process in-house check payments. Review outgoing wire. Dowload and archive outgoing ACH/wires confirmations. | 0.80 |
| 9/26/2025 | David Stapleton | Review of opposition from debtor. Discuss same. | 0.70 |
| 9/26/2025 | Jake Diiorio | Review and approve wires. | 0.20 |
| 9/26/2025 | Michelle Papenfuss | Return of Da Yang rejected bid deposit. Reply re: requested documentation from bidders. Review Lorex system information provided by J. Kaplan. F/U re: additional information needed. | 0.40 |

J.S. Held and its affiliates and subsidiaries are not a certified public accounting firm and do not provide audit, attest, or any other public accounting services. J.S. Held is not a law firm and does not provide legal advice. All rights reserved.



| | |
|---|---|
| **Invoice No:** | INV-01US-0310140 |
| **Date:** | 10/8/2025 |
| **Due date:** | 10/8/2025 |
| **Payment Terms:** | Due Upon Receipt |
| **Bill Through Date:** | 9/30/2025 |

**J.S. Held LLC - US**
**50 Jericho Quadrangle**
**Ste 117**
**Jericho, NY 11753**
**United States**

Phone: 516.621.2900
Tax ID #: 47-3291463

## INVOICE

| PROJECT NO. | PROJECT NAME |
|---|---|
| 250700458 | Whittier Seafood, LLC |

| Date | Staff Member | Description | Hours |
|---|---|---|---|
| 9/26/2025 | Michelle Papenfuss | Review motion and declarations filed by A. Kozlov. Review and provide feedback on Declaration in support of Red Chambers sale. Confer w/ EL. Provide approved budget. | 1.30 |
| 9/26/2025 | Yenni Liang | Process funds transfer for A/P needs. Review outgoing wire. Confer w/ AR re: wire instruction. Provide status update to team. Download wire confirmations. | 0.50 |
| 9/29/2025 | Betsy Landoll | Review motion to terminate Hilco and related emails from Atty. Peterson. T/C w/ Atty. Peterson re: sale process and declaration. | 0.80 |
| 9/29/2025 | Betsy Landoll | Prepare for call and review marketing tracker. Conf. call w/ Hilco and Cathay re: sale process update. Confer w/ DS and MP re: post-call F/U. Emails w/ Atty. Peterson re: equipment APA. | 1.90 |
| 9/29/2025 | Chuck Nguyen | Research and confer w/ MP re: confirming vendor payment status. Review, post and record outgoing ACH payments. | 0.50 |
| 9/29/2025 | David Stapleton | Review emails and responses to opposition. | 0.60 |
| 9/29/2025 | David Stapleton | T/C w/ BL. Review and prepare for call. Review Hilco docs. Attend call. | 1.20 |
| 9/29/2025 | Jake Diiorio | Confer w/ DS re: upcoming auction. | 0.30 |
| 9/29/2025 | Michelle Papenfuss | Review updated draft of APA, motion and declaration from B. Peterson. Confer w/ BL re: case update. Work to access provided Lorex security system. Review outgoing A/P, follow up on lost check and send I. Leversee requested information. | 1.00 |
| 9/29/2025 | Michelle Papenfuss | Review updated motion to sell equipment. T/C w/ G. Rossi re: request from R2. Confer w/ C. Rossi and I. Leversee re: A/P to be processed. T/C to National Construction Rentals re: payment inquiry. F/U re: Da Yang deposit | 1.20 |



**A PART OF** JS HELD

**J.S. Held LLC - US**
**50 Jericho Quadrangle**
**Ste 117**
**Jericho, NY 11753**
**United States**

Phone: 516.621.2900
Tax ID #: 47-3291463

| | |
|---|---|
| **Invoice No:** | INV-01US-0310140 |
| **Date:** | 10/8/2025 |
| **Due date:** | 10/8/2025 |
| **Payment Terms:** | Due Upon Receipt |
| **Bill Through Date:** | 9/30/2025 |

## INVOICE

| PROJECT NO. | PROJECT NAME |
|---|---|
| 250700458 | Whittier Seafood, LLC |

| Date | Staff Member | Description | Hours |
|---|---|---|---|
| | | return. | |
| 9/29/2025 | Michelle Papenfuss | T/Cs w/ DS and BL re: case update and F/U post Salacia call. T/C w/ Hilco and team re: Salacia sale process. | 1.30 |
| 9/30/2025 | Betsy Landoll | Confer w/ CG and review invoices. | 0.30 |
| 9/30/2025 | Betsy Landoll | Review edits to APA. Emails w/ Atty. Peterson re: equipment exhibit. Review updated declaration and sign. Confer w/ MP re: next steps. | 0.60 |
| 9/30/2025 | David Stapleton | Review declarations and filings. Comments on same. Confer w/ team. Work w/ JD re: auction. | 0.90 |
| 9/30/2025 | Jake Diiorio | Updates w/ BL and DS re: auction. Review file for auction details and procedures. | 0.50 |
| 9/30/2025 | Michelle Papenfuss | Review updates to APA. Process AutoCAD renewal. Process National Construction Rentals pmt via phone. Review of refrigeration documents and request for information. Review T. Stratton declaration. | 1.10 |
| | | **TOTAL:** | **116.40** |

*EXHIBIT G*

## Whittier Sale Proceeds Accounting

| | | |
|---|---|---:|
| Deposits from Whittier Sale **-** Deposit from Bush Kornfeld | $ | 440,000 |
| Deposits from Whittier Sale **-** Deposit from Stewart Title | | 1,372,452 |
| Disbursement to Cathay Bank from Vrsalovic Deed | | (350,000) |
| Disbursements from Protective Advances | | (208,088) |
| Floating Check | | 107 |
| Misc. Deposit | | 6 |
| Interest Deposit | | 2,868 |
| **Current bank balance related to Whittier sale** | **$** | **1,257,345.75** |

## Whittier Sale Proceeds

### Per closing details from American Land Title Association

| | | |
|---|---|---|
| Hilco Holdback | | 600,000 |
| Protective Advances | | 500,000 |
| Reserve for Vrsalvic Deed | | 350,000 |
| Holdback for taxes | | 200,000 |
| Unsecured creditors | | 130,000 |
| Qtr OUST fees | | 38,752 |
| **Total receipts from Whittier sale** | **$** | **1,818,752.18** |
| | | |
| Protective advances | | (500,000) |
| Reserve for Vrsalvic Deed paid to Cathay Bank | | (350,000) |
| **Held receipts from Whittier sale** | **$** | **968,752.18** |
| | | |
| **Current bank balance per Plan Admin** | | |
| MMA | | 1,152,868 |
| Operating Account | | 104,471 |
| **Current bank balance per Plan Admin** | **$** | **1,257,339.35** |