1
2
3

Brian T. Peterson, *Pro Hac Vice*
K&L GATES LLP
925 Fourth Avenue, Suite 2900
Seattle, WA 98104-1158
(206) 623-7580

4
5

UNITED STATES BANKRUPTCY COURT
DISTRICT OF ALASKA

6

In re:

7

WHITTIER SEAFOOD, LLC

8

Debtors[1].

Chapter 11
Case No. 24-00139-GS

Jointly Administered

9
10
11

ORDER GRANTING MOTION FOR ORDER
AUTHORIZING THE SALE OF SALACIA
EQUIPMENT FREE AND CLEAR OF ALL
LIENS, CLAIMS, INTERESTS, AND
ENCUMBRANCES

12
13

Continued Hearing Date
DATE: October 10, 2025
TIME:  1:30 p.m.

14       THIS MATTER comes before the Court upon the *Motion for Order Authorizing the Sale of*

15   *the Salacia Equipment Free and Clear of All Liens, Claims, Interests, and Encumbrances* (the

16   "Equipment Sale Motion") (ECF No. 508) filed by The Stapleton Group as Plan Administrator (the

17   "Plan Administrator").  Having considered the Equipment Sale Motion, the accompanying

18   declarations, the testimony of the witnesses presented in court, the Asset Purchase Agreement

19   ("APA") between the Plan Administrator and The Conversion of RCCI, LLC ("Buyer"), a copy of

20   which is attached hereto as Exhibit A, any objections and reply materials, including the objection

21   asserted by Trident Seafoods Corporation during the hearings on October 9 and 10, the arguments of

22   counsel at the hearings to approve the sale, and the pleadings and papers herein, the court **HEREBY**

23   **FINDS AND DETERMINES AS FOLLOWS:**

24

25

26

---

[1] The Debtors are Marine Fishing International, Inc. ("MFI Inc."), Case No. 24-00140; Marine Fishing International, LLC ("MFI LLC"), Case No. 24-00141; Modys, LLC ("Modys"), Case No. 24-00142; Salacia, LLC ("Salacia"), Case No. 24-00143; Silver Wave, LLC ("Silver Wave"), Case No. 24-00144; and Whittier Seafood, LLC ("Whittier") (collectively, the "Whittier Group").

ORDER APPROVING SALE OF SALACIA EQUIPMENT
FREE AND CLEAR - 1

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

A.     The court hereby incorporates its oral findings and rulings made on the record during the continued hearing on October 10, 2025.

B.     The court has jurisdiction over the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334, as well as the terms of the Debtors' Fourth Amended Joint Plan of Reorganization (the "Plan"), and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M), (N), and (O). Venue of this case in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     On June 27, 2025, the court entered its *Order Approving Bidding Procedures for Salacia, LLC and Form of Notice* [ECF No. 407] (the "Bid Procedures Order"), which governed the procedures to be used in connection with marketing the Salacia assets for sale. The Bid Procedures Order provides that if net proceeds of a proposed sale transaction of Salacia assets are not sufficient to pay creditors in full, the notice period for a sale hearing is shortened to seven days and responses or objections are due on or before 4:00 p.m. (Alaska Time) two business days prior to the sale hearing.

D.     As evidenced by the affidavits of service previously filed with the court, the Plan Administrator provided proper, timely, adequate and sufficient notice of the Equipment Sale Motion, the Sale Hearing, the transactions contemplated under the APA in accordance with the United States Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Local Rules of the Bankruptcy Court for the District of Alaska. Such notice was good and sufficient, and afforded parties a reasonable opportunity to object or be heard with respect to the matters that are the subject of this Order, and no other or further notice of the Equipment Sale Motion shall be required.

E.     Salacia, LLC (the "Debtor") and the Plan Administrator marketed the assets being sold pursuant to the APA with Buyer (the "Acquired Assets") and conducted the sale process in compliance with applicable law and rules. Neither the Debtor nor the Plan Administrator has previously sold, assigned, or conveyed the Acquired Assets.

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

F.     The Plan Administrator has full power and authority to execute the APA and all other documents contemplated thereby, and the sale of the Acquired Assets by the Plan Administrator have been duly and validly authorized by all necessary action of the Plan Administrator.

G.     The Plan provides, in Article VII, that the Plan Administrator, with the assistance of Hilco, has the exclusive discretion to accept offers and sell Salacia assets as a whole or piecemeal.

H.     Approval of the APA and consummation of the sale contemplated therein is in the best interests of the Debtor, its creditors, its post-confirmation estate, and other parties in interest.

I.     The Plan Administrator has demonstrated good, sufficient, and sound business purpose and justification for the sale of the Acquired Assets in accordance with Section 363 of the Bankruptcy Code and the terms of the Plan.

J.     The APA was negotiated, proposed and entered into by the Plan Administrator and the Buyer at arm's length without collusion or fraud, and in good faith within the meaning of Section 363(m) of the Bankruptcy Code. As such, the Buyer is a good faith purchaser under Section 363(m) and is entitled to all the protections afforded thereby.

K.     The consideration provided by the Buyer for the Acquired Assets pursuant to the APA (i) is fair and reasonable, (ii) is the highest and best offer for the Acquired Assets, and (iii) will provide a greater recovery for the  post-confirmation estate's creditors than would be provided by any other practical available alternative. The transfer of the Acquired Assets to Buyer constitutes a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code.

L.     The transfer of the Acquired Assets to the Buyer will be a legal, valid, and effective transfer of the Acquired Assets, and, as except as expressly stated in this Order, will vest the Buyer with all right, title, and interest of the Debtors to the Acquired Assets free and clear to the fullest extent permitted under the Bankruptcy Code or other applicable law of all interests in such property of any person or entity.

M.     The Plan Administrator may sell the Acquired Assets free and clear of all interests, including liens, claims and encumbrances, because one or more of the standards set forth in 11

ORDER APPROVING SALE OF SALACIA EQUIPMENT
FREE AND CLEAR - 3

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

U.S.C. § 363(f)(1)-(5) has been satisfied. Other holders of interests who objected to the Equipment Sale Motion fall within one or more of the other subsections of 11 U.S.C. § 363(f) and are adequately protected by having their interests, if any, attach to the cash proceeds of the sale attributable to the property against or in which they assert an interest, in the same order of priority that existed prior to the closing and subject to all objections, counterclaims, recoupments and other defenses of the Debtors' estate.

N.     Prior to the October 10 hearing before the court on this Equipment Sale Motion, the Plan Administrator and Buyer agreed to amend the Purchase Price set forth in the APA from $2,500,000 to $2,900,000.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED THAT:**

1.     The Motion for Order Authorizing the Sale of the Salacia Equipment Free and Clear of All Liens, Claims, Interests, and Encumbrances (ECF No. 508) is **GRANTED** as described below.

2.     The findings of fact and conclusions of law recited above, and set forth by the court during the hearing on October 10, 2025, are incorporated herein.

3.     All objections to the Equipment Sale Motion and the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby overruled on the merits.

4.     The APA attached hereto as Exhibit A, and all of the terms and conditions thereof, is hereby **APPROVED**; provided, however, that the Purchase Price set forth in the APA is amended to $2,900,000.

5.     Pursuant to 11 U.S.C. § 363(b), the Plan Administrator is authorized and directed to consummate the sale to Buyer, pursuant to and in accordance with the terms and conditions of the APA.

ORDER APPROVING SALE OF SALACIA EQUIPMENT
FREE AND CLEAR - 4

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

6.      The Plan Administrator is authorized and directed to execute and deliver, and empowered to perform under, consummate and implement, the APA, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA, and to take all further actions as may be requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer or reducing to possession, the Acquired Assets, or as may be necessary or appropriate to the performance of the obligations as contemplated by the APA.

7.      Except as otherwise specifically provided herein, pursuant to 11 U.S.C. §§ 105(a) and 363(f), the Acquired Assets shall be transferred at Closing to the Buyer, free and clear of all interests, including liens, claims, and encumbrances, with all such interests to attach to the net proceeds of the sale in the order of their priority, with the same validity, force and effect which they now have as against the Acquired Assets, subject to any claims and defenses the Debtor may possess with respect thereto.

8.      The sale of the Acquired Assets by the Plan Administrator to Buyer (A) is or will be legal, valid and effective transfers of the Acquired Assets; (B) constitutes a transfer for reasonably equivalent value and fair consideration under the United States Bankruptcy Code; and (C) except as otherwise specifically provided herein, will vest Buyer with all right, title and interest of the Debtor to the Acquired Assets free and clear of all liens, claims and encumbrances pursuant to Section 363(f) of the Bankruptcy Code (other than liens created by Buyer).

9.      Except as otherwise provided herein, all persons having interests of any kind or nature whatsoever against or in any of the Acquired Assets shall be forever barred, estopped, and permanently enjoined from pursuing or asserting such interests against the Acquired Assets, the Buyer, or any of its assets, property, successors, or assigns.

10.     Except as specifically provided in the APA and this Order, the transfers contemplated by the APA do not and shall not subject the Buyer or the Acquired Assets to any liability for claims against the Debtors by reason of such transfers under: (i) the laws of the United States, any state,

ORDER APPROVING SALE OF SALACIA EQUIPMENT
FREE AND CLEAR - 5

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

territory or possession thereof, including claims relating to the operation of the Debtors' business before the Closing Date; (ii) any employment contract, understanding, or agreement, including, without limitation, collective bargaining agreements, employee pension plans, or employee welfare or benefit plans; and/or (iii) any additional contracts and/or other agreements which have been previously entered into by the Debtor.

11.    The transactions contemplated under the APA do not amount to a consolidation, merger or de facto merger of either the Buyer or the Debtor and/or its post-confirmation estate, particularly as there is no substantial continuity between the Buyer and the Debtor, no continuity of enterprise between the Buyer and the Debtor and the Buyer is not a mere continuation of either the Debtor or its post-confirmation estate.

12.    This court retains exclusive jurisdiction to interpret, enforce, implement and resolve any disputes arising under or in connection with the terms and provisions of the APA, all amendments thereto, any waivers and consents thereunder, and any agreements executed in connection therewith, and this Order.

13.    Neither the Plan Administrator nor the Buyer is required to make any filing with or give any notice to, or to obtain any approval, consent, ratification, permission, waiver or authorization from, any person or any governmental authority in connection with the execution and delivery of the APA, and the Plan Adminsitrator does not need to seek or obtain consent to consummate the sale.

14.    The APA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of the court, provided that there will be no material impact on the post-confirmation bankruptcy estate of Salacia, LLC.

15.    This Order shall be effective immediately upon entry, and any stay of orders provided for in Bankruptcy Rules 6004(h), 6006(d), 7062 and any other provision of the Bankruptcy Code or

ORDER APPROVING SALE OF SALACIA EQUIPMENT
FREE AND CLEAR - 6

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

Bankruptcy Rules shall not apply, is expressly lifted and this Order is immediately effective and enforceable.

16.     If any person or entity that has filed financing statements, mortgages, mechanics' liens, lis pendens, or other documents or agreements evidencing claims against or in the Debtors or the Acquired Assets, shall not have delivered to the Plan Administrator prior to Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all interests which the person or entity has with respect to the Debtors, the Acquired Assets, or otherwise, then (at the Closing) only with regard to the Acquired Assets being acquired by the Buyer pursuant to the APA, the Buyer is hereby authorized to file, register, or otherwise record a certified copy of this Order (and file any UCC-3 termination statements), which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all claims and/or liens against the Acquired Assets.  This Order is deemed to be in a recordable form sufficient to be placed in the filing or recording system of each and every federal, state or local government agency, department or office.

17.     Article 6 of the Uniform Commercial Code governing Bulk Sale Transfers and comparable state statutes are not applicable to the sale of the Acquired Assets to the Buyer.

18.     The Plan Adminsitrator is authorized and directed to disburse the sale proceeds after Closing under the APA in accordance with the terms of Article VII.G of the Plan, as follows:

(a)     First, Hilco shall be paid $87,000 for its contractually owed commission in connection with the APA.

(b)     Second, Cathay Bank shall be reimbursed for its Protective Advances, in the amount of $500,000.

(c)     Third, the Plan Administrator's reasonable fees and costs for the month of August 2025, in the amount of $73,742.77, shall be paid in full.

ORDER APPROVING SALE OF SALACIA EQUIPMENT
FREE AND CLEAR - 7

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

(d)     Fourth, The Plan Administrator shall distribute to Spokane Stainless Technologies, Inc., $192,614.40 in full satisfaction of its Class 8 Allowed Claim under the Plan.

(e)     Fifth, the remaining net proceeds of the sale shall be paid to Cathay Bank.

19.     To the extent that any provision of this Order is inconsistent with the provisions of the APA, any prior order, or any pleading with respect to the motions in this case, the terms of this Order shall control.

DATED this 20th day of October, 2025.

BY THE COURT

_/s/ Gary Spraker_____
GARY SPRAKER
United States Bankruptcy Judge

Presented by:

K&L GATES LLP


_/s/Brian T. Peterson_____
    Brian T. Peterson, _Pro Hac Vice_
Attorneys for The Stapleton Group,
as Plan Administrator

Serve:   Debtors
             G. Eggen, Esq.
             S. Ford, Esq.
             T. Stilley, Esq.
             J. Day, Esq.
             G. Fox, Esq.
             D. Neu, Esq.
             M. Parise, Esq.
             L. Thornton, Esq.
             J. Torgerson, Esq.
             J. Kaplan, Esq.
             R. Murphy, Esq.
             M. Mills, Esq.
             T. Brannon, Esq.
             A. Ivanov, Esq.
             G. Pitts, Esq.
             J.M. Palomares, Esq.
             F. Rasch, Esq.
             J. Welch, Esq.

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

ORDER APPROVING SALE OF SALACIA EQUIPMENT
FREE AND CLEAR - 8

J. Zack, Esq.
J. Tracy, Esq.
B. Peterson, Esq.
A. Smith, Esq.
B. Medeiros, Esq.
M. Kotwick, Esq.
R. Gayda, Esq.
S. Andre, Esq.
K. Evans, Esq.
U.S. Trustee
ECF Participants via NEF

ORDER APPROVING SALE OF SALACIA EQUIPMENT
FREE AND CLEAR - 9

K&L GATES LLP
925 FOURTH AVENUE
SUITE 2900
SEATTLE, WASHINGTON 98104-1158
TELEPHONE: (206) 623-7580
FACSIMILE: (206) 623-7022

EXHIBIT A

Docusign Envelope ID: 3E90A8D0-2237-4428-87D9-2F4A5D89CF3C

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("Agreement") is entered into as of this 30th day of September, 2025, by and between The Conversion of RCCI, LLC, a California limited Liability company, or assignee ("Buyer"), on the one hand, and The Stapleton Group in its capacity as Plan Administrator for Salacia, LLC, a ("Seller" or "Salacia"), on the other hand (each of Buyer and Seller is a "Party" and both are the "Parties).

### RECITALS:

A.      On August 19, 2024 ("Petition Date"), Salacia commenced the Chapter 11 Case by filing a voluntary petition for relief under chapter 7 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Alaska (the "Court") and assigned case no. 24-00143 (the "Bankruptcy Case").

B.      The Court entered an order in the Bankruptcy Case on August 7, 2025, providing that the Plan Administrator shall assume and hold exclusive responsibility for marketing and selling the Salacia Plan and the Salacia Equipment in accordance with Salacia's Fourth Amended Joint Plan of Reorganization (the "Plan").

C.      Buyer desires to purchase from Seller, and Seller desires to sell, convey, assign and transfer to Buyer the Acquired Assets (defined below) pursuant to, *inter alia*, section 363 of the Bankruptcy Code, in the manner and subject to the terms and conditions set forth herein.

D.      Because the sale proceeds generated from the transaction contemplated by this Agreement (the "Transaction") are insufficient to pay Salacia's secured creditors in full as set forth in the Bidding Procedures (Defined in Section 1.1), the Transaction is subject to the approval of the Bankruptcy Court, pursuant to section 363 of the Bankruptcy Code, and may only be consummated pursuant to a final, non-appealable order entered by the Bankruptcy Court in the Chapter 11 Case approving the terms of this Agreement (the "Sale Order").

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

### ARTICLE 1
### DEFINITIONS

**Section 1.1      Defined Terms.**  In addition to the capitalized terms defined elsewhere in this Agreement, the following terms have the following meanings:

(a)      "Acquired Assets" has the meaning set forth in Section 2.1.

(b)      "Agreement" has the meaning set forth in the Preamble.

(c)      "Assumed Executory Contracts" has the meaning set forth in Section 2.2(a).

(d)  "Assumed Lease" has the meaning set forth in Section 2.2(a).

(e)  "Assumed Liabilities" means the obligations under the Assumed Executory Contracts and other obligations assumed by the Buyer as set forth in Section 2.2, below.

(f)  "Bid Procedures" means the Bid Procedures approved by the Court on or about June 27, 2025, in the form attached as Schedule 1.1(i), that govern the process and procedures for another interested buyer to submit a bid higher than the Buyer's offer contained herein, including an auction to the extent that one or more higher bids are submitted.

(g)  "Books and Records" means all books and records pertaining to the Acquired Assets of any kind, wherever located.

(h)  "Business Day" means any day excluding Saturday, Sunday, any legal holiday under the laws of the State of Washington or a day on which banks located in the State of Washington are required by law or other governmental action to close.

(i)  "Buyer" has the meaning set forth in the Preamble.

(j)  "Closing" has the meaning set forth in Section 3.1.

(k)  "Closing Date" means the date on which Closing occurs, which shall be the earlier of October 7, 2025; or, to the extent a Bankruptcy Court approval is required, ten days after entry of the Sale Order, unless a different date is agreed to by the Seller and Buyer in writing.

(l)  "Damages" has the meaning set forth in Section 9.2(d).

(m)  "Deposit" has the meaning set forth in Section 2.5.

(n)  "Deposit Agent" means The Stapleton Group or such Deposit Agent as agreed to by Buyer and Seller.

(o)  "Excluded Assets" has the meaning set forth in Section 2.3.

(p)  "Execution" means the time that both Buyer and Seller have executed and delivered this Agreement.

(q)  "Governmental Authority" means any foreign or United States federal, state, or local government, governmental regulatory, or administrative authority, agency, or commission, or any court, tribunal, or judicial or arbitral body.

(r)  "Knowledge" means the actual knowledge of the Party's officers after reasonable inquiry.

(s)  "Lease" means the leases to which Seller is a party listed on Schedule 2.2.

(t)  "Liabilities" mean all liabilities and obligations (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or

2

Docusign Envelope ID: 3E90A8D0-2237-4428-87D9-2F4A5D89CF3C

unliquidated, due or not yet due), including all liabilities for Taxes with respect to periods before the Closing Date, including periods before the Petition Date.

(u)     "<u>License</u>" means the licenses to which Seller is a licensor listed on Schedule 2.2.

(v)     "<u>Lien</u>" means any lien (statutory or otherwise), hypothecation, encumbrance, security interest, interest, mortgage, deed of trust, pledge, restriction, charge, instrument, license, preference, priority, security agreement, Tax (including foreign, federal, state, or local Tax), order of any Governmental Authority, of any kind including, without limitation: (i) any assignment or deposit arrangement in the nature of a security device; (ii) any claim based on the theory that Buyer is a successor of Seller; and (iii) any leasehold interest, license, or other right, in favor of a third party or Seller, to use any portion of the Acquired Assets, whether secured or unsecured, choate or inchoate, contingent or non-contingent.

(w)     "<u>Party</u>" or "<u>Parties</u>" has the meaning set forth in the preamble to this Agreement.

(x)     "<u>Permit</u>" means all licenses, permits, franchises, approvals, authorizations, consents or orders of, filings with, or notifications to, any Governmental Authority, whether foreign, provincial, municipal, federal, state, or local, necessary for the past or present conduct or operation of Seller's business.

(y)     "<u>Person</u>" means any individual, corporation, partnership, limited liability company, trust, association, joint venture, or other entity of any kind.

(z)     "<u>Personal Property Taxes</u>" has the meaning set forth in <u>Section 3.4(a)</u>.

(aa)     "<u>Purchase Price</u>" has the meaning set forth in <u>Section 2.5(a)</u>.

(bb)     "<u>Purchase Price Allocation Schedule</u>" has the meaning set forth in <u>Section 2.6</u>.

(cc)     "<u>Representative</u>" means any attorney, accountant, agent, independent contractor, or other representative.

(dd)     "<u>Sale Hearing</u>" means the hearing of the Court to approve this Agreement and its contemplated Transaction, to the extent Court approval of the Transaction is required.

(ee)     "<u>Sale Order</u>" means, to the extent Court approval of the Transaction is required, the order of the Court, in the form and substance attached as Schedule 1.1(kk) hereto (or, if revised, reasonably acceptable to Buyer), entered by the Court pursuant to section 363(b) of the Bankruptcy Code: (i) approving this Agreement and its contemplated transactions; (ii) approving the sale of the Acquired Assets to Buyer free and clear of all Liens pursuant to section 363(f) of the Bankruptcy Code; (iii) approving Seller's assumption and assignment to Buyer of the Assumed Executory Contracts pursuant to section 365 of the Bankruptcy Code; (iv) assuming and assigning the Assumed Executory Contracts such that the Assumed Executory Contracts will be in full force and effect from and after the Closing; (v) finding that Buyer is a good-faith purchaser entitled to

1602458994.4
2837 ie22jf01yw

the protections of section 363(m) of the Bankruptcy Code; (vi) confirming that Buyer is acquiring the Acquired Assets free and clear of the Unassumed Liabilities; and (vii) retaining jurisdiction of the Court to interpret and enforce the terms and provisions of this Agreement and the Sale Order.

(ff)     "Schedules" means the Schedules attached to this Agreement.

(gg)     "Tanks" has the meaning provided for in Section 2.1(c).

(hh)     "Tax" means any tax, duty, charge, fee, levy, penalty, or other assessment imposed by any Governmental Authority, including income, profit, provisional, salary, estate, excise, property, sales, use, occupation, transfer, franchise, payroll, windfall or other profits, alternative minimum, gross receipts, intangibles, capital stock, estimated, employment, unemployment compensation or net worth, environmental, ad valorem, stamp, value-added or gains tax, capital duty, registration and documentation fees, custom duties, tariffs and similar charges, withholding, payroll, social security contributions or charges, disability, or other taxes (including any fee, assessment or other charge in the nature of or in lieu of any tax), including any interest, penalties, or additions attributable thereto, and any liability to make payment by way of reimbursement, recharge, indemnity, damages or management charge related to taxes and regardless of whether such amounts are chargeable directly or primarily against Seller.

(ii)     "Title Company" means Stewart Title Guaranty Company.

(jj)     "Unassumed Liabilities" has the meaning provided for in Section 2.4.

## ARTICLE 2
## PURCHASE AND SALE

**Section 2.1     Transfer of Assets.**  Pursuant to the terms and conditions of this Agreement, at the Closing Seller will sell, convey, transfer, assign, and deliver (or cause to be sold, conveyed, transferred, assigned, and delivered) to Buyer, free and clear of all Liens, and Buyer will acquire and accept from Seller, all right, title, and interest in and to, the following assets (collectively, the "Acquired Assets"):

(a)     all of Seller's Equipment including, but not limited to, all the equipment described on Schedule 2.1(b), along with any warranty rights that pertain thereto;

(b)     Nine tanks (the "Tanks") in the possession of Spokane Stainless Technologies, located at 3808 N. Sullivan Rd. Bldg 4-h, Spokane Valley, WA 99216, described on Schedule 2.1 (c)

(c)     Books and Records related to the Acquired Assets;

(d)     except in connection with the Seller's rights, defenses and objections in connection to claims filed in the Bankruptcy Case, all of Seller's rights, claims, credits, immunities, defenses, or rights of set-off against third parties (excluding former and present employees of Seller) relating to the Acquired Assets including, but not limited to, unliquidated rights under warranties;

4

**Section 2.2** **Assignment and Assumption of Executory Contracts and Liabilities/Liens.**

(a)     Schedule 2.2 sets forth each Contract, Lease, and License to be assumed by Seller and assigned to Buyer at Closing.  Each Lease set forth on Schedule 2.2 is referred to in this Agreement as an "<u>Assumed Lease</u>."  Each Contract set forth on Schedule 2.2 is referred to in this Agreement as an "<u>Assumed Contract</u>."  Each License set forth on Schedule 2.2 is referred to in this Agreement as an "<u>Assumed License</u>." Together, the Assumed Contracts, , and the Assumed Licenses are referred to in this Agreement as the "<u>Assumed Executory Contracts</u>."  Schedule 2.2 is all encompassing of any and all Assumed Executory Contracts. Notwithstanding anything to the contrary herein, Buyer has the right in its sole and absolute discretion to remove any Assumed Executory Contract from Schedule 2.2 prior to the Sale Hearing  and with respect to such Assumed Executory Contract so removed from Schedule 2.2, *however,* the Cure Costs associated with any Assumed Executory Contract removed prior to Closing shall be added to the cash portion of the Purchase Price set forth in Section 2.5(a).

(b)     On the Closing Date, Seller shall assume and assign to Buyer the Assumed Executory Contracts and Buyer shall pay in full the Cure Costs related to the Assumed Executory Contracts.

(c)     Buyer assumes all Seller's obligations arising under the Assumed Executory Contracts after Closing.

(d)     Buyer assumes the following liabilities related to the Acquired Assets arising before or after Closing, as specified: i) warranties whenever arising; and ii) all other claims arising after Closing.

(e)     Buyer assumes, at Closing, all obligations to pay the amounts due to the creditors specified on Schedule 2.2(e).

(f)     This <u>Section 2.2</u> does not limit any claims or defenses Buyer may have against any party other than Seller.  The transactions contemplated by this Agreement in no way expand the rights or remedies of any third party against Buyer or Seller as compared with the rights and remedies such third party would have had against Seller absent the Bankruptcy Case had Buyer not assumed such Assumed Liabilities.  Buyer shall indemnify Seller with respect to the Assumed Liabilities, including defense of any action by any third party to seek recovery from Seller of the Assumed Liabilities.

**Section 2.3** **Excluded Assets.**  Notwithstanding anything to the contrary in this Agreement, all assets that are not Acquired Assets, including the following assets are retained by Seller and are not being sold or assigned to Buyer under this Agreement (the "<u>Excluded Assets</u>"):

(a)     cash, cash equivalents, deposits (except those described in <u>Section 2.1</u> above, investment securities, and bank accounts;

(b)     all Existing Contracts that are not Assumed Executory Contracts;

  (c) the Administrative Books and Records, and other documents relating solely to the organization, maintenance, and existence of Seller as limited liability company;

  (d) all Permits;

  (e) Seller's personnel records;

  (f) all refunds, rebates, credits, and other amounts due to Seller related to any Taxes or that arise out of Seller's operation of its business;

  (g) all benefit plans to which Seller is a party and all related rights except to the extent assumed by Buyer;

  (h) all causes of action held by Seller before the Closing including, but not limited to, all actions arising under the Bankruptcy Case;

  (i) all rights under any insurance policy maintained by Seller;

  (j) Seller's ownership in any subsidiary; and

  (k) any rights of Seller under this Agreement.

  **Section 2.4 No Other Liabilities Assumed.** Other than the Assumed Liabilities, the Cure Costs, or as otherwise set forth in this Agreement, Buyer shall not assume or be bound by or be obligated or responsible for any duties, responsibilities, commitments, expenses, obligations or any other Liability of Seller (the "Unassumed Liabilities").

  **Section 2.5 Purchase Price.**

  (a) Purchase Price. The "Purchase Price" for the Acquired Assets shall be $2,500,000 and is comprised of: i) $2,500,000, to be paid, in cash (including the deposit as described in Section 2.5(a)(i) below), at Closing; ii) the total amounts set forth in Schedule 2.2(e) in the amount of zero ($0.00) to be assumed by Buyer; and iii) the total Cure Amounts in the amount of zero ($0.00) to be paid by Buyer.

  (i) Deposit. Prior to execution of this Agreement, Buyer has paid a deposit for the Acquired Assets in the amount of $300,000 to be held and released in accordance with the terms of this Agreement (the "Deposit").

  **Section 2.6 Allocation Schedule.** The Parties agree that the Purchase Price will be allocated among the Acquired Assets in accordance with their relative fair market values as set forth in Schedule 2.6 in compliance with the Bid Procedures. If the Parties are unable to resolve the issues concerning Purchase Price allocation by agreement, they shall submit the allocation matter to the Court for final determination in conjunction with the Sale Notice and Motion, which determination shall be binding and not subject to appeal.  Seller and Buyer must prepare mutually-acceptable and substantially identical initial and supplemental Internal Revenue Service Forms 8594 "Asset Acquisition Statements under 1060" consistent with the Purchase Price Allocation

Docusign Envelope ID: 3E90A8D0-2237-4428-87D9-2F4A5D89CF3C

Schedule (giving effect to mutually agreed-on adjustments through the allocations set forth in the Purchase Price Allocation Schedule as a result of any required adjustments to the Purchase Price).

## ARTICLE 3
## CLOSING

**Section 3.1        Closing.**  On the terms and conditions set forth in this Agreement and in the Sale Order, the closing of the transactions contemplated by this Agreement (the "Closing") will be completed virtually by the parties or held at the offices of K&L Gates LLP, 925 Fourth Ave., Suite 2900, Seattle, Washington (or other location identified by Seller) no later than October 7, 2025,  or ten calendar days after entry of the Sale Order, whichever is later, if all conditions set forth in ARTICLE 7 and ARTICLE 8 below are either satisfied or waived.  The Parties agree to expeditiously seek approval of the Sale Order.  Notwithstanding the foregoing, the Closing may be held at another time and place mutually agreeable to the Parties.

**Section 3.2        Actions at Closing.**

(a)        Documents and Possession.  At Closing, Seller must deliver or cause to be delivered to Buyer:

(i)        one or more bills of sale, and/or documents necessary to transfer the Acquired Assets, free and clear of all Liens, all consistent with the terms of this Agreement and otherwise in a form reasonably acceptable to Buyer, conveying in the aggregate all of the Acquired Assets, duly executed by Seller;

(ii)        if the Transaction requires Court approval, a copy of the Sale Order;

(iii)        the Books and Records relating to the Acquired Assets; and

(b)        Payment.  Buyer must deliver to Seller the Purchase Price (determined in accordance with Section 2.5) *less* an amount equal to the Deposit by wire transfer at Closing of immediately available funds to the account that Seller designates in writing not less than one Business Day before the Closing.

(c)        Form of Documents.  If a form of any document to be delivered under this Agreement is not attached as an exhibit to this Agreement, that document must be created, executed, and delivered in form and substance and in a manner reasonably and mutually satisfactory to the Parties.

**Section 3.3        Transaction Expenses.**  Except as expressly provided in this Agreement, each Party bears its own costs and expenses, including attorney, accountant, and other independent contractor fees, in connection with the execution and negotiation of this Agreement and the consummation of its contemplated transactions.

**Section 3.4        Prorations.**

(a)        Personal Property Taxes.  Ad valorem personal property taxes associated with the Acquired Assets (the "Personal Property Taxes") that are periodically imposed and are

7

payable for a tax period that includes (but does not end on) the Closing Date are prorated as of the Closing Date. Seller bears the proportion of, and has the sole responsibility for, such taxes equal to a fraction, the numerator of which is equal to the number of days elapsed from the beginning of the applicable tax period to the Closing Date and the denominator of which is the number of days in the entire applicable tax period. Buyer is responsible for the remainder.

(b)    Post-Closing Tax Responsibility.  Unless otherwise provided to the contrary in this Agreement, Buyer is solely responsible for Taxes relating to the Acquired Assets applicable to or arising from the Post-Closing Period, including any transfer taxes, and the Seller is solely responsible for Taxes relating to the Acquired Assets applicable to or arising before the Closing.

**Section 3.5    Possession and Risk of Loss.**  Buyer will be deemed to have taken title and possession of all Acquired Assets, wherever located, on the Closing Date.  Buyer assumes all risk of loss by fire or other casualty and all risks relating to all the Acquired Assets on the Closing Date and after. Buyer agrees to remove the Acquired Assets from the premises on which they are located within ten (10) business days from the Closing Date.

**Section 3.6    Closing Escrow.**  The Closing will be accomplished through an escrow to be established jointly by the Parties with the Title Company pursuant to escrow instructions reasonably acceptable to the Title Company and each of the Parties, if necessary.

## ARTICLE 4
## SELLER'S REPRESENTATIONS AND WARRANTIES

As an inducement to Buyer to enter into this Agreement, Seller represents and warrants to Buyer that:

**Section 4.1    Organization and Authorization.**  Seller has all necessary power and authority to enter into this Agreement and has taken all company action necessary to execute and deliver this Agreement, to consummate the transactions contemplated by this Agreement, and to perform Seller's obligations under this Agreement. No other company proceedings on Seller's part are necessary to authorize the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated by this Agreement.  This Agreement has been duly executed and delivered by Seller and is a valid and binding obligation of Seller, enforceable against it in accordance with its terms.  Each agreement or instrument that has been or will be entered into or executed and delivered by Seller in connection with the transactions contemplated by this Agreement has been (or will be) duly authorized, executed and delivered by Seller, and is (or will be when authorized, executed and delivered) a valid and binding obligation of Seller, enforceable against it in accordance with its terms.

**Section 4.2    No Violation.**  Except to the extent not enforceable due to operation of applicable bankruptcy law or the Sale Order, the execution, delivery, and performance of this Agreement and the consummation of its contemplated transactions by Seller do not and will not require any authorization, consent, approval, exemption, or other action by or notice or declaration to, or filing with, any court or administrative or other Governmental Authority or any third party, including, without limitation, under the provisions of Seller's operating agreement or other constitutive documents.

Docusign Envelope ID: 3E90A8D0-2237-4428-87D9-2F4A5D89CF3C

**Section 4.3        Governmental Consents and Approvals.**  Except for the Sale Order, to Seller's Knowledge, there are no consents, waivers, agreements, approvals, permits, or authorizations of, or declarations, filings, notices, or registrations to or with, any Governmental Authority required to be made or obtained by Seller in connection with the execution, delivery, and performance of this Agreement and the consummation of its contemplated transactions.

**Section 4.4        Title to Assets.**

(a)    Seller has good and marketable title to the Acquired Assets.

(b)    Subject to Court approval, Seller has the power and the right to sell, assign, and transfer, and Seller will sell and deliver to Buyer and, on consummation of the transactions contemplated by this Agreement, Buyer will acquire, good and marketable title to the Acquired Assets free and clear of all Liens.

**Section 4.5        As Is.**  Except as expressly set forth in this Agreement, the Acquired Assets are sold "*As Is, Where Is*." Except for the representations and warranties expressly set forth in this ARTICLE 4, Seller neither makes nor implies any other representation or warranty, including a warranty of fitness for a particular purpose or a warranty of merchantability.

**Section 4.6        Personal Property Taxes.**  All Personal Property Taxes that are the responsibility of Seller under Section 3.4 above have been paid or will be paid in full as of the Closing.

# ARTICLE 5
# REPRESENTATIONS AND WARRANTIES OF BUYER

As an inducement to Seller to enter into this Agreement, Buyer represents and warrants to Seller that:

**Section 5.1        Organization.**  Buyer is a limited liability company duly organized, validly existing, and in good standing under the laws of the State of California.

**Section 5.2        Authorization.**  Buyer has all necessary power and authority to enter into this Agreement and has taken all company action necessary to execute and deliver this Agreement, to consummate the transactions contemplated by this Agreement, and to perform Buyer's obligations under this Agreement. No other company proceedings on Buyer's part are necessary to authorize the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated by this Agreement.  This Agreement has been duly executed and delivered by Buyer and is a valid and binding obligation of Buyer, enforceable against it in accordance with its terms.  Each agreement or instrument that has been or will be entered into or executed and delivered by Buyer in connection with the transactions contemplated by this Agreement has been (or will be) duly authorized, executed and delivered by Buyer, and is (or will be when authorized, executed and delivered) a valid and binding obligation of Buyer, enforceable against it in accordance with its terms.

**Section 5.3        Governmental Consents and Approvals.**  To Buyer's Knowledge, other than the Sale Order, no consent, waiver, agreement, approval, permit, or authorization of, or

1602458994.4
2837 ie22jf01yw

declaration, filing, notice or registration to or with, any United States federal or state governmental or regulatory authority is required to be made or obtained by Buyer in connection with the execution, delivery, and performance of this Agreement and the consummation of the transactions contemplated by this Agreement.

**Section 5.4        No Violation.**  The execution and delivery of this Agreement and the other agreements specified in it and the consummation of the transactions contemplated by this Agreement do not and will not (a) violate any provision of Buyer's organizational documents or (b) conflict with or violate any statute or law, or any judgment, decree, order, regulation, or rule of any court or Governmental Authority binding on or applicable to Buyer or by which the property or assets of Buyer are bound or affected.

## ARTICLE 6
## ADDITIONAL COVENANTS

**Section 6.1        Further Assurances.**

(a)    Buyer and Seller shall use commercially reasonable efforts to timely obtain any consent, provide necessary information, or address any other issues required for the consummation of the transactions contemplated by this Agreement.

(b)    Buyer and Seller will execute any documents and use commercially reasonable efforts to take or cause to be taken all actions necessary, proper, or advisable to consummate the transactions contemplated by this Agreement but neither Buyer nor Seller is required to make any payments to any party, except as set forth in this Agreement.

## ARTICLE 7
## CONDITIONS TO SELLER'S OBLIGATIONS

The obligation of Seller to sell the Acquired Assets and to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or before the Closing Date, of each of the following conditions, any of which Seller may waive (in whole or in part) in accordance with Section 10.4 below.

**Section 7.1        Covenants and Representations.**  Each of Buyer's representations and warranties contained in ARTICLE 5 above are true in all material respects as of the Closing Date as though made on that date (except that representations and warranties explicitly made as of a specific date need only be true as of that specific date), and the Buyer has performed in all material respects all covenants, agreements, and conditions required by this Agreement to be performed, satisfied, and complied with by Buyer on or before the Closing.

**Section 7.2        Litigation.**  No action, suit, or other proceeding is pending before any Governmental Authority seeking or threatening to restrain, seek damages in respect of, or prohibit the consummation of the transactions contemplated by this Agreement.

**Section 7.3        Court Approval.**  If the Transaction requires Court approval, the Court has entered the Sale Order.

Docusign Envelope ID: 3E90A8D0-2237-4428-87D9-2F4A5D89CF3C

**Section 7.4** **Closing.** The Closing has occurred on or before October 7, 2025, or ten calendar days after entry of the Sale Order, whichever is later.

**Section 7.5** **Deliveries.** On or before the Closing Date, Buyer has delivered to Seller all of the following:

(a) a certificate from Buyer in a form reasonably satisfactory to Seller, dated as of the Closing Date, stating that the conditions specified in Section 7.1 above have been satisfied; and

(b) the Purchase Price.

# ARTICLE 8
## CONDITIONS TO BUYER'S OBLIGATIONS

The obligations of Buyer to purchase the Acquired Assets and to consummate the transactions contemplated by this Agreement are subject to the satisfaction, on or before the Closing Date, of each of the following conditions, any of which Buyer may waive (in whole or in part) in accordance with Section 10.4 below:

**Section 8.1** **Representations, Warranties and Covenants.** Each of Seller's representations and warranties contained in ARTICLE 4 above are true in all material respects as of the Closing Date as though made on that date (except that representations and warranties that are expressly made as of a specific date need only be true as of that specific date), and the Seller has performed in all material respects all covenants, agreements, and conditions required by this Agreement to be performed, satisfied, and complied with Seller on or before the Closing Date.

**Section 8.2** **Litigation.** No action, suit, or other proceedings is pending before any Governmental Authority seeking or threatening to restrain, seek damages in respect of, or prohibit the consummation of the transactions contemplated by this Agreement.

**Section 8.3** **Court Approval.** If the Transaction requires Court approval, the Sale Order shall have been entered on or before October 7, 2025, and shall not be subject to a court order staying the effect of the Sale Order.

**Section 8.4** **Approvals and Consents.** All necessary consents, including any deemed consents as set forth in the Sale Order, have been duly obtained, made or given, and are not subject to the satisfaction of any condition that has not been satisfied or waived.

**Section 8.5** **Deliveries.** On or before the Closing Date, Seller has delivered to Buyer all of the following:

(a) a certificate in a form reasonably satisfactory to Buyer, dated as of the Closing Date, stating that the conditions specified in Section 8.1 have been satisfied; and

(b) the documents and instruments called for in Section 3.2(a) above.

1602458994.4
2837 ie22jf01yw

## ARTICLE 9
## TERMINATION; REMEDIES

**Section 9.1      Termination.**  This Agreement may be terminated, in writing, at any time before Closing:

(a)      by mutual written consent executed by both Buyer and Seller;

(b)      by Buyer if Seller is in material breach of any material covenant, representation, undertaking or warranty that would prevent a condition in Article 8 from being satisfied, and, if curable, is not cured within ten (10) Business days after written notice from Buyer, or if a condition set forth in ARTICLE 8 is impossible (other than through the failure of Buyer to comply with its obligations under this Agreement) to satisfy and Buyer has not waived such condition in writing on or before the Closing Date;

(c)      by Seller if Buyer is in material breach of any material covenant, representation or warranty that would prevent a condition in Article 7 from being satisfied, and, if curable, is not cured within ten (10) Business days after written notice from Seller, or if it appears that a condition set forth in ARTICLE 7 is impossible (other than through the failure of Seller to comply with its obligations under this Agreement) to satisfy and Seller has not waived such condition in writing on or before the Closing Date; and

(d)      by both Buyer and/or Seller upon Seller's closing of the sale of all or substantially all of the Acquired Assets to a party or parties other than Buyer pursuant to one or more Overbids; and

(e)      by either party, not otherwise then in default of its obligations in this Agreement, if the Closing has not occurred on or before October 7, 2025, or ten days after entry of the Sale Order, whichever is later, unless a later date is agreed in writing by the Parties.

**Section 9.2      Obligations on Termination.**  If this Agreement terminates under Section 9.1 above:

(a)      each Party must redeliver to the furnishing Party all documents, work papers, and other material of the other Party relating to the transactions contemplated by this Agreement, whether obtained before or after Execution;

(b)      all obligations of the Parties under this Agreement terminate, except as set forth in this Section 9.2;

(c)      neither Party has any liability to the other Party except for any obligation to pay any damages (which may be limited to the Deposit under subsection (e) below) awarded by the Court associated with a Party's breach of this Agreement ("Damages");

(d)      except for any Damages, each Party bears its own expenses incurred in connection with the negotiation, preparation, execution, and performance of this Agreement;

12

Docusign Envelope ID: 3E90A8D0-2237-4428-87D9-2F4A5D89CF3C

(e)     if Seller terminates this Agreement because Buyer fails to close without justification and Seller is unable to close a transaction for the Acquired Assets to another buyer pursuant to a Back-Up Bid (as contemplated by the Bid Procedures), Seller may seek an order from the Court for specific performance of this Agreement, including instructing the Deposit Agent to pay Seller the Deposit as liquidated damages on account of Buyer's breach;

(f)     unless used to pay Damages to Seller, the Deposit Agent must return the Deposit to the Buyer within one Business Day of the date of termination; and

(g)     the Deposit Agent's obligations regarding the Deposit under this Section 9.2 survive termination of this Agreement.

## ARTICLE 10
## MISCELLANEOUS

**Section 10.1     Assignment; Successors.**  Neither this Agreement nor any of the rights or obligations under it may be assigned by either Party without the other Party's prior written consent, but: (a) Buyer may assign some or all of its rights under this Agreement to any of its Affiliate so long as Buyer remains liable for its obligations; and (b) Buyer may assign its rights under this Agreement as collateral security to any lender providing Buyer with acquisition financing. Subject to the foregoing, this Agreement binds and inures to the benefit of the Parties and their respective representatives, heirs, legatees, successors, and permitted assigns. No other person has any right, benefit, or obligation under this Agreement.

**Section 10.2     Notices.**  All notices, requests, demands, and other communications given under this Agreement must be in writing and are deemed given: (a) if personally delivered, when received; (b) if transmitted by email, on receipt of delivery confirmation; (c) if sent for next-day delivery to a domestic address by recognized overnight delivery service (*e.g.*, Federal Express), on the day after sending; and (c) if sent by certified or registered mail, return receipt requested, when received.  Notices, demands, and communications must be sent to the following addresses:

13

| If to Buyer: | If to Seller: |
|---|---|
| The Conversion of RCCI, LLC | The Stapleton Group |
| 1912 E Vernon Ave | 515 S. Flower St., 18th Floor, |
| Vernon, CA 90058 | Los Angeles, CA 90071 |
| msk@redchamber.com | Betsy.landoll@jsheld.com |

| With a copy to: | With a copy to: |
|---|---|
| David L. Prince, Esq. | K&L Gates LLP |
| Prince, Attorneys at Law, P.C. | Attn: Brian Peterson |
| 1912 East Vernon Ave., Ste. 100 | 925 Fourth Ave, Suite 2900 |
| Los Angeles, CA 90058 | Seattle, WA 98104 |
| dlp@redchamber.com | brian.peterson@klgates.com |

or to any other address or email address as a Party may designate by written notice to the other Party.

**Section 10.3    Choice of Law; Submission to Jurisdiction.**  This Agreement must be construed and interpreted, and the rights of the parties determined in accordance with, the laws of the State of Washington.  Each Party irrevocably consents to the service of any process in any action or proceeding arising out of or relating to this Agreement by the mailing of copies of such process to each Party at its address specified in Section 10.2 above.  The Parties irrevocably submit to the exclusive jurisdiction of the Court (or any court exercising appellate jurisdiction over the Court) over any dispute arising out of or relating to this Agreement, the Sale Order, or any other agreement or instrument contemplated by or entered into in connection with this Agreement or the Sale Order, but not otherwise.  Each Party irrevocably agrees that any claim in respect of any such dispute or proceedings may be heard and determined in the Court.  The Parties irrevocably waive to the fullest extent permitted by applicable law any objection to the venue or any defense of inconvenient forum relating to any such dispute or proceeding brought in the Court.

**Section 10.4    Entire Agreement; Amendments and Waivers.**  This Agreement, together with all its Exhibits and Schedules, constitutes the entire agreement among the Parties pertaining to this Agreement's subject matter and supersedes all prior agreements, understandings, negotiations, and discussions, whether oral or written, with regard to this Agreement's subject matter.  No amendment of this Agreement is effective unless executed in writing by both Parties. No waiver of any of this Agreement's provisions is effective unless made in a writing by the waiving Party. No waiver of any single provision of this Agreement constitutes either a waiver of any other of this Agreement's provisions (whether or not similar) or a continuing waiver unless otherwise expressly provided.

**Section 10.5    Construction.**  The headings and captions of the various Articles and Sections of this Agreement have been inserted solely for purposes of convenience, are not part of this Agreement, and may not be deemed in any manner to modify, explain, expand, or restrict any

Docusign Envelope ID: 3E90A8D0-2237-4428-87D9-2F4A5D89CF3C

of the provisions of this Agreement.  Unless stated to the contrary, all references in this Agreement to Articles, Sections, paragraphs, sentences, or clauses are to the specified Article, Section, paragraph, sentence, or clause of this Agreement, and all references to Exhibits and Schedules are to the specified Exhibits and Schedules attached to this Agreement, all of which  constitute a part of this Agreement.  All terms defined in this Agreement have the same meanings in the Exhibits and Schedules except as otherwise provided in the Exhibits and Schedules.

**Section 10.6**      **No Third Party Beneficiaries.**  No Person other than the Parties have any rights or claims under this Agreement.

**Section 10.7**      **No Waiver.**  The failure of either Party to seek redress for any breach, or to insist on the strict performance, of any covenant or condition of this Agreement by the other Party does not waive the breach or failure to perform nor prevent a subsequent act or omission in violation of, or not strictly complying with, the terms of this Agreement from constituting a default under this Agreement.

**Section 10.8**      **Counterparts.**  This Agreement may be executed in one or more counterparts, each of which constitutes an original and all of which, taken together, constitute one instrument.

**Section 10.9**      **Delivery by Email.**  This Agreement and any other agreement or instrument entered into in connection with or contemplated by this Agreement, and any amendments, if signed and delivered by email, must be treated in all respects as an original, legally-binding agreement or instrument as if it were the original delivered in person.  No Party may raise the use of email to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through email as a defense to enforceability.

**Section 10.10**      **Invalidity.**  The invalidity, illegality, or unenforceability of any portion of any provision of this Agreement or any instrument referred to in this Agreement does not affect the validity, legality, and enforceability of any other portion of any other provision of this Agreement or such instrument.

**Section 10.11**      **Further Assurances.**  Without limiting any other rights or obligations of the Parties contained in this Agreement, following the Closing, each Party agrees to execute or cause to be executed any documents, instruments, or conveyances and to take any actions reasonably requested by the other Party to effectuate the purposes of this Agreement including, without limitation, any instruments Buyer reasonably requests to vest Buyer with title to the Acquired Assets in accordance with this Agreement.

**Section 10.12**      **Cumulative Remedies.**  All rights and remedies of either Party under this Agreement are cumulative of each other and of every other right or remedy that Party may otherwise have at law or in equity. The exercise of one or more rights or remedies does not affect the concurrent or subsequent exercise of any other rights or remedies.

**Section 10.13**      **Currency.**  Except as otherwise expressly provided in this Agreement, all dollar amounts are stated in United States dollars.

1602458994.4
2837 ie22jf01yw

**Section 10.14** **Representation by Counsel; Mutual Negotiation.** Each Party has been represented by counsel of its choice in negotiating this Agreement. This Agreement has been negotiated and prepared at the Parties' joint request, direction, and construction, at arm's length, with the advice and participation of counsel, and must be interpreted in accordance with its terms without favor to either Party.

**Section 10.15** **Post-Closing Dispute Resolution.** Either Party may submit to the Court any controversy, claim, or dispute arising out of or relating to this Agreement after the Closing that is not resolved within 30 days after written notice to the affected party of such controversy, claim, or dispute. The Court shall have exclusive jurisdiction to resolve any such controversy, claim, or dispute. The prevailing Party is entitled to its reasonable attorneys' fees and costs as determined and awarded by the Court.

**Section 10.16** **Transfer Taxes.** Buyer is responsible for and must pay any transfer, sales, use, or other such Taxes or fees required to be paid with respect to this Agreement or the sale of the Acquired Assets to Buyer.

The Parties have caused this Agreement to be executed by their respective duly-authorized officer as of the day and year first above written.

**(SIGNATURES ON FOLLOWING PAGE)**

Docusign Envelope ID: 3E90A8D0-2237-4428-87D9-2F4A5D89CF3C

**The Stapleton Group as Plan Administrator for Salacia, LLC**

By: _____
Its: _____

**The Conversion of RCCI, LLC**

By: _____
Its: Ming Bin Kou, Member/Manager
10/1/2025

By: _____
Its: Ming Shin Kou, Member/Manager
9/30/2025

[Signature Page to Asset Purchase Agreement]

1602458994.4

2837 ie22jf01yw

Docusign Envelope ID: 3E90A8D0-2237-4428-87D9-2F4A5D89CF3C

# SCHEDULES

Schedule 1.1(i)          Bid Procedures

Schedule 1.1(kk)        Sale Order

Schedule 2.1(a)         Intentionally Omitted

Schedule 2.1(b)         Equipment

Schedule 2.1(c)         Tanks

Schedule 2.2            Contracts, Leases and Licenses

Schedule 2.2(e)         Assumed Creditor Liabilities

Schedule 2.6            Allocation of Purchase Price

1602458994.4

2837 ie22jf01yw

## SCHEDULE 1.1(i)


## Bid Procedures

1602458994.4

2837 ie22jf01yw

## SCHEDULE 1.1(kk)

## Sale Order

Docusign Envelope ID: 3E90A8D0-2237-4428-87D9-2F4A5D89CF3C

## SCHEDULE 2.1(a)

## Intentionally Omitted

**SCHEDULE 2.1(b)**

**Equipment**

| Equipment | Quantity |
|---|---|
| Dantech Freezers (Freezers are complete with belting, housing, eveporators, and fans - unassembled) | 4 units |
| | |
| Triangle - Ishida Scales (Scales for bagging equipment) - Group of computer controlled bucket weighers, (14) pool hoppers, (14) weigh hoppers, feed conveyor, discharge chute, touch screen controls (unused still in original packaging) | 4 units |
| | |
| Tann Corp - RTO - Smoke Filter (Complete except catwalk and smoke stack need installed) | 1 Unit |
| Tann Corp - RTO Spare Parts | 1 Package |
| | |
| Nothum * see below for package details | |
| *PivoFlex 40 (Expandable Conveyor)* | 4 Units |
| *VersaCoat 40HDX Package  (Breader)* | 3 Units |
| *SuperFelx 40HDX Package (Breader Crumb Machine)* | 1 Unit |
| *BatterPro 40HDX (with waterfall) (Batter applicator)* | 2 Units |
| *BatterPro 40HDX (with tempura star roller) (Batter applicator)* | 1 Unit |
| *BatterPro 40HDX (Batter Applicator)* | 1 Unit |
| *NC40-144 Cooling Conveyor (Conveyors with Fan)* | 3 Unit |
| *PankoPro 40HP package (Panko Breader)* | I Unit |
| *ProTherm 40-30 Package with teflon feed (Fryers)* | 3 Units |
| *Spare Parts (Misc)* | 1 Package |
| | |
| Oberlin Oil Filters (Fryer Oil Filtration) | 3 Units |
| Fulton Thermal Boiler (Heats Fryer Oil) | 1 Unit |
| Fulton Steam Boiler (Generates Steam for Processing) | 1 Unit |
| Columbia Hydronics (Lochnivar water heaters one for processing and one for freezer defrost) | 2 Units |



| | - |
|---|---|
| GMC flatbed truck, V8, gas, 5 spd, wood bed | |
| GEHL Dynalift 4x4x4 telescopic forklift, 4-stage boom, cushion tires, (2) stabilizers, cab, 4F/4R, joystick controls, bucket attachment | - |
| Western gallon fuel cube | |
| GK 2-unit bathroom trailer w/handwash station, propane fired water heater | - |
| Yale 4,800 lb cap. Solid tired forklift, 194" 3-stage mast, side shift, propane | |
| Containers | |
| Lincoln Ranger portable welder and generator | |
| Group of steel table, JET bandsaw, vise, shelter, stands, sawhorses & misc. | |
| BILJAX scaffold system w/(10) walk boards, uprights, stairs, cross pieces & accessories | - |
| Group of (2) FROST FIGHTER IDH 500QR oil/diesel portable heaters | |
| Group of jobox w/mini torch set, (3) tig welders & misc. shop supplies | |
| MARKLIFT electric scissor lift | |
| KUBOTA RTV X900 4X4 side by side, diesel, canopy | |
| MATHEY DEARMAN portable pipe beveler | |
| Group of shop area to include: BAILEIGH R-M40 rolls, (2) drill presses, vise, MILLER welder,sandblast cabinet, air compressor, parts washer, steel table, jobox, GRIZZLY press & misc. shop, supplies | - |
| Club Cadet Zero Turn ride on mower | |
| COPPERLOY AS16-70 16,000 lb cap. Portable aluminum forklift ramp, s/n:68999-1 | - |
| Group of (2) 40' containers w/shelter | |



## Schedule 2.1(c)

### Tanks

a.    2 (two) 10312-gallon fry oil storage tanks;

b.    6 (six) 834-gallon fry oil storage tanks;

c.    1 (one) 9657-Gallon water PH balance tank.

## SCHEDULE 2.2

## Assumed Executory Contracts

**A.    Contracts**

     None.

**B.    Leases**

     None.

**C.    Licenses**

     None.

## SCHEDULE 2.2(e)

## Assumed Creditor Liabilities

**None.**

Docusign Envelope ID: 3E90A8D0-2237-4428-87D9-2F4A5D89CF3C

## SCHEDULE 2.6

### Allocation of Purchase Price

| Acquired Asset | Allocation of Purchase Price |
|---|---|
| | |
| The Equipment | $2,395,000 |
| The Tanks | (minimum $105,000) |